No. 26-475

# In the United States Court of Appeals for the Ninth Circuit

AURORA REGINO,
Appellant,

v.

SUPERINTENDENT GREG BLAKE,
in his official capacity as Superintendent of the
Chico Unified School District,
Appellee.

On Appeal from the Order of the United States
District Court for the Eastern District of California
The Honorable Daniel J. Calabretta
District Court Case Number: 2:23-cv-00032-DJC-DMC

**APPELLANT'S OPPOSED MOTION TO EXPEDITE APPEAL UNDER CIRCUIT RULE 27-12**

**EMERGENCY MOTION UNDER CIRCUIT RULE 27-3:
THIS MOTION REQUESTS RELIEF BY FEBRUARY 6, 2026**

Josh Dixon
Center for American Liberty
2145 14th Avenue, Suite 8
Vero Beach, FL 32960
(703) 687-6212
jdixon@libertycenter.org
*Counsel for Appellant*

1

## INTRODUCTION

Appellant Aurora Regino respectfully moves this Court for expedited consideration of her appeal from the district court's order dismissing her Second Amended Complaint. This appeal presents time-sensitive and purely legal constitutional questions concerning the scope of parents' fundamental rights to direct the upbringing of their children and to receive truthful information from public schools regarding matters of grave importance in their children's lives. This is the second time Ms. Regino has been forced to appeal the district court's erroneous dismissal of her case under Rule 12(b)(6) since she first filed her case over three years ago.

Ms. Regino challenges a Policy that is in place at her children's school in the Chico Unified School District. Under the Policy, District personnel may socially transition students at their request, without obtaining parental consent and while withholding information regarding the transition from students' parents. The Policy creates psychological separation between Ms. Regino and her children, impacting the parent-child relationship, and deprives her of information necessary to protect her children's mental and emotional well-being.

This appeal arises in the middle of yet another school year, while Ms. Regino's children continue to be governed by the Policy, and it presents a legal question this Court has already recognized as significant. Delay risks compounding

the constitutional injury and undermining the availability of effective relief. Good cause therefore exists to expedite this appeal.

## BACKGROUND

The Policy governs how school personnel respond when a student requests to use a new name or pronouns associated with the student's asserted transgender identity. This is known as social transitioning. Subject to narrow exceptions, the Policy requires District personnel to honor such requests and to treat the information as confidential from parents unless the student consents to disclosure. Moreover, this confidentiality requirement has no exception for when parents specifically ask District personnel if their children are being socially transitioned. Thus, under the Policy, District personnel may not be truthful to parents in response to a direct request if, in fact, their children are being socially transitioned at school.

Ms. Regino has two daughters who attend schools in the District. During the 2021–22 school year, District personnel socially transitioned Ms. Regino's older daughter without informing Ms. Regino. This experience coincided with, and contributed to, the child experiencing significant psychological distress.

On January 6, 2023, Ms. Regino brought this action seeking declaratory and injunctive relief to prevent future violations of her constitutional rights. The district court dismissed her First Amended Complaint under Rule 12(b)(6), and Ms. Regino appealed. While this Court vacated the dismissal, it did not resolve the ultimate legal

question regarding the scope of parents' rights in this setting. Instead, it remanded with instructions for the district court to apply the correct legal framework in the first instance. *Regino v. Staley*, 133 F.4th 951 (9th Cir. 2025).

On remand, Ms. Regino filed a Second Amended Complaint, a copy of which is attached hereto as <u>Exhibit A</u>.[1] After holding a hearing—a transcript of which Ms. Regino has ordered—the district court again dismissed the action under Rule 12(b)(6), concluding that the Constitution does not protect the parental interests Ms. Regino asserts. A copy of the district court's order is attached hereto as <u>Exhibit B</u>. As a result, the Policy remains in force, and Ms. Regino remains unable to prevent District personnel from again making life-altering decisions about her children without her involvement. Indeed, for all Ms. Regino knows and can ascertain from the District, the District is currently socially transitioning her children.

Ms. Regino timely appealed again, and she now seeks expedited review. Due to the urgent nature of this appeal, Ms. Regino proposes the following expedited briefing and hearing schedule:

- Opening Brief: February 13, 2026
- Answering Brief: March 13, 2026
- Reply Brief: March 20, 2026
- Oral Argument: Week of April 6, 2026

---

[1] Ms. Regino attaches only the Second Amended Complaint itself and not its attachments, which are voluminous. Those attachments are available on the district court docket at ECF entries 84-1 through 84-10.

Appellee is opposed to expedition.[2] Ms. Regino respectfully requests that Appellee be ordered to respond to this motion by January 30, 2026, and that the Court order the relief sought in this motion by February 6, 2026.

## ARGUMENT

The Court should expedite this case. The Policy is currently infringing Ms. Regino's constitutional right to the care, custody, and control of her children. Expedition is particularly appropriate where litigants' constitutional rights are at stake. *See* 28 U.S.C. § 1657 (noting that "[g]ood cause [to expedite] is shown if a right under the Constitution of the United States" is at stake). Moreover, this case has been before the Court already, the record is well-developed, and legal issues are crystallized. Expedition is warranted.

### I. THIS COURT HAS BROAD AUTHORITY TO EXPEDITE APPEALS FOR GOOD CAUSE

This Court has broad discretion to expedite appeals where good cause exists. Federal Rule of Appellate Procedure 2 authorizes courts of appeals to expedite for "good cause." Ninth Circuit Rule 27-12 permits motions for expedited consideration. And Congress has directed that courts "shall expedite the consideration of any action" upon a showing of good cause. 28 U.S.C. § 1657(a).

---

[2] Yesterday, the Court entered a scheduling order setting the following relevant dates: (1) Opening Brief: April 10, 2026, and (2) Answering Brief: May 11, 2026. Dkt. 2.1 at 3.

Good cause exists where delay threatens irreparable harm or where a constitutional right is burdened in a factual context demonstrating the need for prompt judicial review. *Id*. The Supreme Court has repeatedly recognized that time-sensitive deprivations of constitutional rights warrant expedited judicial intervention. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (concluding that loss of constitutional freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury").

Courts regularly expedite appeals involving ongoing constitutional violations, particularly where injunctive or declaratory relief is sought. *See, e.g., TGP Communications, LLC v. Sellers*, No. 22-16826, 2022 WL 17484331, at *2 (9th Cir. Dec. 5, 2022); *Agudath Israel of Am. v. Cuomo,* 979 F.3d 177, 182 (2d Cir. 2020) (granting motion to expedite due to ongoing harm to free exercise rights) . That authority is squarely implicated here: Every day the Policy is enforced is a day in which Ms. Regino's parental rights are being violated and her children's well-being is at threat.

## II. THE DISTRICT'S POLICY INFLICTS ONGOING AND IRREPARABLE HARM ON FUNDAMENTAL PARENTAL RIGHTS

Parents have a "fundamental right" to the "care, custody, and control" of their minor children. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.); *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018). This right rests on the common-law presumptions of parental fitness and affection that (1) "parents possess what a child

6

lacks in maturity, experience, and capacity for judgment" and (2) the "natural bonds of affection lead parents to act in the best interests of their children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979) (cleaned up).

The Policy intrudes upon that protected sphere by authorizing District personnel to make significant, identity-defining decisions for children while deliberately excluding parents from knowledge and participation. While the request to undergo a social transition originates with the child, the Policy requires the District to honor that wish and absent narrow exceptions, to keep the transition secret from the child's parents if the child asks that his or her parents not be informed.

The Policy violates Ms. Regino's constitutional rights for four reasons:

First, parents have the right to consent (or at least to notice) when the government provides healthcare treatment to their children. *Id.*; *Wallis v. Spencer*, 202 F.3d 1126, 1141–42 (9th Cir. 2000) (concluding that parents have the right "to make important medical decisions for their children"). Social transitioning is a form of psychological treatment. Indeed, the very purpose of a social transition is to alleviate the psychological distress caused by the mismatch between a person's gender identity and sex. The Policy allows the District to make the healthcare decision to socially transition a child without the knowledge or consent of their parents.

Second, parents have the right to consent (or at least to notice) when the government makes "important decisions" in their children's lives. *H.L. v. Matheson*, 450 U.S. 398, 411 (1981); *see also Gerson v. Logan River Acad.*, 20 F.4th 1263, 1280 (10th Cir. 2021) (noting that "[p]arents can and must make many decisions on behalf of their children" (cleaned up)). Parents must—and do—have the "primary role" in raising their children. *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). But the Policy usurps that primary role, turning it over to children, who lack the maturity and understanding to make informed decisions regarding the important events in their lives.

Third, the Constitution also protects parents' right to the "integrity of [their] family." *Kelson v. City of Springfield*, 767 F.2d 651, 654 (9th Cir. 1985). This right protects parents against state action that constitutes an "unwarranted intrusion" in the parent-child relationship. *Keates*, 883 F.3d at 1235. Socially transitioning children without obtaining parental consent or providing parental notice is an "unwarranted intrusion" in parents' relationship with their children that fundamentally alters the "deep attachments" parents have with their children. *Bd. of Dir. of Rotary Intern. v. Rotary Club*, 481 U.S. 537, 545 (1987).

Fourth, parents have the right to name their children. *See Sydney v. Pingree*, 564 F. Supp. 412, 413 (S.D. Fla. 1982) (holding that parents have the right to name their children); *O'Brien v. Tilson*, 523 F. Supp. 494, 496 (E.D.N.C. 1981) (same);

8

*Jech v. Berch*, 466 F. Supp. 714, 718–19 (D. Haw. 1979) (same). Socially transitioning a child without parental consent or notice usurps parents' right to decide the name by which their children are known.

To be clear, Ms. Regino does not contend that the parental right is absolute. While the right to the "care, custody, and control" of children "reside[s] first" in their parents, *Troxel*, 530 U.S. at 66, Ms. Regino acknowledges that the State may exercise its *parens patriae* authority to override parents' consent when their children are "subject to . . . apparent danger or harm." *Mueller v. Auker*, 700 F.3d 1180, 1187 (9th Cir. 2012). But here, the Policy does not require the District to find that children are in "apparent danger or harm" before socially transitioning them. Instead, the Policy generally authorizes the District to socially transition children—and to keep the transition secret from their parents—based solely on children's request. Accordingly, the Policy is not a valid exercise of the State's *parens patriae* authority, and the District's asserted interests are insufficient to overcome Ms. Regino's rights.

Moreover, Ms. Regino's constitutional injuries are ongoing. Her children remain enrolled in District schools, and the Policy remains operative. Under the Policy, Ms. Regino faces the ongoing risk that school officials may again socially transition one of her children without her knowledge—depriving her of the opportunity to provide guidance, support, or intervention. Indeed, for all Ms. Regino knows and can ascertain from the District, the District may currently be socially

9

transitioning her children. These risks are sufficient to establish ongoing irreparable injury and the existence of good cause.

### III. THIS APPEAL PRESENTS PURELY LEGAL CONSTITUTIONAL QUESTIONS WARRANTING PROMPT RESOLUTION

Expedition is particularly appropriate where, as here, an appeal presents purely legal constitutional questions. This appeal turns on a narrow but profound question: whether the Constitution permits a public school to socially transition a child absent parental consent and conceal that decision from the child's parent. The Second Amended Complaint is detailed, the record is extensive, and the legal issues have been fully framed through multiple rounds of briefing, including prior briefing before this Court.

This case is also uniquely well-suited for expedited resolution because it is not new to this Court. This Court has already reviewed the underlying dispute, which has been pending for more than three years. In its prior decision, this Court vacated the district court's dismissal and remanded with instructions to apply the correct legal framework. *Regino*, 133 F.4th at 960–67.

Despite that guidance, the district court again dismissed the action, leaving the same core constitutional question unresolved while the Policy continues to operate. Expedition will promote judicial economy by bringing resolution to a case that has already been pending for over three years despite being stuck at the Rule 12(b)(6) stage.

Moreover, delaying resolution serves no countervailing judicial interest. There are no efficiency gains from postponement, and no risk of piecemeal adjudication. To the contrary, expedition promotes judicial economy by resolving a recurring constitutional issue that continues to generate litigation nationwide.

## IV. FURTHER DELAY THREATENS TO UNDERMINE THE AVAILABILITY OF EFFECTIVE RELIEF

Ms. Regino seeks declaratory and injunctive relief to prevent future violations of her constitutional rights. Delay threatens to render that relief meaningless. The Supreme Court has cautioned that courts must act with urgency where ongoing government action risks causing harms that cannot later be remedied. *See, e.g., Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). That principle applies with particular force where minors and parental rights are concerned.

Children's identities, mental health, and family relationships are dynamic and fragile. Once a child has been socially transitioned in secret from his or her parents, the consequences—psychological distress, family rupture, and loss of parental trust—cannot simply be undone by a later favorable ruling. The Constitution does not require parents to endure these harms while appellate review proceeds at an ordinary pace.

Delay is especially unwarranted here given this case has already been pending for more than three years. This delay itself risks harm. *See Pac. Gas & Elec. Co. v.*

11

*State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201-02 (1983) (holding delay in reaching a final resolution would cause irreparable harm). The continued operation of the Policy during years of litigation has effectively denied Ms. Regino the timely adjudication to which she is entitled under 28 U.S.C. § 1657. Expedited review is necessary to ensure that this case finally receives definitive resolution while meaningful relief remains possible.

## CONCLUSION

For these reasons, Ms. Regino respectfully requests that this Court expedite her appeal so that her parental rights are restored as soon as possible.

January 23, 2026

Respectfully submitted,

 */s/ Josh W. Dixon*

Josh Dixon
Center for American Liberty
2145 14th Avenue, Suite 8
Vero Beach, FL 32960
(703) 687-6212
jdixon@libertycenter.org
*Counsel for Appellant*

## WORD COUNT CERTIFICATE

This brief complies with the word count and page limitations of Fed. R. App. P. 27(d)(2)(a) / and Ninth Circuit Rule 27-1(1)(d) because, it contains 2,344 words and is less than twenty pages long.


January 23, 2026

Respectfully submitted,

 */s/ Josh W. Dixon*

Josh Dixon
Center for American Liberty
2145 14th Avenue, Suite 8
Vero Beach, FL 32960
(703) 687-6212
jdixon@libertycenter.org
*Counsel for Appellant*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 16. Circuit Rule 27-3 Certificate for Emergency Motion

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form16instructions.pdf*

**9th Cir. Case Number(s)** | 26-475

**Case Name** | Regino v. Blake

I certify the following:

The relief I request in the emergency motion that accompanies this certificate is:

Expedited Appeal

Relief is needed no later than *(date)*: | February 6, 2026

The following will happen if relief is not granted within the requested time:

Appellant's parental right are currently being violated and will continue to be violated.

I could not have filed this motion earlier because:

Appellant files this motion within one week of filing the Notice of Appeal

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 16** | *1* | *Rev. 11/21/2019*

I requested this relief in the district court or other lower court:  ○ Yes  ● No

> If not, why not:

This relief is unavailable in the district court

I notified 9th Circuit court staff via voicemail or email about the filing of this motion: ● Yes  ○ No

> If not, why not:

I have notified all counsel and any unrepresented party of the filing of this motion:

On *(date)*: January 23, 2026

By *(method)*: Telephone

Position of other parties: Oppose

> Name and best contact information for each counsel/party notified:

Brian Duus
bduus@leonealberts.com
925-974-8600

I declare under penalty of perjury that the foregoing is true.

**Signature** s/ Josh Dixon    **Date** 1/23/23

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 16**                    *2*                    *Rev. 11/21/2019*

# EXHIBIT A

JOSHUA W. DIXON (Admitted Pro Hac Vice)
COURTNEY CORBELLO (Admitted Pro Hac Vice)
**CENTER FOR AMERICAN LIBERTY**
PO Box 200942
Pittsburgh, PA 15251-0942
Telephone: (703) 687-6200
Email: JDixon@LibertyCenter.org
        CCorbello@LibertyCenter.org

JESSE FRANKLIN-MURDOCK (SBN 339034)
**DHILLON LAW GROUP INC.**
177 Post Street, Suite 700
San Francisco, CA 94108
Telephone: (415) 433-1700
Email: JFM@DhillonLaw.com

*Attorneys for Plaintiff*
AURORA REGINO

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AURORA REGINO,<br><br>        Plaintiff,<br><br>    vs.<br><br>SUPERINTENDENT KELLY STALEY, in her official capacity as Superintendent of the Chico Unified School District,<br><br>        Defendant. | Case No.: **2:23-cv-00032-DJC-DMC**<br><br>**SECOND AMENDED COMPLAINT** |

Plaintiff, AURORA REGINO, by and through her undersigned counsel, hereby states the following claims for relief against Defendant KELLY STALEY, in her official capacity as Superintendent of the Chico Unified School District ("Defendant" or the "District"), and respectfully requests that this Court render a declaratory judgment and issue a permanent injunction against the District's ongoing violations of the United States Constitution as set forth herein.[1] In support thereof, Ms. Regino alleges as follows:

## INTRODUCTION

1.      States across the country are grappling with a mental-health crisis among youth. This crisis has created acute challenges for school officials, who are often on the front lines of this epidemic. One particularly vulnerable class of young people are those struggling with their gender identity. Sadly, the Chico Unified School District has erected barriers between these children and their parents—the very people who love and support them most—leading to their isolation and harm.

