No. 26-475

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

AURORA REGINO,

*Plaintiff-Appellant*

v.

Superintendent GREG BLAKE, in his official capacity,

*Defendant-Appellee.*

_____

On Appeal from the United States District Court for the Eastern District of California, Sacramento

No. 2:23-cv-00032-DJC-DMC Hon. Daniel J. Calabretta

_____

## APPELLANT'S OPENING BRIEF

Joshua W. Dixon
Courtney Corbello
CENTER FOR AMERICAN LIBERTY
2145 14th Avenue, Suite 8
Vero Beach, FL 32960
(703) 687-6212
jdixon@libertycenter.org
ccorbello@libertycenter.org

*Attorneys for Appellant*
AURORA REGINO

# TABLE OF CONTENTS

INTRODUCTION .................................................................................1

JURISDICTIONAL STATEMENT .......................................................3

CONSTITUTIONAL AUTHORITIES ...................................................4

ISSUES PRESENTED .........................................................................4

STATEMENT OF THE CASE ..............................................................5

  I.   FACTUAL BACKGROUND ..........................................................5

    A.  Background on gender dysphoria and related conditions..........................5

      1.   Terminology ..................................................................5

      2.   Treating gender dysphoria and related conditions in minors .................5

      3.   Social transitioning is a form of psychological treatment......................6

      4.   Parental involvement is necessary when minors are socially transitioned ..........................................................8

    B.  The Parental Secrecy Policy .....................................................8

    C.  The District socially transitions A.S. in the fifth grade .............................9

  II.  PROCEDURAL HISTORY ......................................................10

SUMMARY OF THE ARGUMENT ....................................................12

STANDARD OF REVIEW .................................................................15

ARGUMENT .....................................................................................15

  I.   THE COMPLAINT PLAUSIBLY ALLEGES THAT THE POLICY INFRINGES MS. REGINO'S FIRST AMENDMENT RIGHTS ..........................................................16

    A.  The First Amendment protects parents' right to make decisions in their children's lives. .........................................16

    B.  The Policy infringes Ms. Regino's right to consent when the state socially transitions her children at school. ....................................17

    1. Parents have the right to direct their children's healthcare treatment..........................................................17

    2. Parents have the right to make the important decisions in their children's lives..........................................................23

    3. Parents have the right to family integrity..............................29

i

C. Alternatively, the Policy violates Ms. Regino's right to be notified—or at least to be told the truth in response to a question—when her children are socially transitioned at school. .................................................................................. 32

D. The district court erroneously evaluated Ms. Regino's substantive due process claims before her First Amendment claims. ................................................................................ 35

II. THE COMPLAINT PLAUSIBLY ALLEGES THAT THE POLICY INFRINGES MS. REGINO'S FUNDAMENTAL SUBSTANTIVE DUE PROCESS RIGHTS ............................... 36

III. THE POLICY DOES NOT SURVIVE ANY LEVEL OF CONSTITUTIONAL REVIEW THAT MIGHT APPLY .......................... 40

A. The Policy is subject to strict scrutiny, which it fails. ............................. 40

B. The Policy fails rational basis review. ..................................................... 41

1. The Policy irrationally requires the social transition of children for whom a transition is psychologically inappropriate. ............... 42

2. The District has no interest in protecting children from domestic abuse without individualized proof that parents are abusive. ..................................................................................... 44

3. The District has no interest in keeping secrets from parents about what it is doing to their children. ....................................... 46

IV. THE COMPLAINT PLAUSIBLY ALLEGES THAT THE POLICY VIOLATES MS. REGINO'S PROCEDURAL DUE PROCESS RIGHTS ................................................................... 49

CONCLUSION ................................................................................... 51

Certificate of Word Count

Certificate of Related Cases

Addendum—Relevant Constitutional Provisions

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis,*
600 U.S. 570 (2023)........................................................................48

*Alfonso v. Fernandez,*
195 A.D.2d 46 (N.Y. App. Div. 1993) ......................................24, 28

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)........................................................................15

*Bd. of Dir. v. Rotary Club,*
481 U.S. 537 (1987)........................................................................17

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)........................................................................15

*Bellotti v. Baird,*
443 U.S. 622 (1979)........................................................................47

*Brown v. Ent. Merchs. Ass'n,*
564 U.S. 786 (2011)........................................................................39

*Burke v. Cnty. of Alameda,*
586 F.3d 725 (9th Cir. 2009) ..........................................................33

*C.N. v. Ridgewood Bd. of Educ.,*
430 F.3d 159 (3d Cir. 2005)..............................................23, 25, 26

*Daniels v. Williams,*
474 U.S. 327 (1986)........................................................................29

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,*
489 U.S. 189 (1989)........................................................................33

*Doe v. Horne,*
115 F.4th 1083 (9th Cir. 2024) .......................................................19

*Farrington v. Tokushige,*
273 U.S. 284 (1927)........................................................................24

*Fields v. Palmdale Sch. Dist.*,
    427 F.3d 1197 (9th Cir. 2005) ................................................26, 37

*Fields v. Palmdale Sch. Dist. (PSD)*,
    447 F.3d 1187 (9th Cir. 2006) ................................................25, 26

*Foote v. Town of Ludlow,*
    128 F.4th 336 (1st Cir. 2025)........................................22, 34, 35, 37

*Ghana v. Pearce*,
    159 F.3d 1206 (9th Cir. 1998) ...........................................................4

*Gruenke v. Seip*,
    225 F.3d 290 (3d Cir. 2000).........................................21, 25, 33

*Hill v. Nat'l Collegiate Athletic Assn.,*
    7 Cal. 4th 1 (1994) ...........................................................................48

*Hodgers-Durgin v. de la Vina*,
    199 F.3d 1037 (9th Cir. 1999) .........................................................30

*Hodgson v. Minnesota*,
    497 U.S. 417 (1990)..........................................................................39

*In re Crawford*,
    194 F.3d 954 (9th Cir. 1999) ...........................................................48

*Int'l Union of Bricklayers & Allied Craftsman Loc. Union No. 20,
    AFL-CIO v. Martin Jaska, Inc.*,
    752 F.2d 1401 (9th Cir. 1985) .........................................................40

*James v. Rowlands*,
    606 F.3d 646 (9th Cir. 2010) ...........................................................33

*Jech v. Berch*,
    466 F. Supp. 714 (D. Haw. 1979) ...................................................30

*Jones v. Johnson*,
    781 F.2d 769 (9th Cir. 1986) ...........................................................15

*Keates v. Koile*,
    883 F.3d 1228 (9th Cir. 2018) ..............................................16, 29, 31

*Kelson v. City of Springfield*,
    767 F.2d 651 (9th Cir. 1985) ..............................................................29

*Kerry v. Din*,
    576 U.S. 86 (2015)............................................................................50

*Lee v. City of L.A.*,
    250 F.3d 668 (9th Cir. 2001) ..............................................................29

*Lee v. Poudre Sch. Dist. R-1*,
    135 F.4th 924 (10th Cir. 2025) ......................................24, 34, 43, 44

*Legal Aid Servs. of Or. v. Legal Servs. Corp.*,
    608 F.3d 1084 (9th Cir. 2010) ............................................................16

*Mahanoy Area Sch. Dist. v. B.L.*,
    594 U.S. 180 (2021)..........................................................................25

*Mahmoud v. Taylor*,
    606 U.S. 522 (2025)..........................................................................25

*Mangum v. Action Collection Serv., Inc.*,
    575 F.3d 935 (9th Cir. 2009) ..............................................................47

*Mann v. Cnty. of San Diego*,
    907 F.3d 1154 (9th Cir. 2018) ............................................................17

*Mario V. v. Armenta*, No. 18-CV-00041-BLF,
    2021 WL 1907790 (N.D. Cal. May 12, 2021) ...................................28

*Marsh v. Cnty. of San Diego*,
    680 F.3d 1148 (9th Cir. 2012) ....................................................31, 37

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)..........................................................................50

*McCabe v. Sharrett*,
    12 F.3d 1558 (11th Cir. 1994) ...........................................................40

*Mead v. Rockford Pub. Sch. Dist.*,
    800 F. Supp. 3d 836 (W.D. Mich. 2025) ...............................19, 34, 49

*Meyer v. Nebraska*,
262 U.S. 390 (1923)........................................................................24

*Mirabelli v. Bonta*,
No. 25A810,
2026 WL 575049 (U.S. Mar. 2, 2026).........16, 17, 23, 24, 33, 34, 37, 40, 41, 46

*Moore v. City of E. Cleveland*,
431 U.S. 494 (1977)........................................................................29

*Mueller v. Auker*,
576 F.3d 979 (9th Cir. 2009) .......................................33, 41, 50, 51

*Mueller v. Auker*,
700 F.3d 1180 (9th Cir. 2012) .....................................................41

*Mullane v. Cent. Hanover Bank & Tr.*,
339 U.S. 306 (1950)........................................................................50

*Mullins v. Oregon*,
57 F.3d 789 (9th Cir. 1995) ..........................................................49

*Nunez by Nunez v. City of San Diego*,
114 F.3d 935 (9th Cir. 1997) ..................................................24, 40

*O'Brien v. Tilson*,
523 F. Supp. 494 (E.D.N.C. 1981) ...............................................30

*Ortez v. Wash. Cnty.*,
88 F.3d 804 (9th Cir. 1996) ..........................................................15

*OSU Student All. v. Ray*,
699 F.3d 1053 (9th Cir. 2012) .....................................................15

*Parents for Priv. v. Barr*,
949 F.3d 1210 (9th Cir. 2020) .....................................................26

*Parham v. J.R.*,
442 U.S. 584 (1979)..............................................16, 17, 27, 44

*Patel v. Searles*,
305 F.3d 130 (2d Cir. 2002)..........................................................30

*Peralta v. Dillard*,
744 F.3d 1076 (9th Cir. 2014) ........................................................15

*Perry v. Sindermann*,
408 U.S. 593 (1972)........................................................................28

*Pierce v. Soc'y of Sisters*,
268 U.S. 510 (1925)..................................................................23, 25

