**CASE NO. 26-475**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

AURORA REGINO,

Plaintiff-Appellant,

v.

GREG BLAKE, Superintendent,

Defendant-Appellee,

and

CAITLIN DALBY; REBECCA KONKIN; TOM LANDO;
EILEEN ROBINSON; and MATT TENNIS,

Defendants-Appellees.

_____

On Appeal from the United States District Court
for the Eastern District of California
Case No. 2:23-cv-00032-DJC-DMC

**BRIEF OF *AMICI CURIAE* MANHATTAN INSTITUTE,
DEFENDING EDUCATION, AND DR. LEOR SAPIR
SUPPORTING PLAINTIFF-APPELLANT AND REVERSAL**

_____

Sarah Parshall Perry
DEFENDING EDUCATION
4532 Cherry Hill Rd., Ste 119
Arlington, VA 22207
(571) 206-1795
sarah@defendinged.org

Ilya Shapiro
  *Counsel of Record*
John Ketcham
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute

March 9, 2026

## CORPORATE DISCLOSURE STATEMENT

The Manhattan Institute and Defending Education, respectively, have no parent companies, subsidiaries, or affiliates, and do not issue shares to the public.

<u>s/ *Ilya Shapiro*</u>
Ilya Shapiro

Dated: March 9, 2026

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT.............................................i

TABLE OF AUTHORITIES....................................................... iii

IDENTITY AND INTEREST OF *AMICI CURIAE*...................................1

BACKGROUND AND SUMMARY OF ARGUMENT .............................2

ARGUMENT ...................................................................4

I.  Social Transition Constitutes a Mental-Health Intervention for
    Children Who Would Otherwise Likely Desist in Their Adopted
    Gender Identity before Adulthood ........................................4

    A. Medical Research Worldwide Demonstrates That Social
       Transition Is a Mental-Health Intervention with Medical
       Implications for Children and Adolescents ...................................5

        1. Childhood gender dysphoria normally remits naturally by
           adulthood, but social transition may cause it to persist. .......7

        2. Transgender identity in adolescents is also likely
           unstable. ................................................................13

    B. Objections to the Persistence and Desistence Literature Do
       Not Withstand Scrutiny .................................................18

    C. Clinicians Are Unable to Consistently Distinguish between
       Transgender and Gender-Nonconforming Youths........................23

    D. U.S. Medical Groups Are Out of Step with World Health
       Authorities' Recognition of the Risks of Pediatric Social
       Transition ...............................................................24

II. U.S. Courts Have Recognized Social Transition as a Medical
    Intervention ...............................................................29

III. The Chico Unified School District Policy Prevents Parents
     from Assessing the Benefits and Risks of Social Transition
     and Other Mental-Health Aspects of Gender Care..........................31

CONCLUSION ...................................................................33

# TABLE OF AUTHORITIES

## Cases

*Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) .... 30

*Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217 (6th Cir. 2016) ................... 30

*Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018) ............. 30

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) ........ 30

*Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18 (1981) ................................ 31

*Parents for Privacy v. Dallas Sch. Dist. No. 2,*
    949 F.3d 1210 (9th Cir. 2020) .......................................................... 30

*Parham v. J.R.*, 442 U.S. 584 (1979) ...................................................... 32

*Prince v. Mass.*, 321 U.S. 158 (1943) ...................................................... 32

*Santosky v. Kramer*, 455 U.S. 745 (1982) ............................................... 32

*Stanley v. Illinois*, 405 U.S. 645 (1972) .................................................. 31

*Troxel v. Granville*, 530 U.S. 57 (2000) ................................................... 31

*United States v. Skrmetti*, 605 U.S. 495 (2025) ................................. 3, 33

*Whitaker v. Kenosha Unified Sch. Dist.,*
    858 F.3d 1034 (7th Cir. 2017) ................................................... 29, 30

## Other Authorities

Am. Psych. Ass'n, DSM-5 ........................................................................ 21

Am. Psych. Ass'n, DSM-IV ...................................................................... 22

Annelou L. C. de Vries & Peggy T. Cohen-Kettenis, *Clinical*
    *Management of Gender Dysphoria in Children and Adolescents:*
    *The Dutch Approach*, 59 J. Homosexuality 301 (2012) .............. 6, 7

Annelou L. C. de Vries et al., *Reliability and Clinical Utility of Gender Identity-Related Diagnoses: Comparisons Between the ICD-11, ICD-10, DSM-IV, and DSM-5*, 8 LGBT Health 133 (2021)...........22

Annika Mutanen, *A Professor Who Treats Adolescent Gender Anxiety Says No to Minors' Legal Gender Correction*, Helsingin Sanomat, Jan. 27, 2023.................................................28

Appendix A to Supp. Expert Report of James Cantor, Ph.D., *Boe v. Marshall*, No. 2:22-cv-00184-LCB-CWB (M.D. Ala. June 24, 2024) ............................................................26

Benjamin Freedman, *Equipoise and the Ethics of Clinical Research*, 317 New Eng. J. Med. 141 (1987) ....................................................12

Br. of *Amici Curiae* Am. Acad. of Pediatrics et al., *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018)..................................30

Br. of *Amici Curiae* Am. Acad. of Pediatrics, *Parents for Privacy v. Dallas Sch. Dist. No. 2*, 949 F.3d 1210 (9th Cir. 2020).................31

Br. of *Amici Curiae* Am. Acad. Pediatrics in Support of Defendants-Appellees and Affirmance, *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34 (2d Cir. 2023) .............................................................30

Br. of *Amici Curiae* Med., Pub. Health, and Mental Health Orgs. in Support of Plaintiff-Appellee, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) ...............................31

Christina M. Roberts et al., *Continuation of Gender-Affirming Hormones Among Transgender Adolescents and Adults*, 107 J. Clinical Endocrinology & Metabolism 3937 (2022) ...........18

