*No. 26-475*

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

AURORA REGINO,

*Plaintiff-Appellant*

v.

Superintendent GREG BLAKE, in his official capacity,

*Defendant-Appellee*

---

On Appeal from the United States District Court for the Eastern District of California, Sacramento

No. 2:23-cv-00032-DJC-DMC Hon. Daniel J. Calabretta

---

BRIEF OF *AMICUS CURIAE* FOUNDATION FOR MORAL LAW
IN SUPPORT OF APPELLANT

FOUNDATION FOR MORAL LAW
John Eidsmoe, Primary Counsel
Roy S. Moore, Associate Counsel
Bethany Page, Associate Counsel
P.O. Box 148
Gallant, AL 35972
(334) 262-1245
eidsmoeja@morallaw.org
kayla@morallaw.org
bethany.b.page07@gmail.com

March 13, 2026                                    Counsel for *Amicus Curiae*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...................................................................... ii-iv

**INTEREST OF THE AMICUS CURIAE** ........................................... 1

**SUMMARY OF THE ARGUMENT** ................................................. 1-2

**ARGUMENT** ............................................................................... 2-18

    1. Social transitioning policies in public schools violate parental rights to name a child and to establish family culture and norms based on sincerely held beliefs. ................................................................................... 2-6

    2. The First Amendment Free Exercise Clause protects parental rights. ... 6-7

    3. The Constitution and U.S. Supreme Court precedent firmly establish parental rights are fundamental. ............................................................. 7-10

    4. History and tradition firmly establish parental rights are not only fundamental to the nurture and education of a child, but they are firmly rooted in the free exercise of religion. ..................................................... 10-15

    5. The Supreme Court has recently upheld parents' long-standing fundamental rights under the Free Exercise Clause and Due Process Clause in *Mirabelli v. Bonta*, 607 U.S. ___ (March 2, 2026) ............................. 15-18

**CONCLUSION** ............................................................................ 18-19

# TABLE OF AUTHORITIES

## CASES

*Alabama Assn. of Realtors v. Department of Health and Human Servs.,*
594 U.S. 758, 763 (2021) .......................................................................15, 17

*Cruzan ex rel. Cruzan v. Dir. Mo. Dep't of Health,*
497 U.S. 261, 277-79 (1990) ...................................................................8

*Diamond Alternative Energy, LLC v. EPA,*
606 U.S. 100, 114 (2025) .............................................................17

*Farrington v. Tokushige,*
273 U.S. 284 (1927) ......................................................14

*Mahmoud v Taylor,*
606 U.S. 522, 559 (2025) ...............................................16

*Meyer v. Nebraska,*
262 U.S. 390 (1923) ....................................................9, 13, 14, 16

*Mirabelli v. Bonta,*
607 U.S. __ (2026) .............................................................. 2,15-18

*Nken v. Holder,*
556 U.S. 418, 434 (2009) ..............................................15

*Parham v. J.R.,*
442 U.S. 584, 602 (1979) ......................................9, 12, 13, 16, 17

*Pierce v. Society of Sisters,*
268 U.S. 510, 534-535 (1925).............................................. 9-10, 13, 14, 16

*Prince v. Massachusetts,*
321 U.S. 158, 166 (1944) ............................................10

*Quilloin v. Walcott*,

    434 U.S. 246, 255 (1978) ....................................................................9

*Roman Catholic Diocese of Brooklyn v. Cuomo*,

    592 U.S. 14, 19 (2020) ....................................................................16

*Troxel v. Granville*,

    530 U.S. 57, 60 (2000) ..................................................................8, 9

*Washington v. Glucksberg*,

    521 U.S. 702, 722-723 (1997)....................................... 8, 9, 10-11

*Wisconsin v. Yoder*,

    406 U.S. 205, 214 (1972) ............................................................14, 16

## CONSTITUTIONS AND STATUTES

United States Constitution

    Amendment I..............................................................6, 13, 15

    Amendment IX ............................................................... 7-8

    Amendment X ....................................................................7

    Amendment XIV ..................................................... 8, 11, 15-16

Cal. Cod. Civ. Pro. Section 1276 (a)(1) ....................................5

## OTHER AUTHORITIES

Apna Sanatan ............................................................... 3-4

Christianity and the Constitution ...........................................12

ChristianityPath.............................................................4

Commentaries on the Laws of England ......................................11

Holy Bible ................................................................................................. 4-5

IslamOnline ................................................................................................4

Oak Brook College of Law & Government Policy ................................................6, 7

Strategies for Parents ........................................................................... 11-12

WallBuilder ..............................................................................................13

## INTEREST OF THE AMICUS CURIAE[1]

Amicus Curiae Foundation for Moral Law ("the Foundation") (www.morallaw.org) is a national public interest organization based in Montgomery, Alabama, dedicated to the strict interpretation of the Constitution as written and intended by its Framers and to the right to acknowledge God in the public arena.

