APPEAL NO. 26-475

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

AURORA REGINO,

Plaintiff-Appellant,

V.

GREG BLAKE,

in his official capacity as Superintendent

of the Chico Unified School District,

Defendant-Appellee,

On Appeal from the United States District Court for the
Eastern District of California
Case No. 2:23-cv-00032-DJC-DMC

## BRIEF OF AMICUS CURIAE OUR DUTY – USA SUPPORTING
## PLAINTIFF-APPELLANT AND REVERSAL

Jennifer W. Kennedy
JENNIFER W. KENNEDY,
ATTORNEY AT LAW
61 S. Baldwin Ave. #1626
Sierra Madre, CA 91025
(626) 888-2263
jenniferkennedyesq@gmail.com

C. Erin Friday
OUR DUTY-USA
P.O. Box 442
San Carlos, CA 94070
(415) 577-9271
erin@ourduty.group

*Counsel for Amicus Curiae Our Duty - USA*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus curiae Our Duty – USA ("Our Duty") is a nonprofit. Our Duty has no parent companies, subsidiaries or affiliates and does not issue shares to the public.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................... ii

TABLE OF CONTENTS ............................................................. iii

TABLE OF AUTHORITIES ......................................................... v

IDENTITY AND INTEREST OF AMICUS CURIAE ................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 3

ARGUMENT ....................................................................... 6

  I.  A Century of Supreme Court Precedent Establishes Parents' Fundamental Right to Direct Their Children's Upbringing, Education, and Medical Care ....................................................... 6

  II.  The District Court Erred When it Rejected Regino's Claim That Excluding Her from the Decision to Socially Transition Her Child Violated Her Parental Rights ................................................. 10

    A.  A School Keeping Secrets about a Child's Gender Confusion at Schools Infringes on the Parent's Ability to Make Medical Decisions. ............................................................. 10

    B.  Schools Justify Secret Social Transition Policies on the Unconstitutional Presumption that Parents Are Unsafe, while it is the Schools that Are Unsafe ................................................. 14

iii

III.    Schools Participation in Socially-Transitioning Children Harms Same Sex Attracted Students .................................................................18

IV.    Amici Stories of Parents Illustrate the Dangers of Schools Engaging in Social Transition of Children Without Parental Involvement.................................................................................................21

    A.    Erin Friday, President of Our Duty.................................................21

    B.    Abigail Martinez .............................................................................24

    C.    Lydia McLaughlin ...........................................................................26

    D.    Sue Y. ...............................................................................................27

    E.    Jessica E.,.........................................................................................28

    F.    Lisa Mullins .....................................................................................29

    G.    Beth Bourne .....................................................................................31

    H.    Jessica Konen...................................................................................33

    I.    Erin Lee ............................................................................................34

    J.    Wendell Perez ..................................................................................35

CONCLUSION...................................................................................................37

CERTIFICATE OF SERVICE............................................................................40

iv

# TABLE OF AUTHORITIES

**Cases**

Colorado parent. See Lee v. Poudre, 135 F.4th 924, 929 (10th Cir. 2025) 34

Konen v. Caldeira, No. 22-cv-1813 (Cal. Super. Ct. Monterey Cnty., June 27, 2022), removed (N.D. Cal., Sept. 12, 2022).......................................33

In re Ma.V., 64 Cal.App.5th 11, 22 (2021)………………………………… 17

Lee v. Poudre School Distr. R-1, 607 U.S. ___, No. 25-89 (Oct. 14, 2025). 13

Mahmoud v. Taylor, 606 U.S. 522, (2025) ................................................8, 9

Meyer v. Nebraska, 262 U.S. 390 (1923) ................................................6, 10

Mirabelli v. Olson, No. 3:23-cv-00768-BEN-WVG, 2025 WL 3713588 at 12 (S.D. Cal Dec. 22, 2025) ..............................................................................12

Mirabelli v. Bonta, 607 U.S. No. 25A810, 2026 WL 575049  (Mar. 2, 2026) ......................................................................................................5, 9, 11, 12

Parham v. J.R., 442 U.S. 584 (1979) .....................................................8, 12

Pierce v. Society of Sisters, 268 U.S. 510 (1925) ..................................6, 10

Troxel v. Granville, 530 U.S. 57 (2000)........................................................7

United States v. Skrmetti, 145 S. Ct. 1816 (2025)....................................24

U.S. v. Skrmetti,  605 U.S 495, 552  (2025)...............................................10

Wisconsin v. Yoder, 406 U.S. 205 (1972) .....................................................7

**Statutes**

California Penal Code §11166 ....................................................17

Family Educational Rights and Privacy Act, 20 U.S.C. §1232g...............22

**Other Authorities**

Hannah Barnes, Inside the Collapse of the Tavistock Centre, The NEW
STATESMAN (Mar. 20, 2024) .....................................................19

Hilary Cass, Independent Review of Gender Identity Services for
Children and Young People: Interim Report 62–63 (Feb. 2022) ...........11

Philip J. Cheng et al. Fertility concerns of the transgender patient,
TRANSLATIONAL ANDROLOGY AND UROLOGY, June 2019 ..........................17

Emerging and Accumulating Safety Signals for the Use of estrogen
Among Transgender Women. Discov. Ment. Health 5, 88 (2025) ..........18

Gender Reassignment Surgery Market Size, Nov. 5, 2025 ......................20

Huge Money Maker': Video Reveals Vanderbilt's Shocking Gender "Care'
Threats Against Dissenting Doctors, DAILY WIRE, Sept. 20, 2022.........20

