No. 26-475

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

AURORA REGINO,

*Plaintiff-Appellant,*

v.

GREG BLAKE, Superintendent,

*Defendant-Appellee,*

and

CAITLIN DALBY; REBECCA KONKIN; TOM LANDO;
EILEEN ROBINSON; MATT RENNIS

*Defendants-Appellees.*

On Appeal from the United States District Court for the
Eastern District of California
No. 2:23-cv-00032-DJC-DMC, Hon. Daniel J. Calabretta

## BRIEF OF AMICUS CURIAE STATE OF MONTANA AND 22 OTHER STATES SUPPORTING PLAINTIFF-APPELLANT AND REVERSAL

AUSTIN KNUDSEN
  *Attorney General of Montana*

MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
PO Box 201401
Helena, MT 59620-1401
(406) 444-2026
Christian.Corrigan@mt.gov

CHRISTIAN B. CORRIGAN
  *Solicitor General*

ASHLEY EVARO*
  *Solicitor's Fellow*

*Counsel for Amicus Curiae
State of Montana*

*\*Admitted in Washington, D.C.
Practicing under the supervision
of Montana attorneys*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................ii

INTERESTS OF AMICI CURIAE.......................................................1

BACKGROUND..............................................................................1

SUMMARY OF ARGUMENT ...........................................................5

ARGUMENT................................................................................10

I. Parents Possess a Longstanding, Fundamental Right to Direct
the Care and Custody of Their Children...........................10

    A.    Parental rights are among the longstanding rights
protected by the Due Process Clause. .....................10

    B.    Longstanding parental rights include the right to be
informed of and make decisions about a child's mental
health and well-being. ............................................19

    C.    The Supreme Court recently stated that parents likely
have a right to be involved in decisions regarding their
children's mental health..........................................22

II. The District's Policy Violates Parents' Fundamental Right
to Participate in Decisions Regarding their Children's
Mental Health............................................................25

    A.    The Policy authorizes school officials to make decisions
about a gender identity behind parents' backs.........25

    B.    School districts across the country have adopted similar
parental exclusion policies. .....................................27

CONCLUSION .............................................................................31

ADDITIONAL COUNSEL ...............................................................33

CERTIFICATE OF COMPLIANCE .....................................................35

i

## TABLE OF AUTHORITIES

### Cases

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022) .................................................... 5, 6, 10, 15, 21

*Doe v. Pub. Health Tr.*,
696 F.2d 901 (11th Cir. 1983) ............................................. 18

*Fields v. Palmdale Sch. Dist.*,
427 F.3d 1197 (9th Cir. 2005) ............................................ 20

*Finch v. Finch*,
22 Conn. 411 (1853) ......................................................... 14

*Furman v. Van Sise*,
56 N.Y. 435 (1874) ........................................................... 14

*Gruenke v. Seip*,
225 F.3d 290 (3d Cir. 2000) ................................... 17, 19, 21

*Jenness v. Emerson*,
15 N.H. 486 (1844) ........................................................... 14

*Jones v. Tevis*,
14 Ky. 25 (1823) .............................................................. 14

*L.W. ex rel. Williams v. Skrmetti*,
83 F.4th 460 (6th Cir. 2023) ....................................... 17–18

*Marbury v. Madison*,
5 U.S. 137 (1803) ............................................................. 31

*May v. Anderson*,
345 U.S. 528 (1953) ........................................................... 1

*Meyer v. Nebraska*,
262 U.S. 390 (1923) ................................................. passim

*Mirabelli v. Bonta*,
2026 WL 575049 (U.S. Mar. 2, 2026) ........................ passim

*Parents for Privacy v. Barr*,
    949 F.3d 1210 (9th Cir. 2020) ........................................................... 20

*Parham v. J.R.*,
    442 U.S. 584 (1979) ................................................................. passim

*Pierce v. Soc'y of Sisters of the Holy Names of Jesus and Mary*,
    268 U.S. 510 (1925) ................................................................. passim

*Porter v. Powell*,
    44 N.W. 295 (Iowa 1890) .................................................................. 14

*Prince v. Massachusetts*,
    321 U.S. 158 (1944) ....................................................... 15, 16, 17, 21

*Regino v. Blake*,
    2026 WL 121667 (E.D. Cal. Jan. 15, 2026) ............................... passim

*Regino v. Staley*,
    133 F.4th 951 (2025) .......................................................... 5, 19, 21

*Sch. Bd. Dist. No. 18 v. Thompson*,
    103 P. 578 (Okla. 1909) .................................................................. 13

*Smith v. Org. of Foster Families for Equal. & Reform*,
    431 U.S. 816 (1977) ......................................................................... 11

*Stanley v. Illinois*,
    405 U.S. 645 (1972) ............................................................ 1, 15, 21

*Thompson v. Oklahoma*,
    487 U.S. 815 (1988) ......................................................................... 16

*Troxel v. Granville*,
    530 U.S. 57 (2000) ...................................................... 6, 9, 10, 17, 31

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ................................................................. passim

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ........................................................... 15, 17, 21

*United States v. Skrmetti*,
    605 U.S. 495 (2025) ......................................................................... 18

## Other Authorities

**United States Constitution**
U.S. Const. amend. XIV ........................................................ 10
U.S. Const. amend. XXVI ..................................................... 16

**United States Code**
10 U.S.C. § 505 ...................................................................... 16
23 U.S.C. § 158 ...................................................................... 16

## Publications

1 William Blackstone, *Commentaries on the Laws of England* (1753) .......................................... 6, 11, 12, 14, 16

2 Baron De Montesquieu, *The Spirit of the Laws* (1749) ...................... 12

2 Hugo Grotius, *The Rights of War and Peace* (Richard Tuck ed., 2005) (1625) .................... 12

Chi. Pub. Schs., *Interim Guidelines: Gender & Sexuality Prot. for CPS Students* (July 2024) ................. 29