2.      Rather than promote open discourse among the District, parents, and their children, the District has adopted an administrative regulation (the "Parental Secrecy Policy" or the "Policy") under which schools in the District must (1) without obtaining parental consent, socially transition[2] any student who claims to have a transgender identity and asks to be socially transitioned and (2) except in very narrow circumstances, keep the social transition secret from the student's parents unless the student specifically authorizes parental notification. Even if the parents would be supportive of their children—as Ms. Regino was and is here—the Parental

---

[1] Ms. Regino files this Second Amended Complaint with Defendant's written consent under Rule 15(a)(2). Defendant reserves all other rights, including but not limited to its right to seek dismissal of this Second Amended Complaint under Rule 12.

[2] Social transitioning is the active affirmation of a person's transgender identity. In the school setting, it primarily refers to calling students by a new name and / or pronouns associated with their asserted transgender identity.

---

Secrecy Policy precludes parents from being involved in this significant decision in their children's lives based on nothing more than the child's say so.

3. While activists and advocacy groups try to downplay the significance of social transitioning as a harmless exploration of a minor's gender identity, the reality is that social transitioning can cause a minor's transgender identity to persist when the minor would otherwise lose that identity—or "desist"—before adulthood.

4. Under the United States Constitution, public schools may not socially transition children upon their request—either by school personnel calling children by a new name and / or pronouns associated with a new asserted gender identity or by the school requiring others in the school environment to call children by a new name and / or pronouns associated with a new asserted gender identity—without first obtaining parental consent or, in the alternative, without providing parental notice. Social transitioning is a powerful psychological intervention affecting a matter of major importance in minors' lives, and the decision whether to socially transition a child is a monumental decision in the child's life. It has long-term consequences that can drastically impact the child's life course, it has serious risks associated with it, and it implicates the integrity of the family unit, altering intimate interpersonal relationships between parents and their children.

5. Ms. Regino's oldest daughter, A.S., fell victim to the District's unconstitutional practices. During the 2021–22 school year, when A.S. was an eleven-year-old fifth grader, she began experiencing psychological struggles and significant stressors in her life. Combined with other factors, these struggles and stressors caused A.S. to question whether she was really a girl.

6. In early 2022, A.S. informed a school counselor that she "felt like a boy." The counselor asked A.S. if she had a boy name she would like to be called and whether she would like to be referred to with male pronouns. A.S. said that she did. After the meeting, the counselor walked A.S. to class and informed A.S.'s teacher about A.S.'s new identity, name, and pronouns. Thereafter, the District, through deliberate governmental action and threat of sanction for non-compliance, required everyone in the school environment—administrators, teachers, and other students—to call A.S. by her new name and pronouns.

7.      Not only did the District socially transition A.S. without Ms. Regino's consent, but the District also kept its actions secret from Ms. Regino based on A.S.'s statement to the counselor that she did not want her mother to know about the transition.

8.      After several weeks of the District treating Ms. Regino's daughter as if she were a boy, Ms. Regino learned about the District's actions. Ms. Regino was supportive of A.S. but upset that the school had socially transitioned her daughter without obtaining her consent and without even informing her what it was doing.

9.      By socially transitioning A.S. without Ms. Regino's consent, the District violated Ms. Regino's fundamental right to direct and control the upbringing of her child. Parents have the right to consent when the state seeks to (1) socially transition their children at school, (2) provide healthcare treatment to their children, (3) make major decisions in their children's lives, and (4) make decisions that implicate the integrity of their family. Schools infringe these rights when they socially transition children without obtaining parental consent or, in the alternative, without providing parental notice.

10.     Ms. Regino brings this action to vindicate these rights. Both of her children still attend school in the District, and the District continues to adhere to the Parental Secrecy Policy. The District is both currently violating Ms. Regino's rights and subjecting her to the credible threat of future violations. Ms. Regino seeks (1) a declaratory judgment declaring the Parental Secrecy Policy unconstitutional and (2) a permanent injunction precluding the District from continuing to enforce it.

## JURISDICTION AND VENUE

11.     This action arises under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and 28 U.S.C. §§ 2201 and 2202.

12.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

13.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Ms. Regino's claims occurred and are occurring within this judicial district.

///

## THE PARTIES

14.     Plaintiff Aurora Regino is a resident of Chico, California. She has sole custody over her two minor daughters, A.S. (age fourteen) and C.S. (age eleven), both of whom live with her. A.S. and C.S attend schools operated by the District.

15.     Ms. Regino is a fit parent, is actively involved in her children's lives, loves her children dearly, always seeks to do what is best for them, and wishes to provide them with the nurturing and guidance of a loving and caring mother in all aspects of their lives. To that end, Ms. Regino engages with her children's schools and other aspects of their lives to ensure that she is informed about what occurs when they are not in her immediate supervision. She intends to continue this level of involvement in her children's lives.

16.     The District is a public school district based in Chico, California. It operates twenty-three schools—twelve elementary schools, four junior high schools, three high schools, and four other schools, some of which educate children as young as four years old. *See Chico Unified Schools District: Our Schools*, attached hereto as Exhibit A; *Chico Unified Schools District: Loma Vista Early Learning Center,* attached hereto as Exhibit B. Over 12,000 students attend school in the District. *Chico Unified Schools District: Our District*, attached hereto as Exhibit C.

17.     Defendant Kelly Staley is the Superintendent of the District. *See Chico Unified Schools District: Superintendent's Office*, attached hereto as Exhibit D. In this capacity, Defendant is responsible for the implementation of all District policies, and the development, adoption, and implementation of all administrative regulations, including the Parental Secrecy Policy, and she has ultimate supervisory authority over all District employees, which includes all employees working at the schools within the District. Defendant acts under color of California law while performing her duties as Superintendent. Defendant is sued in her official capacity only.

## FACTUAL ALLEGATIONS

**Background on Transgender Identities and Gender Dysphoria and its Treatment**

18.     The facts alleged in this section are based on the following documents: (1) the Declaration of Dr. Steven Levine, dated January 4, 2023, attached as Exhibit 1-A to Ms. Regino's

Memorandum in Support of her Motion for Preliminary Injunction, *see* ECF 18-3; (2) *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, Department of Health and Human Services (May 1, 2025), attached hereto as Exhibit E; (3) *The Cass Review: Independent review of gender identity services for children and young people*, Dr. Hilary Cass, United Kingdom National Health Service (April 10, 2024), attached hereto as Exhibit F; (4) Zucker, Ken J., *The Myth of Persistence: Response to "A Critical Commentary on Follow-Up Studies and Desistance Theories about Transgender and Gender Non-Conforming Children" by Temple Newhook et al.*, 19 International Journal of Transgenderism at 237 (2018), attached hereto as Exhibit G; (5) Br. of Amici Curiae Medical, Nursing, Mental Health, and other Health Care Organizations in Support of Appellee in *Adams v. The School Board of St. Johns County*, Case No. 18-13592 (11th Cir. 2022), attached hereto as Exhibit H; and (6) Eappen, Roy, *Most 'Transgender' Kids Turn Out to Be Gay*, Wall Street Journal (Dec. 14, 2023), attached hereto as Exhibit I.

19.    The terms "sex" and "gender" are not interchangeable. "Sex" refers to an individual's immutable biological reproductive capabilities, while "gender" refers to the characteristics of women, men, boys, and girls that are socially constructed.

20.    A person's "gender identity" is the person's internal, felt experience of gender.

21.    Persons with a "transgender" identity feel that their gender identity does not match their sex.

22.    "Gender dysphoria" refers to a psychiatric condition in which the mismatch between an individual's gender identity and sex produces clinically significant psychological distress in the individual.

23.    A person can have a transgender identity without the threshold of associated psychological distress necessary for a gender dysphoria diagnosis. Nevertheless, a large proportion of minors who have a transgender identity also have gender dysphoria or sub-threshold psychological distress. A large proportion of minors who have a transgender identity also have other developmental and psychiatric conditions such as autism, depression, anxiety, eating disorders, and ADHD.

---

24.    While it is not known exactly why some people come to have a transgender identity, broad agreement exists that it is the result of a complex interplay between biological, psychological, and social factors. A person's gender identity can be mutable; this is especially so in minors.

25.    Minors who claim or express interest in pursuing a transgender identity often do so based on stereotypical notions of femaleness and maleness that reflect constrictive notions of what men and women can be. For example, a male minor may feel he has a female gender identity because, in his perception, men like sports and he does not. These minors are simply unaware of the vast array of possibilities of how life can be lived as a man or a woman.

26.    Absent affirmative intervention, most minors who develop a transgender identity will desist—that is, lose their transgender identity—prior to adulthood.

27.    There are four general approaches to treating gender dysphoria in minors: the "watchful waiting" model, the "hands off" model, the "psychotherapy" model, and the "affirmation" model.

28.    The "watchful waiting" model seeks to allow for the fluid nature of gender identity in minors to evolve naturally. Under this model, the mental health professional treats any other psychological co-morbidities without a focus on gender.

29.    The "hands off" model is similar to the "watchful waiting" model insofar as it allows the minor's gender identity to evolve naturally, but it provides no ongoing treatment.

30.    Under the "psychotherapy" model, the mental health professional seeks to identify the causes of the psychological distress and to address those causes through psychotherapy as a means of alleviating the distress.

31.    The "affirmation" model is starkly different from the other three. It holds that any expression of a transgender identity in the minor should be immediately accepted as decisive and permanent, and that the minor's psychological condition will improve with "affirmation" of that identity.

32.    Social transitioning is a primary pillar of the "affirmation" model. The purpose of social transitioning is to alleviate psychological distress caused by the mismatch between a

person's gender identity and sex, even if that distress is not clinically significant. In other words, the purpose of social transitioning is to create a putatively therapeutic environment in which the minor's transgender identity is affirmed, thus putatively alleviating the minor's psychological distress associated with a mind-body mismatch through the affirmation of the minor's transgender identity.

33.     Social transitioning is a significant form of psychological treatment, particularly in minors. The treatment is the creation of the putatively therapeutic environment for the minor.

34.     The very fact that a minor is asking to be socially transitioned indicates that the minor has some measure of psychological distress associated with being identified as the gender associated with the minor's sex.

35.     Social transitioning in minors is not a mere benign intervention or a harmless exploration of the minor's gender identity. Absent social transitioning, most transgender-identifying minors will desist by adulthood. Many of these minors will grow up to be same sex attracted.[3]

36.     When social transitioning is introduced, however, the rate of desistence plummets. Thus, social transitioning in minors makes it more likely that their transgender identity will persist into adulthood due to the psychological effect on the minor of inhabiting that identity. Inhabiting a transgender identity makes desistence more difficult and significantly less likely. Persistence in minors who otherwise would have desisted is psychologically harmful to them.

37.     In most cases where minors undergo a social transition, the minor goes on to receive graduated "affirmative" medical care—*i.e.*, puberty blockers and cross-sex hormones, and, for some, "affirming" surgeries like mastectomies, genital removal surgery, vaginoplasties, and phalloplasties. For this reason, before social transitioning is considered, the risks of this future additional "affirmative" care must be considered. These risks are significant, and include bone

---

[3] For this reason, gender clinicians in the United Kingdom have derisively referred to childhood transitions as "transing the gay away." Eappen, Roy, *Most 'Transgender' Kids Turn Out to Be Gay*, Wall Street Journal (Dec. 14, 2023), attached hereto as Exhibit I.

weakness, cardiovascular harm, depression, decreased sexual response, and sterility.

38.     Social transitioning is not appropriate for every minor with a transgender identity who expresses a desire to be socially transitioned. For example, as discussed, some minors come to have a transgender identity due to their stereotypical notions of gender roles. In that situation, education and / or counseling—not social transitioning—is appropriate, and social transitioning can create psychological complications for the minor.

39.     A minor's request to undergo a social transition should begin a careful evaluation by the parents, with the assistance of a mental health practitioner, of whether the social transition is appropriate for the minor, an evaluation that includes determining the likelihood of desistence in the absence of affirmative intervention. A minor's request to undergo a social transition, even if sincere, should not be dispositive. From a treatment standpoint, it can be—and often is— appropriate for parents to say "no" to a social transition.

40.     The "affirmation" model—and, specifically, the idea that all minors who seek to be socially transitioned should be—is an insufficient "one-size-fits-all" approach that fails to account for the broader and unique issues the minor is facing.

41.     In light of the first principle of medical ethics ("do no harm"), the distinct trend in western Europe is a move away from the "affirmation" model as the first approach to treating gender dysphoria in minors because of the risk of iatrogenic harm associated with the "affirmation" method.

42.     Regardless of the treatment model, parental consent and notice are necessary for the responsible, adequate, and ethical assessment, diagnosis, and treatment of minors with gender dysphoria and related conditions. This includes social transitioning.

43.     Schools that socially transition minors without parental consent necessarily interfere with the parents' ability to take a more cautious approach. By socially transitioning minors without parental consent, schools are making a significant healthcare decision regarding the minor's psychological treatment, well-being, and future life course. In addition, socially transitioning minors without parental consent creates the perception in minors that their parents are the "enemy," thus driving a wedge between parent and child just when the minor needs his or

her parents most.

44.     Schools that socially transition minors without parental consent also violate bedrock principles of medical ethics. Unlike parents, minors are incapable of making sound judgments regarding their own health care and of understanding the risks associated with significant interventions like social transitioning. Even if minors could provide informed consent to a social transition (and they cannot), school personnel lack sufficient knowledge of and training in the complexities and risks of social transitioning to provide students adequate information. And because school personnel lack this knowledge and training, they are unqualified to determine whether a social transition is appropriate for students.

45.     Schools that socially transition minors without parental notice inflict additional harm. When a school socially transitions a minor in secret from his or her parents, the minor secretly inhabits a new gender identity at school, a situation that is inherently psychologically unhealthy for the minor, increases the minor's anxiety and sense of alienation, and further drives a wedge between parents and their children.

46.     No medical or psychological association has endorsed school-based social transitions of minors without parental consent, much less without parental notice.

47.     In general, the state may bypass the requirement of parental consent for minors' healthcare treatment under its *parens patriae* authority in appropriate circumstances, but allowing schools to decide whether to socially transition students without parental consent—much less without parental notice—is not an appropriate exercise of the state's *parens patriae* authority.

**The District's Parental Secrecy Policy**

48.      Defendant has adopted and implements the Parental Secrecy Policy at all schools within the District. *See* Administrative Regulation #5145.3, attached hereto as Exhibit J. The Parental Secrecy Policy is a policy, practice, procedure, and / or custom of the District.

49.     Under the Parental Secrecy Policy, if a student informs District personnel that he or she has a transgender identity and wants to go by a new name and pronouns associated with that identity at school, the Policy requires all District personnel and students to call the student by that new name and pronouns. *Id.* at 5 (providing that it shall be a violation of the Parental Secrecy

Policy to "[r]efus[e] to address a student by a name and the pronouns consistent with the student's gender identity"). In other words, the Parental Secrecy Policy requires schools in the District to socially transition students upon their request. *Id.* The only exception to this rule is when District personnel have a "credible and supportable basis for believing that the student's assertion is for an improper purpose." *Id.* at 6.

50.     The Parental Secrecy Policy does not require schools to obtain parental consent before socially transitioning their children.

51.     Unless students who are undergoing a social transition specifically authorize District personnel to notify their parents, District personnel are prohibited from providing such notification except where (1) notification is "otherwise required by law" or (2) the District has "compelling evidence" that notification is "necessary to preserve the student's physical or mental well-being." *Id.* at 5. As for the first of these exceptions, the District does not interpret the United States Constitution or any other provision of law to require it to notify parents before socially transitioning their children in every case. The second of these exceptions requires District personnel to presumptively assent to students' desire to withhold information from their parents unless that presumption is overcome by compelling evidence that disclosure is necessary for the student's well-being.

52.     Under the Parental Secrecy Policy, the District is authorized to "[t]ak[e] appropriate disciplinary action against students, employees, and anyone determined to have" violated any aspect of the Policy. *Id.* at 4. Thus, the Parental Secrecy Policy is enforced by the coercive power of the state. *Id.*

53.     The prohibition on parental notification has no exception for the situation where parents directly ask District personnel whether their child is being socially transitioned. Thus, the Parental Secrecy Policy requires District personnel to deceive parents in response to a direct question from parents whether their child is being socially transitioned if their children are, in fact, being socially transitioned.