*Ram v. Rubin*,
118 F.3d 1306 (1997).....................................................................33

*Regino v. Blake*,
2026 WL 121667 (E.D. Cal. Jan. 15, 2026) .................................12

*Regino v. Staley*,
133 F.4th 951 (9th Cir. 2025) ......................................11, 38, 49, 50

*Regino v. Staley*,
2023 WL 4464845 (E.D. Cal. July 11, 2023) ................................11

*Regino v. Staley*,
2023 WL 2432920 (E.D. Cal. Mar. 9, 2023) .................................11

*Reno v. Flores*,
507 U.S. 292 (1993)........................................................................41

*Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*,
No. 522CV04015,
2022 WL 1471372 (D. Kan. May 9, 2022)....................24, 26, 44, 46

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984)........................................................................40

*Roper v. Simmons*,
543 U.S. 551 (2005)........................................................................27

*Rotkiske v. Klemm*,
589 U.S. 8 (2019)............................................................................48

*Scanlon v. Cnty. of L.A.*,
92 F.4th 781 (9th Cir. 2024) .....................................................17, 32

*Singleton v. Wulff*,
    428 U.S. 106 (1976)................................................................40

*Smith v. City of Fontana*,
    818 F.2d 1411 (9th Cir. 1987) .......................................29

*Soldal v. Cook Cnty.*,
    506 U.S. 56 (1992)..................................................................36

*Stanley v. Illinois*,
    405 U.S. 645 (1972)..............................................23, 44, 50, 51

*Sterling v. Borough of Minersville*,
    232 F.3d 190 (3d Cir. 2000)..........................................47

*Sydney v. Pingree*,
    564 F. Supp. 412 (S.D. Fla. 1982) .............................30

*Tennessee v. Cardona*,
    737 F. Supp. 3d 510 (E.D. Ky. June 17, 2024).............24

*Thomas v. Evansville-Vanderburgh Sch. Corp.*,
    258 F. App'x. 50 (7th Cir. 2007) ................................21

*Troxel v. Granville*,
    530 U.S. 57 (2000)................................16, 17, 23, 28, 37

*United States v. Rahimi*,
    602 U.S. 680 (2024)..............................................................38

*United States v. Salerno*,
    481 U.S. 739 (1987)..............................................................49

*Usher v. City of L.A.*,
    828 F.2d 556 (9th Cir. 1987) .......................................15

*Vasquez v. Rackauckas*,
    734 F.3d 1025 (9th Cir. 2013) .....................................49

*Vernonia Sch. Dist. 47J v. Acton*,
    515 U.S. 646 (1995)..............................................................25

*Wakefield v. Thompson*,
　177 F.3d 1160 (9th Cir. 1999) ...............................................................4

*Wallis v. Spencer*,
　202 F.3d 1126 (9th Cir. 2000) ..........................17, 29, 41, 44, 50, 51

*Washington v. Glucksberg*,
　521 U.S. 702 (1997)........................................................35, 36, 38, 39

*Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*,
　680 F. Supp. 3d 1250 (D. Wyo. 2023) ...............................................34

*Wisconsin v. Yoder*,
　406 U.S. 205 (1972)..................................................................26, 37

*Witt v. Dep't of Air Force*,
　527 F.3d 806 (9th Cir. 2008) .............................................................42

**Statutes**

20 U.S.C. § 6318 .....................................................................................48

28 U.S.C. § 1291 .......................................................................................4

28 U.S.C. § 1331 .......................................................................................4

28 U.S.C. § 1343 .......................................................................................4

Cal. Bus. & Prof. Code § 2052...............................................................22

Cal. Educ. Code § 49091.10(b) ..............................................................48

Cal. Penal Code § 11164 .........................................................................45

**Other Authorities**

Blackstone, 1 Commentaries on the Laws of England at 441 (1765) ...................39

Carlton F.W. Larson, *Naming Baby: The Constitutional Dimensions
　of Parental Naming Rights*, 80 Geo. Wash. L. Rev. 159, 178 (2011) ...............30

Kent, 2 Commentaries on American Law at 88 (1827) .........................................39

*Konen v. Caldeira*,
   No. 5:22-cv-05195, Complaint (Dkt. 1-1) (N.D. Cal. June 14, 2022)...............26

S. Ernie Walton, *In Loco Parentis, the First Amendment, and Parental
   Rights-Can They Coexist in Public Schools?*, 55 Tex. Tech L. Rev.
   461, 476 (2023).................................................................................................39

# INTRODUCTION

For over a century, the Supreme Court has held that parents—not the state—have the constitutional right to direct the upbringing of their children. This case asks whether that right includes parents' right to consent—or at least to notice—when a public school socially transitions their child. The answer is yes.

Social transitioning refers to the process in which the outward expression of a person's gender is changed to reflect their gender identity and not their sex. In the school setting, it primarily refers to calling students by a new name and pronouns associated with their asserted transgender identity, like calling a male child by a new female name and she / her pronouns.

The purpose of social transitioning is to alleviate the psychological distress that can be caused by having a mismatched sex and gender identity by affirming that identity. But a social transition is not appropriate for all transgender-identifying children who ask to be transitioned. Most children with a transgender identity lose that identity before adulthood. Children who are socially transitioned, however, are much more likely to keep that identity, which can be psychologically harmful to them and lead to life-long complications. Due to the significant impact of a social transition on children's identity development and life course, parents have the right to consent—or at least to notice—when schools socially transition their children.

The Chico Unified School District's Parental Secrecy Policy infringes that right. Under the Policy, schools must socially transition students upon their request, even over their parents' objection. Everyone at school—administrators, teachers, and other students—must refer to the student by his or her new name and pronouns. And unless the student authorizes parental disclosure, schools generally may not notify the student's parents. Schools must even conceal the transition from the student's parents, even if the parents directly ask the school whether their child is being transitioned. No evidence that parents might harm their child is required.

The District secretly socially transitioned Aurora Regino's oldest daughter under the Policy when she was an eleven-year-old fifth grader. Ms. Regino brings this case to enjoin the Policy because it infringes her parental rights.

The district court dismissed Ms. Regino's case. The district court acknowledged that parents have the right to consent when the state provides their children psychological treatment. But it concluded that the social transitions the District is performing do not constitute treatment because they are not part of a broader treatment plan designed by a mental health professional. That was error. A social transition has the same psychological impact on children regardless of whether a professional is involved. That impact flows from the affirmation of the child's transgender identity, which is inherent in every transition.

2

The district court also believed that parents effectively relinquish their rights over their children when they send them to public school. That, too, was error. Under the *in loco parentis* doctrine, parents delegate only a slice of their parental authority to public schools—*i.e.*, the authority to educate their children. That limited delegation does not give public schools the power to make life-shaping decisions like whether to socially transition children, much less to make that decision in secret from their parents.

The parental right is not absolute, but the Policy does not validly override Ms. Regino's rights. It wrongly assumes that all transgender-identifying children who ask to be socially transitioned should be. It unconstitutionally presumes that parents of children who ask to be transitioned in secret are child abusers. It rests on a nonexistent privacy right. And far from protecting children, it irrationally countenances the harm that parental secrecy can cause children.

Under our Nation's history and traditions, public schools may teach children. They may not replace parents. Because the Policy authorizes the District to usurp Ms. Regino's role as the primary decisionmaker in her children's lives, it is unconstitutional. The Court should REVERSE and REMAND.

## JURISDICTIONAL STATEMENT

This is a § 1983 suit against the Chico Unified School District Superintendent, Greg Blake, in his official capacity for declaratory and injunctive relief. ER-111–

3

141. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. *See Ghana v. Pearce*, 159 F.3d 1206, 1207 (9th Cir. 1998).

On January 15, 2026, the district court dismissed the case, with prejudice, under Rule 12(b)(6) and entered judgment for the District. ER-3–36. On January 16, 2026, Ms. Regino appealed. ER-194–95. This Court has jurisdiction under 28 U.S.C. § 1291. *See Wakefield v. Thompson*, 177 F.3d 1160, 1162 (9th Cir. 1999).

## CONSTITUTIONAL AUTHORITIES

The relevant text of the First Amendment and Due Process Clause of the Fourteenth Amendment are set forth in the Addendum to this brief.

## ISSUES PRESENTED

1.     Does the Complaint plausibly allege that the Policy violates Ms. Regino's First Amendment and substantive due process rights by authorizing the District to socially transition her children without her consent, without notifying her, and while concealing the transition from her?

2.     Does the Complaint plausibly allege that the Policy fails strict scrutiny or any other substantive standard that might apply?

3.     Does the Complaint plausibly allege that the Policy violates Ms. Regino's procedural due process rights by authorizing the District to socially transition her children without providing her notice and an opportunity to be heard at a judicial hearing?

# STATEMENT OF THE CASE

## I. FACTUAL BACKGROUND

The Complaint, supported by the materials attached to it, alleges as follows:

### A. Background on gender dysphoria and related conditions

#### 1. Terminology

"Sex" refers to a person's immutable biological reproductive capabilities. ER-116 (¶19). "Gender" refers to socially constructed and mutable characteristics associated with males and females. *Id.* "Gender identity" refers to a person's felt experience of their gender. ER-116 (¶20). Persons with a "transgender identity" feel their gender identity does not match their sex. ER-116 (¶21). A person's gender identity is not biologically determined, and in minors it can be fluid. ER-117 (¶24).

"Gender dysphoria" is a psychiatric condition in which the mismatch in a person's gender identity and sex causes clinically significant psychological distress. ER-116 (¶22). A person can have a transgender identity without having gender dysphoria, but many transgender-identifying minors have gender dysphoria or sub-threshold psychological distress. ER-116 (¶23). Many also have other psychiatric conditions such as autism, depression, anxiety, and ADHD. *Id.*

#### 2. Treating gender dysphoria and related conditions in minors

There are four general approaches to treating gender dysphoria and related conditions in minors. ER-117 (¶27). Under the "hands off" model, the mental health

professional allows the minor's gender identity to evolve with no ongoing treatment. ER-117 (¶29). Under the "watchful waiting" model, the mental health professional allows the minor's gender identity to evolve while treating other co-morbidities without a focus on gender. ER-117 (¶28). Under the "psychotherapy" model, the mental health professional seeks to identify and address the causes of the minor's distress through psychotherapy. ER-117 (¶30).