E. Abbruzzese et al., *The Myth of "Reliable Research" in Pediatric Gender Medicine: A Critical Evaluation of the Dutch Studies— and Research that Has Followed*, J. Sex & Marital Therapy 1 (2023) ..........................................14, 16

Eli Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1 (Suppl. 1) (2022)......................29

iv

Eli Coleman et al., *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, Version 7*, 13 Int'l J. Transgenderism 165 (2012) ..........................................29

Florence Ashley, *Gatekeeping Hormone Replacement Therapy for Transgender Patients Is Dehumanising*, 45 J. Med. Ethics 480 (2019)........................................................17

Hilary Cass, *The Cass Review Independent Review of Gender Identity Services for Children and Young People: Final Report* (2024) .......................................................................27

Hilary Cass, *The Cass Review Independent Review of Gender Identity Services for Children and Young People: Interim Report* (2022) ...................................................................16

Isabel Boyd et al., *Care of Transgender Patients: A General Practice Quality Improvement Approach*, 10 Healthcare 121 (2022)..........18

James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, J. Sex & Marital Therapy 307 (2019)....................................8, 13, 25

James S. Morandini et al., *Is Social Gender Transition Associated with Mental Health Status in Children and Adolescents with Gender Dysphoria?*, 52 Archives Sexual Behav. 1045 (2023)..........3

Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics 1 (2018)................................................................25

Jay Cohn, The Detransition Rate Is Unknown, 52 Archives Sexual Behav. 1937 (2023) .........................................19

Jiska Ristori & Thomas D. Steensma, *Gender Dysphoria in Children*, 28 Int. Rev. Psych. 1 (2016) ..........................................................25

Julia Temple Newhook et al., *A Critical Commentary on Follow-Up Studies and "Desistance" Theories about Transgender and Gender-Nonconforming Children*, 19 Int'l J. Transgenderism 212 (2018) ...............................19, 20, 21

Kenneth J. Zucker, *Adolescents with Gender Dysphoria:*
*Reflections on Some Contemporary Clinical and Research*
*Issues*, 48 Archives Sexual Behav. 1 (2019) ...................................15

Kenneth J. Zucker, *The Myth of Persistence*,
19 Int'l J. Transgenderism 231 (2018) ..............................20, 21, 23

Kristina R. Olson et al., *Gender Identity 5 Years After Social*
*Transition*, 150 Pediatrics 1 (2022) ...................................11, 12, 13

Kristina R. Olson, *Prepubescent Transgender Children:*
*What We Do and Do Not Know*,
55 J. Am. Acad. Child & Adolescent Psych. 155 (2018).................19

Leor Sapir, *Finland Takes Another Look at Youth Gender Medicine*,
Tablet, (Feb. 21, 2023)....................................................................28

Lisa Littman, *Rapid-Onset Gender Dysphoria in Adolescents and*
*Young Adults: A Study of Parental Reports*,
13 PLoS ONE 1 (2018) ...................................................................15

Michael Biggs, *The Dutch Protocol for Juvenile Transsexuals:*
*Origins and Evidence*, J. Sex & Marital Therapy 1 (2022) .............9

NHS England, *Supporting Children and Young People with Gender-*
*related Questions or Distress and Their Sexual Orientation*,
MindEd (July 11, 2023)...................................................................26

Peggy T. Cohen-Kettenis et al., *The Treatment of Adolescent*
*Transsexuals: Changing Insights*, 5 J. Sexual Med. 1892 (2008) ...7

Roberto D'Angelo, *Letter to the Editor: Regret after Gender-affirmation*
*Surgery: A Systematic Review and Meta-analysis of Prevalence*,
9 Plastic & Reconstructive Surgery—Global Open 3951 (2021) ...15

Robin Respaut & Chad Terhune, *Number of Transgender Children*
*Seeking Treatment Surges in U.S.*, Reuters, (Oct. 6, 2022)...........23

Ruth Hall et al., *Access to Care and Frequency of Detransition*
*among a Cohort Discharged by a UK National Adult Gender*

*Identity Clinic: Retrospective Case-Note Review*,
7 BJPsych Open 1 (2021) ............................................................. 18

Ruth Hall et al., *Impact of Social Transition in Relation to Gender
for Children and Adolescents: A Systematic Review*,
109 Archives Disease Childhood (2024) ......................................... 27

Steward L. Adelson et al., *Practice Parameter on Gay, Lesbian, or
Bisexual Sexual Orientation, Gender Nonconformity, and
Gender Discordance in Children and Adolescents*,
51 J. Am. Acad. Child & Adolescent Psych. 957 (2012)................. 10

Thomas D. Steensma & Peggy T. Cohen-Kettenis, *Gender Transitioning
Before Puberty?*, 40 Archives Sexual Behav. 649 (2011) ................ 7

Thomas D. Steensma et al., *Factors Associated with Desistence and
Persistence of Childhood Gender Dysphoria: A Quantitative
Follow-Up Study*,
52 J. Am. Acad. Child & Adolescent Psych. 582 (2013)................. 10

U.S. Dep't Health & Hum. Servs., *Treatment for Pediatric Gender
Dysphoria Review of Evidence and Best Practices* (2025)...... 3, 5, 14

Valeria P. Bustos et al., *Regret After Gender-Affirmation Surgery:
A Systematic Review and Meta-Analysis of Prevalence*,
9 Plastic & Reconstructive Surgery Global Open 3477 (2021)...... 15

William Byne et al., *Report of the APA Task Force on Treatment of
Gender Identity Disorder* 4 (2012) .................................................... 9

Wylie C. Hembree et al., *Endocrine Treatment of Gender-
Dysphoric/Gender-Incongruent Persons: An Endocrine
Society\* Clinical Practice Guideline,* 102 J. Clinical
Endocrinology & Metabolism 3869 (2017) ......................... 10, 14, 25

Yolanda L.S. Smith et al., *Adolescents with Gender Identity Disorder
Who Were Accepted or Rejected for Sex Reassignment Surgery:
A Prospective Follow-Up Study*,
40 J. Am. Acad. Child & Adolescent Psych. 472 (2001)................. 17

### IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

The Manhattan Institute (MI) is a nonprofit policy research foundation whose mission is to develop and disseminate ideas that foster individual responsibility and agency across multiple dimensions. It has filed briefs opposing regulations that interfere with constitutional rights.