The Foundation believes the Constitution protects the rights of parents to custody, nurture, and control of their children, which includes rearing and educating them in their beliefs and moral values. The Foundation further believes California schools, by establishing policies which deny parental consent and notification of social transitioning children in school, is a flagrant violation of parents' fundamental rights to liberty under the Fourteenth Amendment and to free speech and free exercise of religion under the First Amendment.

## SUMMARY OF THE ARGUMENT

In recent years, a battle has ensued between parents and public schools as to who has the authority to determine what is best for children. Public schools across the nation are asserting control by denying parental consent and notification of

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), the Foundation confirms that no party or party's counsel authored this brief in whole or in part, or contributed money that was intended to fund its preparation or submission; and no person other than the amicus curiae, their members, or their counsel, contributed money that was intended to fund the preparation or submission of this brief.

1

school programs that promote and implement social transition of the parents' children. Most of these schools erroneously argue the policy is for the protection of a child's individual rights, which are in fact directly intertwined with and more often than not, superseded by fundamental parental rights. Because the Constitution and the U.S. Supreme Court (including the most recent case, *Mirabelli v. Bonta*, 607 U.S. __ (2026)) firmly establish that parental rights are fundamental, sacred rights endowed by the Creator, any policy by any person or entity acting on behalf of the state cannot infringe upon those rights, especially when those rights are firmly supported by the history and traditions of parenting, including naming a child or establishing family culture and norms based on sincerely held beliefs.

## ARGUMENT

**1. Social transitioning policies in public schools violate parental rights to name a child and to establish family culture and norms based on sincerely held beliefs.**

Appellant's daughter's name was changed at school without permission by the parent and by people who have no authority to change the name, whether the child freely chose her new name or school staff chose it for her. The district court opined that the name change is similar to calling a child by a nickname. Calling a girl by a boy name for the purpose of changing her female identity to a male

2

identity goes exceedingly beyond the intent of a mere nickname and has as its objective the fundamental desire to change the child's belief system, core values, and basic identity. The school policy which denies parental notification and consent attempts to remove a parent's fundamental right in the name of a minor's individual right. Through the policy and social transition programs, the school is brazenly attempting to make the child a creature of the State, rather than a member of a family. By changing the child's name for the purpose of social transition, the school directly violated the parent's rights by infringing upon the sacred privilege of the chosen name her parents gave her at birth and thereby infringing upon the social and cultural traditions of the family unit.

The naming of a child is directly connected to a family's culture, history, and social norms. A name does not just identify one person from another; it also identifies those to whom that person belongs. Naming a child is an essential parental decision. The chosen name often carries special meaning, reflects family heritage, and expresses faith. Often families name their sons after their fathers and their fathers' fathers, a tradition that dates back to renaissance kings and even further back to ancient times.

Various religions have naming ceremonies and followers often name their children based upon their religious heritage. For example, in the Hindu Sanskrit, the Namkaran Sanskar is the Vedic ceremony of naming a newborn. For the

3

Hindu, giving a name is not just a formality; rather it affirms the parents' commitment to raise the child with values, structure, and spiritual awareness. The ceremonially given name influences the child's character, behavior, and destiny.[2] For the Muslim, names are significant and followers are urged to give their children "nice names, not bad ones." Muslims are permitted to call their children by non-Arabic names, but they must follow the sharia rule which requires them to not use names of idols, Satan, or those specified for unbelievers.[3] For the Christian, names carry profound significance. In the Bible, God often chose names for individuals that reflected their purpose in His creation and plan.[4] He changed the father of Israel's name from Abram to Abraham, Sarai to Sarah (Genesis 17:5), Jacob to Israel (Genesis 32:22-31), and Saul to Paul (Acts 9:1-19; 13:9). He commanded Joseph to call the Virgin Mary's child Jesus, which means "The Lord Saves." Matthew 1:21.