Individuals Treated for Gender Dysphoria with Medical and/or Surgical
Transition Who Subsequently Detransitioned: A Survey of 100
Detransitioners 50 Archives of Sexual Behaviors 3353, 3353–69 (2021)
...................................................................................19

New study finds 12-fold higher risk of suicide attempt for adult
transgender patients, WASHINGTON EXAMINER, May 17, 2024...............17

Treatment for Pediatric Gender Dysphoria, Review of Evidence and Best
Practice, Department of Health and Human Services 50–55 (2025)......18

Elie Vandenbussche. Detransition-Related Needs and Support: A Cross-Sectional Online Survey, 69 Journal of Homosexuality 1602 (2022).....19

Colin Wright, BREAKING: New Documents Reveal Shocking Surge in Trans-Identified Students in Davis, CA Schools, Reality's Last Stand, (Jan. 17, 2023),.........................................................................................32

## IDENTITY AND INTEREST OF AMICUS CURIAE[1]

Our Duty respectfully submits this brief as amicus curiae in support of Appellant and urges this Court to reverse the district court's dismissal of her amended complaint. Our Duty is a national non-profit, with over 1,000 members, including many from California. Our mission is to: (1) support families with trans-identified children; (2) assist families in finding non-medical resolutions to gender dysphoria; (3) provide educational materials to safeguard against gender interventions; and (4) pressure government and health services to develop policies and treatments that serve the best interests of children struggling with identity issues related to their sex and those children's families.

In the last decade or so, there has been a meteoric rise in the number of young people rejecting their sex and adopting transgender identities, in conjunction with a rapid infiltration of gender ideology in all aspects of life, including schools. What was once an exceedingly rare circumstance has become commonplace, with every social media platform

---

[1] No counsel for a party authored this brief in whole or in part; no one, other than amicus and its counsel, made a monetary contribution for its preparation or submission; and all parties have consented to its filing.

1

celebrating this rejection of biological reality and entire industries earning billions of dollars altering humans'—including children's—primary and secondary sex characteristics.

Gender ideology is a belief system that rejects the importance of biological sex and replaces it with the idea of "gender identity," a quasi-religious concept that presumes that we all have an invisible "gender" that is known only to us and that may or may not match our bodies. Our Duty's position is that this ideology has resulted in the insidious belief that some children are "born in the wrong body" and that everyone must cater to trans-identified children's beliefs that they are actually the opposite sex, often resulting in lifelong unnecessary medical harms to those kids. Our Duty rejects the harmful false narrative that if adults do not affirm trans-identified children's rejection of their sexed bodies, such children will kill themselves. Our Duty knows that the unprecedented uptick in youth claiming transgender identities is not organic.

Our Duty members have children who have been influenced by teachers, peers and social media to adopt trans identities only to later drop the identity when they are removed from the schools or other indoctrinating settings. Consequently, Amicus has a compelling interest

in protecting the fundamental constitutional rights of parents to direct the upbringing and education of their children, particularly when schools adopt policies that encourage kids to socially transition without their parents' knowledge or consent and require teachers to withhold such knowledge from parents, even to the point of lying when directly asked. For these reasons, Our Duty has a profound interest in the outcome of this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case presents the critical question about whether parents have a fundamental right under the U.S. Constitution to be involved in crucial decisions with lifelong impacts on their children. Plaintiff Aurora Regino had two daughters attending school in the Chico Unified School District. During the 2021–22 school year, District personnel unilaterally created a secret "transgender support plan" for Regino's older daughter A.S. after seizing upon her one-time statement to a school counselor that she "felt like a boy." Under that plan, school faculty and staff socially transitioned Regino's daughter into a male identity, using a male name and pronouns and treating her as though she were a boy, all while hiding the plan from

her mother. The school counselor also clandestinely met with A.S. who was eleven at the time to discuss her identity.

California schools are required to obtain parental consent for innumerable things, including participation in surveys, psychological testing, sex education, and medical treatments. Historically, schools have informed parents whenever students have sustained physical injuries or when there is any question about the student's health or well-being. Schools may not even give a child ibuprofen without first getting permission from a parent. But in California, when it comes to something so essential as whether a child accepts his/her own sex, public schools have decided—at least in many instances—to keep parents in the dark. In this case, the school embarked on a social transition of A.S. without Regino's permission.

For more than one hundred years, the Supreme Court has recognized that parents have a fundamental right to direct the care, upbringing, and education of their children. This constitutional principle, rooted in the Due Process Clause of the Fourteenth Amendment, necessarily encompasses the right to know about and participate in

4

crucial decision-making when someone's child decides to identify as transgender and wishes to be treated in school as the opposite sex.

The district court rejected Regino's argument that her fundamental constitutional rights as a parent entitle her to be notified when her child began identifying as the opposite sex and to withhold permission to treat her child this way. The court's decision contradicts more than a century of black letter law on parents' rights to direct the upbringing of their children and to be involved in critical decisions that will affect their children's entire lives. This conclusion is confirmed by the March 2, 2026, U.S. Supreme Court's per curiam decision in *Mirabelli v. Bonta*, 607 U.S. ___, No. 25A810, 2026 WL 575049 (Mar. 2, 2026). In a 6–3 ruling, the Court held that California school policies requiring concealment of students gender identities from parents likely violate parental rights under the Due Process Clause, precisely the claim that Regino raises here. Thus, the district court's dismissal should be reversed, and Regino should be allowed to proceed on her claims.