D.C. Pub. Schs., *Transgender and Gender-Nonconforming Pol'y Guidance* (2015) ................... 29

Eau Claire Area Sch. Dist., *Admin. Guidance for Gender Identity Support* (Nov. 2021) .................... 29

Elie Vandenbussche, *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, 69 J. Homosexuality 1602 (2021) .................... 27

GLSEN & ACLU, *Know Your Rights: A Guide for Transgender and Gender Nonconforming Students* (2016) .................... 30

GLSEN & Nat'l Ctr. for Transgender Equality, *Model Local Education Agency Policy on Transgender and Nonbinary Students* (Rev. Oct. 2020) .................... 31

Haw. Dep't of Educ., *Guidance on Supports for Transgender Students* .................... 30

Human Rights Campaign, *A Parent's Quick Guide for In-School Transitions* ................................................................. 7, 20

*Independent Review of Gender Identity Services for Children and Young People: Interim Report* (The Cass Review) Apr. 2024 .......... 26

InDoctriNation Map, *Parents Defending Educ.*, (last accessed Feb. 27, 2026)................................................................. 9

Jean-Jacques Burlamaqui, *The Principles of Natural and Politic Law* (1747) ............................................................. 13

John Locke, *The Two Treatises of Civil Government* (Thomas Hollis ed., A. Millar et al.) (1689) .............................................. 12–13

John Witte, Jr., *The Nature of Family, The Family of Nature: The Surprising Liberal Defense of the Traditional Family in the Enlightenment*, 64 Emory L.J. 591 (2015) ............................ 5, 11, 13

Kenneth J. Zucker, *The Myth of Persistence: A Response to "A Critical Commentary on Follow-Up Studies and 'Desistance' Theories About Transgender and Gender Non-Conforming Children" by Temple Newhook et al.* (2018), Int'l J. of Transgenderism .......................... 27

Kinnon R. MacKinnon, *The Truth About Destransitioning*, N.Y. Times, Aug. 17, 2025 ................................................................ 27

L.A. Unified Sch. Dist., *Pol'y Bulletin BUL-6224.3, Gender Identity and Students – Ensuring Equal. and Nondiscrimination* (Aug. 26, 2024) ................................................................ 29

Luke Berg, *How Schools' Transgender Policies Are Eroding Parents' Rights* (Mar. 2022) ..................................................... 26–27

Nat'l Educ. Ass'n, *Legal Guidance on Transgender Students' Rights* (2016) ................................................................ 30

N.Y.C. Dep't of Educ., *Guidelines to Support Transgender and Gender Expansive Students: Supporting Students* ....................................... 30

Sch. Dist. of Phila., *Pol'y 252 Reference Guide* (Feb. 2025) .................... 29

### INTERESTS OF AMICI CURIAE

The States of Montana, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and West Virginia file this amicus brief pursuant to Fed. R. App. P. 29(a)(2). States are entrusted with protecting fundamental rights. Here, amici seek to ensure that parents retain their fundamental right to direct the upbringing of their minor children—a right the Supreme Court has described as "essential" and "far more precious … than property rights." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) and *May v. Anderson*, 345 U.S. 528, 533 (1953)).

### BACKGROUND

Aurora Regino is a single mother with sole custody over her two minor daughters, A.S. and C.S., who both live with her in Chico, California. ER-56 ¶ 16. During the 2021-22 school year, Regino's oldest daughter, A.S., was a fifth-grade student at Sierra View Elementary School ("Sierra View") in the Chico Unified School District ("District"). ER-63 ¶ 55. During the fall semester, A.S. began feeling depressed and anxious,

likely stemming from substantial changes in her home life, including her grandfather's recent passing, Regino's breast cancer treatments, and her increased role in caring for her younger sister, C.S. ER-63 ¶ 56.

During this time, Sierra View's school counselor, Mandi Robertson, visited classrooms to advise students of counseling services, and she routinely addressed issues of gender identity and sexuality in these visits. ER-63–64 ¶ 58. Robertson encouraged students to consider whether they felt that their gender was different than their sex and, if it was, to embrace it. ER-63–64 ¶ 58. In December 2021, A.S. began feeling like she might be a boy, and before her winter break, A.S. met with Robinson to discuss her anxiety and depression—without mentioning any potential gender confusion. ER-64 ¶¶ 59–61. Robinson encouraged A.S. to join the Girls Group, a small girls arts-and-crafts group, when she returned from break, and she sent a permission slip home with A.S., which Regino signed. ER-64 ¶¶ 61–62. A.S. attended her first Girls Group meeting in January 2022, and the initial sessions were, as expected, geared towards arts and crafts. ER-64 ¶ 63.

But after a couple of Girls Group meetings, A.S. told Robertson that she "felt like a boy," and Robinson immediately asked if she had a boy's

2

name and wanted to be referred to by male pronouns. ER-64–65 ¶ 64. A.S. was unsure, but feeling pressured, she said yes and told Robinson her boy's name was "J.S." ER-64–65 ¶ 64. Robinson informed A.S.'s teacher about the new name and pronouns, and her teacher began using the new name and pronouns. During the spring semester, A.S. met one-on-one with Robinson a couple more times, and at these meetings, Robinson referred A.S. to a local group that advocated for LGBTQ+ causes and discussed "top surgery" and "breast binding" with her. *See* ER-65 ¶ 68 & nn.2–3.