54.     The Parental Secrecy Policy does not touch upon the curriculum taught within the District. Instead, it requires the District to perform significant psychological treatment on students

without their parents' consent. In addition, the Policy requires the District to perform this psychological treatment on students without notifying their parents in most cases based on nothing more than students' statement that they do not want their parents to be involved, regardless of the reason.

**A.S.**

55.     During the 2021–2022 school year, Ms. Regino's oldest daughter—A.S.— attended fifth grade at Sierra View Elementary School ("Sierra View"), which is a school within in the District.

56.     In the fall of 2021, when she was eleven years old, A.S. began feeling depressed and anxious. She had just begun puberty, and there had been significant changes in her home life over the preceding months. Her grandfather had recently passed away and her mother (Ms. Regino) had just completed treatment for breast cancer and was obtaining a degree in nursing. A.S.'s father is disabled due to an injury from an automobile accident and, as a result of the changes at home, A.S. began taking on a greater role in caring for her younger sister, C.S., who was seven years old at the time. A.S. began feeling mentally exhausted and emotionally confused.

57.     Throughout the 2021–2022 school year, a school counselor visited A.S.'s class on a regular basis to remind the class of the services the counselor's office provided. During these visits, the counselor often brought up the topic of gender identity. The counselor encouraged students to explore their identities and consider whether they felt like they were not the gender associated with their sex. She explained that that feeling was normal and that students should embrace the feeling if they had it.

58.     A.S. took the counselor's advice. She began wondering if her feelings of anxiety and depression were because she was born the wrong sex.

59.     Around December 2021, A.S. began feeling like she was a boy. These feelings came about as the result of her psychological struggles and exploring her gender identity consistent with the counselor's instructions.

60.     In December 2021, before winter break, A.S. met with the counselor to discuss her feelings of anxiety and depression. At that meeting, A.S. did not mention to the counselor that

she felt like a boy. The counselor encouraged A.S. to join a small group of other girls around her age that she (the counselor) would be organizing when school resumed the following month (the "Girls Group"). The counselor told A.S. that the Girls' Group would be primarily focused on arts and crafts and that the group would be a good opportunity for A.S. to make new friends. The counselor provided A.S. with a permission slip for participation in the Girls Group for her mother to sign.

61.     Ms. Regino agreed that an arts-and-crafts group could facilitate positive social interaction for A.S. with other girls her own age and could help A.S. with her anxiety and depression. Ms. Regino signed the permission slip allowing A.S. to participate in the group once school began in the spring semester of 2022. The permission slip was for attendance at the Girls Group only.

62.     On or about January 20, 2022, A.S. attended her first Girls Group meeting. The meetings included A.S. and about four of her female classmates, whose ages ranged from 10 to 12 years old. The first one or two meetings of the Girls Group were geared towards arts and crafts, as A.S. anticipated, but the subject of the meetings quickly changed.

**The District Socially Transition A.S.**

63.     After one or two Girl's Group meetings, A.S. went to the counselor's office to tell the counselor that she "felt like a boy" or words of similar effect. The counselor asked A.S. if she had a boy's name that she would like to be called and whether she would like to be referred to by male pronouns. A.S. told the counselor her boy's name was "J.S." A.S. was unsure whether she wanted others at school to start calling her by a male name and pronouns, but she believed if she did not say "yes" the counselor would not take her feelings seriously, so she said that she did. The counselor asked A.S. if she wanted her mother to be informed about her new identity at school, and A.S. said she did not. While A.S. did not provide the counselor a reason she did not want her mother to know, at the time, A.S. mistakenly thought that her mother would be "mad" at her for wanting to be a boy.

64.     During this meeting, the counselor did not discuss A.S.'s feelings of anxiety and depression, nor did she attempt to understand the reason(s) behind A.S.'s supposed transgender

identity. Instead, the discussion focused solely on how to effect A.S.'s social transition to a boy.

65.    After the meeting, the counselor walked A.S. to her class and told her teacher that A.S. was now going by the name "J.S." and male pronouns, and her teacher immediately began calling her as such. In addition, pursuant to the Parental Secrecy Policy, the counselor and / or A.S.'s teacher arranged for other school personnel and students to begin calling A.S. by "J.S." and referring to her by male pronouns, which they did.

66.    The counselor's and teacher's actions in socially transitioning A.S. were undertaken pursuant to—and were consistent with—the Parental Secrecy Policy.

67.    Once A.S. told the counselor she "felt like a boy," the Girls Group meetings changed substantially. Instead of arts-and-craft projects, the counselor now led A.S. and her female classmates in discussions regarding gender identity. They discussed how to cope with having feelings that one's sex does not match one's gender—specifically, how embracing those feelings and socially transitioning can alleviate the stress and anxiety of living as the "wrong" gender.

68.    Over the course of the spring semester of 2022, A.S. had approximately two additional one-on-one meetings with the counselor. At these meetings, the counselor provided A.S. with additional resources regarding her supposed new male identity, such as referring A.S. to a local community group that advocates for LGBTQ+ causes and discussing "breast binding" and "top surgery" with her.[4]

69.    A.S. told the counselor that she wanted to tell her mother about her new male identity, but the counselor was not supportive of this course of action. The counselor brushed off A.S.'s request and told her that if she wanted to "come out" to her family, she should notify other family members first.

---

[4] "Breast binding" refers to the flattening of a female's breasts with constrictive clothing to make the chest appear flat. "Top surgery" refers to a double mastectomy. Females who identify as transgender sometimes bind their breasts and / or have a double mastectomy to appear more masculine.

70.     During this time, pursuant to the Parental Secrecy Policy, school personnel and students continued calling A.S. by her new name and referring to her by her new pronouns. Every day at school, A.S. was known as "J.S." and referred to with male pronouns, while at home, she remained A.S. Despite requiring a parental permission slip for A.S. to participate in an arts-and-crafts club, the District socially transitioned A.S. from a girl to a boy without even informing her mother, much less obtaining her permission to do so.

71.     At no time did the counselor or anyone at the District inform A.S. that: (1) she should discuss her feelings with a mental health professional; (2) she should tell her mother about the social transition; (3) she was free to socially transition back to a girl; or (4) there are risks associated with social transitioning, including the risk of making desistence less likely or the risks associated with graduated "affirmative" care. The Parental Secrecy Policy does not require District personnel to make these disclosures to students who are being socially transitioned.

**A.S. "Comes Out" to her Grandmother**

72.     On or about April 8, 2022, A.S. told her grandmother about her new gender identity. A.S.'s grandmother informed Ms. Regino of the news later that day.

73.     Ms. Regino was surprised to learn A.S. was asserting a transgender identity, and she was shocked that the District had socially transitioned A.S. without obtaining her consent or informing her.

74.     Ms. Regino was—and is—supportive of her daughter. Ms. Regino informed A.S. of her support and told her she would assist her with her social transition if that was what she wanted. In addition, Ms. Regino arranged for A.S. to begin attending counseling sessions with a licensed marriage and family therapist to discuss her feelings of depression and anxiety.

75.     Although Ms. Regino was supportive of her daughter, had the District sought Ms. Regino's consent, she would not have allowed the District to socially transition her daughter without first seeking guidance from a mental health professional. Ms. Regino arrived at this view for several reasons, including but not limited to A.S.'s young age, her cognitive incapability of understanding what it might mean to have a transgender identity, the quick onset of A.S.'s feelings of gender confusion, the existence of other stressors in A.S.'s life that were the more likely

explanation of her feelings of gender confusion, and the short duration of A.S.'s feelings of gender confusion.

76.    Even before A.S. "came out" to her grandmother, she had already begun to question whether she really felt like a boy or wanted to continue using her male name and pronouns. But because the Sierra View community now viewed her as a boy, called her by a male name, and referred to her using male pronouns, A.S. felt like she was stuck in the new male identity, which she felt forced to inhabit for the remainder of her fifth-grade year. Based on this fact, her depression and anxiety worsened, which required significant attention and counseling over the summer after her fifth-grade year.

77.    At the beginning of A.S.'s sixth-grade year, she reverted to going by "A.S." and female pronouns.

**Ms. Regino's Current and Future Injury**

78.    A.S. and C.S. attend schools in the District. The District applies the Parental Secrecy Policy at all its schools. Thus, A.S. and C.S. are subject to the Parental Secrecy Policy.

79.    Despite this lawsuit, the District has steadfastly refused to disavow the Parental Secrecy Policy.

80.    By being in place, the Parental Secrecy Policy injures Ms. Regino because it offers her children a way to be socially transitioned at school without obtaining her consent and without her being notified.

81.    By being in place, the Parental Secrecy Policy injures Ms. Regino by sending the message to her children that she is not looking out for their best interests and / or that she does not know what is best for them with respect to social transitioning.

82.    By being in place, the Parental Secrecy Policy injures Ms. Regino because it requires her to alter her relationships with her children to combat its influence and impact on them. Because of the Parental Secrecy Policy, Ms. Regino must speak with her children about gender-identity related issues that she otherwise would not discuss with them to attempt to dissuade them from seeking to be socially transitioned at school without her consent and without her being notified. In the absence of the Parental Secrecy Policy, she would not be required to

have these conversations because her children would not have a way to be socially transitioned at school without her consent and without her being notified.

83. By being in place, the Parental Secrecy Policy injures Ms. Regino because it erects barriers to her involvement in the lives of her children. Because the Parental Secrecy Policy gives Ms. Regino's children a way to be socially transitioned at school without obtaining her consent and without her being notified, it requires Ms. Regino to take additional steps to monitor her children's activities at school more closely than she otherwise would to determine whether they are being socially transitioned at school without her consent and without her being notified. These steps include, among other things, having conversations with her children about whether they are undergoing a social transition and reviewing her children's school materials to attempt to ascertain whether they are undergoing a social transition. In the absence of the Parental Secrecy Policy, Ms. Regino would not be required to take these additional steps because her children would not have a way to be socially transitioned without her consent and without her being notified.

84. In addition, as the counselors office did with A.S.'s class, the counselors office also makes regular visits to C.S.'s class in which the topic of transgender identities arises. Because of A.S.'s experience with the counselors office's visits, and because C.S. is too immature to understand the impact that a social transition might have on her life, Ms. Regino asked the District to allow C.S. to be exempt from the counselors office's visits to her class. To date, the District has allowed C.S. that exemption. Ms. Regino is required to monitor C.S.'s activities at school to ensure that the District is continuing to honor that exemption.

85. By being in place, the Parental Secrecy Policy injures Ms. Regino by causing her emotional distress. Ms. Regino is reasonably concerned that the District will (again) socially transition her children without obtaining her consent and without her being notified. This concern causes Ms. Regino emotional distress that the District will (again) socially transition her children without her consent and without notifying her, just as it previously did with A.S.

86. By being in place, the Parental Secrecy Policy injures Ms. Regino by erecting barriers to her ability to ascertain whether the District is socially transitioning her children at

school. Specifically, under the Parental Secrecy Policy, if Ms. Regino asks District personnel whether her children are being socially transitioned at school, District personnel would be required to deceive her if her children were being socially transitioned and did not authorize parental notice so long as the District determined that disclosure was not appropriate under the terms of the Policy. Accordingly, Ms. Regino has no way of ascertaining the truth from the District regarding whether her children are being socially transitioned at school, and asking the District whether it is socially transitioning them would be a futile act.

87.     The Parental Secrecy Policy presents a credible threat to Ms. Regino's parental right to direct and control the upbringing of her children and to make decisions regarding the care, custody, and control of her children insofar as it allows the District to make decisions regarding her children's social transition without obtaining her consent and without providing her notice.

88.     There is a credible threat that A.S. will (again) come to have a transgender identity in the relatively near future. While A.S. currently identifies as girl, she is still suffering from depression and anxiety, she is still experiencing many of the same or similar life stressors that brought on her transgender identity in the first place, she is now experiencing new life stressors associated with late adolescence, she was previously socially transitioned at school, and she previously felt the psychological inertia of inhabiting a male gender identity. In addition, A.S. continues to face pressure from the District—whether intended or not—to (again) identify as transgender. At A.S.'s school, District personnel are highly supportive of students with a transgender identification, including by posting transgender flags in all but one of her classrooms, wearing clothing that celebrates transgender identities, and convening clubs that celebrate transgender identities. While Ms. Regino does not contend that these actions are unconstitutional, they nevertheless contribute to the creation of a credible threat that A.S. will (again) seek to be socially transitioned at school in the relatively near future.

89.     If A.S. does (again) seek to be socially transitioned at school, there is a credible threat that she will (again) seek to do so in secret from her mother. Ms. Regino is an outspoken critic of the Parental Secrecy Policy, a fact that A.S. knows, and it is likely that A.S. would not want her mother to know she was (again) seeking to socially transition.

90.     There is a credible threat that C.S. will seek to be socially transitioned at school in the relatively near future. Despite being exempted from the counselors office's visits to her classroom, C.S. is being exposed to information at school about transgender identities from other students, she is too immature to understand this information, and she is exhibiting traits and behaviors that cause Ms. Regino reasonably to be concerned that C.S. is likely to seek to be socially transitioned at school, as her sister did.

91.     If C.S. does seek to be socially transitioned at school, there is a credible threat that she will seek to do so in secret from her mother. Ms. Regino is an outspoken critic of the Parental Secrecy Policy, a fact that C.S. knows, and it is likely that C.S. would not want her mother to know she was seeking to socially transition.

92.     Ms. Regino will be supportive of her children regardless of whether they (again) come to have a transgender identity and regardless of whether they (again) seek to be socially transitioned at school. Ms. Regino simply wants to be involved in her children's lives and with the major life choices that have fundamental importance to them, such as whether to undergo a social transition.

## CAUSES OF ACTION

### COUNT ONE

### 42 U.S.C. § 1983—First Amendment

### (Facial Challenge to Parental Secrecy Policy)

93.     Ms. Regino hereby incorporates by reference all other paragraphs of this Second Amended Complaint as though fully set forth herein.

94.     The First Amendment to the United States Constitution protects the fundamental right of individuals to enter into and maintain certain intimate human relationships, including parents' relationships with their children, without undue interference by the state. This right includes, but is not limited to, the right of parents to name their children.

95.     Under the First Amendment, parents have the right to consent when their children's public school seeks to socially transition them; that is, when (1) school personnel call their children by a new name and / or pronouns associated with the child's new asserted gender

identity or (2) the school requires others in the school environment to call their children by a new name and / or pronouns associated with the child's new asserted gender identity. In the alternative, under the First Amendment, parents have the right to notice[5] when their children's public school seeks to socially transition them; that is, when (1) school personnel call their children by a new name and / or pronouns associated with the child's new asserted gender identity or (2) the school requires others in the school environment to call their children by a new name and / or pronouns associated with the child's new asserted gender identity.

96.    The triggering event for a public school's obligation to obtain parental consent—or, in the alternative, to provide parental notice—occurs when (1) school personnel call their children by a new name and / or pronouns associated with the child's new asserted gender identity or (2) the school requires others in the school environment to call children by a new name and / or pronouns associated with the child's new asserted gender identity. The right is not triggered when a child merely asks to go by a new name and / or pronouns associated with the child's new asserted gender identity if the school does not honor that wish or when a child's friends independently call the child by a new name and / or pronouns associated with the child's new asserted gender identity. Rather, the triggering event is the school's own affirmative acts in socially transitioning the child.

97.    Public schools must obtain prior parental consent to (1) call their children by a new name and / or pronouns associated with the child's new asserted gender identity or (2) require others in the school environment to call children by a new name and / or pronouns associated with the child's new asserted gender identity. In the alternative, public schools must provide prior notice to parents that they will be (1) calling their children by a new name and / or pronouns

---

[5] As used herein, the word "notice" means (1) being notified or (2) in the alternative, having the ability to obtain truthful information. In other words, parents have the right (1) to be notified by their children's school when the school socially transitions their children or (2) in the alternative, to have the ability to obtain truthful information from their children's school in response to a direct question about whether their children are being socially transitioned at school.

associated with the child's new asserted gender identity or (2) requiring others in the school environment to call children by a new name and / or pronouns associated with the child's new asserted gender identity.

98.     On its face, by authorizing the District to socially transition children without obtaining parental consent—or in the alternative, without providing parental notice—the Parental Secrecy Policy intentionally interferes with the intimate associations that bond parent and child together. Socially transitioning children is a significant form of psychological treatment involving changing children's names and the way to which they are referred by others that has the potential to fundamentally alter the nature of the parent-child relationship.

99.     On its face, the Parental Secrecy Policy impermissibly assumes that parents are not fit parents who are looking out for their children's best interests, thus violating the constitutionally mandated presumptions of parental fitness and affection.