The "affirmation" model is starkly different from the others. ER-117 (¶31). It holds that minors' assertion of a transgender identity is decisive and that their psychological condition will improve if that identity is affirmed. *Id.*

### 3. Social transitioning is a form of psychological treatment

Social transitioning is a primary pillar of the affirmation model. ER-117 (¶32). In the school setting, social transitioning primarily refers to calling students by a new name and pronouns associated with their transgender identity. *Id.* The purpose of social transitioning is to alleviate psychological distress by creating a putatively therapeutic environment in which the student's transgender identity is affirmed. ER-117–18 (¶¶32–33).

In minors, a social transition is not merely a harmless exploration of gender identity. ER-118 (¶¶35–36). Instead, it is a significant form of psychological treatment. ER-118 (¶33). Absent intervention, most transgender-identifying minors will lose that identity—or desist—before adulthood. ER-118 (¶35). But socially

transitioning minors makes it significantly more likely that their transgender identity will persist into adulthood due to the psychological impact of inhabiting a new gender. ER-118 (¶36). Inducing persistence through a social transition is psychologically harmful to minors who would otherwise desist. *Id.*[1]

In most cases, minors who are socially transitioned later receive affirmative medical treatment, like puberty blockers and cross-sex hormones. ER-118–19 (¶37). The risks of these treatments are significant, and include bone weakness, cardiovascular harm, decreased sexual response, and sterility. *Id.*

Before minors undergo a social transition, they should receive an individualized evaluation from a mental health professional that considers the likelihood of persistence and the risks of affirmative medical care. ER-118–19 (¶¶37–39). Socially transitioning every minor who asks to undergo a transition is a "one-size-fits-all" approach that ignores the unique issues the minor is facing. ER-119 (¶40). Instead of a social transition, some minors simply need counseling to understand their feelings. ER-119 (¶38). For this reason, it can be permissible for parents to say "no" to a minor's request to be socially transitioned. ER-119 (¶39).

---

[1] Most children who identify as transgender grow up to be same sex attracted. ER-118 (¶ 35); ER-174. This phenomenon has caused some mental health professionals to view childhood social transitions as a new type of "conversion therapy" designed to "trans[] the gay away." ER-173–175.

4. <u>Parental involvement is necessary when minors are socially transitioned</u>

When schools socially transition minors without parental consent, they are making a significant decision about the minor's psychological treatment, identity formation, and life trajectory that parents should be making. ER-119–20 (¶¶42–44). Socially transitioning minors without parental consent also drives a wedge in the family, causing minors to view their parents as the "enemy." ER-119–20 (¶43).

Socially transitioning minors without parental notice compounds the harm. ER-120 (¶45). Keeping the transition secret from parents precludes parents from getting their children the professional help they may need. *Id.* It is also inherently psychologically unhealthy for children secretly to inhabit different gender identities at school and at home. ER-120 (¶45).

No professional association endorses school-based social transitions without parental consent, much less without parental notice. ER-120 (¶46).

**B.    The Parental Secrecy Policy**

The Parental Secrecy Policy applies at all the District's schools. ER-120 (¶48); ER-176–82. Under the Policy, if students—who could be as young as four years old—inform District personnel that they want to go by a new name and pronouns associated with their transgender identity, the school "shall accept" the request, unless there is reason to believe it is for an "improper purpose." ER-120–21 (¶49); ER-181. Upon a proper request, everyone at school—administrators, teachers,

8

and students—must call the student by the student's new name and pronouns. ER-120–21 (¶49); ER-180–82. Failure to comply is sanctionable. ER-180–81.

The District is not required to obtain parental consent, nor do parents have the right to override the District's decision to socially transition their child. ER-121 (¶50); ER-180–81. And unless the student affirmatively authorizes parental disclosure, the Policy prohibits District personnel from informing the student's parents, unless the District has "compelling evidence" that disclosure is "necessary" for the student's "well-being." ER-121 (¶51); ER-180.[2] District personnel must also conceal the transition from parents even in response to a direct question about whether their child is being transitioned. ER-121 (¶53); ER-128 (¶87); ER-180–81.

### C.    The District socially transitions A.S. in the fifth grade

During the 2021–22 school year, Ms. Regino's oldest daughter, A.S., was in the fifth grade at a District school. ER-115 (¶14); ER-122 (¶55). Early in the school year, A.S. began feeling depressed, anxious, and emotionally confused due to changes in her life. ER-122 (¶56).

In early 2022, A.S. told a school counselor that she felt "like a boy." ER-123 (¶63). The counselor asked A.S. whether she wanted to go by a boy's name and

---

[2] The Policy also allows parental disclosure when "required by law." ER-180. But Ms. Regino is not aware of any law—other than the Constitution—that would "require[]" parental disclosure, nor has the District identified any such law. Thus, as interpreted by the District, the "required by law" language is a legal nullity.

pronouns. *Id.* A.S. said yes. *Id.* The counselor asked A.S. if she wanted her mother to know. *Id.* Because A.S. thought her mother would be "mad" at her for transitioning, she said no. *Id.* Without further discussion, the counselor and A.S.'s teacher arranged for others at school to begin calling her by her boy's name and male pronouns. ER-124 (¶65). The District did not tell Ms. Regino what it was doing. *Id.*

In April 2022, Ms. Regino learned about the transition. ER-125 (¶72). Ms. Regino is a fit parent, and she told her daughter she would support her no matter what. ER-115 (¶15), ER-125 (¶74). Had the District consulted Ms. Regino, however, she would not have consented to the transition without first seeking guidance from a mental health professional. ER-125–26 (¶75).

Over the spring of 2022, A.S. questioned whether the transition was right for her, but she felt pressure to continue going by her new name and pronouns because the school viewed her as a boy. ER-126 (¶76). During that time, her psychological condition worsened, and she required additional counseling over the summer. *Id.*

At the beginning of the 2022–23 school year, A.S. stopped going by a boy's name and pronouns. ER-126 (¶77). Today, both A.S. and her younger sister, C.S., are subject to the Policy. ER-126–29 (¶¶78–92).

## II. PROCEDURAL HISTORY

On January 6, 2023, Ms. Regino filed this case. ER-201 (Dkt. 1). That same day, she filed a motion for preliminary injunction. ER-201 (Dkt. 2). On March 9,

2023, the district court denied the motion. ER-204 (Dkt. 37); *see also Regino v. Staley*, 2023 WL 2432920 (E.D. Cal. Mar. 9, 2023).

On April 10, 2023, Ms. Regino filed a First Amended Complaint, which the District moved to dismiss under Rule 12(b)(6). ER-205–06 (Dkt. 42, 50). On July 11, 2023, the district court granted the motion, with prejudice, and entered judgment for the District. ER-206–07 (Dkt. 57, 58); *see also Regino v. Staley*, 2023 WL 4464845 (E.D. Cal. July 11, 2023).

Ms. Regino appealed. ER-207 (Dkt. 59). On April 4, 2025, this Court vacated the judgment, concluding that the district court applied the wrong legal standard. App. Dkt. (No. 23-16031) 118; *see also Regino v. Staley*, 133 F.4th 951 (9th Cir. 2025). Rather than decide whether Ms. Regino stated plausible claims, the Court remanded for the district court to apply the correct standard in the first instance.

On April 18, 2025, both parties filed a motion for panel / en banc rehearing, asking the Court to decide whether the Complaint stated plausible claims under the correct standard. App. Dkt. 124, 125. On May 14, 2025, the Court denied those motions, App. Dkt. 126, and remanded the case to the district court.

On June 4, 2025, Ms. Regino filed her Second Amended Complaint (the "Complaint"). ER-111–82. On June 27, 2025, the District moved to dismiss under Rule 12(b)(6). ER-81–110. On September 4, 2025, the district court held oral argument on the motion. ER-37–80. On January 15, 2026, the district court granted

11

the motion, with prejudice, and entered judgment for the District. ER-3–36; *see also Regino v. Blake*, 2026 WL 121667 (E.D. Cal. Jan. 15, 2026).

On January 16, 2026, Ms. Regino appealed. ER-194–95.

## SUMMARY OF THE ARGUMENT

Parents—not the state—have the constitutional right to direct the upbringing of their children. Under our Nation's history and traditions, this right includes the right of parents to consent—or at least to notice—when the state socially transitions their children at school. And while the parental right is not absolute, the Policy does not validly override Ms. Regino's rights. Even if it did, the Policy is procedurally defective.

**First Amendment**. The Complaint plausibly alleges that the Policy violates Ms. Regino's First Amendment rights in three ways.

First, the Policy violates Ms. Regino's right to consent when the state provides healthcare treatment to her children. A school-based social transition constitutes psychological treatment in children. Contrary to the district court's conclusion, whether the transition is part of a broader treatment plan devised by a mental health professional is irrelevant—social transitioning has the same impact on children regardless of whether a professional is involved. It is thus treatment either way.

Second, even if social transitioning were not psychological treatment, the Policy violates Ms. Regino's right to consent when the state makes important

decisions in her children's lives. Whether to socially transition a child is a significant decision that impacts the child's identity development and can have life-long consequences. And parents do not lose their rights simply because they send their children to public school. Under the *in loco parentis* doctrine, parents impliedly delegate to public schools only the authority necessary to educate their children, not to make significant decisions in their lives. Public schools may teach children; they may not replace parents.

Third, even if social transitioning were not psychological treatment, the Policy violates Ms. Regino's right to family integrity. Under the Policy, the District is making decisions that affect her children's identity development and life course, alter her relationships with her children, and countermand her wishes regarding what she wants her children to be called.

Even if Ms. Regino did not have the right to consent, she has the right to be notified. While the Constitution does not require the state to help parents raise their children, Ms. Regino does not seek the District's help. Instead, the District must inform her about its own acts that significantly impact her children's lives.