Defending Education (DE) is a national, nonprofit, grassroots association. Its members include many parents with school-aged children. DE uses advocacy, disclosure, and litigation to combat the increasing politicization and indoctrination of America's youth, and it exists to defend the primacy of parental rights within education. DE has a significant interest in eliminating policies that remove decisions about a child's mental and physical well-being from that child's parents.

Leor Sapir, Ph.D., is a senior fellow at MI, where his research focuses on pediatric gender medicine and medical policy in the U.S. and abroad. His academic work has investigated how America's political

---

[1] Pursuant to Fed. R. App. P. 29, counsel for *amici* states that no party's counsel authored any of this brief, and no person other than *amici*, their members, or their counsel made a monetary contribution to fund its preparation or submission. Further, Plaintiff-Appellant consented to this filing, while counsel for Defendants-Appellees did not respond to repeated attempts to secure consent. Accordingly, a motion for leave has been filed alongside this brief. The Court previously granted *amici*'s motion for leave to file a brief at an earlier stage of the case.

culture and constitutional government shape public policy on matters of civil rights. His scholarship has appeared in many publications, including *Archives of Sexual Behavior*.

*Amici* file this brief because the right to direct the upbringing of one's children is among the most important liberties protected by the Constitution. We highlight medical research showing that social transition is an active mental-health intervention that should be made by, or in consultation with, parents.

## BACKGROUND AND SUMMARY OF ARGUMENT

Decades of research have consistently shown that most children with gender dysphoria ("GD") and most clinically referred children with gender-variant behavior come to terms with their natal sex ("desist") by adulthood. Minors who are socially transitioned, however, are more likely to persist in their cross-gender feelings and, in time, seek medical interventions in the form of gonadotropin-releasing analogues (puberty blockers), cross-sex hormones, and surgeries. These interventions carry known and anticipated risks, including lifelong sterility, sexual dysfunction, mood disorders, and increased risk for cancer and heart

2

disease. *See, e.g.*, *United States v. Skrmetti*, 605 U.S. 495, 534–35 (2025) (Thomas, J., concurring).

In its recent systematic review of treatments for pediatric gender dysphoria, the U.S. Department of Health and Human Services underscored the extraordinarily weak evidentiary foundation for such medical interventions: "The evidence for benefit of pediatric medical transition is very uncertain, while the evidence for harm is less uncertain." U.S. Dep't Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria Review of Evidence and Best Practices* 15 (2025).

In short, social transition is not a neutral act but an active intervention. The crucial question is whether it is a beneficial one. One recent study, and arguably the best-controlled, shows "no significant effects of social transition or name change on mental health status." James S. Morandini et al., *Is Social Gender Transition Associated with Mental Health Status in Children and Adolescents with Gender Dysphoria?*, 52 Arch. Sexual Behav. 1045, 1045 (2023). A comprehensive assessment of over four decades of research suggests, however, that social transition can lock in a temporary phase of identity development, leading to unnecessary medicalization and iatrogenic harm.

Consequently, social transition falls squarely within parents' basic right to guide their children's healthcare. By facilitating social transition without parental knowledge or consent, the Chico Unified School District's policy infringes on that right. Accordingly, this Court should reverse the decision below.

## ARGUMENT

## I. Social Transition Constitutes a Mental-Health Intervention for Children Who Would Otherwise Likely Desist in Their Adopted Gender Identity before Adulthood

"Social transition" refers to the use of youths' preferred names and pronouns, access to sex-specific accommodations, and, in some cases, practices such as breast-binding and genital-tucking. Healthcare professionals worldwide have recognized social transition as an active psychological intervention. Research strongly suggests that the vast majority of gender-dysphoric youths will naturally "desist," growing to feel comfortable with their natal sex. But social transition risks inhibiting this ordinary development, solidifying an otherwise passing phase of identity discordance past adolescence and, in turn, raising the potential for unnecessary medicalization.

In other words, social transition, far from relieving gender-related discomfort, may encourage these feelings to continue far longer than they would without it. Those who facilitate social transitions thus take part in a psychological intervention with potentially enormous ramifications for the well-being of children and adolescents.

A substantial and growing body of evidence underscores the risks of social transition. In May 2025, HHS examined two systematic reviews evaluating the impact of social transition, concluding, "The results suggest that the impact of social transition on long-term GD, psychological outcomes and well-being, and future treatment decisions such as hormones or surgeries remains poorly understood. Evidence on regret associated with social transition is extremely limited. The certainty of evidence for these outcomes is very low." U.S. Dep't Health & Hum. Servs., *supra*, at 89.

### A. Medical Research Worldwide Demonstrates That Social Transition Is a Mental-Health Intervention with Medical Implications for Children and Adolescents

The risks of early social transition were acknowledged by the Dutch clinicians who pioneered pediatric gender transition. In 2012, they recommended that young children not socially transition before puberty

on two grounds: (1) that most gender-dysphoric children will not persist in their adopted gender identity through adolescence; and (2) that such non-persisting youths should be prevented "from having to make a complex change back to the role of their natal gender," which research had suggested would be difficult. Annelou L. C. de Vries & Peggy T. Cohen-Kettenis, *Clinical Management of Gender Dysphoria in Children and Adolescents: The Dutch Approach*, 59 J. Homosexuality 301, 320 (2012).