Names identify a person's character, calling and destiny. Religious and secular parents alike often consider the meaning of names and choose one that

---

[2] Apna Sanatan. *Namkaran Sanskar: The Sacred Vedic Tradition of Naming a Child*. Retrieved February 2, 2023 from https://apnasanatan.com/2025/07/29/namkaran-sanskar-hindu-baby-naming-ceremony/

[3] IslamOnline. *The Rules of Guiding Naming Children in Islam*. Retrieved February 23, 2026 from https://fiqh.islamonline.net/en/the-rules-guiding-naming-children-in-islam/

[4] ChristianityPath. *What Does the Bible Say About Naming a Child (31 Verses Explained)*. Updated January 24, 2026. Retrieved February 23, 2026 from https://christianitypath.com/what-does-the-bible-say-about-naming-a-child/

reflects their values, beliefs, and the legacy they wish to leave. By considering the legacy of a name, parents celebrate history while looking forward to the child's future. In Genesis 48:16, Jacob expresses his desire for his descendants to carry on his name and legacy. The nation of Israel was named after the new name God gave Jacob, which has stayed with his descendants throughout the centuries, identifying them with Israel's special calling and heritage.

Whether their purpose is religious or secular, naming a child is the special privilege of the parents. A child cannot legally change his name without parental consent or until he comes of age, which is usually the age of eighteen. Cal. Cod. Civ. Pro. Section 1276 (a)(1) states:

> All applications for change of names shall be made to the superior court . . . either (A) by petition signed by the person, or, if the person is under 18 years of age, by one of the person's parents, by any guardian of the person, or as specified in subdivision (e), or, if both parents are deceased and there is no guardian of the person, then by some near relative or friend of the person.

Naming is so sacred, that even if a parent is not available, next of kin or another person in *close relationship* or an appointed guardian are the only other people who are legally allowed to participate in the name change.

By calling the child by her boy name of choice, the Chico United School District, acting as a state agent, directly interfered with and violated a sacred parental right. When the school district, acting as a state agent, implemented a

5

policy that denied parental notification and consent on issues that directly related to her daughter's well-being, the school district violated the parent's right to care and nurture her child. When the school, acting as a state agent, socially transitioned the child according to an unrecognized, nontraditional, and controversial change of societal norms, it violated the parent's right to nurture her child in the family's culture and norms based on sincerely held beliefs and moral standards. Whether Appellant adheres to a specific religious sect or not, her rights to express and practice her sincerely held religious beliefs and moral standards were "chilled" by the school's policy and actions.

## 2. The First Amendment Free Exercise Clause protects parental rights.

The Framers of the First Amendment understood that liberty and justice could not prevail if people were unable to follow the mandates of their God. Parental rights are unalienable rights endowed by the Creator, who has given parents the duty and obligation to raise children according to His standard. Nature's God, to whom the founders so often refer, is the God of the Bible, who established proper jurisdiction for self, the family, the church and the state.[5]

God created the jurisdiction of the family when he created male and female and gave them dominion over the earth, commanding them to be fruitful and multiply. Along with this mandate, God gave a stewardship authority over

---

[5] Robert Barth. *Renewing Your Mind as You Study Law*, 39-42 (Oak Brook College of Law and Government Policy 1st ed. 2001)

property which is to be administered through the family. This stewardship authority over property is the basis for the concept of private property and free enterprise.[6] The right to life, liberty, and property, therefore, is tied up in this understanding of the family jurisdiction. The family is a God-ordained unit of one man and one woman to whom He gave the privilege to pro-create. With the privilege of pro-creation, He gave the duty to raise and train children. This privilege and duty belong to the family unit and are necessarily wrapped up in the right to life, liberty, and property.

Without the protection of the free exercise clause, parents' duty and privilege to nurture, care and control their children cannot fully be realized. While parental rights concerning their children are fundamental in themselves, the free exercise of religion gives these rights a new dimension.

**3. The Constitution and U.S. Supreme Court precedent firmly establish parental rights are fundamental.**

The U.S. Constitution neither creates rights nor denies rights, it merely provides securities for unalienable rights. According to the Tenth Amendment, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." The Ninth Amendment confirms, "The enumeration in the Constitution, of certain

---

[6] *Id.* at 41.

rights, shall not be construed to deny or disparage others retained by the people." Therefore, since the Constitution has not enumerated parental duty or privilege, and since it has not delegated such a duty and privilege to the State, then the duty and privilege to parent and train a child is retained by the people. Furthermore, the Fourteenth Amendment states that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens." *Troxel v. Granville*, 530 U.S. 57, 60 (2000), firmly established that parents' right to the care, custody, and control of their children "is perhaps the oldest of the fundamental liberty interests recognized by this Court."