## ARGUMENT

### I. A Century of Supreme Court Precedent Establishes Parents' Fundamental Right to Direct Their Children's Upbringing, Education, and Medical Care

The Supreme Court has recognized for over a century that the Constitution protects a parent's fundamental right to direct the upbringing, education, and medical care of his/her children. This principle represents one of the most enduring and consistently applied doctrines in American law.

The modern framework for parental rights emerged in the 1920s with two landmark Supreme Court decisions that established the constitutional foundation still governing today. In Meyer v. Nebraska, 262 U.S. 390 (1923), the Court held that the Fourteenth Amendment's liberty guarantee encompasses the right "to bring up children" and control their education. Two years later, in Pierce v. Society of Sisters, 268 U.S. 510 (1925), the Court struck down an Oregon statute requiring children to attend public schools, declaring that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." Id. at 535. The Court recognized that parents

6

serve as the primary gatekeepers controlling their children's exposure to ideas and influences, stating that the statute "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control." Id. at 534–35.

The Supreme Court has consistently reaffirmed and expanded upon these principles. In Wisconsin v. Yoder, 406 U.S. 205 (1972), the Court recognized a parent's right to shield his/her children from influences contrary to a family's values, holding that compulsory education laws could not force Amish children to attend high school against their parents' religious beliefs. The Court emphasized that "[t]he history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children." Id. at 232.

In Troxel v. Granville, 530 U.S. 57 (2000) (plurality opinion), the Court reaffirmed that "the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." Id. at 65. The Court established a presumption that "fit parents act in the best interests of their children" and that governmental interference with parental decision-making requires compelling justification. Id. at 68–69; see also Parham v. J.R.,

442 U.S. 584 (1979) (holding that a parent has the authority to commit his/her child to a mental health facility, reasoning that parents generally act in the best interest of their children).

The Supreme Court's recent decision in *Mahmoud v. Taylor*, 606 U.S. 522, (2025), affirmed parents' incontrovertible right to raise their children according to their own moral beliefs. In Mahmoud, a diverse group of parents challenged their school district's refusal to provide notice and an opportunity for those parents to opt their kids out of curriculum involving storybooks that promoted "LGBTQ+-inclusive" topics. The Court ruled in favor of the parents, holding that they have the right to opt their children out of exposure to materials that conflict with their fundamental beliefs about sensitive topics.

If the fundamental constitutional rights of parents to control the education and upbringing of their children are implicated in the context of opting those children out of exposure to materials introducing them to the concept of transgenderism, such rights are certainly implicated when a school adopts a policy of conspiring with children to socially transition them to the opposite sex and actively seeking to mislead their parents about it and/or ignore parents' directions to stop. That is precisely what

8

the Supreme Court ruled this month in Mirabelli v. Bonta, 607 U.S. ___, No. 25A810, 2026 WL 575049 (Mar. 2, 2026)(per curiam).

In Mirabelli, the Supreme Court confirmed that parents—not the state—control the upbringing, education and medical treatments of their children.  Id. In vacating the Ninth Circuit's stay of an injunction by a district court on behalf of parents objecting to secret social transition policies, the Court held that "the intrusion on parents' free exercise rights here—unconsented facilitation of a child's gender transition—is greater than the introduction of LGBTQ storybooks we considered sufficient to trigger strict scrutiny in Mahmoud."  Id. at 2.

The Court made clear that "California's policies will likely not survive the strict scrutiny that Mahmoud demands." Id. at 2-3.  It wisely observed that "those policies cut out the primary protectors of children's best interests: their parents," rejecting the state's claim that keeping secrets from all parents was an effective way to ensure students' safety. Id. at 3.

The Mirabelli Court did not limit its findings to parents who object to secret transition policies under the Free Exercise Clause. It held that "parents who object to the policies on due process grounds" would be

9

likely to succeed on the merits of their claims as well. Id. at 3. "Under long established precedent, parents—not the State—have primary authority with respect to 'the upbringing and education of children.'" Id. (citing Pierce, 268 U.S. at 534–35, and Meyer, 262 U.S. at 399–400).

In keeping with the unwavering precedence that hold that parents rights are tantamount, Regino as the parent, should have been involved with any decision by the school to socially transition her minor daughter. The district court ignored clear substantive due process rights of Regino and must be reversed.

## II. The District Court Erred When it Rejected Regino's Claim That Excluding Her from the Decision to Socially Transition Her Child Violated Her Parental Rights.

### A. A School Keeping Secrets about a Child's Gender Confusion at Schools Infringes on the Parent's Ability to Make Medical Decisions.

As this Court recognized in *U.S. v. Skrmetti*, 605 U.S 495, 552 (2025), the appropriate treatment for children who reject their sex is hotly contested. This fact alone makes clear that parental involvement about treatment is essential. The district court in this case tied itself into

10

knots to avoid reaching the correct conclusion that the school's action of secretly socially transitioning 21

no's daughter implicated her fundamental rights, getting distracted that it needed to determine that use of a name and pronoun was medical treatment, but that is not the actual crucial factor. Whether or not the actions of the school constitute medical treatment is not the issue.[2] It is whether the school is *depriving parents the opportunity to provide medical treatment* to their own children by intentionally keeping them in the dark about their child's symptoms. As the Supreme Court in *Mirabelli* made clear,

> [t]he right protected by these precedents includes *the right not to be shut out of participation in decisions regarding their children's mental health.* Gender dysphoria is a condition that has *an important bearing on a child's mental health*, but when a child exhibits symptoms of gender dysphoria at school, California's policies conceal that information from parents.