During the spring semester, A.S. was known as "J.S." at school and referred to by male pronouns, and she was known as "A.S." at home and referred to by female pronouns. As required by the District's policy, neither Robinson nor any District officials informed Regino that A.S. "felt like a boy" and had socially transitioned at school. ER-64–66 ¶¶ 64, 70–71; *see also* ER-62–63 ¶¶ 51–54. When she told Robinson that she wanted to tell her mother, Robinson was unsupportive and suggested speaking with other family members instead. ER-66 ¶ 69. So, in early April 2022, A.S. told her grandmother about her new gender identity, and her grandmother informed Regino later that day. ER-66 ¶ 72.

3

Regino was supportive of A.S.'s choice but shocked that the District socially transitioned A.S. without involving her. ER-66 ¶¶ 73–74. Even more troubling, A.S.'s feeling about being a boy subsided over the course of the semester. *See* ER-67 ¶¶ 76–77. Rather than helping her anxiety and depression, A.S.'s immediate social transition left her feeling stuck with a male name and pronouns because the Sierra View community now viewed her as a boy. *See* ER-67 ¶ 76. A.S. used the male name and pronouns for the rest of the school year. ER-67 ¶ 76. Rather than diminish A.S.'s gender-related distress and anxiety, the District amplified it. *See* ER-67 ¶ 76 (A.S.'s "depression and anxiety worsened to the point where she wanted to transfer to a different school").

The District's policy of withholding critical information about whether students have taken any action concerning their gender identity leaves Regino (and other parents) completely in the dark about her children's mental and emotional well-being. Regino sued the District for violation of her substantive due process rights, *see* ER-52–81, but the district court dismissed the complaint, erroneously holding that Regino failed to allege a "clearly established" right. *See* ER-11–13. The Ninth Circuit vacated the district court's dismissal and remanded the case for

further proceedings because the district court failed to conduct the proper analysis. *Regino v. Staley,* 133 F.4th 951, 961–62, 967–68 (9th Cir. 2025). In January 2026, the district court again dismissed Regino's complaint, erroneously holding that the right to make important decisions on behalf of one's children is not "objectively, deeply rooted in this Nation's history and tradition." *Regino v. Blake*, No. 2:23-CV-00032-DJC-DMC, 2026 WL 121667, at *6 (E.D. Cal. Jan. 15, 2026) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)). This Court should correct that error and reverse.

## SUMMARY OF ARGUMENT

The Due Process Clause of the Fourteenth Amendment "specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition.'" *Glucksberg*, 521 U.S. at 720–21. To determine whether a right is "objectively, 'deeply rooted in this Nation's history and tradition,'" *see id.*, a court must conduct a "careful analysis of the history of the right at issue." *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2246 (2022) (quoting *Glucksberg*, 521 U.S. at 721).

The American common-law understanding of the reciprocal rights and duties that the natural law imposes on parents and children was greatly influenced by the writings of Sir William Blackstone. *See* John Witte, Jr., *The Nature of Family, The Family of Nature: The Surprising Liberal Defense of the Traditional Family in the Enlightenment*, 64 Emory L.J. 591, 598, 658–62 (2015). Blackstone—who drew from prominent natural law thinkers before him—argued that parents' duty to "provide for the *maintenance* of their children is a principle of natural law" and that a necessary incident of this duty is the authority to provide for the maintenance of one's children without state interference. *See* 1 William Blackstone, *Commentaries on the Laws of England* *447, 452–53 (1753).

The Supreme Court grounded the common law understanding of parental rights in the "liberty" secured by the Due Process Clause. *See Meyer*, 262 U.S. at 399–400. A century later, the Supreme Court continues to recognize and protect "the fundamental rights of parents to make decisions concerning the care, custody, and control of their children." *See Troxel v. Granville*, 530 U.S. 57, 66 (2000); *see also Dobbs*, 142 S. Ct. at 2257 (recognizing a "right to make decisions about the education of one's

children"). Despite the Supreme Court's longstanding recognition of this right, the district court concluded that it is "simply not the case that a history to make important decisions on behalf of children is 'objectively, deeply rooted in this Nation's history and tradition.'" *Regino v. Blake*, 2026 WL 121667, at *6 (citing *Glucksberg*, 521 U.S. at 720–21). The district court based its decision on previous Ninth Circuit rulings denying parents the right to consent when school curriculum includes sexual topics, or when a school's bathroom and locker room policies put students at risk of exposure to opposite-sex nudity. *See id.*

Taking steps to socially transition a student, however, is distinguishable from exposing a student to sexual topics or to opposite-sex nudity at school. Advocacy organizations have insisted that affirming a student's gender identity can be "life-saving." Hum. Rts. Campaign, *A Parent's Quick Guide for In-School Transitions* at 11, https://perma.cc/DC65-MH4K. An intervention with such significant consequences should include parents, who have "primary rights in the upbringing of children." *See Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000) (acknowledging that counseling and psychological testing that pertains to private family activities can exceed school authority and infringe on parental rights).

While it is true that in the Ninth Circuit, schools can educate children in matters concerning gender and sexuality without parental consent, s*ee Regino v. Blake*, 2026 WL 121667, at *11, concluding that schools must also be permitted to socially transition students without informing parents indicates a misunderstanding of the gravity of such an intervention and the nature of parental rights.

The Supreme Court recently signaled disagreement with the district court's conclusion. *See Mirabelli v. Bonta*, No. 25A810, 2026 WL 575049, at *1 (U.S. Mar. 2, 2026) (per curiam). In an interlocutory order, the Court indicated that a California policy requiring teachers to conceal a student's social transition from parents likely violated the parents' due process rights. *See id.* at *3 (per curiam). Though the determination isn't final, the Court's order was accompanied by a brief discussion where it observed that "[u]nder long-established precedent, parents—not the State—have primary authority with respect to 'the upbringing and education of children.'" *Id.* (per curiam) (quoting *Pierce v. Soc'y of Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534–535 (1925)). The Court also noted that under these long-established precedents, parents have the "right not to be shut out of participation in decisions regarding

8

their children's mental health." *Id.* (per curiam) (citing *Parham v. J.R.*, 442 U.S. 584, 602 (1979)). This preliminary discussion indicates that the Court would find that a parent's right to be included in important decisions relating to their child's mental health is a right rooted in this nation's history and tradition. *See id.* (per curiam).