100.     Parents' First Amendment rights vis-à-vis their children is not absolute, and the state may override those rights in the appropriate exercise of its *parens patriae* authority. But on its face, the Parental Secrecy Policy is not an appropriate exercise of the state's *parens patriae* authority. Parents have the right to notice and an opportunity to be heard at a judicial hearing designed determine if they are abusive or neglectful if the state seeks to compel their child to receive healthcare treatment over their objection. Under the Parental Secrecy Policy, however, parents are not afforded such a hearing before their right to consent is abridged. And while the state may provide healthcare treatment to children even in the absence of a judicial hearing in an emergency—*i.e.*, when, after a thorough investigation, there is reasonable cause to believe that the child is in imminent danger of serious bodily injury—social transitioning is not emergency treatment, the Parental Secrecy Policy does not require schools to conduct a thorough investigation, and the Parental Secrecy Policy does not require schools to make a finding that children are in imminent danger of serious bodily injury prior to socially transitioning them. Moreover, even in an emergency, the state must notify parents after it has provided healthcare treatment to their children. The Parental Secrecy Policy fails to comply with even this modest command.

101.    Further, on its face, the Parental Secrecy Policy is not narrowly tailored to any compelling governmental purpose; does not further any important or legitimate government purpose; is not supported by any rational basis; constitutes an unwarranted interference with family relationships; and is the product of deliberate indifference to the rights of parents and their children.

102.    Students have no right of privacy vis-à-vis their parents with respect to the fact that their school is socially transitioning them. Even if they did, parents' right to consent—or in the alternative, to notice—trumps any countervailing right their children might have.

103.    Ms. Regino has no adequate remedy at law for these deprivations and will suffer serious and irreparable harm to her constitutional rights unless Defendant is enjoined as set forth herein.

104.    Ms. Regino is entitled to declaratory relief and permanent injunctive relief invalidating and restraining Defendant from its ongoing violations of her constitutional rights as set forth herein.

### COUNT TWO

### 42 U.S.C. § 1983—First Amendment

### (As-Applied Challenge to Parental Secrecy Policy)

105.    Ms. Regino hereby incorporates by reference all other paragraphs of this Second Amended Complaint as though fully set forth herein.

106.    As applied to Ms. Regino, by authorizing the District to socially transition her children without obtaining her consent—or in the alternative, without providing her notice—the Parental Secrecy Policy intentionally interferes with the intimate associations that bond her and her children together. Socially transitioning children is a significant form of psychological treatment involving changing children's names and the way to which they are referred by others that has the potential to fundamentally alter the nature of the parent-child relationship

107.    As applied to Ms. Regino, the Parental Secrecy Policy impermissibly assumes that she is not a fit parent who is looking out for her children's best interests, thus violating the constitutionally mandated presumptions of parental fitness and affection.

108.    As applied to Ms. Regino, the Parental Secrecy Policy is not an appropriate exercise of the state's *parens patriae* authority; is not narrowly tailored to any compelling governmental purpose; does not further any important or legitimate government purpose; is not supported by any rational basis; constitutes an unwarranted interference with family relationships; and is the product of deliberate indifference to the rights of parents and their children.

109.    Ms. Regino's children have no right of privacy vis-à-vis her with respect to the fact that their school is socially transitioning them. Even if they did, Ms. Regino's right to consent—or in the alternative, to notice—trumps any countervailing right her children might have.

110.    Ms. Regino has no adequate remedy at law for these deprivations and will suffer serious and irreparable harm to her constitutional rights unless Defendant is enjoined as set forth herein.

111.    Ms. Regino is entitled to declaratory relief and permanent injunctive relief invalidating and restraining Defendant from its ongoing violations of her constitutional rights as set forth herein.

## COUNT THREE

### 42 U.S.C. § 1983—Fourteenth Amendment (Substantive Due Process)
### (Facial Challenge to Parental Secrecy Policy)

112.    Ms. Regino hereby incorporates by reference all other paragraphs of this Second Amended Complaint as though fully set forth herein.

113.    The substantive component of the Due Process Clause of the Fourteenth Amendment to the United States Constitution protects the fundamental rights of parents to direct and control the upbringing of their children and to make decisions concerning the care, custody, and control of their children.

114.    Under the substantive component of the Due Process Clause, parents have the right to consent when their children's public school seeks to socially transition them; that is, when (1) school personnel call their children by a new name and / or pronouns associated with the child's new asserted gender identity or (2) the school requires others in the school environment to call

their children by a new name and / or pronouns associated with the child's new asserted gender identity. In the alternative, parents have the right to notice when their children's public school seeks to socially transition them; that is, when (1) school personnel call their children by a new name and / or pronouns associated with the child's new asserted gender identity or (2) the school requires others in the school environment to call their children by a new name and / or pronouns associated with the child's new asserted gender identity.

115. Under the substantive component of the Due Process Clause, parents have the right to consent when their children's public school seeks to provide healthcare treatment to them. Social transitioning is a form of healthcare treatment. Thus, parents have the right to consent when their children's public school seeks to socially transition them. In the alternative, parents have the right to notice when their children's public school seeks to provide healthcare treatment to them. Social transitioning is a form of healthcare treatment. Thus, parents have the right to notice when their children's public school seeks to socially transition them.

116. Under the substantive component of the Due Process Clause, parents have the right to consent when their children's public school seeks to make a major decision in their children's lives. Whether a child undergoes a social transition is a major decision in the child's life. Thus, parents have the right to consent when their children's public school seeks to socially transition them. In the alternative, parents have the right to notice when their children's public school seeks make a major decision in children's lives. Whether a child undergoes a social transition is a major decision in the child's life. Thus, parents have the right to notice when their children's public school seeks to socially transition them.

117. Under the substantive component of the Due Process Clause, parents have the right to consent when their children's public school seeks to make a private family decision vis-à-vis their children. Whether a child undergoes a social transition is a private family decision. Thus, parents have the right to consent when their children's public school seeks to socially transition them. In the alternative, parents have the right to notice when their children's public school seeks make a private family decision vis-à-vis their children. Whether a child undergoes a social transition is a private family decision. Thus, parents have the right to notice when their children's

1    public school seeks to socially transition them.

2        118.    The triggering event for a public school's obligation to obtain parental consent—

3    or, in the alternative, to provide parental notice—occurs when (1) school personnel call their

4    children by a new name and / or pronouns associated with the child's new asserted gender identity

5    or (2) the school requires others in the school environment to call children by a new name and /

6    or pronouns associated with the child's new asserted gender identity. The right is not triggered

7    when a child merely asks to go by a new name and / or pronouns associated with the child's new

8    asserted gender identity if the school does not honor that wish or when a child's friends

9    independently call the child by a new name and / or pronouns associated with the child's new

10   asserted gender identity. Rather, the triggering event is the school's own affirmative acts in

11   socially transitioning the child.

12       119.    Public schools must obtain prior parental consent to (1) call their children by a

13   new name and / or pronouns associated with the child's new asserted gender identity or (2) require

14   others in the school environment to call children by a new name and / or pronouns associated with

15   the child's new asserted gender identity. In the alternative, public schools must provide prior

16   notice to parents that they will be (1) calling their children by a new name and / or pronouns

17   associated with the child's new asserted gender identity or (2) requiring others in the school

18   environment to call children by a new name and / or pronouns associated with the child's new

19   asserted gender identity.

20       120.    The right to consent—or in the alternative, to notice—at issue here flows from the

21   well-established right of parents to (1) direct and control their children's healthcare treatment, (2)

22   make important decisions in the lives of their children, and (3) make private familial decisions

23   regarding their children without undue interference by the state. Social transitioning is a

24   significant form of healthcare treatment that is neither routine nor uniformly beneficial, even for

25   those children who assert a transgender identity. Even if social transitioning were not healthcare

26   treatment (and it is), whether to socially transition a child is an important decision in the child's

27   life that can dramatically alter the child's life course. And even if social transitioning were not

28   healthcare treatment (and it is), whether to socially transition a child is a private family decision

that cannot be unilaterally made by the state. Accordingly, a public school's decision to (1) call children by a new name and / or pronouns associated with the child's new asserted gender identity or (2) require others in the school environment to call children by a new name and / or pronouns associated with the child's new asserted gender identity implicates the parental right.

121.     The right to consent—or in the alternative, to notice—at issue here is deeply rooted in our nation's history and tradition and implicit in the concept of ordered liberty. Under the common law, parents had the right not merely to be notified of their children's actions, but to speak and act on their behalf. In addition, parents had the common-law right to settle their children properly in life, by preventing the ill consequence of too early and precipitate decisions. Under the common law, parents would have had the right to consent—or in the alternative, to notice— if their children's school sought to socially transition them. Moreover, this concept of the authority of parents in the lives of their children persisted in the decades leading up to the ratification of the Fourteenth Amendment. Indeed, throughout our nation's history parents have had the authority to direct and control their children's healthcare treatment, to make important decisions in their children's lives, to make private family decisions regarding their children, and, more generally, to give their children names. At the time of the adoption of the Fourteenth Amendment, parents would have had the right to consent—or in the alternative, to notice—if their children's school sought to socially transition them. Further, while parents delegate a slice of their parental power to their children's school under the *in loco parentis* doctrine, that slice of power goes only so far as the purposes of the delegation—that is, to educate children—and does not include the power to make important decisions in the child's life like whether to undergo a social transition.

122.     On its face, the Parental Secrecy Policy impermissibly takes from parents the authority to consent—or in the alternative, deprives them of the right to notice—when their children's public school seeks to socially transition them.

123.     On its face, the Parental Secrecy Policy impermissibly assumes that parents are not fit parents who are looking out for their children's best interests, thus violating the constitutionally mandated presumptions of parental fitness and affection.

124.    On its face, the Parental Secrecy Policy is not an appropriate exercise of the state's *parens patriae* authority; is not narrowly tailored to any compelling governmental purpose; does not further any important or legitimate government purpose; is not supported by any rational basis; constitutes an unwarranted interference with family relationships; and is the product of deliberate indifference to the rights of parents and their children.

125.    Students have no right of privacy vis-à-vis their parents with respect to the fact that their school is socially transitioning them. Even if they did, parents' right to consent—or in the alternative, to notice—trumps any countervailing right their children might have.

126.    Ms. Regino has no adequate remedy at law for these deprivations and will suffer serious and irreparable harm to her constitutional rights unless Defendant is enjoined as set forth herein.

127.    Ms. Regino is entitled to declaratory relief and permanent injunctive relief invalidating and restraining Defendant from the ongoing violations of her constitutional rights as set forth herein.

## COUNT FOUR

### 42 U.S.C. § 1983— Fourteenth Amendment (Substantive Due Process)

### (As-Applied Challenge to Parental Secrecy Policy)

128.    Ms. Regino hereby incorporates by reference all other paragraphs of this Second Amended Complaint as though fully set forth herein.

129.    As applied to Ms. Regino, the Parental Secrecy Policy impermissibly takes from her the authority to consent—or in the alternative, deprives her of the right to notice—when her children's public school seeks to socially transition them.

130.    As applied to Ms. Regino, the Parental Secrecy Policy impermissibly assumes that she is not a fit parent who is looking out for her children's best interests, thus violating the constitutionally mandated presumptions of parental fitness and affection.

131.    As applied to Ms. Regino, the Parental Secrecy Policy is not a proper exercise of the state's *parens patriae* authority; is not narrowly tailored to any compelling governmental purpose; does not further any important or legitimate government purpose; is not supported by

any rational basis; constitutes an unwarranted interference with her family relationships; and is the product of deliberate indifference to the rights of Ms. Regino and her children.

132.    Ms. Regino's children have no right of privacy vis-à-vis her with respect to the fact that their school is socially transitioning them. Even if they did, Ms. Regino's right to consent—or in the alternative, to notice—trumps any countervailing right her children might have.

133.    Ms. Regino has no adequate remedy at law for these deprivations and will suffer serious and irreparable harm to her constitutional rights unless Defendant is enjoined as set forth herein.

134.    Ms. Regino is entitled to declaratory relief and permanent injunctive relief invalidating and restraining Defendant from the ongoing violations of her constitutional rights as set forth herein.

**COUNT FIVE**

**42 U.S.C. § 1983— Fourteenth Amendment (Procedural Due Process)**

**(Facial Challenge to Parental Secrecy Policy)**

135.    Ms. Regino hereby incorporates by reference all other paragraphs of this Second Amended Complaint as though fully set forth herein.

136.    The procedural component of the Due Process Clause of the Fourteenth Amendment to the United States Constitution protects individuals' liberty interests against governmental infringement without due process of law.

137.    When schools socially transition students without parental consent and / or providing parental notice, they infringe parents' constitutionally protected liberty interests.

138.    On its face, the Parental Secrecy Policy infringes upon parents' protected liberty interests without providing them adequate procedural safeguards, including but not limited to notice and an opportunity to be heard by a judicial offer prior to the social transition of their children, a thorough investigation into the relevant facts, and notice after their children are socially transitioned.

139.    Ms. Regino has no adequate remedy at law for these deprivations and will suffer

serious and irreparable harm to her constitutional rights unless Defendant is enjoined as set forth herein.

140.     Ms. Regino is entitled to declaratory relief and permanent injunctive relief invalidating and restraining Defendant from its ongoing violations of her constitutional rights as set forth herein.

## COUNT SIX

### 42 U.S.C. § 1983— Fourteenth Amendment (Procedural Due Process)
### (As-Applied Challenge to Parental Secrecy Policy)

141.     Ms. Regino hereby incorporates by reference all other paragraphs of this Second Amended Complaint as though fully set forth herein.

142.     When the District socially transitions Ms. Regino's children without her consent and / or providing her notice, it infringes her constitutionally protected liberty interests.

143.     As applied to Ms. Regino, the Parental Secrecy Policy infringes upon her protected liberty interests without providing her adequate procedural safeguards, including but not limited to notice and an opportunity to be heard by a judicial offer prior to the social transition of her children, a thorough investigation into the relevant facts, and notice after her children are socially transitioned.

144.     Ms. Regino has no adequate remedy at law for these deprivations and will suffer serious and irreparable harm to her constitutional rights unless Defendant is enjoined as set forth herein.

145.     Ms. Regino is entitled to declaratory relief and permanent injunctive relief invalidating and restraining Defendant from its ongoing violations of her constitutional rights as set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Regino requests the following relief:

1.     A declaration that the Parental Secrecy Policy is facially invalid and invalid as applied to her under the First Amendment, the substantive component of the Due Process Clause, and the procedural component of the Due Process Clause;

2.      A permanent injunction preventing Defendant and all those acting in concert with it from implementing, enforcing, or abiding by the Parental Secrecy Policy or any policy that allows the social transition of minor children without prior parental consent in the absence of a judicial hearing designed to determine whether the parents are abusive or neglectful, both facially and as applied to her;

3.      In the alternative, a permanent injunction preventing Defendant and all those acting in concert with it from implementing, enforcing, or abiding by the Parental Secrecy Policy or any policy that allows the social transition of minor children without prior parental notification, both facially and as applied to her;

4.      In the alternative, a permanent injunction preventing Defendant and all those acting in concert with it from implementing, enforcing, or abiding by the Parental Secrecy Policy or any policy that allows the social transition of minor children without subsequent parental notification, both facially and as applied to her;

5.      Costs and attorney's fees pursuant to 42 U.S.C. § 1988;

6.      A trial by jury on all claims for which she has such a right; and

7.      Such further relief that the Court deems just and proper.

Respectfully submitted,

Dated: June 4, 2025

/s/ Joshua W. Dixon
JOSHUA W. DIXON
COURTNEY CORBELLO
**CENTER FOR AMERICAN LIBERTY**
PO Box 200942
Pittsburgh, PA 15251-0942
Telephone: (703) 687-6200
Email: JDixon@LibertyCenter.org
          CCorbello@LibertyCenter.org

JESSE FRANKLIN-MURDOCK (SBN 339034)

**DHILLON LAW GROUP INC.**
177 Post Street, Suite 700
San Francisco, CA 94108
Telephone: (415) 433-1700
Email: JFM@DhillonLaw.com

*Attorneys for Plaintiff*
AURORA REGINO

# EXHIBIT B

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    AURORA REGINO,                          No. 2:23-cv-00032-DJC-DMC

12                   Plaintiff,

13        v.                                   ORDER

14
     SUPERINTENDENT GREG BLAKE, in
15   his official capacity as Superintendent
     of the Chico Unified School District,
16
                     Defendant.
17

18

19        This case concerns Chico Unified School District's Policy regarding how to

20   handle the situation where a student expresses a desire to use a different name and

21   pronouns that do not align with the student's sex at birth.  Subject to certain

22   exceptions not relevant here, the school will generally defer to the student's request

23   to use the name and pronouns of their choosing.  Significantly for this case, the school

24   district treats this information as confidential – including from parents – unless the

25   student consents or disclosure is otherwise required by law.