And even if Ms. Regino did not have the right to be notified, at the very least, she has the right to receive truthful information in response to a direct question. The Policy fails even this modest command.

**Substantive Due Process**. For the same reasons, the Complaint plausibly alleges that the Policy violates Ms. Regino's fundamental substantive due process rights. Contrary to the district court's conclusion, Ms. Regino is not required to satisfy *Glucksberg* because she does not ask the Court to recognize a new right. Rather, she asks the Court to apply the preexisting parental right to a new context, and the right she asserts is encompassed within that preexisting right.

Even if *Glucksberg* applied, the Complaint satisfies it. Ms. Regino has carefully described the right at issue, which is deeply rooted in our Nation's history and traditions and implicit in the concept of ordered liberty.

**Substantive Review**. While parents' rights are not absolute, the state may only override them if it complies with strict scrutiny, which the Policy fails. Below, the District did not dispute these points, so it has waived them.

The Policy also fails rational basis review. It wrongly assumes that social transitioning is appropriate for every child who asks to undergo a transition. It impermissibly presumes that parents will abuse their children without individualized evidence that parents are abusive. It rests on a nonexistent privacy right. And far from protecting children, it irrationally countenances the harm that parental secrecy can cause children.

**Procedural Due Process**. Because the Policy infringes Ms. Regino's First Amendment and fundamental substantive due process rights, it triggers procedural

14

due process. Yet the Policy does not provide her notice or an opportunity to be heard at a judicial hearing before her children are socially transitioned. The Policy thus violates her procedural rights as well.

For these reasons, the Court should REVERSE and REMAND.

## STANDARD OF REVIEW

This Court reviews Rule 12(b)(6) dismissals *de novo*. *Ortez v. Wash. Cnty.*, 88 F.3d 804, 807 (9th Cir. 1996).

## ARGUMENT

To survive a Rule 12(b)(6) motion, the complaint need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint satisfies this standard when the allegations give rise to a "plausible inference" of a legal violation. *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009); *OSU Student All. v. Ray*, 699 F.3d 1053, 1076 (9th Cir. 2012).

When evaluating a Rule 12(b)(6) motion, courts "must presume all factual allegations [of the complaint are] true and draw all reasonable inferences in favor of the" plaintiff. *Usher v. City of L.A.*, 828 F.2d 556, 561 (9th Cir. 1987). This requirement applies to all allegations, including those of a scientific or technical nature. *Jones v. Johnson*, 781 F.2d 769, 772 n.1 (9th Cir. 1986) (presuming truth of allegations regarding medical causation), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014).

Here, the Complaint plausibly alleges that the Policy violates Ms. Regino's parental rights under the First Amendment, substantive Due Process Clause, and procedural Due Process Clause.[3]

## I. THE COMPLAINT PLAUSIBLY ALLEGES THAT THE POLICY INFRINGES MS. REGINO'S FIRST AMENDMENT RIGHTS

The Complaint plausibly alleges that the Policy infringes Ms. Regino's parental rights under the First Amendment.

### A. The First Amendment protects parents' right to make decisions in their children's lives.

Parents have the fundamental right to "make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality op.); *Keates v. Koile*, 883 F.3d 1228, 1235–36 (9th Cir. 2018); *see also Mirabelli v. Bonta*, No. 25A810, 2026 WL 575049, at *3 (U.S. Mar. 2, 2026). This right rests on two common-law presumptions: (1) that "parents possess what a child lacks in maturity, experience, and capacity for judgment"; and (2) that the "natural bonds of affection lead parents to act in the best interests of their children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979).

---

[3] The Complaint alleges both facial and as-applied claims. ER-129–39 (¶¶ 93–145). The legal standard for evaluating both types of claims is the same. *See Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010). Any distinction between Ms. Regino's facial and as-applied claims is therefore irrelevant for purposes of this appeal.

"Although the Supreme Court has largely grounded [the parental] right in the Due Process Clause, this Court has also found it to be protected by the First . . . Amendment." *Scanlon v. Cnty. of L.A.*, 92 F.4th 781, 797–98 (9th Cir. 2024) (cleaned up); *see also Bd. of Dir. v. Rotary Club*, 481 U.S. 537, 545 (1987) (locating right to family association in First Amendment); *Troxel*, 530 U.S. at 95 (Kennedy, J., dissenting on other grounds) (noting that if early parental rights cases "had . . . been decided in recent times, [they] may well have been grounded upon First Amendment principles protecting freedom of speech [and] belief").

## B. The Policy infringes Ms. Regino's right to consent when the state socially transitions her children at school.

The Complaint plausibly alleges that the Policy infringes Ms. Regino's right to consent when the state socially transitions her children at school in three ways.

### 1. Parents have the right to direct their children's healthcare treatment.

The Complaint plausibly alleges that the Policy violates Ms. Regino's right to consent when the state provides healthcare treatment to her children. Parents have the right to make the important "decisions" in their children's lives, *Troxel*, 530 U.S. at 66, which includes "decisions regarding their children's mental health." *Mirabelli*, 2026 WL 575049, at *3 (citing *Parham*, 442 U.S. at 602); *see also Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000); *Mann v. Cnty. of San Diego*, 907 F.3d 1154, 1161 (9th Cir. 2018) (similar).

The Complaint plausibly alleges that socially transitioning a child at school constitutes psychological treatment:

- Social transitioning is a "primary pillar" of the affirmation model of treatment. ER-117–18 (¶32).

- A child who asks to undergo a social transition should be seen by a mental health professional due to the close correlation between such a request and gender-related psychological conditions. ER-119 (¶39).

- A child who asks to undergo a social transition is experiencing psychological distress arising from others' use of the child's birth name and sex-associated pronouns. ER-118 (¶34).

- The purpose of social transitioning is to alleviate that distress, even if the child does not have a diagnosable psychological condition. ER-117–18 (¶32).

- When a child is socially transitioned at school, the school is creating a putatively therapeutic environment in which the child's transgender identity is affirmed. *Id.*

- Like other forms of psychological treatment, social transitioning is not without risks. A social transition can make it more likely that the child's transgender identity will persist when the child would otherwise desist. ER-118 (¶¶35–36).

- In most cases, children who are socially transitioned receive future affirmational medical care, like puberty blockers and cross-sex hormones. ER-118–19 (¶37). For this reason, the risks associated with this medical care must be considered before a child is socially transitioned. *Id.* These risks are significant and include bone weakness, cardiovascular harm, and sterility. *Id.*

These allegations plausibly establish that school-based social transitions constitute psychological treatment. *See Mirabelli*, 2026 WL 575049, at *3. Indeed, this Court

has already recognized that social transitioning constitutes psychological "treatment" in the school setting. *Doe v. Horne*, 115 F.4th 1083, 1107 n.13 (9th Cir. 2024); *see also Mead v. Rockford Pub. Sch. Dist.*, 800 F. Supp. 3d 836, 850 (W.D. Mich. 2025) (holding that school-based social transitions violate parents' right to direct their children's healthcare treatment).

The district court acknowledged that social transitioning "can be" psychological treatment. ER-5. But it concluded that the social transitions the District performs under the Policy are not treatment because those transitions are not "implemented as part of a broader treatment plan by [a] licensed medical professional." *Id.*

That conclusion ignores the Complaint's well-pled allegations and supporting materials. As the Complaint alleges, whether a school-based social transition is part of a treatment plan designed by a professional is immaterial—the impact on the child is the same either way. ER-117–19 (¶¶32–40). Indeed, the district court's conclusion is directly contrary to the *Cass Review*—an evidence review of the affirmational model of care commissioned by the United Kingdom's National Health Service—which states:

> Social transitioning may not be thought of as an intervention or treatment because it is not something that happens in the healthcare setting and it is within the agency of a [minor] to do it for themselves. However, . . . it is important to view it as an active intervention because it may have significant effects on [minors] in terms of their psychological functioning and longer-term outcomes.

ER-153 (¶12.5); *see also id.* (¶12.6) (noting that, regarding social transitioning, "[t]he importance of what happens in school cannot be underestimated"). The United States Department of Health and Human Services' evidence review reached the same conclusion. ER-143 (¶5.2). And Dr. Ken Zucker—a leading expert on childhood gender dysphoria—has explained that social transitioning is a "psychosocial treatment that will increase the odds of long-term persistence" even if "initiated . . . without formal clinical consultation." ER-168.

The district court also believed that the District's social transitions are not psychological treatment because the District does not require children to have a diagnosed psychological condition before transitioning them. ER-16. But the fact a child requests a social transition means that the child is experiencing psychological distress, and socially transitioning such a child is no less psychological treatment than if the child has full-blown gender dysphoria. ER-118 (¶34). The district court's conclusion otherwise is like saying a teacher who gives a child Adderall is not providing treatment unless the child is under a doctor's care for ADHD. That's plainly wrong. Adderall affects children physiologically even if they are not under a doctor's care for ADHD, just as social transitioning affects children psychologically even if they are not being treated by a professional for gender dysphoria.

The district court worried that recognizing the District's social transitions as psychological treatment would mean there was no limiting principle to keep such a

holding from applying to school-based counseling or conversations between teachers and students about how to cope with being bullied. ER-19. But routine discussions with counselors and teachers that are uniformly beneficial to all students and do not have serious risks do not implicate the parental right. *See, e.g.*, *Thomas v. Evansville-Vanderburgh Sch. Corp.*, 258 F. App'x. 50, 54 (7th Cir. 2007) (holding that routine conversations between child and school counselor did not violate parental right).

To be sure, if a school counselor conducted a sustained course of hypnotherapy on a student, for example, that might violate the parental right. *See, e.g.*, *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000) (noting that "school-sponsored counseling" that "overstep[s] the boundaries of school authority" can violate parental right). But the line between routine, uniformly beneficial discussions with teachers and counselors, on the one hand, and significant interventions that are not appropriate for all children and that can have serious risks, on the other hand, is easy to apply. A school nurse may put a Band-Aid on a child's paper cut without parental consent, for example, but he may not give the child medication or stitches. The District's policies already reflect this bright line. ER-183–93.