The Dutch team also noted the danger of early social transition even for minors who *do* go on to full medical transition. Because medical transition cannot literally change a person's sex, they reasoned, it is important to ground the patient in reality and lower expectations about what drugs and surgeries can accomplish. The problem with "early transitions," they warned, "is that some children who have done so (sometimes as preschoolers) barely realize that they are of the other natal sex." *Id.* at 308. They develop a sense of reality so different from physical reality that acceptance of the protracted treatments they will later need is made unnecessarily difficult. *Id. See also* Thomas D. Steensma & Peggy T. Cohen-Kettenis, *Gender Transitioning Before Puberty?*, 40

Archives Sexual Behav. 649, 649–50 (2011) (predicting "that the drawbacks of having to wait until early adolescence … may be less serious than having to make a social transition twice").

Strikingly, in a 2008 article, the Dutch clinicians suggested that, given an "80-95%" desistence rate for gender dysphoria in children, a "real life test" or "real life experience" (*i.e.*, social transition) should be postponed until adolescence, and then only after an initial diagnosis of "gender identity disorder." Peggy T. Cohen-Kettenis et al., *The Treatment of Adolescent Transsexuals: Changing Insights*, 5 J. Sexual Med. 1892, 1893 (2008). Social transition and pharmacological puberty suppression, they suggested, are both part of a prolonged *diagnostic* phase in the clinical management of youth gender dysphoria. *Id.* Both were to be used to discern the need for additional, more invasive, interventions—such as surgery. The Dutch thus seemed to have viewed social transition as less reversible than the medical use of puberty blockers.

> 1. **Childhood gender dysphoria normally remits naturally by adulthood, but social transition may cause it to persist.**

The Dutch researchers' cautious approach to social transition and their warnings about its risks are buttressed by <u>decades of research</u>

finding that most children with gender identity issues come to terms with their natal sex, typically during adolescence. Those studies found desistence rates of between 61 and 100 percent, with specific percentages as follows in chronological order of publication: 75; 87.5; 100; 95.5; 90; 98; 87.5; 61; 88; 63; 87.7. James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, J. Sex & Marital Therapy 307, 313 (2019) (collecting 11 studies from 1972 to 2019).

Of note, the studies found not only that most gender-dysphoric children eventually desist, but that a majority of natal males (63–100 percent) and a substantial minority of natal females (32–50 percent) who desisted later turned out to be gay or lesbian, not transgender. Cross-gender feelings and behaviors in children are thus thought to be more predictive of later same-sex attraction than of lifelong gender dysphoria and trans identity. Early social transition may hinder healthy development of gender-nonconforming homosexual children. *See also* Michael Biggs, *The Dutch Protocol for Juvenile Transsexuals: Origins and Evidence*, J. Sex & Marital Therapy 1, 5 (2022).

The American Psychiatric Association observed in a 2012 literature review that "only a minority" of those diagnosed with childhood gender

identity disorder "will identify as transsexual or transgender in adulthood (a phenomenon termed *persistence*), while the majority will become comfortable with their natal gender over time (a phenomenon termed *desistance*)." William Byne et al., *Report of the APA Task Force on Treatment of Gender Identity Disorder* 4 (2012). That same year, the American Academy of Child and Adolescent Psychiatry acknowledged "longitudinal evidence that gender discordance persists in only a small minority of untreated cases arising in childhood," and warned that "further research is needed on predictors of persistence and desistence of childhood gender discordance as well as the long-term risks and benefits of intervention before any treatment to eliminate gender discordance can be endorsed." Steward L. Adelson et al., *Practice Parameter on Gay, Lesbian, or Bisexual Sexual Orientation, Gender Nonconformity, and Gender Discordance in Children and Adolescents*, 51 J. Am. Acad. Child & Adolescent Psych. 957, 968 (2012).

A major concern among researchers and clinicians who treat gender-diverse youth is that social transition will inhibit that natural remission and solidify an otherwise passing phase of identity discordance. For example, the Endocrine Society cautions that children

who have socially transitioned "may have great difficulty in returning to the original gender role upon entering puberty," and that social transition "has been found to contribute to the likelihood of persistence." Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline,* 102 J. Clinical Endocrinology & Metabolism 3869, 3879 (2017).

One study found that childhood social transition was a factor associated with persistence. Thomas D. Steensma et al., *Factors Associated with Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, 52 J. Am. Acad. Child & Adolescent Psych. 582, 588 (2013). The most relevant question, however, pertains to the nature of that association. But are children more likely to be identified as transgender early on and then socially transitioned, or does social transition lock in cross-gender feelings and make it harder for gender-dysphoric kids to accept their bodies?

A 2022 study, published in *Pediatrics*, challenges the conventional wisdom about desistence described above. Kristina R. Olson et al., *Gender Identity 5 Years After Social Transition*, 150 Pediatrics 1, 1 (2022)

(special article). Based on their observation of 317 children, psychologist Kristina Olson and her colleagues claim to show that young children who are socially transitioned and "supported" in their new gender identity rarely change their minds. *Id.* at 6.

To be eligible for participation in the study, candidates had to have completed a full, "binary" (male to female or female to male) social transition. *Id.* at 2. By the end of the study's five-year follow-up term, 3.5 percent of the children had replaced their male or female self-identification with a "non-binary" one, while 2.5 percent had "retransitioned" (*i.e.*, come to terms with and learned to accept their natal sex). *Id.* at 3. For the study's authors and supporters of the "gender-affirmative" approach, this was good news: it confirmed the oft-repeated claim that "trans kids know who they are" and that children benefit from having adults agree with ("affirm") their asserted gender.

The serious problem with this interpretation is that it lacks "equipoise," the requirement that investigators show genuine uncertainty about an intervention's effects. *See, e.g.*, Benjamin Freedman, *Equipoise and the Ethics of Clinical Research*, 317 New Eng. J. Med. 141, 141 (1987). Olson et al. failed to consider alternative

11

explanations for why their findings conflicted with all previous research on persistence. With one partial exception, the children in the earlier studies did not undergo social transition and, with no exception, the studies yielded high rates of desistence. In Olson's study, however, all the children had been fully socially transitioned, and almost none desisted.