The district court holds in the matter at hand that the Ninth Circuit directs the Court to carefully formulate the fundamental right at issue. The district court referred to *Washington v. Glucksberg*, 521 U.S. 702, 722-723 (1997) when it stated a need to be "precise" in asserting the fundamental right issue. The court used *Cruzan ex rel. Cruzan v. Dir. Mo. Dep't of Health*, 497 U.S. 261, 277-79 (1990) as an example of identifying a specific 'constitutionally protected right to refuse lifesaving hydration and nutrition" rather than the generic "right to die." Document 96, 10. However, in regard to parental rights, the Supreme Court has repeatedly affirmed that the fundamental right of parents specifically, not generically, consists of the care, custody, and control of their children. Enumeration beyond that is not required and neither should it be as parenting has been retained by the people.

8

Quoting *Glucksberg* at 720, the Court in *Troxel* stated that the Fourteenth Amendment's Due Process clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel* held that those fundamental rights included parents' rights to make decisions concerning the care, custody, and control of their children. *Troxel* referred to *Meyer v. Nebraska*, 262 U.S. 390 (1923), which held seventy-five years earlier that the liberty "protected by the Due Process Clause includes the right of parents to 'establish a home and bring up children' and 'to control the education of their own.'" In reference to *Parham v. J.R.*, 442 U.S. 584, 602 (1979), *Troxel* reiterated that a presumption exists that parents act in their children's best interests. *Troxel* stated, "there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability" of parents to make the best decisions regarding their children. *Id.* at 68-69.

School policies which prevent parents from making decisions regarding the care and control of their children are violating parents' fundamental rights. They are completely ignoring the well-established judicial precedent that "the relationship between parent and child is constitutionally protected." *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978). They are ignoring what *Parham v. J.R.* concluded to be the Western civilization concept of the family-- a "*unit* with broad parental authority over minor children." (emphasis added). *Pierce v. Society of*

9

*Sisters*, 268 U.S. 510, 534-535 (1925), specifically stated that a child "is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944), also affirmed the higher rights of parents when it stated, "It is cardinal with us that the custody, care and nurture of the child reside *first* in the parents, whose primary function and freedom include preparation for obligations the state *can neither supply nor hinder*." (emphasis added). Parents' primary function and freedom include the upbringing of their children. The state cannot supply or hinder this function.

It is not the state's duty to determine the proper upbringing of any child. The U.S. Supreme Court has consistently concluded that parents' rights come first; that children are first under the authority of parents; and that the state has no right to interfere.

**4. History and tradition firmly establish parental rights are not only fundamental to the nurture and education of a child, but they are firmly rooted in the free exercise of religion.**

According to *Wash. v. Glucksberg*, 521 U.S. 702, 720 (1997), one of the primary features of the substantive due-process analysis is that it protects those fundamental liberties which are "deeply rooted in this Nation's history and tradition," and "implicit in the concept of ordered liberty," such that "neither

10

liberty nor justice would exist if they were sacrificed." From this nation's inception, the founders understood that the Creator endowed unalienable rights upon humanity, among which are life, liberty, and the pursuit of happiness. The Founders understood the Creator gave humanity these unalienable rights to fulfill His created purpose. One such purpose was to raise children with good moral character and virtue.

The Commentaries on the Laws of England written by Sir William Blackstone from 1765-1769 embody the principles and beliefs upon which our rights and liberties are predicated and are often cited by the United States Supreme Court. With regard to Parent and Child in the 16th Chapter of Book 1, the duties of parents to legitimate children consisted principally of three particulars,"... their maintenance, their protection, and their education." The Law of England recognized the power of a parent to give authority to a tutor or schoolmaster "*in loco parentis*" for "restraint and correction," as necessary for instruction. Nothing in the law ever suggested a schoolmaster could assist a child to act against the parents' control or consent, especially to assist a child to alter his or her gender contrary to natural law.