---

[2] However, Amicus disagrees that social transition is not a medical treatment. See, Hilary Cass, *Independent Review of Gender Identity Services for Children and Young People: Interim Report* 62–63 (Feb. 2022),https://webarchive.nationalarchives.gov.uk/ukgwa/202503101438 46/https://cass.independent-review.uk/home/publications/interim-report/ (explaining social transition is an active invention with significant effects on psychological functioning and it is not neutral).

*Id.* at 3 (citing *Parham*, 442 U.S. at 602) (emphasis added).[3] Likewise, the district court in *Mirabelli* astutely observed,

> The constitutional question is really not whether expressing gender incongruence is pathological or healthy, or, whether socially transitioning is or is not a medical procedure. That debate is a red herring. The constitutional question is about *when* gender incongruence is *observed*, whether parents have a right to be informed and make the decision about whether further professional investigation or therapy is needed. Put another way, the question is whether being involved in potentially serious medical or psychological decision-making for their school student is a parent's constitutional right.

*Mirabelli v. Olson*, No. 3:23-cv-00768-BEN-WVG, 2025 WL 3713588 at 12 (S.D. Cal Dec. 22, 2025) (emphasis in original). The Supreme Court's vacatur of the stay of the district court's order indicates that the Court almost certainly agrees. Additionally, the Justice Alito in his opinion in *Lee v. Poudre School Distr. R-1*, 607 U.S. ___, No. 25-89 (Oct. 14, 2025)

---

[3] Even Justice Kagan, joined by Justice Brown, dissenting from the opinion on the grounds that the Court should have waited to weigh in on the issue of secret social transition until it hears a case, signaled agreement with the majority on the likely merits of the claim. Kagan wrote: "None of this is to say that the Court gets the merits here wrong. . . . I have no doubt that parents have rights, even though unenumerated, concerning their children, and the life choices they make. . . . California's policy, *in depriving all parents of information critical to their children's health and well-being, could have crossed a constitutional line.*" *Mirabelli*, at 7 (Kagan, J., dissenting)(emphasis added).

states that schools' purposeful "interfere[nce] with parents' access to critical information about their children's gender-identity choices and school personnel's involvement in and influence on those choices" are both "troubling—and tragic". It is the act of deception and interference of parental involvement in the crucial decision on how to treat a gender dysphoric child that that triggers the violation of parental rights. Parents are blocked by the schools from having any input or being able to decide whether they will seek professional assistance, assist their child to return to comfort in his/her natural body, or socially transition the child.

The district court also erred when it rejected Regino's claim that the policy violated her "right to consent when the state makes 'important decisions' in her children's lives … decisions that go to the 'heart of parental decision-making.'" *Regino*, 2026 WL 121667, at 9. While it is true that "parental rights are not without limitations," *id.*, and parents "do not have a fundamental right generally to direct <u>how</u> a public school teaches their child," *id.* at 11, the policy at issue here is not about curriculum or small administrative concerns but rather about keeping from parents a key development in the child's life with which parents are in the best position to help that child. Moreover, the fact that a child may

13

wish to keep this information from his/her parents, or does not agree with how he/she thinks his/her parents will address the situation, is irrelevant. As the Supreme Court recognized, the fundamental rights of parents to control the upbringing of their children rests on the notion that "natural bonds of affection lead parents to act in the best interests of their children." *Parham*, 442 U.S. at 602 (citations omitted). And, "[s]imply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Id.* at 603.

Parental rights are not merely about directing children's upbringing in the abstract; they include the specific authority to protect children from medical or any other type of decision-making that may have permanent, lifelong impacts.

### B. Schools Justify Secret Social Transition Policies on the Unconstitutional Presumption that Parents Are Unsafe, while it is the Schools that Are Unsafe.

Each school policy that excludes parents from knowledge of their kids' social transitions has, at its core, the presumption that parents are

14

"unsafe" and incapable of making appropriate decisions—medical and otherwise—for their children. It proceeds on the assumption that only parents who believe in and approve of the concept of "gender identity" are capable of effectively helping their child cope with gender dysphoria or any other mental distress that may be causing them to want to be perceived as something other than their sex.

Thus, many parents are prevented from exploring the causes of the child's sex rejection and helping him/her accept his/her natural body. Instead, they are secretly adjudicated abusive *in absentia* and afforded no due process against the heinous label while the school cements the harmful notation identity that the child is born in the wrong body.

The reproachful nature of these secrecy policies against parents is echoed in the district court's statement that "schools, understandably, have an interest in ensuring that they remain a safe space in which students can explore their identities, as children do . . . in the school environment." *Regino v. Blake*, No. 2:23-CV-00032-DJC-DMC, 2026 WL 121667, at *1 (E.D. Cal. Jan. 15, 2026). The implication is that the safe space of the school is one that protects children (and their ability to

15

explore identities) *from their own parents*, who are presumed unable to support their children's exploration.

The unrebuttable presumption by schools that parents will be abusive without providing any ability for the parent to defend against such accusations is completely at odds with this Court's well-established case law regarding parental rights, which "historically . . . has recognized that natural bonds of affection lead parents to act in the best interests of their children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979). Moreover, "[t]he statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition." *Id*. at 603 (emphasis in original). The Supreme Court in *Mirabelli* reaffirmed this principle and noted that involving parents in a child's decision to socially transition at school does not interfere with a state's ability to "shield children from unfit parents." Child abuse laws remain enforceable and most school staff are mandatory reporters.[4] 2026 WL 575049 at 3.