Here, the District's policy excludes parents from critical decisions regarding their children's gender identity and mental health. School personnel are required to use a student's requested name and pronouns and are prohibited from informing parents of a student's social transition unless the student authorizes disclosure. ER-62 ¶ 52. This violates parents' fundamental rights under the Due Process Clause. *See Troxel*, 530 U.S. at 57. Schools across the nation have adopted similar policies, shutting parents out of the decisionmaking process whenever a student declines to authorize disclosure.[1] Though the policies vary in content, all impair parents' fundamental right to be involved in important decisions

---

[1] Parents Defending Education ("PDE"), a nationwide membership organization that seeks to prevent the politicization of K-12 education and to protect parental rights, has compiled a list of public school districts across the country with similar policies. *See InDoctriNation Map*, Parents Defending Educ., (last accessed Feb. 27, 2026) (filtering for "incidents," "public schools," and "parents rights" yields over 360 results for school policies), https://defendinged.org/map/).

regarding their children's mental health and well-being. Here, the district court failed to recognize that this right is deeply rooted in this Nation's history and tradition and is therefore protected by the Due Process Clause. *See* ER-21. This Court should correct this error and reverse.

ARGUMENT

I. **Parents Possess a Longstanding, Fundamental Right to Direct the Care and Custody of Their Children.**

   A. **Parental rights are among the longstanding rights protected by the Due Process Clause.**

Under the Fourteenth Amendment, states may not "deprive any person of … liberty … without due process of law." U.S. Const. amend. XIV. The Fourteenth Amendment's Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests," *see Troxel*, 530 U.S. at 65 (quoting *Glucksberg*, 521 U.S. at 720)—including those unenumerated rights that are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, *see Dobbs*, 142 S. Ct. at 2242 (quoting *Glucksberg*, 521 U.S. at 721). To determine whether a right is deeply rooted in history and tradition, courts must "engage[] in a careful analysis of the history of the right at issue." *Id.* at 2246.

The right of parents to direct the care and custody of their children "is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel*, 530 U.S. at 65 (citing *Meyer*, 262 U.S. at 399). But parents' liberty interest in the care and custody of their minor children has a much earlier origin than *Meyer*. *See Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 845 (1977) (arguing that "the liberty interest in family privacy" is "older than the Bill of Rights" and "has its source … not in state law, but in intrinsic human rights" (cleaned up)).

During the late-eighteenth and early-nineteenth century, Sir William Blackstone's writings greatly influenced the American common-law understanding of the reciprocal rights and duties that the natural law imposes on parents and children. *See* Witte, Jr., *supra*, at 598, 658–62. Blackstone defined the parent-child relationship as "the most universal relation in nature" and explained that parents have a duty to provide for their children's maintenance, protection, and education. Blackstone, *supra*, *446. While recognizing that municipal laws reinforce these duties, he argued that "Providence has done it more effectually … by implanting in the breast of every parent that natural … affection, which not even the

deformity of person or mind, … wickedness, ingratitude, … [or] rebellion of children[] can totally suppress or extinguish." *Id.* *447. Parental authority stems from parents' duties to provide for their children's maintenance, protection, and education and includes, as a necessary incident, the authority to perform those duties without unreasonable state interference. *See id.* *452–53.

Blackstone wasn't writing on a blank slate. Instead, he drew from influential natural law thinkers like Samuel Pufendorf and Baron Montesquieu. *See id.* *447 (arguing, by reference to Pufendorf, that parents' duty to "provide for the *maintenance* of their children is a principle of natural law … laid on them not only by nature herself, but by their own proper act[] in bringing them into the world"); *see id.* ("[T]he establishment of marriage in all civilized states is built on this natural obligation for the father to provide for his children." (citing 2 Baron De Montesquieu, *The Spirit of the Laws* 69 (1749))). Similar views on the parent-child relationship can be found in the earlier writings of Hugo Grotius, John Locke, Jean-Jacques Burlamaqui, and others. *See, e.g.,* 2 Hugo Grotius, *The Rights of War and Peace* 208–12 (Richard Tuck ed., 2005) (1625) ("Children need to be educated and conducted by the Reason of another.

And none but Parents are naturally [e]ntrusted with this Charge."); John Locke, *The Two Treatises of Civil Government* 243 (Thomas Hollis ed., A. Millar et al.) (1689) ("The *power ... that parents have* over their children arises from that duty which is incumbent on them to take care of their offspring during the imperfect state of childhood." (cleaned up)); Jean-Jacques Burlamaqui, *The Principles of Natural and Politic Law* 61 (1747) (arguing that "Providence ... has inspired parents with that instinct or natural tenderness ... for the preservation and good of those whom they have brought into the world").