26        Plaintiff is the parent of two students who attend schools in the Chico Unified

27   School District.  Her elder daughter previously requested to use a "boy name" and

28

                                            1

1   male pronouns at school, and the Plaintiff is concerned that under the District's Policy,

2   one of her children could again make a similar request and she would not be

3   informed.  In her Second Amended Complaint, she brings claims under the First and

4   Fourteenth Amendment arguing that the District's Policy is unconstitutional to the

5   extent it deprives her of the ability to withhold consent to the school using different

6   names and pronouns to refer to her children.

7        The Court is well aware of the ongoing societal debate about how to best

8   respond to children who may identify as transgender.  Parents understandably want to

9   know if their child is struggling with their gender identity, and many will be supportive

10  of their children as they explore this aspect of themselves.  And schools,

11  understandably, have an interest in ensuring that they remain a safe space in which

12  students can explore their identities, as children do in myriad ways in the school

13  environment.  Where to draw that line, however, is not for this Court to resolve.  Nor is

14  the wisdom of the District's Policy.  The much more limited question presented by the

15  School District's Motion to Dismiss is whether the United States Constitution has

16  anything to say on the matter.  The Court concludes it does not.

17       While Plaintiff alleges a constitutional right to consent before the School District

18  uses different names and pronouns, no such right exists.  Primarily, Plaintiff attempts

19  to cast the School District's Policy as about the provision of a medical treatment, which

20  Plaintiff refers to as "social transitioning."  While the Court has no doubt that the use of

21  names and pronouns can be a part of treatment for gender dysphoria when

22  implemented as part of a broader treatment plan by licensed medical professionals, a

23  school's decision to use a student's preferred name and pronouns, standing alone, is

24  not medical treatment, and does not implicate caselaw giving parents a constitutional

25  right to consent to medical treatment on behalf of their children.  Plaintiff's alternative

26  arguments – that the School District's Policy implicates a fundamental right to consent

27  when the state makes important decisions in a child's life, maintain the integrity of the

28

1    family, and to name children – lacks support in this nation's history and tradition.

2    Accordingly, the Court will GRANT the Defendant's Motion to Dismiss.

3                                   **BACKGROUND**

4    **I.    Factual Background**

5            Plaintiff Aurora Regino brings suit against Defendant Greg Blake,

6    Superintendent of the Chico United Schools District, alleging that the implementation

7    of the Administrative Regulation 5145.3 ("the Policy") violates parental rights under

8    the First and Fourteenth Amendments of the United States Constitution.  The facts are

9    largely known to the Parties.  (*See* ECF No. 57) at 2–4); *Regino v. Staley,* 133 F.4th 951,

10   956–59 (9th Cir. 2025).   Nevertheless, the Court summarizes the operative allegations

11   here.

12           On its face, the Policy reads as a measure concerning nondiscrimination and

13   anti-harassment and includes a subsection discussing policies related to transgender

14   and gender non-conforming students.  (*See* Policy (ECF No. 88-3, Ex. C); Mot. Dismiss

15   (ECF No. 88) at 11–12.)  Under the Policy, the District prohibits "[r]efusing to address a

16   student by a name and the pronouns consistent with the student's gender identity[,]"

17   and "[r]evealing a student's transgender status to individuals who do not have a

18   legitimate need for the information, without the student's consent[.]" (Policy at 5.)

19   Additionally, the Policy directs District personnel to address situations involving

20   transgender and gender non-conforming students, on a "case-by-case basis, in

21   accordance with [certain] guidelines[.]" (*Id.*)  These guidelines include a "[r]ight to

22   privacy" wherein the "student's transgender or gender-nonconforming status is the

23   student's private information and the district shall only disclose the information to

24   others with the student's prior written consent[.]" (*Id.*)  This right to privacy exists

25   "except when the disclosure is otherwise required by law or when the district has

26   compelling evidence that disclosure is necessary to preserve the student's physical or

27   mental well-being." (*Id.*)

28

1     Plaintiff's child, A.S., was an eleven-year-old, fifth grade student who attended

2    Sierra View Elementary School in the District. (*Id.* ¶¶ 55, 56.) In fall 2021, A.S. began

3    to feel depressed and anxious following significant changes to her home life. (*See*

4    *id.* ¶ 56.) Plaintiff alleges that a school counselor visited A.S.'s class on a regular basis

5    to remind students of the school's counseling services. (*Id.* ¶ 57.) In December 2021,

6    A.S. began to feel "like she was a boy", and met with the counselor to discuss her

7    feelings of anxiety and depression but did not mention that she felt like a boy.

8    (*Id.* ¶¶ 59, 60.) At the advice of the counselor, and with Plaintiff's permission, A.S.

9    joined a school-run "Girls Group" led by the counselor that would be focused mostly

10   on arts with a small group of girls. (*Id.* ¶¶ 60, 61.)

11     In January 2022, A.S. informed the school counselor that "she felt like a boy"

12   and after being asked, said she wanted to be called "J.S." and use male-identifying

13   pronouns. (*Id.* ¶ 63.) A.S. told the counselor that she did not want her mother to

14   know, because she was worried that her mother would be "mad." (*Id.*) "[T]he

15   counselor did not discuss A.S.'s feelings of anxiety or depression, nor did she attempt

16   to understand the reason(s) behind A.S.'s supposed transgender identity." (*Id.* ¶ 64.)

17   As required by the Policy, school personnel referred to A.S. as "J.S." and with male

18   pronouns. (*Id.* ¶ 65.) Following A.S.'s request, Plaintiff alleges that the topics of the

19   Girls Group changed to discussions regarding gender identity. (*Id.* ¶ 67.) Plaintiff also

20   alleges that the counselor "was not supportive of" A.S. telling her mother about her

21   new identity by "brush[ing] off" her "request" and instead telling "her that if she

22   wanted to 'come out' to her family, she should notify other family members first." (*Id.*

23   ¶ 69.) In 2022, A.S. informed her grandmother about her new identity, and A.S.'s

24   grandmother informed Plaintiff. (*Id.* ¶¶ 72, 73.) Plaintiff was unaware of A.S.'s new

25   identity and contends that Defendant "socially transitioned" Plaintiff's child without

26   Plaintiff's consent and "kept its actions secret" from Plaintiff based on A.S.'s statement

27   that A.S. did not want Plaintiff to know. (*Id.* ¶ 7.) The following school year, A.S.

28   began using the name "A.S." again and female-identifying pronouns. (*Id.* ¶ 77.)

4

1   Plaintiff is nevertheless concerned that the school may "socially transition" A.S. or

2   Plaintiff's other child, C.S., without Plaintiff's consent or notice. (*See id.* ¶¶ 78–92.) In

3   the SAC, Plaintiff includes a series of studies to support her claims about healthcare

4   treatment. (*Id.* ¶ 18.)

5        Plaintiff now brings six causes of action under 42 U.S.C. § 1983 alleging

6   violations of the First and Fourteenth Amendments to the United States Constitution

7   all premised on parental rights arguments. These are: (1) a facial First Amendment

8   challenge; (2) an as-applied First Amendment challenge; (3) a facial Fourteenth

9   Amendment substantive due process challenge; (4) an as-applied Fourteenth

10  Amendment substantive due process challenge; (5) a facial Fourteenth Amendment

11  procedural due process challenge; and (6) an as-applied Fourteenth Amendment

12  procedural due process challenge. Defendant seeks to dismiss the action alleging

13  that Plaintiff has failed to plausibly state claims upon which relief can be granted. The

14  matter is fully briefed (Opp'n (ECF No. 90); Reply (ECF No. 93)) and was ordered

15  submitted following oral argument.

16  **II.    Procedural Background**

17       In January 2023, Plaintiff filed her initial Complaint (ECF No. 1) and Motions for

18  Preliminary Injunction (ECF Nos. 2, 18). The Motions for Preliminary Injunction were

19  denied (ECF Nos. 11, 37) and Plaintiff proceeded to file a First Amended Complaint

20  (ECF No. 42). Defendant then filed a motion to dismiss Plaintiff's First Amended

21  Complaint, which was granted with prejudice, because Plaintiff failed to allege the

22  existence of a fundamental right that was clearly established in existing precedent.

23  (ECF No. 57.) Plaintiff appealed the decision to the Ninth Circuit, (ECF No. 59) which

24  vacated the district court's order and remanded the case (ECF No. 70). The Ninth

25  Circuit held that erroneous legal standards were applied to the substantive and

26  procedural due process claims, and that the distinction between Plaintiff's facial and

27  as-applied challenges was not addressed. *Regino v. Staley,* 133 F.4th 951, 962, 967

28

1    (9th Cir. 2025).  The case was then reassigned to this Court (ECF No. 72), which now

2    assesses Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint.

3                                **LEGAL STANDARD**

4        A party may move to dismiss for "failure to state a claim upon which relief can

5    be granted[.]"  Fed. R. Civ. P. 12(b)(6).  The motion may be granted only if "the

6    complaint lacks a cognizable legal theory or sufficient facts to support a cognizable

7    legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.,* 521 F.3d 1097, 1104 (9th Cir.

8    2008).  While the court assumes all factual allegations are true and construes "them in

9    the light most favorable to the nonmoving party," *Steinle v. City & Cnty. of S.F.,* 919

10   F.3d 1154, 1160 (9th Cir. 2019), if the complaint's allegations do not "plausibly give

11   rise to an entitlement to relief" the motion must be granted.  *Ashcroft v. Iqbal,* 556 U.S.

12   662, 679 (2009).

13       A complaint need contain only "a short and plain statement of the claim

14   showing that the pleader is entitled to relief[,]" Fed. R. Civ. P. 8(a)(2), not "detailed

15   factual allegations."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).  However,

16   this rule demands more than unadorned accusations; "sufficient factual matter" must

17   make the claim at least plausible.  *Iqbal,* 556 U.S. at 678.  In the same vein, conclusory

18   or formulaic recitations of elements do not alone suffice.  *Id.*  "A claim has facial

19   plausibility when the plaintiff pleads factual content that allows the court to draw the

20   reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.

21   (citation omitted).

22                            **REQUEST FOR JUDICIAL NOTICE**

23       Both Parties submitted Requests for Judicial Notice (ECF Nos. 88-3, 92.)

24   Plaintiff opposes Defendant's Request for Judicial Notice in part.  (ECF No. 91.)  A

25   district court may take judicial notice of "a fact that is not subject to reasonable

26   dispute because. . . it can be accurately and readily determined from sources whose

27   accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).

28

1    Defendant's Request involves three exhibits: Exhibit A – "Frequently Asked

2    Questions: School Success and Opportunity Act (Assembly Bill 1266) Frequently

3    Asked Questions"; Exhibit B – "California School Boards Association ("CSBA") sample

4    'Regulation 5145.3"; and Exhibit C – Administrative Regulation 5145.3." (ECF No. 88-

5    3). Plaintiff opposes Defendant's request as it relates to Exhibits A and B. Because the

6    Court need not rely on Exhibits A and B in determining the instant Motion, the Court

7    DENIES Defendant's request as to Exhibits A and B, and GRANTS the request as to

8    Exhibit C. *See Khoja v. Orexigen Therapeutics, Inc.,* 899 F.3d 988, 999 (9th Cir. 2018)

9    (explaining that courts may take judicial notice of matters of public record); *Lifeway*

10   *Foods Inc. v. Millenium Products, Inc.,* No. 16-cv-7009-R, 2016 WL 7336721, at *1 (C.D.

11   Cal. Dec. 14, 2016) (explaining that publicly available government records are

12   commonly subject to judicial notice).

13   Plaintiff also requests judicial notice of three exhibits: Exhibit A – Administrative

14   Regulation #6153 concerning the District's school trip policy; Exhibit B –

15   Administrative Regulation #5141.21 concerning administering health medication to

16   students; Exhibit C – #5141.32 concerning the policy on health screenings of students

17   for school entry. (ECF No. 92). For the same reasons the Court granted Defendant's

18   request as to its Exhibit C, the Court GRANTS Plaintiff's Request.

19                                   **DISCUSSION**

20   Plaintiff brings six causes of action against Defendant pursuant to 42 U.S.C.

21   § 1983 alleging that the Policy infringes on constitutionally protected parental rights

22   and rights of familial association. Plaintiff raises both facial and as-applied challenges.

23   "[A] facial challenge is a challenge to an entire legislative enactment or provision."

24   *Hoye v. City of Oakland,* 653 F.3d 835, 857 (9th Cir. 2011). However, an as-applied

25   challenge "contends that the law is unconstitutional as applied to the litigant's

26   particular [circumstances], even though the law may be capable of valid application to

27   others." *Foti v. City of Menlo Park,* 146 F.3d 629, 635 (9th Cir. 1998).

28

1       To state a claim for relief in an action under section 1983, plaintiffs must show

2  that (1) "they were deprived of a right secured by the Constitution or laws of the

3  United States" and (2) "the alleged deprivation was committed under color of state

4  law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50 (1999).  Defendant

5  contends that Plaintiff has failed to state any claim upon which relief can be granted

6  because legislative policy accepting the preferred name and pronouns of a

7  transgender student (1) does not constitute medical treatment because the decision

8  has not been made in connection with a medical plan and requires no specialized

9  skill; (2) does not interfere with a parent's familial relationship because it does not

10 affect how parents, themselves, interact with the child; and (3) does not violate

11 parents' rights because the Constitution does not afford parents the authority to

12 compel state action.

### I.      Substantive Due Process Claims

14      The Fourteenth Amendment's Due Process Clause prohibits states from

15 depriving any person of life, liberty, or property, without due process of law.  U.S.

16 Const. Amend. XIV, § 1.  Rooted within the Due Process Clause's concept of "liberty"

17 are certain fundamental rights and liberty interests that are protected from state

18 action, *Washington v. Glucksberg,* 521 U.S. 702, 719–20 (1997) (citations omitted),

19 unless the government "infringement is narrowly tailored to serve a compelling state

20 interest," *Reno v. Flores,* 507 U.S. 292, 302 (1993).  Where a law does not infringe on a

21 fundamental right, the law need only be "rationally related to legitimate government

22 interests."  *Stormans, Inc. v. Wiesman,* 794 F.3d 1064, 1085 (9th Cir. 2015) (quoting

23 *Glucksberg,* 521 U.S. at 728).  The Supreme Court has repeatedly instructed courts "to

24 exercise the utmost care" before breaking new ground in the area of unenumerated

25 fundamental rights.  *Regino,* 133 F.4th at 960 (citing *Khachatryan v. Blinken,* 4 F.4th

26 841, 856 (9th Cir. 2021) (alteration accepted) (quoting *Collins v. City of Harker Heights,*

27 503 U.S. 115, 125) (1992)).  As such, new fundamental rights must "be defined in a

28

1   most circumscribed manner, with central reference to specific historical practices." *Id.*

2   (citing *Khatchatryan,* 4 F.4th at 856 (citation omitted)).

3          In its decision on appeal, the Ninth Circuit instructed this Court to consider

4   whether Plaintiff has alleged the infringement of a fundamental right by employing the

5   "established method of substantive due process analysis." *Id.* at 964 (citing

6   *Glucksberg,* 521 U.S. at 720).  This analysis is to proceed by "carefully formulating" the

7   asserted fundamental right and considering whether the asserted right itself, or one in

8   which it is encompassed, is "objectively, deeply rooted in this Nation's history and

9   tradition and implicit in the concept of ordered liberty, such that neither liberty nor

10  justice would exist if [it was] sacrificed." *Id.* at 960 (citations omitted).  The Ninth

11  Circuit further noted that neither party had previously articulated a position that was

12  supported by precedent.  *Id.* at 965.

13         **A.  Executive Action vs. Legislative Action**

14         The Supreme Court has applied two different legal standards to substantive

15  due process claims: the fundamental rights analysis, and the shocks the conscience

16  standard.  *See Martinez v. City of Oxnard,* 337 F.3d 1091,1092 (9th Cir. 2003) (per

17  curiam).  In its decision on appeal, the Ninth Circuit acknowledged that these are the

18  two standards of review, but applied only the fundamental rights analysis as that was

19  the theory under which Plaintiff asserted her claims.  *Regino,* 133 F.4th at 960 n.5.  The

20  court further stated that it expressed no opinion on the shocks the conscience

21  standard's applicability here.  *Id.*

22         In his Motion, Defendant contends that the shocks the conscience standard

23  governs Plaintiff's as-applied substantive due process claim.  (Mot. Dismiss at 28–29.)