The district court was also concerned that recognizing the District's social transitions as psychological treatment would mean that people who called students by their new names and pronouns would be engaged in the "practice [of medicine]"

under California law. ER-19 (citing Cal. Bus. & Prof. Code § 2052). Not so. Ms. Regino's theory is that the District is providing treatment by mandating the creation of a school environment in which the child's transgender identity is affirmed. Much like a group therapy session, it is the creation of this environment that constitutes treatment, not the participation by any one individual. Moreover, whether conduct constitutes treatment for purposes of federal constitutional law has no bearing on the meaning of the "practice [of medicine]" under California statutory law. If this Court concludes that the Complaint plausibly alleges that a school-based transition is psychological treatment for federal constitutional purposes—as it should—California is free to conclude the opposite under its own laws regulating the practice of medicine.

Finally, the district court's reliance on *Foote v. Town of Ludlow* was misplaced. ER-17. While the court in *Foote* concluded that the complaint there did not plausibly allege social transitioning was psychological treatment, that complaint merely "label[ed]" social transitioning as treatment with "conclusory allegations" that were not entitled to a presumption of truth. 128 F.4th 336, 349 (1st Cir. 2025). The court emphasized that its conclusion was limited "[s]olely [to the facts] as pled" on the bare-bones complaint before it, *id.* at 350, and it left open whether a school-based transition might be "treatment" on more extensive allegations, *id.* at 350 n.18.

Here, the Complaint's exhaustive allegations and supporting materials plausibly allege that the District's social transitions constitute psychological treatment.

At this stage in the proceedings, the Court need not decide whether social transitioning constitutes psychological treatment. Rather, the question is whether the Complaint plausibly alleges it is. The Complaint satisfies this standard.

2. <u>Parents have the right to make the important decisions in their children's lives.</u>

Even if social transitioning were not psychological treatment, the Complaint plausibly alleges that the decision to socially transition a child is sufficiently significant that it falls within the parental right. *See Mirabelli*, 2026 WL 575049, at *3 (holding that policies that "facilitate a degree of gender transitioning during school hours" likely violate the parental right); *see also C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005) (holding that parents have the right to make those decisions that go to the "heart of parental decision-making"). Beyond healthcare treatment, courts have held that the parental right protects parents' decisions regarding:

- With whom children associate, *Troxel*, 530 U.S. 57;

- Who has custody over children, *Stanley v. Illinois*, 405 U.S. 645, 652 (1972);

- Whether to send children to private school, *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925);

- The subjects children can be taught at school, *Meyer v. Nebraska*, 262 U.S. 390 (1923) ; *Farrington v. Tokushige*, 273 U.S. 284, 298 (1927);

- Whether children can go out at night, *Nunez v. City of San Diego*, 114 F.3d 935, 952 (9th Cir. 1997); and

- Whether children have access to birth control at school, *Alfonso v. Fernandez*, 195 A.D.2d 46, 60 (N.Y. App. Div. 1993).

The decision to socially transition a child falls squarely within the logic of this precedent. That decision impacts the child's identity development and is likely to have reverberations throughout the child's life course. ER-117–119 (¶¶ 32–40). It changes the gender by which the child is known to the outside world, it results in the odds of desistence dropping dramatically, and it is likely to lead to medicalization and the consequent risks. *Id.* Due to the magnitude of this decision in children's lives, the right to make it belongs to parents. *See Mirabelli*, 2026 WL 575049, at *3; *see also Tennessee v. Cardona*, 737 F. Supp. 3d 510, 556 (E.D. Ky. June 17, 2024) (holding that "parents retain a constitutionally protected right to guide their own children on matters of identity"); *Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*, No. 522CV04015, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022) (concluding that parents "have [the right to] have a say in what [their] minor child[ren are] called" by their school); *Lee v. Poudre Sch. Dist. R-1*, 135 F.4th 924, 937 (10th Cir. 2025) (McHugh, J., concurring) (noting that a school "may not seize control of a child's upbringing based on a simple disagreement about what is in the child's best interests" (cleaned up)).

The district court concluded that parents who send their children to public school forfeit the right to consent to their children's social transition because public schools have broad discretion over children. ER-21–24. According to the district court, parental rights essentially evaporate at the schoolhouse door. *Id.*

That is wrong. Parents' rights are not "shed at the schoolhouse gate." *Mahmoud v. Taylor*, 606 U.S. 522, 545 (2025) (cleaned up); *see also Fields v. Palmdale Sch. Dist. (PSD)*, 447 F.3d 1187, 1190–91 (9th Cir. 2006) ("*Fields II*") (deleting language from opinion stating otherwise); *C.N.*, 430 F.3d at 185 n.26; *Gruenke*, 225 F.3d at 307. Children who attend public school do not become "mere creature[s] of the state." *Pierce*, 268 U.S. at 535.

Instead, the scope of public schools' authority over children is determined by the *in loco parentis* doctrine. *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 189 (2021); *see also Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995). Under that doctrine, public schools have "inferred parental consent" that gives them "a degree of authority [over children] commensurate with . . . their . . . educational mission." *Mahanoy*, 594 U.S. at 200 (Alito, J., concurring). In other words, public schools have the authority to educate children. *Id.* And under that authority, public schools generally may decide (1) what students are taught and (2) how students are taught, including things like "the hours of the school day, school discipline, [and] the timing and content of examinations." *Fields v. Palmdale Sch. Dist.*, 427 F.3d

1197, 1200, 1206 (9th Cir. 2005) ("*Fields I*"), *opinion amended on denial of reh'g by Fields II*, 447 F.3d 1187 (9th Cir. 2006); *see also Parents for Priv. v. Barr*, 949 F.3d 1210, 1232–33 (9th Cir. 2020) (similar).

Public schools' authority to educate children under the *in loco parentis* doctrine does not include the power to socially transition them. Socially transitioning students is not educational. It is a significant decision in a child's life, and it thus falls outside the scope of public schools' inferred delegation of parental power. *See C.N.*, 430 F.3d at 183 (noting that "'*in loco parentis*' does not mean 'displace parents'"). Indeed, childhood social transitions did not occur in meaningful numbers in the United States until the last two decades. ER-145–48. And school-based social transitions without parental consent are even more recent. The first decision by a federal court involving a school policy that authorized social transitions without parental consent involved the 2020–21 school year. *Ricard*, 2022 WL 1471372, at *8; *see also Konen v. Caldeira*, No. 5:22-cv-05195, Complaint (Dkt. 1-1) (N.D. Cal. June 14, 2022) (2018–19 school year). There is no basis in our Nation's history and traditions to conclude that public schools have the implied authority to socially transition children. *See Wisconsin v. Yoder*, 406 U.S. 205, 226–27 (1972) (concluding that the "relatively recent development" of "compulsory education beyond the eighth grade" confirmed Amish parents' right to direct their children's religious upbringing).

The district court also believed that the Policy was permissible because "it is the student"—and not the District—that initiates the request for a social transition. ER-25. But while children *request* to undergo a transition, the District *effectuates* that request by requiring everyone in the school environment to refer to the child by a new name and pronouns. ER-180. That decision is the District's, not the child's.

Moreover, the district court's reasoning assumes that children have the maturity to decide for themselves whether a social transition is appropriate for them. That assumption not only ignores the Complaint's contrary allegations, ER-120 (¶44), but it also disregards Supreme Court precedent. Parents have the right to make the important decisions in their children's lives precisely because children lack the "maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham*, 442 U.S. at 602 (emphasis added); *see also Roper v. Simmons*, 543 U.S. 551, 569 (2005) (noting that children are "vulnerable . . . to negative influences and outside pressures" and often make "impetuous and ill-considered . . . decisions"). Assigning primary decision-making authority to parents protects children not only from unwarranted state interference; it also protects them from their own immature choices. *See Parham*, 442 U.S. at 603. That is why no professional association recommends a school-based social transition without parental consent. ER-120 (¶46).

For this reason, it does not matter that children initiate the request to undergo a social transition under the Policy. Parents have the right to make this decision, and just as the state may not directly interfere with this right, it may not facilitate allowing children to assume the primary role in their own upbringing. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (noting that the state may not "produce a result which it could not command directly" (cleaned up)); *see also Alfonso*, 195 A.D.2d at 56–57 (holding that in-school condom distribution program violated parental rights—even though students voluntarily participated in it—because it lacked parental opt-out and notification). Under the district court's logic, it would be permissible for a school to provide Zoloft to a student because she wanted to stop her sad thoughts. It would be permissible for a school to allow a student's estranged grandmother to have lunch with her over her parents' objections because she wanted to see her Nana. And it would be permissible for a school to retain custody of a child who ran away from home because she did not want to eat her peas. Of course, none of this is the law. *See Mario V. v. Armenta*, No. 18-CV-00041-BLF, 2021 WL 1907790 (N.D. Cal. May 12, 2021) (holding that public school teacher violated parents' rights by conducting blood-sugar tests on students without parental consent even though students were willing participants); *Troxel*, 530 U.S. at 66–68 (holding that parents have right to determine child visitation without mentioning wishes of

28

child); *Wallis*, 202 F.3d at 1138 (holding that the state may maintain custody of child without judicial authorization only where the child is in "imminent danger").

In short, the district court's logic puts children—not their parents—at the apex of the family and enables children—not their parents—to make life-altering decisions before they are mature enough to do so. That is legal error.

### 3. Parents have the right to family integrity.

Even if social transitioning were not psychological treatment, the Complaint plausibly alleges that the Policy infringes Ms. Regino's right to the "integrity of [her] family." *Kelson v. City of Springfield*, 767 F.2d 651, 654 (9th Cir. 1985) (cleaned up), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986); *see also Moore v. City of E. Cleveland*, 431 U.S. 494, 499 (1977) (noting that "freedom of personal choice in matters of . . . family life" is constitutionally protected) (plurality op.). Parents have the right to be free from "unwarranted state interference" in their relationships with their children. *Keates*, 883 F.3d at 1236 (quotations omitted); *Lee v. City of L.A.*, 250 F.3d 668, 686 (9th Cir. 2001).