One interpretation of this discrepancy, favored by Olson, is that virtually all the children who participated in the 2022 study were "true transgender" children. *See* Olson, *supra*, at 4–6. But another explanation, overlooked by the authors, is that social transition itself caused them to persist, creating a self-fulfilling prophecy. Recall the Dutch clinicians' warnings that social transition can disrupt a child's grasp of reality and make coming to terms with his or her natal sex more difficult. *See* de Vries & Cohen-Kettenis, *supra*, at 308.

Despite its authors' interpretation, the Olson study suggests that social transition may in fact be a powerful psychological intervention with potential to lock in gender incongruence. If true, the consequences are serious: at least 60 percent of the children in the study had commenced hormonal interventions, which carry significant health risks, at the five-year follow-up. Olson, *supra*, at 2. If some of these children

might have desisted and avoided unnecessary medicalization, then their social transition caused them medical harm.

### 2. Transgender identity in adolescents is also likely unstable.

Proponents of social and medical gender reassignment for minors argue that when gender dysphoria begins in childhood and intensifies at the outset of puberty, the chances of desistence are very slim. This belief is not supported by evidence.

First, in the 11 desistence studies discussed above, some of the minors who desisted did so after they had entered adolescence. Cantor, *supra*, at 5. That's why the Endocrine Society's guidelines mention that "childhood GD/gender incongruence does not invariably persist into adolescence *and adulthood*." Hembree et al., *supra*, at 3876 (emphasis added). As HHS's Review states, "there are no reliable methods to distinguish which patients will experience long-term GD." U.S. Dep't Health & Hum. Servs., *supra*, at 73.

Second, gender clinics in a variety of countries and researchers who study gender dysphoria in youth have observed a new patient cohort that does not fit the profile of the youth who participated in the original Dutch study and for whom the Dutch pioneered pediatric gender transition. *See*

13

E. Abbruzzese et al., *The Myth of "Reliable Research" in Pediatric Gender Medicine: A Critical Evaluation of the Dutch Studies—and Research that Has Followed*, J. Sex & Marital Therapy 1, 12–13 (2023). This new cohort, which accounts for most of the meteoric increase in the number of minors seeking gender-transition services over the past decade, is comprised of young people who did not have gender-identity issues in childhood and whose gender-dysphoric symptoms began, often suddenly, after the start of puberty. *Id.* Most are natal girls with comorbid mental-health problems. *Id.* The very fact that these teenagers exist suggests that transgender identity is neither innate nor immutable. *See also* Kenneth J. Zucker, *Adolescents with Gender Dysphoria: Reflections on Some Contemporary Clinical and Research Issues*, 48 Archives Sexual Behav. 1, 7 (2019); Lisa Littman, *Rapid-Onset Gender Dysphoria in Adolescents and Young Adults: A Study of Parental Reports*, 13 PLoS ONE 1, 30–33 (2018).

Third, researchers are increasingly acknowledging the phenomenon of regret and detransition. Claims that regret and detransition are extremely rare—less than 2 percent, by some accounts—are based mainly on studies of adults who transitioned as adults. *See*

Valeria P. Bustos et al., *Regret After Gender-Affirmation Surgery: A Systematic Review and Meta-Analysis of Prevalence*, 9 Plastic & Reconstructive Surgery Global Open 3477, 3510 (Mar. 2021). These studies suffer from high drop-out rates, short follow-up times, and highly restrictive definitions of detransition. Pablo Expósito-Campos and Roberto D'Angelo, *Letter to the Editor: Regret after Gender-affirmation Surgery: A Systematic Review and Meta-analysis of Prevalence*, 9 Plastic and Reconstructive Surgery—Global Open 3951 (2021). The very few adolescents included in these statistics were all transitioned under the Dutch protocol, a relatively conservative approach that contrasts with the affirmative approach practiced in American clinics. *See* Abbruzzese et al., *supra*, at 14–15. It is irresponsible to say that the extremely low rates of regret/detransition in earlier studies apply to most minors seeking social or medical transition today. These are distinct clinical cohorts with different presentations and clinical needs, and there is no high-quality research on the adolescent-onset group.

Unlike the more conservative Dutch protocol, which requires a childhood diagnosis of GD that intensifies in adolescence and no serious psychological comorbidities, the affirmative approach regards

adolescent-onset GD—even when it appears abruptly and develops rapidly—as a valid transgender identity and considers co-occurring mental-health problems as secondary to gender identity problems.

In her interim report to the U.K.'s National Health Service, Dr. Hilary Cass called this problem "diagnostic overshadowing": once the clinician identifies gender as a source of distress, all other problems, including ones that might be causing the gender distress, are ignored. Hilary Cass, *The Cass Review Independent Review of Gender Identity Services for Children and Young People: Interim Report* 17 (2022). Some prominent proponents of the gender-affirmative model for youth have argued that there should be no "gatekeeping" at all, only "informed consent." *See*, *e.g.*, Florence Ashley, *Gatekeeping Hormone Replacement Therapy for Transgender Patients Is Dehumanising*, 45 J. Med. Ethics 480, 480–81 (2019). Lowering the thresholds for medical treatment is likely to increase the rate of false positives and thus the rate of regret.

A lesser-known study published by Dutch researchers in the 2000s provides a lesson in contrast to the affirmative model. It followed clinically referred adolescents who were not offered hormones or surgeries because they had disqualifying mental-health conditions and

found that, up to seven years after being rejected, 80 percent did not pursue transition as adults. Yolanda L.S. Smith et al., *Adolescents with Gender Identity Disorder Who Were Accepted or Rejected for Sex Reassignment Surgery: A Prospective Follow-Up Study*, 40 J. Am. Acad. Child & Adolescent Psych. 472, 477 (2001). Two of the 14 rejected subjects expressed slight regret at not being able to transition as minors, and only one continued to want to transition as an adult. *Id*. In short, at least 11 and arguably all 14 of the adolescents benefitted from not being allowed to transition as minors.