Even before the United States gained independence, colonists understood the necessity of educating and nurturing their children. Christian groups, such as the Puritans, Anglicans, Catholics, and Dutch Reformed established a majority of

America's earliest schools and colleges to include renowned colleges such as Yale, Harvard, and William and Mary College. Private donors funded the operation of early schools. Families and tutors were responsible for teaching younger elementary children math and reading. As the settlements grew, towns began to charter their own public schools. Colonial America focused education on the religious needs of the communities, especially the need for trained ministers. Colonial settlers encouraged literacy so that all people could read the Bible.[7] In 1647, Massachusetts even enacted the Old Deluder Satan Act, which required towns to appoint one of their own to teach children to read and write "because it was 'one chief project of the old deluder, Satan, to keep men from the knowledge of the Scriptures."[8] All across the nation, the earliest colleges offered ministerial training in addition to civics and history in order to educate future spiritual, political, and business leaders.[9]

The pillars of early government were religion and good moral conduct, which had always been encouraged through education. In 1789, President George Washington signed into law the Northwest Ordinance which set forth the requirements of statehood for prospective territories. When the territories applied

---

[7] Patrick Capriola, *The History of Education in America: A Timeline*, Strategies for Parents (2022), https://strategiesforparents.com/the-history-of-education-in-america-a-timeline/ (retrieved Feb. 26, 2026)

[8] John Eidsmoe. Christianity and the Constitution. Baker Book House (1987) p. 28.

[9] Patrick Capriola

for admission as a State, Congress would issue an enabling act that would require the state to form its government in a manner "not repugnant to the Ordinance."[10] Consequently, many state constitutions also made provisions similar to Article III of the Ordinance which declared: "Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." Framers of the Ordinance, who were also the framers of the First Amendment, believed that schools and educational systems would encourage religion, morality, and knowledge.[11] Rather than take authority away from parents, the early government, both federal and local, established schools to enhance the morality, knowledge, and religion that parents were already providing for their children.

Even as states established more schools and asserted more control over education, the fundamental right of parents to control the nurture and education of their children remained firmly intact. In *Pierce v. Society of the Sisters*, 268 U.S. 510 (1925), the Court expanded upon *Meyer* v. *Nebraska* by striking down an Oregon law that forced all parents to send their children to public schools, stating:

> rights guaranteed by the Constitution may not be abridged by legislation which has no reasonable relation to some purpose within the competency of the State. The fundamental theory of liberty upon which all governments in this Union repose excludes any general

---

[10] David Barton, *Original Intent: The Courts, the Constitution, & Religion*. WallBuilder Press, 47 (2008).

[11] *Id.*

13

power of the state to standardize its children by forcing them to accept instruction from public teachers only.

Two years later, in *Farrington v. Tokushige*, 273 U.S. 284 (1927), the Court held that not only could a governmental entity (in this case the Territory of Hawaii) not force parents to send their children to public schools; they also could not force them to send their children to private schools that were essentially the same as public schools. Over forty years later, the Court ruled in favor of Amish parents, who asserted their right to determine the upbringing and education of their children coupled with their First Amendment right to free exercise of religion. Citing *Meyer* and *Pierce*, the Court concluded in *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972):

> A State's interest in universal education, however highly we rank it, is not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children, so long as they, in the words of *Pierce*, 'prepare [them] for additional obligations.'

The Court further stated at 232,

> The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. *This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.* (emphasis added).

*Yoder* settled the debate. Parenting is an enduring American tradition, a tradition that dates back to the beginning of time. History and tradition consistently affirm that parenting belongs to parents, not to the state. American

14

history and tradition consistently affirm that raising a child is a God given, sacred right that the state cannot infringe upon.

**5. The Supreme Court has recently upheld parents' long-standing fundamental rights under the Free Exercise Clause and Due Process Clause in *Mirabelli v. Bonta*, 607 U.S. ___ (March 2, 2026).**

Parents appealed a Ninth Circuit order staying a permanent injunction which was entered by a District Court on behalf of parents and teachers who claimed that certain California policies violate their rights under the Free Exercise Clause and Due Process Clause. The parents objected to the policies which prevent schools from telling them about their children's engagement in gender transitioning at school without the children's consent. The Court vacated the Ninth Circuit's stayed injunction with respect to the parents because the stay was not justified under the governing four-factor test. *Mirabelli v. Bonta* (slip op., at 4) (quoting *Alabama Assn. of Realtors v. Department of Health and Human Servs.*, 594 U.S. 758, 763 (2021); see also *Nken v. Holder*, 556 U.S. 418, 434 (2009)). The Court explained how the four-factor test applied to the parents in this case.