---

[4] Child abuse laws are not based upon purely speculative possibilities about what might happen but rather upon actual knowledge or a reasonable suspicion about what is happening. See Cal. Penal Code §11166 and *In re Ma. V.*, 64 Cal.App.5th 11, 22 (2021).

16

Moreover, once one understands what gender ideology most often leads to, it is the school that is the "unsafe" space, not the parents. When a school participates in the social transition of a child, it solidifies a child's belief that he/she was born in the wrong body—everything is wrong—his/her facial structure, voice, genitalia, movements and hair growth. In the vast majority of case, this belief leads to the notion that the child can only be "fixed" by arresting his/her endocrine system, taking powerful drugs for life, and ultimately undergoing multiple surgeries to remove healthy and vital body parts, or create body parts that don't belong, leaving the body scarred, non-functioning and diseased.[5] (See

---

[5] Potential outcomes of sex-rejecting medical interventions include sterilization/infertility, sexual dysfunction, increased prevalence of suicides, lowering of IQ and brain development issues, and heart attacks and stroke. See, Philip J. Cheng et al. *Fertility concerns of the transgender patient*, TRANSLATIONAL ANDROLOGY AND UROLOGY, June 2019, doi:10.21037/tau.2019.05.09; M.E. Kerckhof, et al, *Prevalence of Sexual Dysfunctions in Transgender Persons: Results from the ENIGI Follow-Up Study*, 16 J SEX MED. 12:2018-2029. (December 2019) doi: 10.1016/j.jsxm.2019.09.003. Epub 2019 Oct 24. Erratum in: J Sex Med. 2020 Apr;17(4):830. doi: 10.1016/j.jsxm.2020.02.003. PMID: 31668732. Gabrielle M. Etzel, *New study finds 12-fold higher risk of suicide attempt for adult transgender patients*, WASHINGTON EXAMINER, May 17, 2024, https://www.washingtonexaminer.com/policy/healthcare/3007980/new-study-finds-12-fold-higher-risk-of-suicide-attempt-for-adult-transgender-patients/. Schwartz, L., *et al. Emerging and Accumulating*

Appendix A, depicting the gruesome cost to the human body for sex-rejecting interventions.)

Based upon the foregoing, the lower court's rationale in this case that schools need to "remain a safe space in which students can explore their identities" without parental knowledge or involvement is not justified.

## III. Schools Participation in Socially Transitioning Children Harms Same Sex Attracted Students

There is a growing recognition that children who would ultimately grow up to be gay or lesbians are over-represented as those adopting a transgender identity. The Dutch protocol that opened the flood gates to pediatric sex-rejecting interventions in the US, began through experiments on same-sex attracted adolescents seeking treatment for distress over their natural bodies.[6] All but one of the children is the experiment was heterosexual. The medicalization of their bodies is

---

*Safety Signals for the Use of estrogen Among Transgender Women. Discov. Ment. Health* 5, 88 (2025).

[6] See Dep't. of Health and Human Serv., *Treatment for Pediatric Gender Dysphoria, Review of Evidence and Best Practice*, Department of Health and Human Services 50–55 (2025).

tantamount to "trans'ing the gay away." In 2012, 90% of the United Kingdom's Gender Identity Development Service's (GIDS) female adolescent subjects reported that they were same-sex attracted and 80.8% of the males reported the same.[7] In Lisa Littman's 2021 study of detransitioners, she noted that *only* 18 of 100 participants claimed to be purely heterosexual.[8] The recent Health and Human Services Report recognizes that children who are likely to grow up to gay are being swept up into the transgender social contagion craze, altering their bodies to appear to be "straight."[9]

Importantly, even though many of the children who identify as trans end up actually just being gay, the two identities are not the same. Much of the reasoning about embracing "trans" children and accepting

---

[7] See Hannah Barnes, *Inside the Collapse of the Tavistock Centre*, The NEW STATESMAN (Mar. 20, 2024) https://www.newstatesman.com/politics/health/2024/03/inside-the-collapse-of-the-tavistock-centre.

[8] Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners* 50 Archives of Sexual Behaviors 3353, 3353–69 (2021); See also, Elie Vandenbussche. *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, 69 Journal of Homosexuality 1602 (2022).

[9] See Note 6.

them for "who they are" appears to stem from societal guilt about not having treated gay people (including kids) well in past decades. But identifying as transgender and identifying as gay have completely different lifelong repercussions. No medical industries are profiting from gay identities the way the medical community and hospitals profit from trans identities. A trans-identified child is potentially a lifelong medical patient—there is no similar analog for gay people.[10]

Thus, in an attempt to make up for past wrongs against gay people, this new movement is in fact harming a whole new generation of gays in a much more damaging way: by permanently deforming and in many cases sterilizing them.

---

[10] See, Prestigiacomo, Amanda, *'Huge Money Maker': Video Reveals Vanderbilt's Shocking Gender "Care' Threats Against Dissenting Doctors*, DAILY WIRE, Sept. 20, 2022, (last viewed March 7, 2026), see also, Precedence Research, *Gender Reassignment Surgery Market Size*, Nov. 5, 2025 (sex-rejecting surgeries alone have revenues of $2.93B in the US in 2025 and is predicted to reach $5.51B in 2034) https://www.precedenceresearch.com/gender-reassignment-surgery-market#:~:text=The%20gender%20reassignment%20surgery%20market%20is%20witnessing%20strong,market%20is%20valued%20at%20%242.93%20billion%20in%202025. (last viewed Mar. 7, 2026).