State courts often leaned on Blackstone's collected wisdom to resolve questions about the nature of parental rights and duties—including parent-school disputes and parental support cases—thus incorporating these natural law conceptions of parental rights into the corpus of early American common law. *See* Witte, Jr., *Nature of Family*, *supra*, at 597–98 (arguing that the views of the Enlightenment thinkers like Grotius, Pufendorf, Locke, Montesquieu, and others "penetrated deeply into the Anglo-American common laws of the eighteenth and nineteenth centuries, courtesy especially of William Blackstone"); *see also*, *e.g.*, *Sch. Bd. Dist. No. 18 v. Thompson*, 103 P. 578, 581–82 (Okla. 1909) (parents may

exclude their child from some courses of study because, under the common law, they retained authority "sufficient to keep the[ir] child in order and obedience" and "the common law presum[ed] that the[ir] natural love and affection … for their children would impel them to faithfully perform th[e] duty [to provide an education]" (citing Blackstone, *Commentaries*, *supra*, at *451–53)); *Furman v. Van Sise*, 56 N.Y. 435, 439–40 (1874) (grounding parents' right to the services of their children in their natural law obligation to "maintain, educate and take care of [their minor] children," which entitles parents to "the custody and control of such children" and "to the services of the children").[2]

And a century ago, the Supreme Court grounded that common-law right—parents' right to direct the care and custody of their minor children—in the "liberty" secured by the Fourteenth Amendment's Due Process Clause. *See Meyer*, 262 U.S. at 399–400 (stating that the Due Process Clause secures parents' right to "establish a home and bring up

---

[2] *See also*, *e.g.*, *Porter v. Powell*, 44 N.W. 295, 297 (Iowa 1890) (parents' "right to exercise care, custody and control over the[ir] child" arises out of their natural law duty to "provide for the maintenance of their children" (citing Blackstone, Commentaries, supra, at *446)); *Finch v. Finch*, 22 Conn. 411, 415 (1853) (same); *Jenness v. Emerson*, 15 N.H. 486, 488–89 (1844) (same); *Jones v. Tevis*, 14 Ky. 25, 27 (1823) (same).

children"). In doing so, the Court drew on "the natural duty of the parent"—which "[c]orrespond[ed] to the right of control"—"to give his children education suitable to their station in life." *Id.* at 400. Over the last century, the Court has reaffirmed that right time and again. *See Pierce*, 268 U.S. at 534–35 ("liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control"); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."); *Stanley*, 405 U.S. at 651 (raising one's children has been treated as an "essential" and "basic civil right[] of man" (citation and quotation marks omitted)); *see Dobbs*, 142 S. Ct. at 2257 (identifying, among a list of longstanding rights, "the right to make decisions about the education of one's children"). A century after *Meyer*, this much is clear: "Th[e] primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972).

That parental authority is based in part on the commonsense recognition "that parents possess what a child lacks in maturity, experience,

and capacity for judgment required for making life's difficult decisions." *Parham*, 442 U.S. at 602. The law thus makes a basic assumption about children as a class: "[It] assume[s] that they do not yet act as adults do, and thus [it] act[s] in their interest by restricting certain choices that … they are not yet ready to make with full benefit of the costs and benefits attending such decisions." *Thompson v. Oklahoma*, 487 U.S. 815, 826 n.23 (1988). That basic assumption justifies many restrictions on minor children's rights, including their right to vote, *see* U.S. Const. amend. XXVI, enlist in the military without parental consent, *see* 10 U.S.C. § 505, or to drink alcohol, *see*, *e.g.*, 23 U.S.C. § 158. And that same principle is traditionally at work in public schools, which routinely require parental consent before a student can receive medication or participate in certain school activities.

But this authority is based also—and perhaps more importantly—on the idea that parents are best suited to "prepar[e their children] for obligations the state can neither supply nor hinder." *Prince*, 321 U.S. at 166; *see also Pierce*, 268 U.S. at 535 (declaring that "[t]he child is not the mere creature of the State," but "those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and

prepare him for additional obligations"). Indeed, Blackstone explained that "the power of parents over their children is derived from … their duty." *Commentaries*, *supra*, at \*452. And Blackstone's understanding of the reciprocal rights and duties that the natural law imposes on parents and children permeates the Court's decisions in cases like *Meyer*, *Pierce*, *Prince*, *Yoder*, *Parham*, and *Troxel*. *See, e.g.*, *Meyer*, 262 U.S. at 400 ("natural duty of the parent"—which "[c]orrespond[s] to the right of control"—is "to give his children education suitable to their station in life"); *Pierce*, 268 U.S. at 535 (parents have "the right" and "high duty" to prepare [their children] "for additional obligations");[3] *Prince*, 321 U.S. at 166 ("[C]ustody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."). Parents' obligation to care and provide for their minor children necessarily requires that they not be denied access to information necessary to perform those functions.

Yet this parental authority is not absolute—parents have no license to abuse or neglect their children. *Parham*, 442 U.S. at 602–04. Nor does

---

[3] *Parham*, *Yoder*, and *Troxel* rely on this principle from *Pierce*. *See Parham*, 442 U.S. at 602; *Yoder*, 406 U.S. at 233; *Troxel*, 530 U.S. at 68–69.

the parental relationship give parents the right to disregard lawful limitations on the use of medical procedures or drugs. *See L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 475 (6th Cir. 2023), *aff'd on other grounds*, *United States v. Skrmetti*, 605 U.S. 495 (2025) ("[P]arents do not have a constitutional right to obtain reasonably banned treatments for their children."); *Doe v. Pub. Health Tr.*, 696 F.2d 901, 903 (11th Cir. 1983) ("John Doe's rights to make decisions for his daughter can be no greater than his rights to make medical decisions for himself."); *cf. Skrmetti*, 605 U.S. at 523–24 (upholding a state law banning gender-affirming medical treatments for minors based on the treatments' associated risks). Relatedly, some parental decisions about a child's medical care may be "subject to a physician's independent examination and medical judgment." *Parham*, 442 U.S. at 604; *but see id.* ("[Yet parents] retain a substantial, if not the dominant, role in the decision, absent a finding of neglect or abuse, and that the traditional presumption that the parents act in the best interests of their child should apply."). But parents are not stripped of their authority to act in the best interest of their children "[s]imply because the[ir] decision … is not agreeable to a child or because it involves risks." *See id.* at 603–04 ("Most children, even in adolescence,

18

simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment.").