24  Specifically, Defendant points to a distinction between "executive acts" and

25  "legislative acts" wherein the former are often analyzed under the shocks the

26  conscience standard, and the latter is subjected to a fundamental rights analysis.  (*Id.*

27  at 27.)  An executive act typically arises "from the ministerial or administrative activities

28  of members of the executive branch," *McKinney v. Pate,* 20 F.3d 1550, 1557 n.9 (11th

1    Cir. 1994), and generally concern "a specific act of a governmental officer that is at

2    issue," *County of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998).  A legislative act

3    "generally appl[ies] to a larger segment of – if not all – society[.]"  *Id.* at 846.  An

4    administrative regulation and executive order, while executive in nature, may be

5    classified as legislative when broadly applicable.

6        Defendant argues that Plaintiff's as-applied claim involves an executive act,

7    because the challenge concerns the application of the Policy to her as a "specific, one-

8    time circumstance."  (Mot. Dismiss at 27–28.)  Plaintiff's SAC advances arguments only

9    under the fundamental rights analysis and states that the fundamental rights analysis is

10   applicable here to the as-applied challenge.  (Opp'n at 18.)  The Court finds that

11   because Plaintiff here primarily targets the contents of the Policy, rather than the

12   district's conduct in its application of the Policy to Plaintiff's child, the action being

13   targeted here is legislative in nature.  As such, the shocks the conscience standard

14   does not apply.

15       **B.  Formulations of the Right**

16       As directed by the Ninth Circuit, the Court begins by "carefully formulating" the

17   fundamental right at issue.[1]  *Regino,* 133 F.4th at 964 (citing *Glucksberg,* 521 U.S. at

18   722).  The Supreme Court has emphasized the need to be "precise" in asserting the

19   fundamental right at issue.  *Glucksberg,* 521 U.S. at 723; *see, e.g., Cruzan ex rel.*

20   *Cruzan v. Dir. Mo. Dep't of Health,* 497 U.S. 261, 277–79 (1990) (identifying the

21   "constitutionally protected right to refuse lifesaving hydration and nutrition" rather

22   than a more generic "right to die").  Thus, the Court will "eschew sweeping

23   generalizations" and consider "the scope of the challenged regulation and the nature

24   of Plaintiff's allegations."  *Regino,* 133 F.4th at 964–65 (citations omitted).

25   _____

26   [1] Plaintiff brings claims under both the First Amendment and the Due Process Clause of the Fourteenth
     Amendment.  Given that the First Amendment claims are all related to an alleged right to family

27   association, the Court concludes, as did the Ninth Circuit, that "Regino's familial association claims
     under the First Amendment are entirely subsumed within her familial association claims premised on

28   substantive due process."  *Regino,* 133 F.4th at 961 n.6.

1    In reviewing the SAC and the briefing in the Motion to Dismiss, Plaintiff asserts

2    that she has a fundamental right to "make decisions concerning the care, custody, and

3    control" of her children under *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality op.).

4    As the Ninth Circuit recognized, however, the broad formulation of parental rights that

5    has been utilized in some decisions come with "important limitations," *Regino*, 133

6    F.4th at 963.  Moreover, as the Ninth Circuit cautioned, the "Supreme Court has

7    repeatedly rejected broad formulations of asserted fundamental rights, in favor of

8    being 'more precise.'" *Id*. at 964 (quoting *Glucksberg*, 521 U.S. at 723).  While there

9    are some inconsistencies between the allegations in the SAC and Plaintiff's

10   Opposition to the Motion to Dismiss, in reviewing both, it appears that Plaintiff has

11   alleged the following as fundamental rights that are infringed by Defendant's policies:

12   - The right to consent when the state seeks to provide healthcare
13     treatment to a child.  (SAC ¶ 115; Opp'n at 6.)

14   - The right to consent when the state makes important decisions in their
15     child's life.  (SAC ¶ 116; Opp'n at 9.)

16   - The right to maintain the integrity of her family and to maintain a tight
17     familial bond.  (Opp'n at 11.)

18   - The right to name her children.  (Opp'n at 12.)

19   - The right to notice when the school seeks to "socially transition" a child.
20     (SAC ¶ 114; Opp'n at 13.)[2]

21   The Court will proceed to analyze each to determine if the right in question is

22   "objectively, deeply rooted in this Nation's history and tradition and implicit in the

23   concept of ordered liberty, such that neither liberty nor justice would exist if [it was]

24   sacrificed." *Glucksberg*, 521 U.S. at 720–21 (cleaned up).  If it is, the Court will

25   determine if the particular right is implicated by the Defendant's Policy.

26   _____

27   [2] While in the Court's view, this is better understood as a procedural due process right, see *Mueller v. Auker*, 576 F.3d 979, 997 (9th Cir. 2009) (cited by Plaintiff at Opp'n at 13), the Court will also address
28   whether this is a substantive due process right in the interest of fully exploring all the bases on which Plaintiff claims a substantive due process right.

### 1. Right to Consent to Healthcare Treatment

In the SAC, Plaintiff alleges that the Defendant's Policy amounts to "social transitioning" which is described as a "putatively therapeutic environment in which the minor's transgender identify is affirmed, thus putatively alleviating the minor's psychological distress associated with a mind-body mismatch through the affirmation of the minor's transgender identity." (SAC ¶ 32.) The Complaint further alleges that social transitioning "is a significant form of psychological treatment." (*Id.* ¶ 33.) Having alleged that the Defendant's Policy is effectively a form of psychological treatment, Plaintiff argues that the Policy violates a parent's right to consent to medical treatment on behalf of their child.

Plaintiff is correct that parents have a substantive due process right "to seek and follow medical advice" concerning one's children. *Parham v. J.R.,* 422 U.S. 584 (1979). Generally speaking, this recognized right "to seek and follow medical advice" appears to involve "intrusions upon the bodily integrity of the child or other conduct with clinical significance – whether through a medical procedure, examination, or hospitalization" by a state actor. *Foote v. Ludlow Sch. Comm.,* 128 F.4th 336, 349 (1st Cir. 2025); *see City of Huntington Beach v. Newsom,* 790 F. Supp. 3d 812, 831–32 (C.D. Cal. 2025) (citing *Parham v. J. R.*, 442 U.S. 584, 604 (1979) (recognizing parental right to have child committed to hospital for mental illness); *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1150 (9th Cir. 2021) (complaint sufficiently alleged violation of parental right to notice of medical exam of children, right to parental consent in advance of exam, and right to be present at exam, where exam included genital and anal inspection, urine and blood tests, and/or vaccinations); *Mann v. Cnty. of San Diego*, 907 F.3d 1154, 1161 (9th Cir. 2018) (county infringed on parental right to notice and consent to county conducting medical examinations on children, including gynecological and rectal exam and collecting blood and urine samples); *Greene v. Camreta*, 588 F.3d 1011, 1036–37 (9th Cir. 2009) (defendant violated familial rights for parents and children to be with each other during potentially traumatic medical

1  examinations absent a valid reason); *Wallis v. Spencer*, 202 F.3d 1126, 1141–42 (9th

2  Cir. 2000) (recognizing parental right to make important medical decisions and "be

3  with their children while they are receiving medical attention" in the context of

4  "invasive vaginal and anal medical examinations."). Given that *Parham* involved the

5  commitment of a child to a state mental hospital, however, this right surely applies to

6  significant psychological treatment.

7        While Plaintiff has articulated a cognizable substantive due process right, the

8  Court concludes that Defendant's Policy does not implicate that right. While the Court

9  must accept as true the factual allegations in the SAC, a "pleading that offers labels

10  and conclusions or a formulaic recitation of the elements of a cause of action will not

11  do." *Iqbal*, 556 U.S. at 678 (cleaned up). In this case, simply because Plaintiff asserts

12  that utilizing a student's name and preferred pronouns constitutes medical treatment

13  does not make it so. *See City of Huntington Beach,* 790 F. Supp. 3d at 830 (collecting

14  cases where courts have dismissed similar due process claims at the 12(b)(6) stage

15  where the alleged conduct does not plausibility constitute medical treatment). While

16  the Court accepts as true the allegation that social transitioning "is a primary pillar of

17  the 'affirmation' model" of care for treating gender dysphoria (SAC ¶¶ 25, 32), it is

18  simply not plausible that acquiescing to a minor's request to use a particular name or

19  gender pronoun – without more – constitutes medical treatment. *See City of*

20  *Huntington Beach*, 790 F. Supp. 3d at 830–32.

21        As to Plaintiff's facial challenge, nothing in the Policy requires that a minor have

22  a diagnosis of gender dysphoria in order for the Policy to apply. Rather, school

23  officials "shall accept the student's assertion of his/her gender identity and begin to

24  treat the student consistent with that gender identity unless district personnel present

25  a credible and supportable basis for believing that the student's assertion is for an

26  improper purpose." (Policy at 6.) No physician, mental health professional, or other

27  medical provider is involved in this determination. Instead, it is ministerial in nature.

28

1    Nor does the Policy implicate healthcare treatment as it was applied to

2  Plaintiff's child.  While it may be that the "school counselor" to whom A.S. made her

3  initial request to use the name "J.S." and male pronouns was a mental health

4  professional (SAC ¶ 63), it is clear that the counselor did not make any diagnosis of

5  A.S. or consider using the male name and pronouns to constitute medical treatment.

6  In fact, the SAC affirmatively alleges that during the meeting at which the name and

7  pronouns were discussed, "the counselor did not discuss A.S.'s feelings of anxiety and

8  depression, nor did she attempt to understand the reason(s) behind A.S.'s supposed

9  transgender identity." (*Id.* ¶ 64.)  There is no allegation that the use of a male name

10  and pronouns – made at A.S.'s request – was part of a larger treatment plan for

11  gender dysphoria or any other diagnosis.

12    This conclusion is in alignment with other courts that have addressed this issue.

13  In *Foote*, the First Circuit rejected a claim that a policy much like the one at issue in this

14  case implicated a parent's right to consent to medical treatment.  128 F.4th at 349–50.

15  The Court wrote that "we do not believe that using the Student's chosen name and

16  pronouns – something people routinely do with one another, and which requires no

17  special training, skill, medication or technology –without more, can be reasonably

18  viewed as evidencing some indicia of medicalization." *Id.* at 350.  Similarly in *City of*

19  *Huntington Beach*, the district court rejected a challenge to Assembly Bill 1955, which

20  prohibits disclosure of a student's gender identity unless otherwise required by state

21  or federal law.  *See* 790 F. Supp. 3d at 819–20.  The Court concluded that while social

22  transitioning could be "part of a broader care plan that also includes medical

23  treatments and procedures" it was not itself a medical treatment. *Id.* at 829–30.

24    *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019), cited by Plaintiff, is not to

25  the contrary.  If anything, it proves the point. *Edmo* concerned whether prison officials

26  were deliberately indifferent in violation of the Eighth Amendment when they refused

27  to provide gender confirmation surgery to Edmo, a prison inmate. *Id.* at 767, 772.  All

28  parties agreed that Edmo "suffer[ed] from gender dysphoria, a serious medical

14

1    condition." *Id.* at 767.  In considering the inmate's challenge to the prison's policy, the

2    Ninth Circuit conducted an exhaustive review of that diagnosis, as well as the standard

3    of care for treating it, standards which Plaintiff points to in support of her argument

4    that the Defendant's Policy constitutes medical treatment.  While it is true that

5    "changes in gender expression and role (which may involve living part time or full time

6    in another gender role, consistent with one's gender identity)" is one of the treatment

7    options for individuals with gender dysphoria, along with psychotherapy, hormone

8    therapy, and in some circumstances, surgery, *id.* at 770, such treatment is part of a

9    diagnosis of gender dysphoria.  That diagnosis requires "a marked incongruence

10   between one's experienced/expressed gender and assigned gender, of at least 6

11   months," plus two of six listed criteria, and also must be associated with "clinically

12   significant distress" that "impairs or severely limits the person's ability to function in a

13   meaningful way and has reached a threshold that requires medical or surgical

14   intervention, or both." *Id.* at 768.  There is no such requirement, either facially or as

15   applied in this case, requiring such a medical diagnosis before a student is permitted

16   to use different pronouns or a different name.  While "social transitioning" may be part

17   of an approved treatment plan for individuals with gender dysphoria, using a

18   student's names and pronouns without any diagnosis or involvement of medical

19   professionals does not involve medical treatment, and nothing in *Edmo* suggests

20   otherwise.

21         While the district court in *Mirabelli v. Olson,* No. 3:23-cv-00768-BEN-WVG,

22   2025 WL 3713588 (S.D. Cal. Dec. 22, 2025) reached the opposite conclusion,[3] this

23   Court respectfully does not find that decision persuasive.  First, there is no careful

24   formulation of the fundamental right at issue as the court seems to couch the various

25   articulations in a broad parental right to make decisions about their children.  *See*

26   

27   [3] The Ninth Circuit has stayed the district court's injunction pending appeal, in part concluding that the
     State had made a "strong showing that the district court likely erred in its substantive due process
28   analysis." *Mirabelli v. Bonta*, No. 25-8056, 2026 U.S. App. LEXIS 403, *11 (January 5, 2025).

1   *Regino,* 133 F.4th at 964.  Second, *Mirabelli* brushes off the defendant's argument that

2   the policies are not social transitioning, or even if they are, then it is not medical care –

3   referring to the debate as a "red herring."  2025 WL 3713588 at *8–11.[4]  This Court

4   disagrees.  Whether the policy constitutes a form of medical treatment is crucial to

5   determining whether it falls within the substantive due process right to consent to

6   medical treatment.  *See Regino*, 133 F.4th at 965 (instructing that "[a]fter formulating

7   the asserted fundamental right, the district court must consider whether the asserted

8   right itself, or one in which it is encompassed, is objectively, deeply rooted in this

9   Nation's history and tradition. . . ." (cleaned up)).

10          Finally, the Court observes that the implications of Plaintiff's arguments are far-

11   reaching.  As an initial matter, if social transitioning is really the provision of a mental

12   health treatment, it logically follows that the teachers and counselors engaging in it

13   are engaged in the illegal (and criminal) practice of healthcare without a license.  *See*

14   Cal. Bus. & Prof. Code §2052.  Moreover, there are many examples in which school

15   officials engage in conduct that could be considered medical treatment under

16   Plaintiff's theory.  Teachers, coaches, and other school officials often occupy a trusted

17   position with respect to children, who confide in them and seek their advice.  A

18   teacher may well use similar tools a therapist might in helping the student to handle

19   being bullied, for example, and adopting Plaintiff's logic would lead to the conclusion

20   that the teacher is providing mental health care.  Untethering components of mental

21   health treatment from a diagnosis and treatment plan developed by a mental health

---

22   [4] The *Mirabelli* court cites to a footnote in *Doe v. Horne*, which states that a "[t]he generally accepted

23   medical practice is to treat people who suffer from gender dysphoria with necessary, safe, and effective gender-affirming medical care."  115 F.4th 1083, 1107 n. 13 (9th Cir. 2024) (quotation marks and

24   citation omitted)).  As part of the medical treatment to alleviate gender dysphoria, treatment includes "one or more of the following components: (i) social transition, including adopting a new name,

25   pronouns, appearance, and clothing, and correcting identity documents; (ii) medical transition, including puberty-delaying medication and hormone-replacement therapy; and (iii) for adults,

26   surgeries to alter the appearance and functioning of primary-and secondary-sex characteristics."  *Id.* Importantly, "[f]or social transition to be clinically effective, it must be respected consistently across all

27   aspects of a transgender individual's life."  *Id.* (citation omitted).  The footnote in *Doe* further underscores this Court's point that using a student's names and pronouns – in a limited context – does

28   not in and of itself constitute healthcare treatment.

1   professional risks medicalizing a host of everyday interactions between children and

2   school officials.

3        Accepting Plaintiff's theory would also greatly expand the substantive due

4   process right to consent to medical treatment beyond any notion of history and

5   tradition.  As discussed above, all the cases involving a parental right to consent to

6   medical treatment have involved invasive medical treatment or psychological

7   treatment by a medical professional.  During the hearing on Defendant's Motion to

8   Dismiss, Plaintiff suggested that there might be some "constitutional" understanding

9   of medical treatment that is broader than the typical definition employed under state

10  law.  But Plaintiff points to no authority – and the Court is unaware of any – suggesting

11  that parents have a right to consent to some kind of broader conception of medical

12  treatment than that provided by a licensed medical professional.  Likewise, Plaintiff

13  has failed to meet her burden of establishing that such a right to consent to some

14  broader concept of healthcare is "objectively, deeply rooted in this Nation's history

15  and tradition, and implicit in the concept of ordered liberty, such that neither liberty

16  nor justice would exist if [it was] sacrificed."  *Regino*, 133 F.4th at 960 (quoting

17  *Khachatryan*, 4 F.4th at 858 (9th Cir. 2021) and *Glucksberg*, 521 U.S. at 729).  Rather,

18  this articulation of the right appears to be another way of articulating the claimed right

19  of parents to make important decisions in their children's lives, which the Court turns

20  to next.