The Constitution protects against a broad array of government actions that interfere with family relationships, including actions that: (1) unduly alter parents' "familial bond" with their children, *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999); (2) create "mistrust among the members of [the] family,"

29

*Patel v. Searles*, 305 F.3d 130, 140 (2d Cir. 2002); and (3) interfere with parents' right to name their children, *see Sydney v. Pingree*, 564 F. Supp. 412, 413 (S.D. Fla. 1982); *O'Brien v. Tilson*, 523 F. Supp. 494, 496 (E.D.N.C. 1981); *Jech v. Berch*, 466 F. Supp. 714, 718–19 (D. Haw. 1979); *see also* Carlton F.W. Larson, *Naming Baby: The Constitutional Dimensions of Parental Naming Rights*, 80 Geo. Wash. L. Rev. 159, 178 (2011) (observing that there are "no circumstances in American history, other than slavery, in which [the right to name children] has been exercised by anyone other than parents").

The Policy constitutes an unwarranted interference in Ms. Regino's relationships with her children. From the clothing and toys parents give their children, to the friends parents allow their children to have, to the sports parents allow their children to play, the parent-child relationship is deeply shaped by the child's gender identity. Socially transitioning Ms. Regino's children without her consent threatens to fundamentally alter the nature of her bond with her children. In addition, because the Policy authorizes Ms. Regino's children to decide for themselves whether to undergo a transition, it treats her as the "enemy," impermissibly driving a wedge into the parent-child relationship that lies at the heart of the family. ER-119–20 (¶43). And by requiring everyone at school to refer to Ms. Regino's children by a name other than the ones she gave them, the Policy unjustifiably countermands her wishes about the way her children are to be known.

The district court concluded that the right to family integrity applies only when the state "physically separat[es]" parents from their children or "terminat[es]" the "legal relationship" between them. ER-27. But that conclusion is foreclosed by this Court's precedent, *see, e.g.*, *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1152 (9th Cir. 2012) (holding that parents have the right to control dissemination of photographs of their deceased children's bodily remains), and it is inconsistent with the weight of authority, as set forth above. Instead, the Constitution prohibits *any* "unwarranted state interference" with the family. *Keates*, 883 F.3d at 1236 (quotations omitted).

The district court was concerned that Ms. Regino's theory would prevent schools from referring to students by their chosen nickname. ER-29. But calling a child "Jimmy" instead of "James" at his request does not impact the child's identity development and future life course, alter the nature of the parent-child relationship, or drive a wedge in the family. Moreover, when a child adopts a nickname, schools do not enforce its use. Instead, administrators, teachers, and other students remain free to use the child's given name. When the District socially transitions a child under the Policy, by contrast, it requires everyone to use the child's chosen name. ER-180. In doing so, the Policy impermissibly interferes with parental authority over how they want their children to be addressed.

31

\*   \*   \*

To be clear, Ms. Regino does not assert that the District's constitutional duties are triggered if District personnel merely have a suspicion—or even direct knowledge—that her children are asserting a transgender identity at school. Thus, this case is not about "outing" children to their parents. Rather, Ms. Regino asserts that the District may not undertake the act of socially transitioning her children—by referring to them by a new name and pronouns associated with their asserted transgender identity and requiring others at school to do the same—without obtaining her consent. By undertaking this act without parental consent, the District violates the Constitution.

### C.   Alternatively, the Policy violates Ms. Regino's right to be notified— or at least to be told the truth in response to a question—when her children are socially transitioned at school.

Even if Ms. Regino did not have the right to consent when her children are socially transitioned at school, she has the right to be notified. As this Court has held, the parental right "has both substantive and procedural components, . . . guaranteeing parents fundamentally fair procedures before the state intervenes into ongoing family affairs." *Scanlon*, 92 F.4th at 798 (cleaned up). And when the state makes a significant decision in children's lives, it must at least notify parents. *See, e.g.*, *Mueller v. Auker*, 576 F.3d 979, 995 (9th Cir. 2009) ("*Mueller I*") (noting that the state must notify parents when it provides emergency healthcare treatment to child);

32

*Ram v. Rubin*, 118 F.3d 1306, 1310 (1997) (noting that the state must notify custodial parents when it takes custody of child); *see also James v. Rowlands*, 606 F.3d 646, 654–55 (9th Cir. 2010) (holding that the state must notify non-custodial parent when it places child in new home); *Burke v. Cnty. of Alameda*, 586 F.3d 725, 733 (9th Cir. 2009) (same when state removes child from custodial parent's custody). For the same reasons parents have the right to consent when the state socially transitions their children at school, they have the right to be notified. *See Mirabelli*, 2026 WL 575049, at *3 (noting that parents may not be "shut out of participation" in the decision whether to socially transition children at school).

The district court rejected this conclusion, noting that the Constitution does not require states to help parents raise their children. ER-31 (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)). That principle is true, but it is irrelevant here. Ms. Regino does not contend that the District must help her raise her children by providing her information about them. Rather, she contends that the District must inform her about its own act of making an important decision in her children's lives. *See Gruenke*, 225 F.3d at 306 (holding that school coach's "failure to notify" parents of his investigation into child's pregnancy violated parental right).

And even if Ms. Regino did not have the right to be notified when her children are socially transitioned at school, she at least has the right to receive truthful

33

information in response to a direct question. *See Mirabelli*, 2026 WL 575049, at * 3 (noting that school "policies that conceal . . . information from parents" likely violate the Constitution); *Foote*, 128 F.4th at 353 (noting that school's "deceptive communication" to parents arguably violates parental right); *Mead*, 800 F. Supp. 3d at 849 (similar); *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 680 F. Supp. 3d 1250, 1277 (D. Wyo. 2023) (similar); *see also Lee*, 135 F.4th at 937 (McHugh, J., concurring) (concluding that helping children conceal their gender identities from their parents implicates parental right). The Policy fails even this modest command.

The district court disregarded Ms. Regino's allegation that the Policy precludes District personnel from telling parents the truth in response to a direct question because it believed that this allegation was not plausible. ER-32. That was error. The Policy provides that children have a "[r]ight to privacy" over whether they are being socially transitioned at school. ER-180. This alleged right specifically applies against "parents." ER-181. The Policy authorizes parental disclosure only when the District has "compelling evidence that disclosure is necessary to preserve the student's . . . well-being." ER-180. The Policy has no exception for when parents directly ask District personnel whether their child is undergoing a transition. ER-121 (¶53). Thus, the Policy requires District personnel to not tell parents the truth even

in response to a question. *Id.*; *see also* ER-128 (¶87). This allegation is not merely plausible; it is the only reasonable way to read the Policy.[4]

The district court also pointed out that Ms. Regino did not allege that the District actually concealed A.S.'s prior social transition from her. ER-32 (citing *Foote*, 128 F.4th at 352). That is true, but it is beside the point. The fact that Ms. Regino did not previously ask the District whether it was socially transitioning A.S. does not mean that the District would have told her the truth if she had asked. And unlike the parents in *Foote*, Ms. Regino does not seek damages for the District's past conduct. Instead, she seeks prospective relief against the Policy's ongoing and future enforcement. Thus, unlike *Foote*, the lack of past parental concealment is immaterial. Instead, the question is whether the Policy requires parental concealment in the future. The Complaint plausibly alleges that it does.

### D. The district court erroneously evaluated Ms. Regino's substantive due process claims before her First Amendment claims.

The district court never independently evaluated Ms. Regino's First Amendment claims. ER-13 n.1. Instead, the district court concluded those claims were "subsumed" within her substantive due process claims, which it evaluated under *Washington v. Glucksberg*, 521 U.S. 702 (1997). ER-14.

---

[4] At the hearing on the District's motion to dismiss, the district court did not ask counsel for the District whether the District interpreted the Policy to preclude district personnel from telling the truth in response to a direct question. ER-37–80.

That sequencing was exactly backward. When a plaintiff asserts claims under both an explicit constitutional guarantee and the substantive Due Process Clause, courts must analyze the explicit textual provision first. *See Soldal v. Cook Cnty.*, 506 U.S. 56, 70 (1992). By treating Ms. Regino's First Amendment claims as "subsumed" within her substantive due process claims, the district court skipped this first step.

That sequencing error matters. Because the district court collapsed Ms. Regino's First Amendment claims into her substantive due process claims, it effectively subjected her First Amendment claims to *Glucksberg*. ER-13–14. But *Glucksberg* does not apply to First Amendment claims. Instead, it applies only to claims of new unenumerated rights. 521 U.S. at 710. Rather than subject Ms. Regino's First Amendment claims to *Glucksberg*, the district court should simply have asked whether those claims alleged a plausible violation of the First Amendment. For reasons already explained, they do.

## II. THE COMPLAINT PLAUSIBLY ALLEGES THAT THE POLICY INFRINGES MS. REGINO'S FUNDAMENTAL SUBSTANTIVE DUE PROCESS RIGHTS

For the same reasons the Complaint plausibly alleges that the Policy violates Ms. Regino's First Amendment rights, it also plausibly alleges that the Policy violates her fundamental substantive due process rights.

The district court concluded that Ms. Regino's substantive due process claims failed under *Glucksberg*. ER-13–14. But *Glucksberg* does not apply here. *Glucksberg* applies only to "new" substantive due process rights, 521 U.S. at 720 (quotations omitted), and the parental right is not "new." Indeed, it "is perhaps the oldest of the fundamental liberty interests" recognized by the Supreme Court. *Troxel*, 530 U.S. at 65; *see also Yoder*, 406 U.S. at 232 (noting that parental rights are "established beyond debate as an enduring American tradition"). In *Troxel*, for example, the Supreme Court held that parents' right to decide their children's associates fell within the parental right without conducting a *Glucksberg* analysis. 530 U.S. at 65–73; *id.* at 76–78 (Souter, J., concurring); *id.* at 80 (Thomas, J., concurring); *see also Mirabelli*, 2026 WL 575049, at *3 (concluding that the parental right "includes the right" to make "decisions regarding their children's mental health" without conducting *Glucksberg* analysis). Moreover, this Court has repeatedly held that the question in parental rights cases is whether the asserted right is "encompassed within" the broader, preexisting parental right. *Fields I*, 427 F.3d at 1204; *see also Marsh*, 680 F.3d at 1154 (asking whether the asserted right in question "flows from" the preexisting parental right). And the only other Circuit Court that has addressed whether a school policy that authorizes school-based social transitions without parental consent violates parents' fundamental substantive due process rights rejected *Glucksberg*'s applicability. *See Foote*, 128 F.4th at 348

(asking whether asserted right "fell within the broader, well-established parental right").