Recent studies have shown high rates of regret and detransition. A study using data from the U.S. military healthcare system found that 30 percent of those who started treatments discontinued them within four years. *See* Christina M. Roberts et al., *Continuation of Gender-Affirming Hormones Among Transgender Adolescents and Adults*, 107 J. Clinical Endocrinology & Metabolism 3937, 3937 (2022). Another study from the U.K. found that 10 percent of those treated at an adult transgender clinic detransitioned within 16 months of treatment. Ruth Hall et al., *Access to Care and Frequency of Detransition among a Cohort Discharged by a UK National Adult Gender Identity Clinic: Retrospective Case-Note Review*, 7

BJPsych Open 1, 7 (2021). An additional 22 percent disengaged from the clinic before completing treatment. *Id.* at 5. Another study on adults found a rate of regret or detransition of 12 percent and a rate of discontinuation of 20 percent. Isabel Boyd et al., *Care of Transgender Patients: A General Practice Quality Improvement Approach*, 10 Healthcare 121, 11 of 16 (2022). The authors of the study noted that "the detransition rate found in this population is novel and questions may be raised about the phenomenon of overdiagnosis, overtreatment, or iatrogenic harm as found in other medical fields." *Id.* at 13.

In sum, today's evidence suggests that transgender identity is less stable in adolescents than social-transition advocates assert. The true rate of regret and detransition is not known. *See generally* Jay Cohn, The Detransition Rate Is Unknown, 52 Archives Sexual Behav. 1937 (2023). High-quality research is necessary, especially on teenagers with complex presentations of gender-related distress, to know how many will experience regret or detransition.

## B. Objections to the Persistence and Desistence Literature Do Not Withstand Scrutiny

To interpret away the overwhelming evidence that childhood gender dysphoria typically remits by adulthood, some researchers and

transgender activists have raised methodological objections to the studies discussed above. These all fail upon close scrutiny. One such objection is that many or most of the children in the desistence studies were not "truly transgender." As a result, the objection asserts, this desistence finding is artificially inflated. *See, e.g.*, Julia Temple Newhook et al., *A Critical Commentary on Follow-Up Studies and "Desistance" Theories about Transgender and Gender-Nonconforming Children*, 19 Int'l J. Transgenderism 212, 214–16 (2018); Kristina R. Olson, *Prepubescent Transgender Children: What We Do and Do Not Know*, 55 J. Am. Acad. Child & Adolescent Psych. 155, 155–56 (2016). This argument is built on two claims. First, earlier studies inappropriately included not just children diagnosed with gender-identity disorder—or GID, as it was called at the time—but also children who were merely gender-nonconforming. Newhook et al., *supra*, at 215–16. Second, even the children who were diagnosed with GID were not necessarily transgender because the diagnostic criteria under the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM) Edition III (1980), III-R (1987), and IV (1994) were not as demanding as those for gender dysphoria in DSM-5 (2013). *Id.*

The first claim fails because subsequent research has borne out the durability of the desistence literature. Dr. Kenneth Zucker, an internationally renowned expert in pediatric GD who chaired the DSM-5's Work Group on Sexual and Gender Identity Disorders and helped write the diagnostic guidelines for "gender identity disorder" in the DSM-III-R and DSM-IV, conducted a re-analysis of the earlier studies in the light of criticism about the validity of their findings. *See* Kenneth J. Zucker, *The Myth of Persistence*, 19 Int'l J. Transgenderism 231, 233–34 (2018). He divided the children in these studies into two groups: those who did not meet the GD threshold but were still dysphoric enough to require referral to a gender clinic, and those who met the diagnostic threshold. Those who were subthreshold desisted at a rate of over 90 percent, while nearly 70 percent of those who met the threshold desisted. *Id.* at 234–35.

The second claim fares no better. The DSM-5 includes two criteria for diagnosing GD in children: at least six months of "marked incongruence between one's experienced/expressed gender and assigned gender" and "clinically significant distress or impairment in social,

school, or other important areas of functioning." Am. Psych. Ass'n, DSM-5, at 452.

The DSM-5's innovation on previous editions is its inclusion, within the first criterion ("marked incongruence"), of sub-criterion A1: "A strong desire to be of the other gender or insistence that one is the other gender (or some alternative gender different from one's assigned gender)." *Id.* Critics of the desistence literature argue that A1 represents a raising of the diagnostic threshold, and consequently, many or most of the children diagnosed with GID under previous DSM editions would not have met the DSM-5's threshold. Newhook et al., *supra*, at 214–15.

But the addition of A1 is of no real clinical significance, and the objection is misguided. The diagnostic criteria from the DSM-IV include "a strong and persistent cross-gender identification" and, in children, a "[r]epeatedly stated desire to be, or insistence that he or she is, the other sex." Am. Psych. Ass'n, DSM-IV, at 581 (DSM-IV-TR: Gender Identity Disorder in Children (302.6) and Gender Identity Disorder in Adolescents or Adults (302.85)). Critics largely ignore the crucial guideline accompanying the text of the diagnostic criteria, advising that the "disorder is not meant to describe a child's nonconformity to stereotypic

21

sex-role behavior" and that it instead "represents a profound disturbance of the individual's sense of identity with regard to maleness or femaleness." *Id.* at 580. It is wrong to infer that the DSM-IV included mere gender-nonconformity in its description of gender-identity disorder.

An analysis of the differences between the DSM-IV and DSM-5 by the Dutch team that pioneered pediatric gender transition concludes that "both editions ... of gender-identity related diagnoses seem reliable and convenient for clinical use." Annelou L. C. de Vries et al., *Reliability and Clinical Utility of Gender Identity-Related Diagnoses: Comparisons Between the ICD-11, ICD-10, DSM-IV, and DSM-5*, 8 LGBT Health 133, 133 (2021). Dr. Zucker, who helped author the diagnostic guidelines for both DSM editions, has written: "It is my clinical opinion that the similarities across the various iterations of the DSM are far greater than the differences." Zucker, *The Myth of Persistence*, *supra*, at 234.