First, the parents who sought religious exemptions had a strong likelihood to succeed on the merits because California's policies likely trigger strict scrutiny since they *substantially* interfere with the parents' rights "to guide the religious development of their children." *Mirabelli* (slip op., at 5) (emphasis added) (quoting

15

*Mahmoud v Taylor*, 606 U.S. 522, 559 (2025); *see also Wisconsin v. Yoder* at 205). The Court stated that California's policies violate sincerely held religious beliefs and "impos[e] the kind of burden on religious exercise that *Yoder* found unacceptable." *Mirabelli* (slip op., at 5) (quoting *Mahmoud* at 550.) The Court further stated that "the intrusion on parents' free exercise here—unconsented facilitation of a child's gender transition—is greater than the introduction of LGBTQ storybooks we considered sufficient to trigger strict scrutiny in *Mahmoud*." *Id.*

The Court further stated that the likelihood of the merits also pertained to those parents who object to the policies on Fourteenth Amendment Due Process grounds, reiterating the long-established precedent "that parents—not the State—have primary authority with respect to 'the upbringing and education of children.'" *Id.* (quoting *Pierce v. Society of Sisters* at 534-535 and *Meyer v. Nebraska* at 399-400). The Court further stated that the right protected includes the right "not to be shut out of participation in decisions regarding their children's mental health." *Id.* (referring to *Parham v. J.R.* at 602).

The third factor of the test, irreparable harm, was established because "the denial of plaintiffs' constitutional rights during the potentially protracted appellate process constitutes irreparable harm." *Id.* at 6 (referring to *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020)). The fourth factor, balance

of equities, was also established stating that "equities do not justify depriving [the parents] of the District Court's judgment in their favor." *Id.* at 6 (quoting *Alabama Assn. of Realtors* at 765.)  Finally, the Court stated that the Ninth Circuit's procedural objections to the injunction were unlikely to prevail for the following reasons: "parents protected by the injunction very likely have standing because they are objects of the challenged exclusion policies."; and class certification was likely proper.  *Id.* at 6-7 (directing attention to *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025).

While the State argued that its policies advance a compelling state interest in student safety and privacy, these policies "cut out the primary protectors of children's best interests: their parents." *Mirabelli* (slip op., at 5).  If children's safety and privacy are the State's primary equity concern, then the Court's ruling satisfies the issue because the injunction "promotes child safety by guaranteeing fit parents a role in some of the most consequential decisions in their children's lives." *Id.* at 6.  In her concurring opinion, Justice Barrett pointed out that California's nondisclosure policy "obviously excludes parents from highly important decisions about their child's mental health." *Mirabelli* (slip op., Barrett, J. concurring, 2); see also *Parham* at 601-604.  She further states that California's policy will exclude parents "*perhaps for years*—from participating in consequential decisions about their child's mental health and wellbeing." *Id.* at 3 (emphasis added).  Justice

17

Barrett holds, "Our resolution of the parents' likelihood of success on this claim is dictated by existing law." *Id.*at 2.

Through this most recent decision, the Court has once again firmly established parental rights as fundamental under both the Free Exercise Clause and Due Process Clause. When parents are the object of challenged public school exclusion policies, they automatically have a claim and standing.

## CONCLUSION

The battle ensuing across this nation in the public schools and in the courts is to settle one question: Who has the fundamental authority and control of a child? History and tradition have long established the proper relationship of parent and child. The Constitution and United Sates Supreme Court precedent has firmly settled fundamental parental rights. From its foundation, the United States has understood that justice and liberty depend on parents' duty and privilege to nurture, care and control their children. If states do not protect the fundamental liberties of the family unit, they will sacrifice both liberty and justice.

The Foundation urges this court to recognize the Appellant's fundamental parental rights as established by the First Amendment Free Exercise Clause and the Fourteenth Amendment's Due Process Clause and as supported by history and tradition. By ruling that the school, acting as a state agent, violated Appellant's

fundamental right to nurture, care, and control her child, this Court will uphold the nation's sacred law, tradition, and already settled question of authority.

March 13, 2026                                        Respectfully submitted,

                                                     /s/ John Eidsmoe
                                                     Counsel for *Amicus Curiae*