## IV. Amici Stories of Parents Illustrate the Dangers of Schools Engaging in Social Transition of Children Without Parental Involvement

Through these vignettes of mostly California parents[11] the pattern of schools' indoctrination of students into transgender ideology, active participation in their transitions and concomitant deception of their parents is evident, as is the destructive effect of the schools' actions on children. Affirming a child's "transgender" identity is not a neutral act and has the ability to determine which child will desist and which shall persist and move towards a medical pathway.

### A. Erin Friday, President of Our Duty

Erin's daughter, P., was eleven when, after sex-ed class, she and her entire friend group each chose a new identity. P. shifted from across a myriad of identities, ultimately choosing to identify as transgender at age thirteen. Her friends' identities likewise morphed.

During P.'s freshman year (online due to lockdowns), Erin overheard teachers referring to her with a male name and pronouns.

---

[11] Unless otherwise noted, these stories are from California. Some parents choose to remain anonymous because they are afraid of retaliation from trans-rights activists.

School officials told Erin that per school policy and the law, they had to follow her daughter's request and not inform her parents. They stated that school was meant to be a "safe space" for P. Meanwhile, they clearly telegraphed that Erin was "unsafe" by calling Child Protective Services ("CPS") on her.

Erin removed P. from school and requested records pursuant to FERPA[12] to see whether the school would produce the social transition plan or any other evidence that it was socially transitioning her daughter; it did not.

After getting the support she needed, and P. stopped rejecting her sex and now accepts her body as an adult.

Erin has since spoken to nearly 500 parents whose children suddenly adopted sex-rejecting identities and who have battled schools to protect their children from being socially transitioned. Many parents fear objecting to it or even <u>asking</u> if their child is being transitioned, because they are afraid CPS will be called. Many parents report that

---

[12] Family Educational Rights and Privacy Act, 20 U.S.C. §1232g.

22

school counselors are persuading students that they are "transgender" and that schools relentlessly push transgenderism in every classroom.

Erin advises parents to unenroll from public schools if possible and homeschool. She suggests families move to conservative states, though secrecy policies are nearly ubiquitous. Teachers and school board members who disapprove of indoctrinating students and deceiving parents also contact Erin seeking advice on combating secrecy policies. The teachers voice confusion as to what the law requires—whether they can be honest with parents or must lie, so most stay silent for fear of losing their jobs.

Erin's experience with all of the parents she has spoken to is that all of them have responded lovingly towards their confused children. She knows of no family who has abandoned their child because of the adoption of a transgender identity.

### B.    Abigail Martinez[13]

The avoidably tragic story of Abigail and her daughter, Yaeli, began when Yaeli started high school, after a difficult middle-school experience riddled with bullying. Yaeli, looking for a place to fit in, found friendship with a sex-rejecting older female student, who directed her to the school's LGBTQ club. Yaeli joined without Abigail's knowledge. Through the club, Yaeli was readily persuaded that her growing severe depression could be resolved if she "transitioned." Yaeli shed her feminine appearance and the public high school, in keeping with its policy, treated Yaeli as a boy without consulting her mom. Abigail sought help for her daughter's depression from the school's psychologist, unaware that the psychologist was actually working to solidify Yaeli's sex-rejecting identity, and against Abigail.

When Yaeli attempted suicide in high school, the school's principal met Abigail at the hospital demanding that she call Yaeli by her chosen male name, asking why she can't just capitulate. But Abigail knew that

---

[13] See also, Abigail Martinez's Brief Supporting Respondents and Affirmance in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025) (No. 23-477).

Yaeli's mental health issues did not stem from Abigail not affirming her delusion, but rather that the adoption of a male identity was an outgrowth of her depression. The school and the "trans" friend's parent continued their coercive tactics against Abigail, even hiding Yaeli, as Abigail searched frantically for her missing daughter. Led by the school psychologist into calling CPS against her mother in order to get the sex-rejecting interventions she wanted, Yaeli filed false claims of physical and mental abuse, and was removed from the home. While CPS quickly cleared Abigail of the physical abuse allegations, the emotional abuse claims lingered.

While in state custody, Yaeli was placed on testosterone and cycled through foster homes and facilities, sleeping on couches and living in abject poverty. Abigail was granted limited supervised visits with Yaeli but was forbidden from discussing the harms of sex-rejecting interventions or her religious faith. After about three years following Yaeli's removal, Abigail was absolved of all abuse claims; however, it was too late. Yaeli's physical suffering from the effects of testosterone in her tiny female body was too much, and she committed suicide by kneeing in front of an oncoming train.

25

### C.    Lydia McLaughlin

Lydia's daughter T. adopted a transgender identity, even though she had no prior body discomfort. T simultaneously started self-harming. T.'s public high school solidified her sex-rejecting identity by indoctrinating her with lessons about "transgenderism" and enthusiastically using the male name and pronouns T. requested. Solely by happenstance, Lydia discovered that the school was socially transitioning T.

Lydia demanded that teachers stop referring to her daughter as male. The teachers assured her they would, but this was a lie. Afterwards, the principal told T. that her transgender identity would be their secret, colluding with her against her mom. Lydia made a FERPA request to determine if the school was continuing to defy her instruction, but the school refused to provide T's records. After engaging counsel, the school provided the records evidencing that indeed the school was continuing to socially transition T.

As T. fell deeper into the identity, she wore a breast binder and developed an explosive temper, accusing her parents of abuse and developing an eating disorder.