When a school district's policies "conflict with the fundamental right of parents to raise and nurture their child," "the primacy of the parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest." *Gruenke*, 225 F.3d at 305. But school districts have no interest—much less a compelling one—in concealing minor students' social gender transitions from their parents.

## B. Longstanding parental rights include the right to be informed of and make decisions about a child's mental health and well-being.

The district court recognized the longstanding right of parents to make decisions concerning the care, custody, and control of their children, but noted that modern jurisprudence "has repeatedly rejected broad formulations of asserted fundamental rights, in favor of being 'more precise.'" *See Regino v. Blake*, 2026 WL 121667, at *5 (quoting *Regino v. Staley*, 133 F.4th 951, 964 (2025) (quoting *Glucksberg*, 521 U.S. at 723)). But the district court rejected the precise formulation offered by Regino—that parents have the right to be involved in critical decisions regarding their children's mental health and well-being. The district

19

court concluded that "[i]t is simply not the case that a history to make important decisions on behalf of children is 'objectively, deeply rooted in this Nation's history and tradition,' *Glucksberg*, 521 U.S. at 720–21, given the myriad ways in which schools educate children in matters concerning gender and sexuality." *Regino v. Blake*, 2026 WL 121667, at *11. In other words, because the Ninth Circuit has said that parents have no right to consent before schools instruct on sexual topics, *see Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1207 (9th Cir. 2005), *amended on denial of rehearing*, 447 F.3d 1187 (9th Cir. 2006), or adopt policies exposing children to opposite-sex nudity, *see Parents for Privacy v. Barr*, 949 F.3d 1210, 1232–33 (9th Cir. 2020), parents also lack the right to be informed of critical developments pertaining to their child's mental health and well-being. *See Regino v. Blake*, 2026 WL 121667, at *6.

A child's decision to socially transition is a significant intervention that is fundamentally different from mere exposure to sexual topics in curriculum or to opposite-sex nudity in a locker room. The Human Rights Campaign—the nation's largest LGBTQ+ advocacy organization—tells parents that "[a]ffirming your transgender or non-binary student" is "critical" and "often, life-saving." Hum. Rts. Campaign, *supra*, at 11. If

social transitioning is—as its advocates claim—such an important medical intervention, parental involvement is key. *See Prince*, 321 U.S. at 166. And providing the intervention without the parents' knowledge would "overstep the boundaries of school authority and impermissibly usurp the fundamental rights of parents to bring up their children." *See Gruenke*, 225 F.3d at 307 (observing that counseling and psychological testing pertaining to private, family matters can usurp parental rights).

This Court made clear in its decision to remand that, "a right need not have been expressly recognized as fundamental in caselaw for it to be deeply rooted in our history and tradition and implicit in the concept of ordered liberty." *Regino v. Staley*, 133 F.4th at 962. For over a century, the Supreme Court has acknowledged parents' right to direct the care and custody of their children under the Fourteenth Amendment's Due Process Clause. *See Meyer*, 262 U.S. at 399–400; *Pierce*, 268 U.S. at 534–35; *Prince*, 321 U.S. at 166; *Stanley*, 405 U.S. at 651; *Dobbs*, 142 S. Ct. at 2257, *Yoder*, 406 U.S. at 232. Parents such as Regino should be afforded their right to be informed of and involved in decisions regarding their child's mental health and well-being.

### C. The Supreme Court recently stated that parents likely have a right to be involved in decisions regarding their children's mental health.

The Supreme Court recently vacated an order staying a permanent injunction entered by a district court preventing schools from concealing a student's gender transition from parents. *See Mirabelli*, 2026 WL 575049, at *1 (per curiam). In *Mirabelli*, parents and teachers contested a California policy prohibiting school personnel from informing parents of a student's social transition at school without the student's consent. *See id.* at *2 (per curiam). One set of parents learned that their child had socially transitioned at school only after the child attempted suicide and was being treated in the hospital. *See id.* (per curiam). Another set of parents confronted the school principal because they believed the school had socially transitioned their child. *See id.* (per curiam). The parents were told that "state law prohibited the school from sharing information about a child's transitioning with the child's parents without the child's consent." *Id.* at *2–3 (per curiam).

Plaintiffs brought claims under the Free Exercise Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment. *See id.* at *1 (per curiam). The district court granted relief to the

plaintiffs, enjoining the California policy that shut parents out of the decisionmaking process. *See id.* at *2 (per curiam). The Ninth Circuit then stayed the injunction pending appeal. *See id.* (per curiam). Regarding the due process claims, this Court expressed skepticism—"it viewed those claims as seeking to expand the protection afforded by established precedent." *See id.* (per curiam). In vacating the Ninth Circuit's stay, the Supreme Court signaled firm disagreement with this Court. *See id.* at *3 (per curiam). Evaluating the likelihood of success on the merits, the Court observed that "[u]nder long-established precedent, parents—not the State—have primary authority with respect to 'the upbringing and education of children.'" *Id.* (per curiam) (quoting *Pierce*, 268 U.S. at 534–535). Further, the Court acknowledged that the right "protected by these precedents includes the right not to be shut out of participation in decisions regarding their children's mental health." *Id.* (per curiam) (citing *Parham*, 442 U.S. at 602). The state policies in question withheld from parents information about their children's gender dysphoria and mental health. *See id.* (per curiam). The Court concluded that such policies "likely violate[d] parents' rights to direct the upbringing and education of their children." *Id.* (per curiam).