21       In sum, the Defendant's Policy does not violate a parent's right to consent to

22  healthcare treatment.

23                    **2.  Right to Make Important Decisions**

24       Plaintiff also asserts a "right to consent when the state makes 'important

25  decisions' in her children's lives . . . that is, those decisions that go to the 'heart of

26  parental decision-making.'"  (Opp'n at 9, quoting *H.L. v. Matheson*, 450 U.S. 398, 410

27  (1981) and *C.N. v. Ridgewood Bd. Of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005).  Plaintiff

28  finds support for this fundamental right from decisions recognizing the ability of

17

1  parents to control child visitation, *Troxel*, 530 U.S. 57, whether to send children to

2  private school and the ability to have them taught in their chosen language, *Pierce v.*

3  *Society of Sisters*, 268 U.S. 510 (1925), *Meyer v. Nebraska*, 262 U.S. 390 (1923), the

4  ability to determine if children can go out in public at night*, Nunez by Nunez v. City of*

5  *San Diego*, 114 F.3d 935 (9th Cir. 1997), and the purported ability to decide whether

6  children may have access to birth control at school, *Matter of Alfonso v. Fernandez*,

7  195 A.D. 2d 46, 60 (N.Y. App. Div. 1993).[5]

8          The Supreme Court has long recognized the fundamental of parents to make

9  decisions concerning the care, custody and control of their children.  *Troxel*, 530 U.S.

10  at 65 ("The interest of parents in the care, custody, and control of their children . . . is

11  perhaps the oldest of the fundamental liberty interests recognized by this Court.").

12  This right is known as the *Meyer-Pierce* right because those are the two Supreme

13  Court cases where it originated.  In *Meyer,* the Supreme Court recognized the right of

14  parents to "establish a home and bring up children" and "to control the education of

15  their own."  262 U.S. at 399–401.  *Pierce* recognized that the "liberty of parents and

16  guardians" includes the right "to direct the upbringing and education of children

17  under their control."  268 U.S. at 534–35.  This right has further been expanded to

18  include the right to make decisions about the physical custody of the child, *Stanley v.*

19  *Illinois,* 405 U.S. 645, 651 (1972), as well as the extent of education a child receives,

20  *Wisconsin v. Yoder,* 406 U.S. 205, 213–14 (1972).  *See Regino,* 133 F.4th at 966

21  (collecting cases).

22          Although broad, parental rights are not without limitations.  For instance, in the

23  context of schooling, the state "as *parens patriae*" may restrict parents' interest in

24  custody, care and nurture of their children "by requiring school attendance, regulating

25  or prohibiting the child's labor, and in many other ways."  *Prince v. Massachusetts,* 321

26  U.S. 158, 166 (1944).  Even the scope of *Pierce* has been greatly cabined and is now

27

28  [5] *But see, contra, Parents United for Better Schs., Inc v. Sch. Dist. Of Philadelphia Bd. of Educ.*, 148 F.3d 260 (3d. Cir. 1998) (upholding school district's consensual condom distribution program).

1    understood to stand for the proposition that a state "may not pre-empt the

2    educational process by requiring children to attend public schools." *Norwood v.*

3    *Harrison,* 413 U.S. 455, 461–62 (1973); *see also Yoder,* 406 U.S. at 239 (1972) (White,

4    J., concurring) (stating that the *Pierce* right "lends no support to the contention that

5    parents may replace state educational requirements with their own idiosyncratic views

6    of what knowledge a child needs to be a productive and happy member of society[ ]").

7        Significantly, in the context of discussing sexuality in schools, the Ninth Circuit

8    has held that the "right to limit what public schools or other state actors may tell their

9    children regarding sexual matters, is not encompassed within the *Meyer–Pierce* right

10   to control their children's upbringing and education." *Fields v. Palmdale Sch. Dist.*,

11   427 F.3d 1197, 1207 (9th Cir. 2005), *amended on denial of rehearing,* 447 F.3d 1187

12   (9th Cir. 2006).  And in *Parents for Privacy v. Barr,* the Ninth Circuit rejected attempts to

13   create a "parental right to determine whether and when their children will have to risk

14   being exposed to opposite sex nudity at school" when parents challenged a school's

15   Student Safety Plan for transgender students to use the bathroom and locker room

16   reflecting their gender identity.  949 F.3d 1210, 1232–33 (9th Cir. 2020).

17       As these precedents illustrate, while there may be broad language in earlier

18   decisions such as *Meyer and Pierce*, such dicta must be understood in the context of

19   modern Supreme Court jurisprudence that "has repeatedly rejected broad

20   formulations of asserted fundamental rights, in favor of being 'more precise.'" *Regino*,

21   133 F.4th at 964 (quoting *Glucksberg*, 521 U.S. at 723).  Asserting a broad-based right

22   to make "important decisions" in a child's life is counter to the Ninth Circuit's

23   instruction to "eschew sweeping generalizations, and instead 'adopt a narrow

24   definition of the interest at stake.'" *Regino*, 133 F.4th at 964 (quoting *Raich v.*

25   *Gonzales*, 500 F.3d 850, 863 (9th Cir. 2007)).

26       Examining how courts have articulated the alleged fundamental right in other

27   cases illustrates the proper approach.  As the Ninth Circuit noted in *Regino*, in *Reno*,

28   the Supreme Court considered the rights of undocumented children detained by

1   immigration authorities, who under the policy at issue in that case could only be

2   released to parents, close relatives, or legal guardians.  507 U.S. at 297.  The Court

3   rejected the articulation of the substantive due process right as being "freedom from

4   physical restraint" but rather articulated the right as that "of a child who has no

5   available parent, close relative, or legal guardian, and for whom the government is

6   responsible, to be placed in the custody of a willing-and-able private custodian rather

7   than of a government-operated or government-selected child-care institution."  *Id*. at

8   302.

9           Closer to the case at hand is *Parents for Privacy*, in which the court addressed a

10  school policy that permitted transgender students to use the bathroom

11  corresponding to their gender identity rather than their sex assigned at birth.  949

12  F.3d at 1218–19.  Parents who opposed the policy brought a suit alleging, among

13  other substantive due process rights, the right "to direct the education and

14  upbringing of one's children."  *Id*. at 1217.  In articulating the right at issue, however,

15  the Ninth Circuit framed it as the right to "determine whether and when their children

16  will have to risk being exposed to opposite sex nudity at school" and "whether their

17  children, while at school, will have to risk exposing their own undressed or partially

18  unclothed bodies to members of the opposite sex" in "intimate, vulnerable settings

19  like restrooms, locker rooms and showers."  *Id*. at 1233.  In so doing, the Ninth Circuit

20  expressly held that "the fundamental right to control the upbringing of one's children

21  does not extend so far as Plaintiffs' hypothesize."  *Id*.  Likewise, this Court concludes

22  that the formulation of the right as the ability to "make important decisions in a child's

23  life" is insufficiently narrow.  Rather, Plaintiff would have this court "define the relevant

24  liberty interest at the very highest level of generality," *Khachatryan*, 4 F.4th at 857,

25  which is inconsistent with the Supreme Court's directive in *Glucksberg*.

26          In any event, even if sufficiently articulated, such a broad formulation of the

27  right is not supported by history and tradition.  The Ninth Circuit has endorsed the

28  view that the *Meyer-Pierce* line of cases can be understood to mean that "[w]hile

20

1   parents may have a fundamental right to decide <u>whether</u> to send their child to a

2   public school, they do not have a fundamental right generally to direct <u>how</u> a public

3   school teaches their child." *Fields*, 427 F.3d at 1206 (citing *Blau v. Fort Thomas Pub.*

4   *Sch. Dist.*, 401 F.3d 381, 395–96 (6th Cir. 2005)).  And as in *Parents for Privacy*, Plaintiff

5   here "fail[s] to cite any Supreme Court authority showing that parents' substantive due

6   process rights under the Fourteenth Amendment encompass a right to direct the

7   curriculum, administration, or policies of public schools" generally.  949 F.3d at 1232.

8   Indeed, in *Parents for Privacy* the Ninth Circuit further emphasized that "parents not

9   only lack a constitutional right to direct the curriculum that is taught to their children,

10  but that they also lack constitutionally protected rights to direct school administration

11  more generally." *Id.*

12         In many circumstances, courts have upheld state actions that "intrude upon the

13  liberty interest of parents in controlling the upbringing and education of their

14  children." *Fields,* 427 F.3d at 1204.  Of particular note, whatever fundamental rights

15  parents have to make decisions concerning the care, custody, and control of their

16  children, in the school context that right does not extend to providing consent before

17  children are exposed to opposite-sex nudity at school, *Parents for Privacy*, 949 F.3d at

18  1233, asked about sexual topics in elementary school, *Fields*, 427 F.3d at 1200, given

19  condoms in public school, *Parents United for Better Schools, Inc.,* 148 F.3d at 275; *see*

20  *also Curtis v. School Committee of Falmouth*, 652 N.E.2d 580 (Mass. 1995), provided

21  education in sexuality and health, *Leebaert v. Harrington*, 332 F.3d 134 (2d Cir. 2003),

22  or required to attend a compulsory high school assembly educating them on AIDS

23  and other health concerns in which sexuality is expressly discussed, *Brown v. Hot,*

24  *Sexy, and Safer Prods.*, 68 F.3d 525, 529 (1st Cir. 1995), *abrogated on other grounds*

25  *by DePoutot v. Raffaelly,* 424 F.3d 112, 118 n.4 (2005)  It is simply not the case that a

26  history to make important decisions on behalf of children is "objectively, deeply

27  rooted in this Nation's history and tradition," *Glucksberg*, 521 U.S. at 720–21, given the

28

21

1    myriad ways in which schools educate children in matters concerning gender and
2    sexuality.

3          Additionally, it is important to note that the Policy here does not allow state
4    actors to replace the parent as the "decision-maker" for the child's best interests.
5    Rather, it is the <u>student</u> that makes decisions about their names and pronouns.
6    Although Plaintiff argues that by acquiescing to the students' wishes the school is
7    taking an affirmative step to enforce their identity, the school – at no point – has the
8    ability to direct a student to use a different name or pronouns in how they refer to
9    themselves.  This further distinguishes the instant case from those in which laws were
10   found to have violated parental rights by replacing the parent with a state actor.  *See*
11   *City of Huntington Beach,* 790 F. Supp. 3d at 832 (collecting cases).

12         Accordingly, the Defendant's Policy does not violate a parent's right to make
13   important decisions on behalf of their children, either facially or as applied.

14                 **3.  The Right to Maintain the Integrity of the Family**

15         Plaintiff next argues that the Defendant's Policy violates a right to "family
16   integrity."  According to Plaintiff, by "authorizing the District to socially transition Ms.
17   Regino's children without her consent, the Policy threatens to fundamentally alter the
18   nature of her 'familial bond' with them." (Opp'n at 11.)  In support of her argument
19   that there is a substantive due process right to family integrity, Plaintiff cites to *Marsh*
20   *v. County of San Diego*, 680 F.3d 1148 (9th Cir. 2012), *Kelson v. City of Springfield*,
21   767 F.2d 651 (9th Cir. 1987), *overruled on other grounds by Daniels v. Williams,* 474
22   U.S. 327, 328 (1986), and *Smith v. City of Fontana*, 818 F.2d 1411 (9th Cir. 1987),
23   *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir.
24   1999).  However, to state the facts of these cases is to distinguish them.

25         In *Kelson*, parents brought an action under 42 U.S.C. § 1983 after their son
26   committed suicide while at school.  767 F.2d at 653.  The Ninth Circuit concluded the
27   parents had stated a claim for relief, holding that "a parent has a constitutionally
28   protected liberty interest in the companionship and society of his or her child."  *Id*. at

22

1    655.  In so holding, the Ninth Circuit relied on Supreme Court decisions concluding

2    that an indigent defendant in a paternity proceeding brought by the State has a right

3    to receive blood work to establish parentage, *see Little v. Streater*, 451 U.S. 1 (1981),

4    and that parents have a right to due process during proceedings to terminate their

5    parental rights, *see Lassiter v. Department of Social Services*, 452 U.S. 18 (1981) and

6    *Santosky v. Kramer*, 455 U.S. 745 (1982).  In those decisions, the Supreme Court

7    observed that "a parent's desire for and right to the companionship, care, custody and

8    management of his or her children is an important interest that undeniably warrants

9    deference and, absent a powerful countervailing interest, protection." *Lassiter*, 452

10   U.S. at 27 (cleaned up).

11       The Ninth Circuit in *Kelson* also relied on a Ninth Circuit decision, *Morrison v.*

12   *Jones*, 607 F.2d 1269 (1979), *cert. denied,* 445 U.S. 962 (1980), in which the Court

13   found the parents had alleged the violation of a substantive due process right when

14   "county officials transported the California plaintiff's son, a German alien and ward of

15   the state, to Germany on the grounds that the plaintiff was incapable of providing the

16   special care which her mentally ill son required." *Kelson*, 767 F.2d at 654 (citing

17   *Morrison,* 607 F.2d at 1275).  In so holding, the *Morrison* Court described the nature

18   of the right as "the integrity of the family unit", *Morrison*, 607 F.2d at 1275–76, which

19   appears to be the source of the language that Plaintiff points to in support of finding

20   the violation of a substantive due process right in this case.

21       Two of the other cases cited by Plaintiff, *Smith* and *Lee*, also involve substantial

22   interference in the ability of a parent and child to maintain their familial relationship.

23   In *Smith*, the Court concluded that just as a parent had a substantive due process right

24   to companionship with a parent, so too did a child have such a right.  818 F.2d at 1418

25   ("The companionship and nurturing interests of parent and child in maintaining a tight

26   familial bond are reciprocal, and we see no reason to accord less constitutional value

27   to the child-parent relationship than we accord to the parent-child relationship.")

28   Accordingly, the Court concluded that a child whose father was shot and killed by

1  police in the course of an arrest could maintain a cause of action under the Fourteenth

2  Amendment. *Id.* at 1420.  And in *Lee*, the Ninth Circuit concluded that a parent's

3  fundamental right of companionship and society of a child, coupled with the First

4  Amendment protection of family relationships, were implicated where state officials

5  confused plaintiff's mentally disabled son for another individual and extradited him

6  from California to New York, where he spent two years in prison.  250 F.3d at 676,

7  685–86.

8        Thus, while Plaintiff is correct that there is a substantive due process right to

9  maintain family integrity, that right is implicated where state officials separate a parent

10  and child either through death or for a substantial length of time.  None of the cases

11  cited by Plaintiff come remotely close to extending that right to the names or

12  pronouns used by a school district.  There is no allegation that the Defendant's Policy,

13  either facially or as applied, deprived Plaintiff from the companionship of her child.  At

14  most, the SAC includes an allegation that after A.S. told the counselor that she

15  "wanted to tell her mother about her new male identity," "the counselor was not

16  supportive of this course of action [and] brushed off A.S.'s request and told her that if

17  she wanted to 'come out' to her family, she should notify other family members first."

18  (SAC ¶ 69.)  Even in the light most favorable to the Plaintiff, this allegation does not

19  demonstrate the level of interference by state actors present in the cases on which

20  Plaintiff relies.  While Plaintiff may be able to cherry-pick language from these cases

21  that discuss the right to maintain the integrity of her family or the familial bond, these

22  cases and the Supreme Court decisions on which they ultimately rely are properly

23  understood as protecting against the state physically separating a parent and child or

24  terminating the legal relationship between them.  That right is simply not implicated in

25  this case.

26        Finally, *Marsh v. County of San Diego* is even farther afield.  While the Ninth

27  Circuit in that case relied on the "well-established substantive due process right to

28  family integrity," 680 F.3d at 1154, it narrowly defined the right in that case to be "a

1    parent's right to control the physical remains, memory and images of a deceased child

2    against unwarranted public exploitation by the government." *Id*. If anything, *Marsh*

3    indicates that the right to family integrity should not be used to justify the broad-

4    based right suggested by Plaintiff but rather reinforces the need to describe new

5    fundamental rights in a "most circumscribed manner." *Regino*, 133 F.4th at 960

6    (quoting *Khachatryan*, 4 F.4th at 856).

7        For these reasons, the Court concludes that Defendant's Policy does not violate

8    a parent's right to family integrity.

9                 **4.  The Right to Name Children**

10        Plaintiff briefly argues that she has a constitutional right to name her children.

11    Assuming that such a right exists, however, it is not implicated in this case. There is no

12    argument that, on the face of the policy or as applied, that Defendants have interfered

13    with Plaintiff's right to name her children. Under the Defendant's Policy, while the

14    school may refer to a student by a different name, the student's legal name remains

15    unchanged unless supported by proper documentation. (Policy at 7.)