Parents are thus not required to satisfy *Glucksberg* every time the state devises some new way to infringe their rights. If that were the law, parental rights could not apply to the state's decisions to give children a cochlear implant, to allow children to participate in organized contact sports at school, or to require private schoolchildren to attend school via Zoom, for example, because those things are recent innovations. The Court must take care that its rulings do not "trap[]" the Constitution "in amber." *United States v. Rahimi*, 602 U.S. 680, 691 (2024). And because the right Ms. Regino asserts is encompassed within the broader, preexisting parental right, the Complaint states plausible substantive due process claims.[5]

Even if Ms. Regino were required satisfy *Glucksberg*, she has done so. She has "careful[ly] descri[bed]" the right at issue. *Glucksberg*, 521 U.S. at 721 (quotations omitted). Parents have the right to consent—or at least to notice—when the state socially transitions their children at school. *See also* Section I.B, *supra*, at 17–32 (different formulations of the right).

---

[5] The *Regino* panel confusingly stated both that parents bringing substantive due process claims must satisfy *Glucksberg* and that the question in such cases was whether the asserted right in question was "encompassed" within the broader, preexisting parental right. 133 F.4th at 964, 965. In any event, that discussion was dicta. And for the reasons in the text, Ms. Regino is not required to satisfy *Glucksberg* here.

That right is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Glucksberg*, 521 U.S. at 721 (quotations omitted). At common law, parents had the right "to speak and act on their [children's] behalf." *Hodgson v. Minnesota*, 497 U.S. 417, 483 (1990) (Kennedy, J., concurring in part and dissenting in part). This expansive view of parental rights persisted in the "decades leading up to and following" the founding. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 835 (2011) (Thomas, J., dissenting on other grounds). And while parents impliedly delegate a slice of their parental authority to public schools under the *in loco parentis* doctrine, that delegation has always been limited to education. *See* S. Ernie Walton*, In Loco Parentis, the First Amendment, and Parental Rights-Can They Coexist in Public Schools?*, 55 Tex. Tech L. Rev. 461, 476 (2023); *see also* Blackstone, 1 Commentaries on the Laws of England at 441 (1765) (noting that a father "delegate[s] [only] a part of his parental . . . authority to the . . . schoolmaster"); Kent, 2 Commentaries on American Law at 88 (1827) (noting that parental authority "may be delegated to a tutor . . . [for the] purposes of education").

Based on this history and tradition, it beggars belief to think that the Fourteenth Amendment's framers would have thought public schools could socially transition children without parental consent, without notifying parents, and while

39

concealing the transition from parents. The Complaint thus plausibly alleges that the Policy violates Ms. Regino's substantive due process rights.

## III. THE POLICY DOES NOT SURVIVE ANY LEVEL OF CONSTITUTIONAL REVIEW THAT MIGHT APPLY

While the parental right is not absolute, the state may override parents' rights only if it satisfies strict scrutiny. The Policy does not meet that demanding standard. Indeed, it fails rational basis review.

### A. The Policy is subject to strict scrutiny, which it fails.

Below, the District did not dispute that strict scrutiny applies when the state infringes parents' rights, nor did it defend the Policy under that standard. ER-81–110. It has therefore waived these arguments. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976); *Int'l Union of Bricklayers & Allied Craftsman Loc. Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1406 (9th Cir. 1985).

Even if the District had preserved these arguments, they fail. Infringements of the parental right are subject to strict scrutiny, whether analyzed under the First Amendment, *see Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984); *McCabe v. Sharrett*, 12 F.3d 1558, 1566 (11th Cir. 1994), or substantive due process, *Glucksberg*, 521 U.S. at 720–21; *Nunez*, 114 F.3d at 952. *Accord Mirabelli*, 2026 WL 575049, at *3. To satisfy strict scrutiny when the state seeks to override parents' right to care for their children, the state must show that the child is subject to "apparent danger or harm." *Mueller v. Auker*, 700 F.3d 1180, 1187 (9th Cir. 2012)

("*Mueller II*") (quotation omitted). The state must make that showing at a "judicial hearing" unless the child is in "imminent danger of serious bodily injury." *Mueller I*, 576 F.3d at 995 (quotation omitted); *see also Wallis*, 202 F.3d at 1138. And even when the state takes emergency action, it must always give parents "post-deprivation notice" of its actions. *Mueller I*, 576 F.3d at 997.

The Policy fails at every step. It does not require the District to show to a judge that children face apparent danger or harm before socially transitioning them. It does not require the District to find that children are in imminent danger before bypassing judicial approval. And it does not require the District to notify parents that it has socially transitioned their children. The Policy therefore fails strict scrutiny.

The Policy also fails under the traditional strict scrutiny test because it is not narrowly tailored to serve any compelling interest. *See Reno v. Flores*, 507 U.S. 292, 302 (1993); *see also Mirabelli*, 2026 WL 575049, at *3. Indeed, as set forth below, the Policy fails rational basis review. It thus necessarily fails strict scrutiny.

The district court did not apply strict scrutiny because it concluded the Complaint did not plausibly allege that the Policy infringed Ms. Regino's parental rights. ER-32. As discussed, that conclusion was error. *See* Sections I and II, *supra*, at 16–40. Accordingly strict scrutiny applies, and the Policy does not satisfy it.

### B.    The Policy fails rational basis review.

The district court concluded that rational basis review applied and that the

41

Policy satisfied that standard. ER-32–33. That is error. Even if rational basis review applied, the Policy does not satisfy it.

To satisfy rational basis review, a law must be "rationally related" to a "legitimate state interest." *Witt v. Dep't of Air Force*, 527 F.3d 806, 814–15 (9th Cir. 2008). Below, the District argued—and the district court held—that the Policy survived rational basis review for two reasons: (1) it creates a "zone of protection from potential domestic abuse"; and (2) it protects "student privacy." ER-6, 32–33; *see also* ER-107. These justifications fail rational basis review.

## 1. The Policy irrationally requires the social transition of children for whom a transition is psychologically inappropriate.

As an initial matter, neither of these proffered justifications explains why the District has an interest in socially transitioning every child who asks to undergo a transition. Rather, they both relate only to the District's asserted interest in keeping the transition secret from parents. But that interest only arises once the District has already socially transitioned the child. Because the District never explained what interest it has in socially transitioning children in the first place, the Policy fails rational basis review without further analysis.

In any event, the District does not have a legitimate interest in socially transitioning every child who asks to undergo a transition, nor is doing so rationally related to any legitimate goal. Social transitioning is not psychologically appropriate for every child who requests a transition, even if the request is sincere. ER-119 (¶38–

39); *see also* ER–117–119 (¶¶25, 35–37, 39–40). Instead, such a request should begin a careful evaluation—directed by the child's parents—designed to determine whether transitioning is appropriate for that specific child. ER-119 (¶39). Instead of transitioning, some children simply need counseling to understand their feelings. ER-119 (¶¶38–39). For these children, a social transition is not only inappropriate; it is psychologically harmful to them. ER-118 (¶36).

The District has no interest in socially transitioning children for whom a transition is harmful. Yet by requiring the District to socially transition every child who asks to undergo a transition, that is exactly what the Policy requires. That is irrational as a matter of law.

It is no answer for the District to say that it is merely honoring the child's request. Children are too immature to make this decision on their own. ER-120 (¶44); *see also* Section I.B, *supra*, at 27–29. The District must therefore obtain parental consent before socially transitioning their children. ER-119–20 (¶¶42–44). And if the parents say "no," then—absent some showing by the District that the parents' decision falls outside the bounds of permissible parenting with respect to that specific child—the District has no legitimate interest in the transition. *See Lee*, 135 F.4th at 937 (McHugh, J., concurring) (concluding that a school "may not seize control of a child's upbringing based on a simple disagreement about what is in the child's best interests" (cleaned up)). Because the Policy wrongly assumes that a

social transition is appropriate for all children who sincerely ask to be transitioned, it fails rational basis review.

2. The District has no interest in protecting children from domestic abuse without individualized proof that parents are abusive.

To the extent the Policy prevents domestic abuse, it does so through its parental secrecy requirement. As the district court explained, that requirement is based on the concern "that some students might be placed in danger if their parents were informed" that they were being socially transitioned at school. ER-33. In other words, the Policy requires parental secrecy in all cases because some parents might abuse their children if they knew their children were being socially transitioned. *Id.*

The district court thought that this purpose satisfied rational basis review, but its reasoning impermissibly turns the presumptions of parental fitness and affection "on [their] head." *Lee*, 135 F.4th at 937 (McHugh, J., concurring). The Supreme Court has squarely rejected the "statist notion" that the government may displace "parental authority in *all* cases because *some* parents abuse . . . [their] children." *Parham*, 442 U.S. at 603 (emphasis in original). Instead, for the state to have a legitimate "interest . . . in protecting children from their parents," it must have "evidence that [specific parents are] unfit and the child is in imminent danger." *Wallis*, 202 F.3d at 1142 n.14; *see also Stanley*, 405 U.S. at 652 (holding that the state may not presume parental unfitness); *Ricard*, 2022 WL 1471372, at * 8 n.12.

The Policy does not require the District to have individualized evidence that

44

parents are likely to abuse their children before socially transitioning them in secret. Instead, the Policy presumes that parental secrecy is required in all cases a child is socially transitioned because some parents might be abusive if they knew about the transition. Because this presumption is unconstitutional, the Policy fails rational basis review as a matter of law.