Finally, the assumption that the DSM-5's diagnostic threshold is higher than that of earlier editions is itself dubious. The number of minors receiving a GD diagnosis has skyrocketed since the publication of the DSM-5. In the United States, according to data collected by Komodo Health and reported by *Reuters*, diagnoses in youth ages 6-17 rose by

approximately 20 percent annually between 2017 and 2020, and by approximately 70 percent between 2020 and 2021, for a total of 121,882 new diagnoses added during these years. Robin Respaut & Chad Terhune, *Number of Transgender Children Seeking Treatment Surges in U.S.*, Reuters, (Oct. 6, 2022). Since these data are based on insurance claims, they likely represent an undercount of the true number. It seems that the DSM-5 makes it easier, not harder, to receive a diagnosis. In short, there is no basis to believe that four decades of research have yielded an artificially inflated rate of desistence.

### C. Clinicians Are Unable to Consistently Distinguish between Transgender and Gender-Nonconforming Youths

Some supporters of social transition argue that clinicians can reliably distinguish persisters from desisters in childhood. Children who express gender identity in a way that is "insistent, persistent, and consistent" (IPC), these supporters argue, can be regarded as "true transgender" children. The ability to avoid false positives means that clinicians can recommend social transition even if many or most children desist, and even if social transition is inappropriate for children who appear to be, but are not, transgender.

23

Proponents of IPC point to research showing that some factors are associated with a higher rate of persistence. They argue that children in whom one or more of these factors appear are "true transgender." The problem with this argument is that it tries to infer *individual* predictions from *population* data. As one group of experts explains:

> Factors predictive for the persistence of GD have been identified on a group level, with higher intensity of GD in childhood identified as the strongest predictor for a future gender dysphoric outcome. The predictive value of the identified factors for persistence are, however, on an individual level less clear cut, and the clinical utility of currently identified factors is low.

Jiska Ristori & Thomas D. Steensma, *Gender Dysphoria in Children*, 28 Int. Rev. Psych. 1, 6 (2016) (internal citations omitted). The Endocrine Society's 2017 guidelines on treatment of gender dysphoric youth likewise recognize that "[w]ith current knowledge, we cannot predict the psychosexual outcome for any specific child." Hembree et al., *supra*, at 3876.

### D. U.S. Medical Groups Are Out of Step with World Health Authorities' Recognition of the Risks of Pediatric Social Transition

The American Academy of Pediatrics has called for automatic gender affirmation (social transition) of minors, regardless of age, since

24

2018. Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics 1, 5–7 (2018). The AAP analysis has been subject to thorough criticism for its inaccuracies and misrepresentations, *see* Cantor, *supra*, at 313, and contrasts sharply with medical authorities abroad. Even leading members of the World Professional Association for Transgender Health (WPATH) have admitted that the AAP's statement has "a very weak methodology." Appendix A to Supp. Expert Report of James Cantor, Ph.D., at iv, *Boe v. Marshall*, No. 2:22-cv-00184-LCB-CWB (M.D. Ala. June 24, 2024) (quoting internal email).

In 2023, the NHS published a module for schools in which it reiterated that social transition is "a complex decision and should be considered an 'active intervention.'" NHS England, *Supporting Children and Young People with Gender-related Questions or Distress and Their Sexual Orientation*, MindEd, July 11, 2023, https://bit.ly/478qu8z. "Supporting a social transition without the involvement of parents or carers," the NHS emphasized, "can create complex difficulties within families and is not recommended. Secrets between parents or carers and their children are problematic and are likely to create further issues in

25

the future." *Id.* As for the concern about abusive parents, "if there are significant concerns . . . schools should seek careful and detailed safeguarding oversight to assess risks." *Id.*

The Cass Review, a comprehensive report on youth gender transition commissioned by the National Health Service of England, found an "absence of robust evidence of the benefits or harms of social transition for children and adolescents." Ruth Hall et al., *Impact of Social Transition in Relation to Gender for Children and Adolescents: A Systematic Review*, 109 Archives Disease Childhood 1 (2024). The Review emphasized that social transition should be thought of as an "active intervention because it may have significant effects on the child or young person in terms of their psychological functioning and longer-term outcomes." Hilary Cass, *The Cass Review Independent Review of Gender Identity Services for Children and Young People: Final Report* 158 (2024). For young children in particular, full social transition may lock in a temporary phase of identity confusion, making persistence and medicalization more likely. "Clinical involvement in the decision-making process should include advising on the risks and benefits of social transition as a planned intervention, referencing best available evidence.

This is not a role that can be taken by staff without appropriate clinical training." *Id.* at 164. And crucially, for both children and adolescents, "Outcomes for children and adolescents are best if they are in a supportive relationship with their family. For this reason parents should be actively involved in decision making unless there are strong grounds to believe that this may put the child or young person at risk." *Id.*

Dr. Riittakerttu Kaltiala, chief psychiatrist at Tampere University's pediatric gender clinic in Finland, confirmed that "four out of five" children with GD desist by adulthood. Leor Sapir, *Finland Takes Another Look at Youth Gender Medicine*, Tablet, (Feb. 21, 2023), https://bit.ly/3YVwxZp. Asked to comment on a proposed law that would grant minors the ability to define their gender for purposes of official documents, Dr. Kaltiala said that while it is "important to accept [children] as they are," "negating the body" by confirming that a child's gender self-perception is real can send the child "a message that there is something wrong with him or her." Annika Mutanen, *A Professor Who Treats Adolescent Gender Anxiety Says No to Minors' Legal Gender Correction*, Helsingin Sanomat, (Jan. 27, 2023) (translated from Finnish using Google Translate). The Finnish Paediatric Society and Finnish

Medical Association both objected to legal gender self-identification for minors, so the proposal was defeated. *See* Sapir, *supra.*

Even the U.S.-based WPATH, recognized that "[t]he current evidence base is insufficient to predict the long-term outcomes of completing a gender role transition," and that the desire for social transition "may reflect an expression of their gender identity" but it could also "be motivated by other forces." Because "[a] change back to the original gender role can be highly distressing," parents should rely on "[m]ental health professionals" to help them "make decisions regarding the timing and process of any gender role changes for their young children." Eli Coleman et al., *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People*, *Version 7*, 13 Int'l J. Transgenderism 165, 176 (2012).

WPATH's Version 8 now recommends social transition for children but only "when it would be beneficial." Eli Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1, S76 (Suppl. 1) (2022). Who determines that? According to WPATH, "health care professionals [should] discuss the potential benefits and risks of a social transition with

28

families who are considering it." *Id.* at S69, S77. WPATH recommends that "family members . . . work collaboratively" with "community members," *such as school officials*, "unless [families'] involvement is considered harmful to the adolescent." *Id.* at S52. WPATH's new recommendations are not based on systematic reviews of evidence and discuss only the benefits of social transition, yet even they emphasize the need for clinical consultation.

## II. U.S. Courts Have Recognized Social Transition as a Medical Intervention

Lawsuits over the past decade have raised the question of how schools must accommodate transgender-identified students under Title IX of the 1972 Education Amendments and the Fourteenth Amendment's Equal Protection Clause. Social transition has constituted an important element of these accommodations. Transgender-identified plaintiffs and their counsel have argued, and in most cases, courts have agreed, that using restrooms and other sex-specific facilities are a crucial part of a treatment protocol for a "medically diagnosed and documented condition." *Whitaker v. Kenosha Unified Sch. Dist.*, 858 F.3d 1034, 1050 (7th Cir. 2017).

A therapeutic rationale for social transition and gender identity-based access to school restrooms has been stated by transgender-identified students and their representatives in multiple circuits. *See, e.g.*, Br. of *Amici Curiae* Am. Acad. Pediatrics et al. in Support of Defendants-Appellees and Affirmance at 6, *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34 (2d Cir. 2023); Br. of *Amici Curiae* Am. Acad. of Pediatrics at 14, *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018); Br. of *Amici Curiae* Med., Pub. Health, and Mental Health Orgs. in Support of Plaintiff-Appellee at 3, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020); *Whitaker*, 858 F.3d at 1050 (7th Cir. 2017); Br. of *Amici Curiae* Am. Acad. of Pediatrics at 3–4, *Parents for Privacy v. Dallas Sch. Dist. No. 2*, 949 F.3d 1210 (9th Cir. 2020); *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 834–35 (11th Cir. 2022) (Pryor, J., dissenting). Five circuits accepted that social transition and thus accommodations for the sex students identify with are important for treatment. *See Doe v. Boyertown Area Sch. Dist.*, 897 F.3d at 529–31 (3d Cir.); *Grimm*, 972 F.3d at 615, 619 (4th Cir.); *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221–22 (6th Cir. 2016); *Whitaker*, 858 F.3d at 1050 (7th Cir.); *Parents for Privacy*, 949 F.3d at 1210 (9th Cir.).

## III. The Chico Unified School District Policy Prevents Parents from Assessing the Benefits and Risks of Social Transition and Other Mental-Health Aspects of Gender Care

When social transition is properly understood as an active mental-health intervention, it becomes clear that the Chico Unified School District's policy infringes on Plaintiff-Appellant's parental rights.

Because social transition is a powerful mental-health intervention, it is a decision that should be made by, or in consultation with, the parents or legal guardians of students. This decision falls squarely within the ambit of parents' fundamental right to make healthcare decisions for their children. *See, e.g.*, *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (affirming parents' rights "in the companionship, care, custody, and management" of their children); *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981) (quoting *Stanley* and reaffirming that parents' interest over their children "undeniably warrants deference and, absent a powerful countervailing interest, protection"). The Supreme Court has been consistent in stressing that parents or legal guardians are the ones best positioned to understand and address the needs of minors, including unique mental-health needs. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 66–69 (2000). Overriding their discretion requires an exceedingly

31

persuasive justification, such as compelling evidence that physical or emotional abuse will ensue if a student's desire for social transition is disclosed. *See Santosky v. Kramer*, 455 U.S. 745, 752–54 (1982). Even in these very limited circumstances, school staff should not be at liberty to perform social transitions but should instead consult the appropriate state child welfare services. In extreme circumstances, the state has some limited power over parents' decisions for their children's mental and physical health.

By facilitating active psychological interventions without parental knowledge or consent, the Chico Unified School District violated Plaintiff-Appellant's fundamental right to determine the healthcare decisions of her child. *See Parham v. J.R.*, 442 U.S. 584, 604 (1979) (noting the "substantial, if not the dominant, role" parents have in healthcare decision-making). That right prevails even when children or school officials dislike or disagree with fit parents' decisions. The Supreme Court has consistently protected the "cardinal" principle "that the custody, care and nurture of the child reside first in the parents" and "respected the private realm of family life which the state cannot enter." *Prince v. Mass.*, 321 U.S. 158, 166 (1943).

Given the known and expected risks associated with social transition, school officials should not expose children to the potential for medicalization and iatrogenic harm, even if well intended. The Supreme Court's recent decision in *United States v. Skrmetti* recognized the "fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments in an evolving field." 605 U.S. at 525.

When school staff make decisions about social transition in secret, they usurp the authority of parents and violate their well-established constitutional rights. Most importantly, they put the mental and physical health of minors at risk.

## CONCLUSION

For the foregoing reasons, and those stated by the Plaintiff-Appellant, the judgment below should be reversed.

Respectfully submitted,

s/ *Sarah Parshall Perry*
Sarah Parshall Perry
DEFENDING EDUCATION
4532 Cherry Hill Rd. Ste 119
Arlington, VA 22207
(571) 206-1795
sarah@defendinged.org

s/ *Ilya Shapiro*
Ilya Shapiro
  *Counsel of Record*
John Ketcham
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute

March 9, 2026

33

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-475

I am the attorney or self-represented party.

**This brief contains 6,199 words**, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ X ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ *Ilya Shapiro*         **Date** March 9, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

34