26

Despite T.'s vitriol, Lydia refused to affirm her, knowing the danger of surrendering to her daughter's maladaptive identity, she forced the school to treat T. as a girl threatening legal action and showered her with affection. T., now a college student, has completely dropped her trans identity.

### D.    Sue Y.

When Sue Y.'s daughter G. turned 12, her demeanor changed. G. began dressing in dark, oversized clothes, and becoming easily agitated and suicidal. Amidst these changes, G. announced she was "transgender."

Sue promptly took G. to a Kaiser gender clinic. Outside her mother's presence, a Kaiser clinician told G. about hormonal treatments and surgeries "to make her authentic." The clinic then told Sue she had to choose between "a dead daughter or a live son." Terrified, Sue followed the clinic's advice and placed G. on puberty blockers and directed G.'s school to cooperate with the social transition, which it did.

Sue committed to G.'s "transition" for years, but G.'s mental health deteriorated. G. was self-harming, suicidal, borderline anorexic, and in and out of psychiatric hospitals.

After an out-of-state psychiatrist advised that G.'s distress stemmed from mental illness, Sue stopped the blockers and stopped affirming the male identity. The school counselor was furious when Sue instructed her and the school staff to stop referring to G. as a boy and called CPS, asserting that raising G. as her sex was abuse. Sue removed G. from public school. G. is now a well-adjusted adult woman who embraces her female sex.

### E.     Jessica E.

At age 13, Jessica E.'s daughter M. was subjected to California's mandated sex education curriculum, exposing her to a wide range of sexual and so-called gender identities. Following class, her friends each selected "queer" labels. M. began identifying as "bisexual" and shortly thereafter cutting herself. The next year, because M. dressed in "anime-themed" clothes—sometimes a sign of identity crisis—the school counselor invited her to meet trans-identifying older students. In

response to these meetings and private school counseling without parental consent, M. began identifying as "transgender."

M. informed her mother about her new identity and her mental health plummeted. Jessica then realized that M. had been obsessively consuming "transgender" content on social media while the school had been affirming her newly adopted identity without parental notification or consent.

Jessica took away M.'s phone and unenrolled her from school. The school counselor, however, refused to stop indoctrinating M. and even tried contacting M. through her brother. Jessica then unenrolled her son and moved to Arizona. M., now a high school graduate, shed her "trans" identity and her mental health improved. M. is both angry and embarrassed that she rejected biological reality as she embarks on a career as a firefighter.

## F.    Lisa Mullins

Lisa's daughter M. struggled in middle school as she gained significant weight due to a medical condition. M. was artsy and disliked

sports, pushing her out of the "cool" group. When she started high school during Covid-19 lockdowns, she lost all peer interactions.

M. turned to the internet and fell into the transgender subculture, consuming Anime, YouTube videos, and TikToks with transgender themes. She changed markedly: began wearing cartoon-like makeup, shaving her eyebrows, and decorating her bedroom with witchcraft imagery. She also started cutting. Worried, Lisa listened to some of M.'s online classes and became alarmed by the overt sexual themes with no educational value. She heard the teacher asking whether M. would be comfortable masturbating in a room with another person or engaging in anal sex. Lisa also heard classes promoting transgenderism.

M. began decompensating and cut herself so deeply it required an emergency room visit. A psychiatrist diagnosed M. with depression and anxiety and prescribed medication.

Lisa then discovered M. had changed her name and pronouns at school, using "they/them" and flipping back and forth between male and female names. The school adopted every change M. requested as she circulated through multiple different sex-rejecting identities.

Lisa met with school officials to demand that they stop treating M. as a boy. The school refused, informing Lisa that M. had sole authority over her name and pronouns. But when M. reverted to asking teachers to use her given name, they refused, still using M.'s "trans" names, as did the school counselor. Lisa believes the school's aim was not M's best interests but simply to exert power over "bigots and transphobes" like her.

Lisa toured the school, photographing how the Wellness Center enticed students with an "Explore Me" box filled with "trans tape," used for binding breasts or penises or creating a fake penis "bulge." They also advertised that they provided kids with free breast binders.

In college, M. finally shed her transgender identities, her mental health issues subsided, and her feminine appearance returned. Lisa's family ultimately fled California to safeguard her other child from a school system that willfully deceives parents.

### G.    Beth Bourne

Beth is the mother of S., a 20-year-old female who began identifying as a transgender boy at age 13, after a series of other LGBTQ identities. Beth surmises that S. wanted to present as a boy as a way to shield

herself from the type of terrible sexual assault suffered by her best friend in sixth grade. S. also had long-standing mental health issues that worsened as her identity crisis emerged. A significant contributing factor to S.'s adoption of a transgender identity was her school—Davis Joint Unified High School, which has one in twenty-five students who identify as transgender, 2.8 times the national average.[14] The school was encouraging and counseling Beth that S.'s cutting and anxiety would resolve if she would only treat S. as a boy. At first Beth listened to the "experts" in her desperation to help her child, but over time became alarmed that her daughter's medical team suggested that her mentally unstable daughter undergo life-changing sex-rejecting medical interventions before she could even drive a car. The school counselor habitually pressured Beth to move forward in S.'s "transition" and tried to drive a wedge between mother and child, using Beth's refusal to go along with it to help. S.'s affirming father obtain complete custody of S. In an extraordinary act of selflessness, Beth gave up visitation with S. in

---

[14]    Colin Wright, *BREAKING: New Documents Reveal Shocking Surge in Trans-Identified Students in Davis, CA Schools*, Reality's Last Stand (Jan. 17, 2023), https://www.realityslaststand.com/p/breaking-new- documents-reveal-shocking.

exchange for an agreement that S's father would not allow any sex-rejecting interventions while S. was still a minor, thus giving her time to mature before any permanent damage was done.

Now an adult, S. has not medicalized and is showing signs of desistence, moving from trans to non-binary, wearing normal bras instead of breast binders, wearing dresses and typical female make up, and changing her name from a clearly male name to a feminine one. Tragically, the chasm between S. and Beth fostered by the school and medical community still has not been bridged and S. has no direct contact with Beth.

### H.     Jessica Konen[15]

Jessica is the mother of M., a female. When M. was 11, in 2019, a friend invited her to a gender sexuality club ("GSA"). She joined and then quit but rejoined when a teacher personally invited her back. When the Club teachers asked her for her sexuality, to fit in, M. said she was bisexual, even though she did not understand what that meant. The teachers then convinced her that she was actually a transgender boy, and

---

[15] *Konen v. Caldeira*, No. 22-cv-1813 (Cal. Super. Ct. Monterey Cnty., June 27, 2022), *removed* (N.D. Cal., Sept. 12, 2022).

encouraged her to choose a male name. The school then called her the male name and created a secret gender support plan that noted that M.'s parent should not be told. M.'s mental health declined.

M.'s club teachers were then caught on tape at a California Teachers Association meeting admitting how they circumvent parental involvement and root through students' google searches to find candidates to recruit for their club. They also instructed teachers to use creative names for the club, to hide its true purpose.

After discovering all this, Jessica disenrolled M. from the offending school, and M.'s mental health steadily improved until finally, M. ceased identifying as "transgender."

## I.    Erin Lee[16]

At age 12, Erin's daughter, C.L., announced she was transgender. C.L.'s favorite teacher had invited her to "Art Club." However, it was not actually an art club but instead was a "Genders Sexualities Alliance"

---

[16] Colorado parent. See *Lee v. Poudre*, 135 F.4th 924, 929 (10th Cir. 2025), *cert denied*, No. 25-89 (Oct. 14, 2025).

("GSA") club. An outside instructor visited the club bringing a variety of LGBTQ flags, bracelets and other "swag" for students who claimed transgender identities. Because of these tactics, C.L. began identifying as trans. Shortly thereafter, she became despondent and suicidal, as did other 12-year-old students in the club and similar clubs at other schools where this instructor also spoke.

Erin, along with another set of parents whose daughter attempted suicide, filed a lawsuit. Both young girls, leaving the club, returned to identifying as their sex.

### J.  Wendell Perez[17]

Wendell is the father of female A.P. When A.P. was twelve years old, Wendell learned that she had attempted suicide for the second time that school year. The school had *not told him* about A.P.'s first attempt. A school counselor had been secretly meeting with A.P. weekly for months, encouraging her to socially transition to a male identity and instructing A.P.'s teachers to use her chosen male name in class, but not to tell her parents.

---

[17] Florida parent.

A.P.'s thought process was that taking male hormones would protect her from boys. The "cool" LGBTQ posters and materials in the school counselor's office had also influenced her to believe that her interest in sports and video games actually meant she was a boy trapped in a girl's body.

A.P.'s parent removed her from school and with the help of her parent's love and compassion, A.P. began re-identifying with her sex but continued to struggle with her mental health.

\* \* \*

Each of these young people adopted transgender identities and wished to socially transition and to take hormones and/or undergo surgeries to appear as the opposite sex. Each was secretly supported or influenced by their schools. Thanks to parental intervention, most of the children were able to later have a change of heart, thereby avoiding the worst consequences of medical gender interventions, except for tragically Yaeli, the one child removed from her parent. We present these stories as cautionary tales, underlining the dangers that indoctrinating schools pose to young people and the critical importance of parental involvement in children's healthy development.

36

# CONCLUSION

Based upon the foregoing, this Court should reverse the District Court.

Dated: March 12, 2026

/s/ *Jennifer W. Kennedy*

JENNIFER W. KENNEDY

ATTORNEY AT LAW

61 S. Baldwin Ave. #1626

Sierra Madre, CA 91025

(626) 888-2263

jenniferkennedyesq@gmail.com

/s/ C. Erin Friday

C. Erin Friday

OUR DUTY-USA

P.O. Box 442

San Carlos, CA 94070

(415) 577-9271

erin@ourduty.group

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** Appeal No. 26-475.

I am the attorney or self-represented party.

**This brief contains 6821 words,** including **0 words** manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ X ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.

38

[ ] a party or parties are filing a single brief in response to multiple briefs.

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Date: March 12, 2026                    */s/ Jennifer W. Kennedy*

JENNIFER W. KENNEDY

ATTORNEY AT LAW

61 S. Baldwin Ave. #1626

Sierra Madre, CA 91025

(626) 888-2263

jenniferkennedyesq@gmail.com

# CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2026, I electronically filed the foregoing brief with the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that counsel for all parties in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Jennifer W. Kennedy*

JENNIFER W. KENNEDY
ATTORNEY AT LAW
61 S. Baldwin Ave. #1626
Sierra Madre, CA 91025
(626) 888-2263
jenniferkennedyesq@gmail.com

# APPENDIX A



Phalloplasty using the skin from forearm



Phalloplasty using the thigh skin



**Female Double mastectomy with evidence of severe self-harming scars on torso, shoulders and arms**