23

To be sure, the Court's assessment of the merits in *Mirabelli* is preliminary. *See id.* at *4 (Barrett, J., concurring). Even so, the Court provided a discussion of the merits with its order because the merits "bear on the limited question" of whether parents are "entitled to the benefit of the judgment entered by the District Court while California tries to overturn that judgment on appeal." *See id.* (Barrett, J., concurring). Thus, interim relief was granted with the acknowledgement that parents are being excluded "from participating in consequential decisions about their child's mental health and wellbeing" and "are likely to suffer irreparable harm if California enforces its policy while this litigation winds its way through the courts." *See id.* (Barrett, J., concurring). Although the Supreme Court has yet to issue a final determination, it has provided a strong signal that the Due Process Clause does in fact protect parents' "right not to be shut out of participation in decision regarding their children's mental health." *See id.* at *3 (per curiam) (citing *Parham*, 442 U.S. at 602). The Supreme Court has signaled a "course correction" and cleared the path forward. *See id.* at *4 (Barrett, J., concurring). This Court should heed these signals and reverse the district court's ruling.

## II. The District's Policy Violates Parents' Fundamental Right to Participate in Decisions Regarding their Children's Mental Health.

### A. The Policy authorizes school officials to make decisions about a gender identity behind parents' backs.

The District applies Admin. Reg. #5145.3 ("Policy")—which requires all District personnel to refer to a student by a new name and pronouns at school if the student informs them of their new identity and preferred name and pronouns, *see* ER-62 ¶ 52—to each of its twenty-three schools. ER-56 ¶ 18; ER-62 ¶ 51. But District personnel may not inform the student's parents of the transition *unless* the student specifically authorizes the disclosure, except where disclosure to parents is "otherwise required by law" or there is "compelling evidence that disclosure is necessary to preserve the student's physical or mental well-being." ER-62 ¶ 52. Apart from these few exceptions, the District may take disciplinary measures against employees and students that violate the Policy, including the requirement to refer to a student with their new name and pronouns. ER-62–63 ¶ 53. So under the Policy, students of any age can insist that their parents are kept in the dark about their transgender status, even when they must get parental consent for lesser matters.

25

The District's policy gives ultimate decisionmaking authority to children and displaces parents' longstanding, primary role in ensuring their child's mental health, safety, and well-being. The policy goes a step further by obligating school personnel to facilitate the transition of a student who believes they are transgender and to hide this change from parents who may not approve. As a recent review of youth gender treatments recognized, "[s]ocial transition[ing]" is "an active intervention because it may have significant effects on the child or young person in terms of their psychological functioning and longer term outcomes."[4] The District presumably does not treat a child's depression or other mental health issues without involving parents, and it has no duty or right to keep parents in the dark about gender-related distress either.

Worse still, the District's 'immediate transition' approach lacks any solid, scientific foundation. Many medical professionals believe that this approach "can become self-reinforcing and do long term harm." Luke Berg, *How Schools' Transgender Policies Are Eroding Parents' Rights*, at

---

[4] *Independent Review of Gender Identity Services for Children and Young People: Final Report* (The Cass Review), Apr. 2024, at 158, https://perma.cc/3JZT-CWKS.

3, (Mar. 2022).[5] Given the recent explosion of students dealing with gender identity issues, there is a greater need for caution. *See id.* Not only that, but existing research suggests that these feelings eventually recede for most children—that is, for those who do not transition. *See id.* And there is a spike in "detransitioners," which further supports a cautious, rather than hasty, approach. *See id.* (citing Elie Vandenbussche, *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, 69 J. Homosexuality 1602 (2021)); *see also* Kinnon R. MacKinnon, *The Truth About Detransitioning*, N.Y. Times, Aug. 17, 2025, at SR8.

## B. School districts across the country have adopted similar parental exclusion policies.

Regrettably, the Policy is neither groundbreaking nor unique. In recent years, school districts nationwide have quietly implemented

---

[5] *See, e.g.*, Kenneth J. Zucker, *The Myth of Persistence: A Response to "A Critical Commentary on Follow-Up Studies and 'Desistance' Theories About Transgender and Gender Non-Conforming Children" by Temple Newhook et al.* (2018), Int'l J. of Transgenderism, at 7 (arguing that "parents who support, implement, or encourage a gender social transition (and clinicians who recommend one) are implementing a psychosocial treatment that will increase the odds of long-term persistence"); *Independent Review, supra*, at 158 ("systematic review" showed that "those who had socially transitioned at an earlier age and/or prior to being seen in clinic were more likely to proceed to a medical pathway").

similar gender transition guidelines.[6] These parental exclusion policies differ in execution—*i.e.*, whether they place students or school officials in the driver's seat—but they both relegate parents to the back seat. All such policies thus prevent parents from helping their children make crucial decisions about their identity and mental health, in direct violation of parents' fundamental rights. *Parham*, 442 U.S. at 603.

Some policies leave parental involvement to the student's discretion. These policies forbid school officials from disclosing information about a student's transgender status to parents unless the student has authorized the disclosure. Policies like this have shown up in large cities

---

[6] *See supra* n.1 at 9.

like Washington, D.C.,[7] Philadelphia,[8] Chicago,[9] and Los Angeles,[10] as well as smaller cities like Eau Claire, Wisconsin.[11]

Other policies require school officials to determine whether it is appropriate to disclose the student's transgender status to their parents. These policies give school officials discretion to determine whether parents should be part of a student's transition plan. Policies like this have

---

[7] *See* D.C. Pub. Schs., *Transgender and Gender-Nonconforming Pol'y Guidance*, at 8 (2015) (instructing educators not to share transgender status with parents without permission from the child), https://perma.cc/G94K-YQ9C.

[8] *See* Sch. Dist. of Phila., *Pol'y 252 Reference Guide*, at 1 (Feb. 2025) ("School personnel should not disclose information that may reveal a student's gender identity to others without the student's authorization (this includes speaking with parents)"), https://perma.cc/L6GV-BKKN.

[9] *See* Chi. Pub. Schs., *Interim Guidelines: Gender & Sexuality Prot. for CPS Students*, at 3–4 (July 2024) ("Parent(s)/guardian(s) consent is not required for a student to be addressed by their affirmed name and pronouns"), https://perma.cc/ZLW6-MZYU.

[10] *See* L.A. Unified Sch. Dist., Pol'y Bulletin BUL-6224.3, *Gender Identity and Students – Ensuring Equal. and Nondiscrimination*, at 4 (Aug. 26, 2024) (instructing school personnel not to disclose a student's gender identity with a parent without the student's consent), https://perma.cc/7DUH-5P62.

[11] *See* Eau Claire Area Sch. Dist., *Admin. Guidance for Gender Identity Support*, at 2 (Nov. 2021) ("School personnel should speak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent/guardian"), https://perma.cc/RY5U-FZ35.

29

shown up in school districts in Flagstaff,[12] and New York City,[13] as well as Hawaii's Department of Education.[14] While these policies condition parental involvement on school officials' consent, they still impair parents' fundamental right to raise their children.

The explosion of these policies appears to stem from ideologically driven advocacy groups claiming that federal law requires this result.[15] One such group, the Gay, Lesbian, and Straight Education Network (GLSEN), promotes a so-called "model" policy—similar to the District's—which falsely claims that disclosing a student's "gender identity and

---

[12] *See* Flagstaff Unified Sch. Dist., *Guidelines for Support of Transgender Students*, at 2 (Dec. 2023) ("School staff are not required to inform parents of a student's preferences regarding gender identity and name against the wishes of the student"), https://perma.cc/KN5W-SMRX.

[13] *See* N.Y.C. Dep't of Educ., *Guidelines to Support Transgender and Gender Expansive Students: Supporting Students* ("[S]chools [must] balance the goal of supporting the student with the requirement that parents be kept informed about their children."), https://perma.cc/RT86-YQXT.

[14] *See* Haw. Dep't of Educ., *Guidance on Supports for Transgender Students*, at 5 ("[I]nitial meeting[s] may or may not include the student's parents."), https://perma.cc/ECZ6-NJGE.

[15] *See, e.g.*, Nat'l Educ. Ass'n, *Legal Guidance on Transgender Students' Rights*, at 19–20 (2016) (arguing that FERPA precludes sharing transgender status in most circumstances), https://perma.cc/V7U5-ZXGK; GLSEN & ACLU, *Know Your Rights: A Guide for Transgender and Gender Nonconforming Students*, at 5 (2016) ("If your school reveals [transgender status] to anyone without your permission, it could be violating federal law."), https://perma.cc/RPD4-UFJJ.

transgender status" without the student's consent may violate the Family Education Rights Privacy Act (FERPA). *See* GLSEN & Nat'l Ctr. for Transgender Equality, *Model Local Education Agency Policy on Transgender and Nonbinary Students*, at 4 (Rev. Oct. 2020). Even if that strained interpretation of FERPA had any merit (it doesn't), rights created by federal statute yield to those grounded in the U.S. Constitution whenever there is a conflict. *See*, *e.g.*, *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it."). These federal statutes—no matter how laudable their aims—cannot displace parents' longstanding right to care for their children.

## CONCLUSION

When a student considers transitioning genders, parents have a longstanding, constitutional right to not be shut out of that decisionmaking process. *See Troxel*, 530 U.S. at 65. Yet school districts across the country, strong-armed by ideologically driven advocacy groups, have done just that, trampling on parents' longstanding right to be informed of and involved in critical decisions regarding their child's mental health and well-being.

This Court must therefore reverse.

DATED this 13th day of March 2026.

AUSTIN KNUDSEN
  *Montana Attorney General*

*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN
  *Solicitor General*
ASHLEY EVARO*
  *Solicitor's Fellow*
Montana Department of Justice
215 North Sanders
PO Box 201401
Helena, MT 59620-1401
Tel: (406) 444-2026
Chrisian.Corrigan@mt.gov

*Attorneys for the State of Montana*

*Admitted in Washington, D.C. Practicing under the supervision of Montana attorneys*

## ADDITIONAL COUNSEL

STEVE MARSHALL
*Attorney General of
Alabama*

STEPHEN J. COX
*Attorney General of
Alaska*

TIM GRIFFIN
*Attorney General of
Arkansas*

JAMES UTHMEIER
*Attorney General of
Florida*

CHRISTOPHER M. CARR
*Attorney General of
Georgia*

RAÚL R. LABRADOR
*Attorney General of
Idaho*

THEODORE E. ROKITA
*Attorney General of
Indiana*

BRENNA BIRD
*Attorney General of
Iowa*

KRIS W. KOBACH
*Attorney General of
Kansas*

LIZ MURRILL
*Attorney General of
Louisiana*

LYNN FITCH
*Attorney General of
Mississippi*

CATHERINE L. HANAWAY
*Attorney General of
Missouri*

MICHAEL T. HILGERS
*Attorney General of
Nebraska*

DREW H. WRIGLEY
*Attorney General of
North Dakota*

DAVE YOST
*Attorney General of
Ohio*

GENTNER F. DRUMMOND
*Attorney General of
Oklahoma*

ALAN WILSON
*Attorney General of
South Carolina*

MARTY J. JACKLEY
*Attorney General of
South Dakota*

JONATHAN SKRMETTI
*Attorney General of
Tennessee*

DEREK BROWN
*Attorney General of
Utah*

KEN PAXTON
*Attorney General of
Texas*

JOHN B. MCCUSKEY
*Attorney General of
West Virginia*

### CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, Christian B. Corrigan, an employee in the Office of the Attorney General of the Montana, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,440 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements and length limits of Rules 29 and 32(a)(5)–(7), and Circuit Rule 29-2(c)(3).

*/s/Christian B. Corrigan*
CHRISTIAN B. CORRIGAN