16        As the cases cited by Plaintiff indicate, while the school may <u>refer</u> to a student

17    by a name other than the student's legal name, that does not implicate a substantive

18    due process right to <u>name</u> a child. For example, in *Sydney v. Pingree*, 564 F. Supp.

19    412 (S.D. Fla. 1982), the court held that parents had a substantive due process to

20    choose a legal name for their child, and that a statute requiring parents to give a child

21    born in wedlock the father's surname was unconstitutional. Indeed, most of the cases

22    cited by Plaintiff involve a parents' right to choose the surname of their children that

23    would appear on the child's birth certificate. *See O'Brien v. Tilson*, 523 F. Supp. 494

24    (E.D. N.C. 1981); *Jech v. Burch*, 466 F. Supp. 714 (D. Haw. 1979). That right is not, of

25    course, implicated in this case.

26        And as Plaintiff impliedly acknowledges, even the right to choose a child's legal

27    name is not without limits. In *Henne v. Wright*, 904 F.2d 1208 (8th Cir. 1990), three

28    parents challenged a Nebraska statute that required a child's surname to be that of a

1   married woman's husband, the surname or maiden surname of the mother, or a

2   hyphenated name of both parents. *Id*. at 1213 n. 5. In assessing the asserted

3   fundamental right at issue, the Court characterized it as the "right to give a child a

4   surname at birth with which the child has no legally established parental connection."

5   *Id*. at 1213. After discussing many of the cases cited throughout Plaintiff's brief, the

6   court held there was no such due process right. As the court noted, "[w]hile *Meyer*

7   and *Pierce* extended constitutional protection to parental decisions relating to child

8   rearing, the parental rights recognized in those cases centered primarily around the

9   training and education of children." *Id*. at 1214. Recognizing a right to choose a

10  surname without a legally established parental connection was an extension of *Meyer*

11  and *Pierce*, the court concluded that such extension "has to be grounded in the

12  tradition and history of this nation." *Id*. Finding no support for the right articulated by

13  the parents, the Court declined to apply strict scrutiny to the Nebraska law, and

14  upheld it on rational basis review. *Id*. at 1215.

15        In short, while there may be a limited fundamental right to choose a child's

16  legal name, Plaintiff has pointed to no authority that a school may not use a different

17  name at that child's request without parental approval. Without seeking to trivialize

18  Plaintiff's understandable interest over her child's professed desire to go by a different

19  gender, the Court observes that Plaintiff does not explain how her legal theory would

20  not apply to the everyday situation where a school official refers to a child by a

21  nickname or other moniker than their legal name.

22        In sum, the Defendant's Policy does not violate a substantive due process right

23  to choose a child's name, and Plaintiff has offered no support for the proposition that

24  any such right should be extended to calling a child by a name other than their legal

25  name.

26              **5. Alternative Right to Notice**

27        Alternatively, Plaintiff alleges that "public schools may not socially transition

28  children upon their request. . .without providing parental notice." (SAC ¶ 4.) The

1    SAC defines "notice" as "(1) being notified or (2) in the alternative, having the ability to

2    obtain truthful information." (*Id.* ¶ 95 n. 5.) According to Plaintiff, the right to notice

3    "flows from the well-established right of parents to (1) direct and control their

4    children's healthcare treatment; (2) make important decisions in the lives of their

5    children, and (3) make private familial decisions regarding their children without

6    undue interference by the state." (*Id.* ¶ 120.) Plaintiff alleges that "[i]f the student

7    does not authorize parental notification, the Policy requires that the transition be

8    concealed from the student's parents, except when disclosure is either "required by

9    law" or "compelling evidence" exists that disclosure is "necessary" for the student's

10   "well-being." (Opp'n at 4.) Moreover, "[t]he prohibition on parental notification has

11   no exception for when parents ask District personnel whether their child is being

12   socially transitioned." (SAC ¶ 53.)

13        In *City of Huntington Beach*, the district court analyzed the fundamental right to

14   information about their children's gender identity in the context of AB 1955, which

15   included provisions that prohibited school personnel from disclosing information

16   related to a pupil's sexual orientation, gender identity or gender expression to

17   another person without the pupil's consent. 790 F. Supp. 3d at 819. The court

18   considered whether parents have a fundamental right to information about their

19   children's gender identity that, like the case here, imposed an affirmative duty on

20   schools to inform parents of their children's gender identity. *Id.* at 834. There, the

21   court reasoned that although courts have recognized a parental right to notice and

22   consent of medical examinations of their children, such a right was not implicated

23   because the plaintiffs failed to allege conduct considered to be medical treatment. *Id*.

24   So is the case here. For the reasons described above, the Court rejects Plaintiff's

25   argument that healthcare treatment is at issue such that a fundamental parental right

26   to be notified follows.

27        However, as the *Huntington Beach* court acknowledged, even where medical

28   treatment is not at issue, "parents may nonetheless have a right to information about

1   their child's gender identity or social transition efforts because such knowledge affects

2   their right to direct the upbringing of their children." *Id.* Nevertheless, the court

3   rejected finding such a fundamental right, in part because "constitutional parental

4   rights are not so broad as to impose an affirmative duty on third parties to inform

5   parents of their children's actions, where those actions are done voluntarily and not

6   initiated by the third party." *Id.* at 835–36.

7       The Court finds this reasoning persuasive. *See id.* at 834–36. Here, Plaintiff is

8   asserting a fundamental right to have schools notify them prior to calling their children

9   by a new name and/or pronouns or requiring others to call their child by a new name

10  and/or pronouns upon request by the child. (SAC ¶ 97.) As previously discussed,

11  parental rights are not without limitation. Especially relevant here are the Ninth

12  Circuit's holdings that parents "lack constitutionally protected rights to direct school

13  administration more generally", *Parents for Privacy,* 949 F.3d at 1231, and that "the

14  right to limit what public schools or other state actors may tell their children regarding

15  sexual matters, is not encompassed within the *Meyer-Pierce* right to control their

16  children's upbringing and education", *Fields,* 427 F.3d at 1207. Moreover, the

17  Supreme Court has stated that the Due Process Clause, "cannot fairly be extended to

18  impose an affirmative obligation on the State to ensure that those interests do not

19  come to harm through other means." *DeShaney v. Winnebago County Dep't of Soc.*

20  *Servs.,* 489 U.S. 189, 195 (1989). Considering these cases together, Plaintiff has not

21  established a fundamental parental right to notice prior to the school using a different

22  name or pronouns to refer to a student nor have they established that such a right is

23  encompassed within a recognized fundamental right.

24      The Court turns next to Plaintiff's conception of the right to notice as "having

25  the ability to obtain truthful information." (SAC ¶ 95 n.5.) The First Circuit's analysis in

26  *Foote* is instructive on this issue. There, the court rejected the argument that a

27  school's nondisclosure protocol, which provided that "parents are not to be informed

28  of their child's transgender status and gender-affirming social transition to a

1    discordant gender identity unless the child, of any age, consents[,]" restricted the

2    parental right to direct their child's upbringing by deceiving them and deprived them

3    of information about the child. *Foote,* 128 F.4th at 352.  On the "deception" issue, the

4    court noted that the plaintiffs' allegations did not plausibly illustrate any affirmative

5    misrepresentation made by the school. *Id.*  Here, the SAC provides general

6    allegations that the Policy would require the school to deceive parents because there

7    is "no exception for the situation where parents directly ask District personnel whether

8    their child is being socially transitioned." (SAC ¶ 53.)  However, the language of the

9    Policy does not plausibly support such an inference of affirmative misrepresentation.

10   Rather the Policy states that ". . .the district shall only disclose the information to others

11   with the student's prior written consent, except when the disclosure is otherwise

12   required by law or when the district has compelling evidence that disclosure is

13   necessary to preserve the student's physical or mental well-being."  Further, there are

14   no allegations that school personnel deceived Plaintiff in response to any direct

15   questioning that would give rise to an as-applied challenge.  Accordingly, Plaintiff has

16   failed to establish a fundamental parental right to notice under either of her provided

17   definitions.

18                    *        *        *        *        *

19       To summarize, each of the theories of substantive due process articulated by

20   Plaintiff either do not find support in this nation's history and traditions, or do not

21   extend to prohibit schools from utilizing a student's preferred name and pronouns.

22   Accordingly, Defendant's policy is subject to rational basis review.

23       **C.  Rational Basis Review**

24       Turning to rational basis review, to satisfy this low bar the provisions must be

25   "rationally related to a legitimate state interest." *Fields,* 427 F.3d 1208.  Here, the state

26   asserts a "legitimate state interest to protect student privacy and create a zone of

27   protection from potential domestic abuse." (Mot. at 27, citing *Sterling v. Borough of*

28   *Minersville*, 232 F.3d 190,193–97 (3d Cir. 2000) and *Mueller v. Auker*, 700 F.3d 1180,

1  1186–87 (9th Cir. 2012)).  As the cited cases illustrate, these are legitimate state

2  interests.  Moreover, the Defendant's Policy is rationally related to them.  Declining to

3  inform a parent about a student's desire to use a different name or pronouns at school

4  by definition protects a student's privacy.  And while the Court has no reason to doubt

5  Plaintiff's assertion that she is supportive of her children (SAC ¶ 2) and there is no

6  indication of potential abuse, that is sadly not true in all families, and the school could

7  reasonably conclude that some students might be placed in danger if their parents

8  were informed they had requested to be called by a different name or pronouns than

9  that which reflected their sex at birth.  As Defendant's Policy survives rational basis

10  review, Plaintiff's claim alleging a violation of substantive due process fails.

11  ## II.      Procedural Due Process Claims

12        Plaintiff also brings as-applied and facial procedural due process claims.  "The

13  requirements of procedural due process apply only to the deprivation of interests

14  encompassed by the Fourteenth Amendment's protection of liberty and property."

15  *K.W. ex rel. D.W. v. Armstrong,* 789 F.3d 962, 972 (9th Cir. 2015) (quoting *Bd. of*

16  *Regents of State Colls. v. Roth,* 408 U.S. 564, 569 (1972)).  To state a viable claim,

17  Plaintiff must first allege that she "has been deprived of a protected interest in

18  property or liberty."  *Regino,* 133 F.4th at 966 (citing *Am. Mfrs.,* 526 U.S. at 59 and U.S.

19  Const. Amend. XIV, § 1).  If she does adequately allege such a deprivation, the next

20  question is "whether the procedure attendant upon that deprivation were

21  constitutionally sufficient."  *Id.* (citing *Am. Civ. Liberties Union of Nev. v. Masto,* 670

22  F.3d 1046, 1058 (9th Cir. 2012).  In its decision on appeal, the Ninth Circuit explained

23  that Plaintiff need not allege a fundamental right to state a claim for procedural due

24  process violations.  *Id.* at 967.  "This is because the procedural component of the Due

25  Process Clause protects more than just fundamental rights."  *Id.* (cleaned up).  Instead,

26  "procedural due process protects all liberty interests that are derived from state law or

27  from the Due Process Clause itself."  *Id.* (cleaned up).

28

1    Plaintiff contends that by socially transitioning her children without consent, the

2 Policy infringes on her constitutionally protected liberty interests and fails to provide

3 her without adequate procedural safeguards.  (SAC ¶ 142.)  She specifically notes the

4 lack of an opportunity to receive notice and an opportunity to be heard by a judicial

5 officer prior to the social transition of her children, a thorough investigation of the

6 relevant facts, and notice after her children are socially transitioned.  (*Id.* ¶ 143.)

7    As an initial matter, Plaintiff has not plausibly alleged the deprivation of a liberty

8 interest.  For the reasons discussed above, there is no identifiable fundamental right at

9 issue here.  However, as the Ninth Circuit explained, the failure to identify a

10 fundamental right does not end the inquiry into whether a liberty interest is at stake.

11 But the SAC does not point to any other state law or Due Process right that might

12 serve as a basis for a protected liberty interest.  Without any such argument, the Court

13 cannot assess whether a procedural due process right exists.  Instead, the procedural

14 due process claims appear to be premised solely on the existence of a fundamental

15 parental right.  *See Mead v. Public Schl District,* 800 F. Supp. 3d. 836, 851 (W.D. Mich.

16 2025) (declining to dismiss a procedural due process claim where the plaintiff had

17 alleged a deprivation of a liberty interest).

18    Moreover, even if an interest had been identified, both parties agree that where

19 a deprivation of a protected interest derives from a legislative act, a person is not

20 entitled to procedural due process beyond the government's compliance with the

21 standard legislative process.  (Mot. Dismiss at 30; Opp'n at 24.)  Here, the Policy was

22 created based on a sample anti-harassment and anti-discrimination policy from the

23 California School Boards Association.  (Mot. Dismiss at 11.)  The CSBA received

24 guidance from the California Department of Education, who issued guidance pursuant

25 to its authority under California Education Code § 33308.5.  (*Id.* at 10.)  Plaintiff does

26 not disagree that the Policy is a legislative act.

27    Rather, Plaintiff contends that because the Policy creates an adjudicatory

28 procedure governing case-by-case determinations that can result in the deprivation of

1  liberty interests, procedural due process entitlements exist when questions of fact are

2  determined. (Opp'n at 24.) Plaintiff considers the Policy to be adjudicative because it

3  requires school personnel to determine (1) whether the child's request is being made

4  for an "improper purpose" and (2) if the child wants the social transition to occur in

5  secret from his or her parents, whether there is "compelling evidence" that parental

6  disclosure is necessary for the child's well-being. (Id.) Defendants argue that this

7  argument fails as well because any actions taken by the Policy are against a student,

8  rather than a parent. (Reply at 14.)

9      The Policy provides students with certain rights as it pertains to the use of the

10  students preferred name and/or pronouns. (See Policy at 5.) As such, any "adverse"

11  action would be taken against the <u>student</u> seeking to have school personnel use their

12  preferred name and pronouns. As Defendants point out, a district may deny a student

13  the first right of being addressed by their preferred name and/or pronouns if the

14  district determines that the request was made for an improper purpose and/or may

15  deny non-disclosure where it appears that (1) disclosure is required by law or (2)

16  compelling evidence establishes disclosure is necessary for the physical or mental

17  well-being of the student. (Id. at 5-6.) Thus, even if a liberty interest had been

18  identified, the Court concludes that it is not an adjudicatory action against the <u>parent</u>.

19  Thus, Plaintiff's facial challenge based on procedural due process fails. Moreover, as

20  the Plaintiff has not alleged any deviation from the Policy, her as applied claim fails as

21  well.

22  **III.    Leave to Amend**

23      Requests for leave to amend should be granted with "extreme

24  liberality." *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir.

25  2020) (quoting *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 972 (9th Cir. 2009) (citation

26  omitted)). When considering whether to grant leave to amend, a district court should

27  consider several factors including undue delay, the movant's bad faith or dilatory

28  motive, repeated failure to cure deficiencies by amendments previously allowed,

1  undue prejudice to the opposing party, and futility. *Id.* (citing *Foman v. Davis*, 371

2  U.S. 178, 182 (1962)).  Of the *Foman* factors, prejudice to the opposing party carries

3  the most weight. *Id.* (citing *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052

4  (9th Cir. 2003)).  Absent prejudice, or a strong showing of any of the

5  remaining *Foman* factors, there exists a presumption under Rule 15(a) in favor of

6  granting leave to amend.  *Eminence Capital, LLC*, 316 F.3d at 1052 (citing *Lowrey v.*

7  *Texas A & M Univ. Sys.*, 117 F.3d 242, 245 (5th Cir. 1997)).  However, "[t]he district

8  court's discretion to deny leave to amend is particularly broad where plaintiff has

9  previously amended the complaint." *Allen v. City of Beverly Hills*, 911 F.2d 367, 373

10  (9th Cir. 1990) (quoting *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160

11  (9th Cir. 1989)).

12        With this in mind, the Court nevertheless finds that further amendment would

13  be futile.  Plaintiff has had the opportunity to submit multiple amended complaints –

14  and still has not provided sufficiently alleged her claims.  Further, Plaintiff has received

15  Ninth Circuit guidance as to what she needed to do to state her causes of actions and

16  has not done so.  Given that many of the conclusions drawn here are largely legal,

17  there is no indication that further factual development would allow Plaintiff's claims to

18  succeed.  Thus, leave to amend is DENIED.

**CONCLUSION**

20        For the reasons discussed above the Court GRANTS Defendant's Motion to

21  Dismiss (ECF No. 88).

22

23        IT IS SO ORDERED.

24  Dated:  __**January 15, 2026**__

25                       Hon. Daniel J. Calabretta

                     UNITED STATES DISTRICT JUDGE

26

27

28