This case illustrates why schools may not presume the worst about parents. A.S. thought her mother would be "mad" at her for "wanting to be a boy." ER-123 (¶63). And because A.S. did not authorize the District to tell her mother about the transition, the District kept it secret. ER-125 (¶73). But Ms. Regino is a fit parent who will always look out for her daughters' best interests. ER-115 (¶15); ER-125–26 (¶¶74–75). When she learned about A.S.'s transition, she was "supportive," told A.S. that she would "assist with" the transition if that was what she wanted, and arranged for A.S. to see a therapist. ER-125 (¶74). While the District was content to allow A.S. to suffer alone, Ms. Regino took immediate action to help her daughter.

Even without the Policy, the District is empowered to protect children from domestic abuse. Many District personnel are mandated reporters under the Child Abuse and Neglect Reporting Act. *See* Cal. Penal Code § 11164, *et seq.* And unlike the District, Child Protective Services and other state and local agencies have the resources to address domestic abuse while respecting parents' rights through individualized evaluations. The Policy impermissibly bypasses those individualized

safeguards by imposing its unconstitutional presumption. It therefore fails rational basis review.

   3. <u>The District has no interest in keeping secrets from parents about what it is doing to their children.</u>

The district court also thought that the Policy satisfied rational basis review because keeping parents in the dark about their child's social transition "protects [student] privacy." ER-33. But student privacy is not a legitimate interest here.

This case is not about student privacy from the public. It is about student privacy from their parents. And transitioning children in secret from their parents does not protect children. To the contrary, it harms them. It increases the chances that children will be inappropriately transitioned. ER-120 (¶44). It causes children to live a double life at school and at home. ER-120 (¶45). It increases children's sense of anxiety and alienation. *Id.* And it distances children from the "primary protectors of [their] best interests: their parents." *Mirabelli*, 2026 WL 575049, at *3; *see also* ER-120 (¶45); ER-159 (¶12.36) (noting that children do "best if they are in a supportive relationship with their family"). Indeed, that is why no professional association recommends that schools socially transition children in secret from their parents. ER-120 (¶46). Schools thus have "no interest in withholding or concealing from . . . parents" the fact that it is socially transitioning their children. *Ricard*, 2022 WL 1471372, at * 8.

Worse, the Policy acknowledges that parental secrecy can harm children—and it countenances that harm. When a child does not authorize parental disclosure, the Policy permits such disclosure only when "the [D]istrict has compelling evidence that disclosure is necessary to preserve the student's . . . well-being." ER-180. If the District has strong—but not "compelling"—evidence that parental disclosure is highly likely—but not "necessary"—to preserve the child's well-being, that evidence is insufficient to overcome the Policy's secrecy requirement. *Id.* Because the Policy elevates parental secrecy over children's well-being, it is irrational as a matter of law.

The district court thought that student privacy was a legitimate interest because it believed children have a privacy right to keep their social transition secret from their parents. ER-32. But the lone case the district court cited for that proposition involved an adult, not a child. *Sterling v. Borough of Minersville*, 232 F.3d 190, 192 (3d Cir. 2000) (noting that the decedent was an "18-year old"). Children's constitutional rights "cannot be equated with those of adults." *Bellotti v. Baird*, 443 U.S. 622, 634 (1979). And no Circuit has ever held that children have a privacy right to keep their social transition secret from their parents. This Court should not be the first.

Moreover, a privacy right exists only when there is a legitimate "expectation of privacy" in the information at issue. *Mangum v. Action Collection Serv., Inc.*, 575

47

F.3d 935, 944 (9th Cir. 2009), *abrogated on other grounds by Rotkiske v. Klemm*, 589 U.S. 8 (2019). A school-based social transition is evident to everyone at school—administrators, teachers, and other students—any of whom could inform the child's parents. And parents have a statutory right to "observ[e] [their children's] classroom activities." 20 U.S.C. § 6318(d)(2)(C); *see also* Cal. Educ. Code § 49091.10(b). Children therefore have no legitimate expectation of privacy in their social transition at school.

Finally, even if children had a privacy right to keep their social transition secret from their parents, privacy rights must yield to a "proper governmental interest." *In re Crawford*, 194 F.3d 954, 959 (9th Cir. 1999). Ms. Regino is a fit parent who will always act in her children's best interests. ER-115 (¶15); ER-125–26 (¶¶74–75). Her parental rights thus outweigh any privacy right her children might have. The Policy therefore fails rational basis review.[6]

---

[6] Below, the District predicated its argument that children have a privacy right to keep their social transition secret from their parents on federal law only. ER-102; ER-107. But even if the District had invoked California law, the California right to privacy is similar to the federal right. *See Hill v. NCAA*, 7 Cal. 4th 1, 36 (1994). Thus, any argument that children have a right to privacy under California law would fail for the same reasons stated in the text. Moreover, Ms. Regino's federal parental right would trump any contrary state-law privacy right her children may have. *303 Creative LLC v. Elenis*, 600 U.S. 570, 592 (2023) ("[W]hen [state] law and the Constitution collide, there can be no question which must prevail.").

## IV.   THE COMPLAINT PLAUSIBLY ALLEGES THAT THE POLICY VIOLATES MS. REGINO'S PROCEDURAL DUE PROCESS RIGHTS

The Complaint plausibly alleges that the Policy violates Ms. Regino's procedural due process rights. A procedural due process claim has two elements: (1) the deprivation of a protected liberty or property interest; and (2) constitutionally inadequate procedures. *Regino*, 133 F.4th at 966. The Complaint plausibly alleges both.

First, the Complaint plausibly alleges that the Policy infringes Ms. Regino's First Amendment and fundamental substantive due process rights. *See* Sections I and II, *supra*, at 16–40. Both rights are liberty interests protected by procedural due process. *See Vasquez v. Rackauckas*, 734 F.3d 1025, 1043 (9th Cir. 2013) (First Amendment rights); *Mullins v. Oregon*, 57 F.3d 789, 795 (9th Cir. 1995) (substantive due process rights); *see also Mead*, 800 F. Supp. 3d at 851 (holding that parents stated plausible procedural due process claim in challenge to similar policy). Moreover, the Policy would trigger procedural due process even if it satisfied substantive review. *See United States v. Salerno*, 481 U.S. 739, 746 (1987) (concluding that when a statue "survives substantive due process scrutiny, it must still be implemented in a fair manner").

Second, the Complaint alleges that the Policy impermissibly denies Ms. Regino notice and an opportunity to be heard at a judicial hearing when the District decides whether to socially transition her children. ER-138–39 (¶¶138, 143). When

the state deprives someone of their parental rights on a case-by-case basis, it must justify the deprivation at a judicial hearing in the absence of an emergency. *See Stanley*, 405 U.S. at 652; *Mueller I*, 576 F.3d at 995; *Wallis*, 202 F.3d at 1138. Moreover, the minimum requirements of procedural due process are notice and an opportunity to be heard. *See Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) ("The essence of due process is the requirement that a person . . . be given notice of the case against him and opportunity to meet it." (cleaned up)); *Mullane v. Cent. Hanover Bank & Tr.*, 339 U.S. 306, 313 (1950) (similar). The Policy deprives Ms. Regino of her parental rights without providing her notice and an opportunity to be heard at a judicial hearing. It thus violates her procedural due process rights.

The district court thought that the Policy did not trigger procedural due process because Ms. Regino did not allege the deprivation of a constitutionally protected liberty interest. ER-34. As discussed, that conclusion was wrong. And even if the substantive due process rights Ms. Regino identifies were not fundamental, those rights are nevertheless important enough that they qualify as liberty interests sufficient to trigger procedural due process. *Regino*, 133 F.4th at 967 (cleaned up); *see also Kerry v. Din*, 576 U.S. 86, 109–10 (2015) (collecting cases) (Breyer, J., dissenting).

The district court also concluded that the Policy did not violate Ms. Regino's procedural due process rights because its adjudicatory process was designed to

protect children, not parents. ER-35. The district court did not cite a single case in support of this conclusion, and it is wrong. When the state deprives someone of their parental rights on a case-by-case basis, it must justify the deprivation at a judicial hearing, regardless of any other procedural protections the state has created. *See Stanley*, 405 U.S. at 652; *Mueller I*, 576 F.3d at 995; *Wallis*, 202 F.3d at 1138. Whether the Policy's procedures were designed to protect children or their parents is immaterial. Because the Policy does not provide Ms. Regino notice and an opportunity to be heard at a judicial hearing before her children are socially transitioned in secret from her, she has plausibly alleged that it violates her procedural due process rights.

## CONCLUSION

For the foregoing reasons, Ms. Regino respectfully asks this Court to REVERSE and REMAND.

March 6, 2026                          Respectfully submitted,

                                       By: */s/Joshua W. Dixon*
                                       Joshua W. Dixon
                                       Courtney Corbello
                                       CENTER FOR AMERICAN LIBERTY
                                       2145 14th Avenue, Suite 8
                                       Vero Beach, FL 32960
                                       jdixon@libertycenter.org
                                       ccorbello@libertycenter.org

                                       *Attorneys for Appellant*
                                       AURORA REGINO

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 26-475

I am the attorney or self-represented party.

**This brief contains** | 12,130 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated | | .

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Joshua W. Dixon | **Date** | March 6, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**          *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 26-475

The undersigned attorney or self-represented party states the following:

○   I am unaware of any related cases currently pending in this court.

○   I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

●   I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

> Mirabelli v. Bonta, No. 25-8056; Chino Valley Unified School District v. Newsom, No. 25-3686; City of Huntington Beach v. Newsom, 25-3826
>
> This case appears to be related to the above-referenced cases under Circuit Rule 28-2.6(b) because they all raise the same or closely related issues; namely, whether school policies that authorize schools to socially transition students without parental consent or notice violate the Constitution.

**Signature** | s/Joshua W. Dixon    **Date** | March 6, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 17**      *New 12/01/2018*

## <u>ADDENDUM</u>

### Relevant Constitutional Provisions

<u>**U.S. Const. amend. I:**</u>

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech . . . ."

<u>**U.S. Const. amend. XIV § 1:**</u>

". . . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ."