No. 26-475

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

AURORA REGINO,

*Plaintiff-Appellant,*

v.

Superintendent GREG BLAKE, in his official capacity,

*Defendant-Appellee.*

On Appeal from the United States District Court for the Eastern District of California, Sacramento

No. 2:23-cv-00032-DJC-DMC Hon. Daniel J. Calabretta

## MOTION OF THE ROBERTSON CENTER FOR CONSTITUTIONAL LAW FOR LEAVE TO FILE BRIEF AMICI CURIAE OF PROFESSORS S. ERNIE WALTON AND ERIC A. DEGROFF IN SUPPORT OF PLAINTIFF-APPELLANT

LAURA B. HERNANDEZ
*Counsel of Record*
Christian B. Edmonds
ROBERTSON CENTER FOR
CONSTITUTIONAL LAW
1000 Regent University Dr.
Virginia Beach, VA 23464
(757) 352-4000
lhernandez@regent.edu

Counsel for *Amici Curiae*

## INTEREST OF AMICI

The Robertson Center for Constitutional Law (Center) moves for leave to file the accompanying brief Amici Curiae on behalf of Professors S. Ernie Walton and Eric A. Degroff in support of Plaintiff-Appellant. Counsel for Plaintiff-Appellant consented to the filing of this brief. Counsel for Defendants-Appellees did not respond to the undersigned counsel's request for consent to the filing of this brief.

Professor DeGroff has taught courses in the Regent University Schools of Law, Government, and Education in education law, administrative law, and legal history. His scholarship has focused on parental rights, education policy, and religious liberty. He has lectured on topics related to the history and principles of American education and law and contemporary public-school issues.

Dean Walton, who also serves as an Associate Professor, writes and speaks on the intersection of parental authority and public-schools' policies. Amici's publications include: Eric A. DeGroff, Parental Rights and Public School Curricula: Revisiting Mozert after 20 Years, 38 J.L. & Educ. 83 (2009); and Sex Education in the Public Schools and the Accommodation of Familial Rights, 26 Child. Legal Rts. J. 21 (2006); S. Ernie Walton, In Loco Parentis, The First Amendment, and Parental Rights–Can They Coexist in Public Schools?, 55 Tex. Tech L. Rev. 461 (2023); and Gender Identity Ideology: The Totalitarian, Unconstitutional Takeover of America's Public Schools, 34 Regent U. L. Rev. 219 (2022), among other law review articles

and frequent opinion/editorial pieces in a variety of outlets.

## THE PROPOSED BRIEF IS DESIRABLE AND RELEVANT

The Court should grant this motion for leave to file the accompanying brief as amici curiae because of the unique historical backdrop this brief can provide to judges in this case. Research by amici Professors demonstrates parents' historical right to direct the upbringing of their children and the limits of a school's authority to hide information from the parents about important moral and religious matters.

For centuries before the Founding, parents directed and controlled their children's upbringing and education, especially about subjects as sensitive as values, identity, and religious beliefs. This historical right continued at the Founding and later after the advent of public education in the nineteenth century. Although parents have long entrusted their children to others for the purposes of education, those third parties (whether public or private schools, or individual tutors) act in loco parentis within clear boundaries, exercising only the limited authority delegated to them by parents. At no time are schools, public or private, empowered to usurp parental authority over a child's moral development or decision-making. Throughout the history of this nation, this Court has enforced limits on the authority of educators acting in loco parentis and protected the rights of parents to direct the care, custody, education, and upbringing of their children. The proposed amici curiae brief focuses on the history of conflicts that arose from attempts to enforce religious

conformity in schools, and the success of parental opt-outs as a mechanism for avoiding those conflicts in public schools that serve religiously diverse populations.

Thus, the brief adds pertinent arguments on issues central to the proper resolution of this case. "[C]ourts should welcome amicus briefs for one simple reason: '[I]t is for the honour of a court of justice to avoid error in their judgments.'" *Lefebure v. D'Aquilla*, 15 F.4th 670, 675 (5th Cir. 2021). "No benefit would be served by depriving the [C]ourt of the opportunity to engage with" the arguments presented in this brief. *Id*. at 674. "[T]o the contrary, that would contradict the whole point of our adversarial legal system . . . ." *Id*.

For these reasons, the Court should grant the motion and file the attached brief.

Respectfully Submitted,

*/s/ Laura B. Hernandez*
LAURA B. HERNANDEZ
*Counsel of Record*
Christian B. Edmonds
ROBERTSON CENTER FOR
CONSTITUTIONAL LAW
1000 Regent University Dr.
Virginia Beach, VA 23464
(757) 352-4000
lhernandez@regent.edu

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 606 words.


2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

3. This document has been scanned for viruses and is virus-free.

Dated: March 13, 2026

*/s Laura B. Hernandez*
Laura B. Hernandez

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** _____ **No. 26-475** _____

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[X] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**
[ ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)***:**

**Signature** ___s/ *Laura B. Hernandez*_____ **Date** _March 13, 2026_____
*(use "*s/[typed name]*" to sign electronically-filed documents)*

No. 26-475

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

AURORA REGINO,

*Plaintiff-Appellants,*

v.

Superintendent GREG BLAKE, in his official capacity,

*Defendant-Appellee.*

On Appeal from the United States District Court for the Eastern District of California, Sacramento

No. 2:23-cv-00032-DJC-DMC Hon. Daniel J. Calabretta

## BRIEF OF PROFESSORS S. ERNIE WALTON AND ERIC A. DEGROFF AS AMICI CURIAE IN SUPPORT OF PLAINTIFF-APPELLANT

Laura B. Hernandez
   *Counsel of Record*
Christian B. Edmonds
ROBERTSON CENTER FOR
CONSTITUTIONAL LAW
1000 Regent Univ. Dr. Ste. 303
Virginia Beach, VA 23464
(757) 676-2037
lhernandez@regent.edu

Counsel for *Amici Curiae*

i

# TABLE OF CONTENTS

**Page**

**TABLE OF CONTENTS** ................................................................... i

**TABLE OF AUTHORITIES** ............................................................ ii

**IDENTITY AND INTEREST OF *AMICI CURIAE*** .......................... 1

**INTRODUCTION** ............................................................................ 2

**ARGUMENT** ................................................................................... 3

I.      Historically, Parents Controlled Their Children's Education. ....................... 5

II.     *In Loco Parentis* Is Limited in U.S. Law. .................................... 7

    A. Courts routinely constrained school authority in favor of parents………....…9

    B. *In loco parentis* rarely extends to medical decisions………………… ........12

    C. A school's authority to act *in loco parentis* cannot infringe on parents' rights. ..............................................................................15

III.     The School's Actions Exceeded any Reasonable Delegated Authority. ......16

**CONCLUSION** ...............................................................................18

ii

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Bonner v. Moran*, 126 F.2d 121 (D.C. Cir. 1941) ....................................................12

*Dubbs v. Head Start, Inc.*, 336 F.3d 1194 (10th Cir. 2003) ....................................13

*Hardwick v. Bd. of Sch. Trs.*, 205 P. 49 (Cal. App. 1921)............................... 11, 12

*Janus v. Am. Fed. of State, Cnty., and Mun. Employees*, 138 S. Ct. 2448 (2018) ..16

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396 (6th Cir. 2019) ...................................................................................................................................13

*Kennedy v. Bremerton Sch. Dist.,* 597 U.S. 507 (2022) ...........................................4

*Kennedy v. School District of Lebanon*, No. 11-cv-00382, 2011 U.S. Dist. LEXIS 157416 (M.D. Pa., Dec. 21, 2011)..........................................................................14

*Lander v. Seaver*, 32 Vt. 114 (1859)........................................................................8

*Mahanoy Area Sch. Dist. v. B. L.,* 141 S. Ct. 2048 (2021)......................................15

*Meyer v. Nebraska*, 262 U.S. 390 (1923) .............................................................5, 9

*Morrow v. Wisconsin,* 35 Wis. 59 (1874) ...............................................................10

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ...........4

*Parham v. J.R.*, 442 U.S. 584 (1979)......................................................................18

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925) ....................................................9

*Sch. Bd. Dist. No. 18 v. Thompson*, 103 P. 578 (Okla. 1909)..................................8

*State v. Ferguson*, 144 N.W. 1039 (Neb. 1914) .....................................................11

*State v. Pendergrass*, 19 N.C. 365 (1837) ...............................................................8

iii

*State v. Sch. Dist.*, 48 N.W. 393 (Neb. 1891) .......................................................11

*Town of Greece v. Galloway*, 572 U.S. 565 (2014)....................................................4

*Troxel v. Granville*, 530 U.S. 57 (2000). ....................................... 3, 4, 14

*Wisconsin v. Yoder*, 406 U.S. 205 (1972)............................................9. 10

*Zoski v. Gaines*, 260 N.W. 99 (Mich. 1935)..........................................13

**OTHER AUTHORITIES**

Aviad M. Kleinberg, *A Thirteenth-Century Struggle Over Custody: The Case of Catherine of Par-aux-Dames*, 20 Bull. Medieval Canon L. 51 (1990)................7

Eric A. DeGroff and Steven W. Fitschen, *The Not-So-Silent Epidemic of Secret Gender Affirming Policies in the Nation's Schools: Parental Rights and the Promise of* Pierce v. Society of Sisters, 100 Notre Dame L. Rev. (forthcoming 2026) ....................................................................................6, 15

Eric A. DeGroff, *Parental Rights and Public School Curricula: Revisiting* Mozert *after 20 Years*, 38 J.L. & Educ. 83 (2009)............................... 1, 5, 6, 7

Eric A. DeGroff, *Sex Education in the Public Schools and the Accommodation of Familial Rights*, 26 Child. Legal Rts. J. 21 (2006)................................1

James Kent, *Commentaries On American Law,* Lecture 29 (1826–30) ...................8

Lee M. Friedman, *The Parental Right to Control the Religious Education of a Child*, 29 Harv. L. Rev. 485 (1916).........................................................6

Noa Ben-Asher, *The Lawmaking Family*, 90 Wash. U. L. Rev. 363 (2012)............8

Robert Wolstenholme Holland, *The Law Relating to the Child: Its Protection, Education, and Employment* (1914) .....................................................6

S. Ernie Walton, *Gender Identity Ideology: The Totalitarian, Unconstitutional Takeover of America's Public Schools*, 34 Regent U. L. Rev. 219 (2022)... 1, 17, 18

S. Ernie Walton, In Loco Parentis*, The First Amendment, and Parental Rights–Can They Coexist in Public Schools?*, 55 Tex. Tech L. Rev. 461 (2023).... 1, 8, 15, 16

iv

S. Ernie Walton, *No Judge Hinkle, Gender Identity Is Not Real, Nor Legally Relevant*, The American Spectator, June 12, 2023 .............................................17

S. Ernie Walton, *The Fundamental Right to Homeschool: A Historical Response to Professor Bartholet*, 25 Tex. Rev. L. & Pol. 377 (2021) ......................................5

William Blackstone, *Commentaries on the Laws of England* (1983) ..................5, 7

1

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

Professor DeGroff has taught courses in the Regent University Schools of Law, Government, and Education in education law, administrative law, and legal history. His scholarship has focused on parental rights, education policy, and religious liberty. He has lectured on topics related to the history and principles of American education and law and contemporary public-school issues.

Dean Walton, who also serves as an Associate Professor, writes and speaks on the intersection of parental authority and public-schools' policies.

Amici's publications include: Eric A. DeGroff, *Parental Rights and Public School Curricula: Revisiting* Mozert *after 20 Years*, 38 J.L. & Educ. 83 (2009); and *Sex Education in the Public Schools and the Accommodation of Familial Rights*, 26 Child. Legal Rts. J. 21 (2006); S. Ernie Walton, In Loco Parentis*, The First Amendment, and Parental Rights–Can They Coexist in Public Schools?*, 55 Tex. Tech L. Rev. 461 (2023); and *Gender Identity Ideology: The Totalitarian, Unconstitutional Takeover of America's Public Schools*, 34 Regent U. L. Rev. 219 (2022), among other law review articles and frequent opinion/editorial pieces in a variety of outlets.

---

[1] Pursuant to Fed. R. App. P. 29, counsel for amici states that no party's counsel authored any of this brief, and no person other than amici, their members, or their counsel made a monetary contribution to fund its preparation or submission. Further, counsel for Plaintiff-Appellant consented to this filing, while counsel for Defendants-Appellees did not respond to amici's counsel's request for consent. Accordingly, a motion for leave has been filed alongside this brief.

## INTRODUCTION

School policies that deliberately conceal information from parents about their children's mental and physical health interfere with parents' fundamental right to direct the education and upbringing of their children. This interference becomes even more egregious when it extends to acting contrary to the parents' specific instructions. Such actions usurp parental authority and violate the Supreme Court's long-standing jurisprudence recognizing both the right and the authority of fit parents to determine what is in their own children's best interest. The Court should reverse the judgment below to vindicate the parents' fundamental right to guide and control the development of their children.

For centuries before the Founding, parents directed and controlled their children's upbringing. Parents' legal authority included the right to direct their children's education and to determine the most appropriate way to provide for their children's health care. This historical right continued through the Founding and has been consistently recognized by this Court. Although parents have long entrusted their children to others for the purposes of education, those third parties (whether public or private schools, or individual tutors) act *in loco parentis* within clear boundaries, exercising only the limited authority delegated to them by parents. At no time are schools, public or private, empowered to completely usurp parents'

3

decision-making authority, especially regarding matters as sensitive as moral development or medical care. Throughout the history of this nation, this Court has enforced limits on the authority of educators acting *in loco parentis* to protect the rights of parents to direct the education and development of their children.

The Chico Unified School District's Parental Secrecy Policy infringes Plaintiff-Appellant's primary role in directing her children's upbringing. Their action to encourage and facilitate A.S.'s "social transition" to a new gender identity contrary to Plaintiff-Appellant's wishes is a grave violation of Plaintiff-Appellant's rights and far exceeds any reasonable delegation of parental authority. By withholding critical information about her child's mental wellbeing and fundamental life choices, the District, the School, and their employees, all of whom are delegees acting with limited authority *in loco parentis*, usurped the parental role and denied Plaintiff-Appellant her deeply rooted right to control her child's education and upbringing.

## ARGUMENT

The actions of the District violated the fundamental right of Plaintiff-Appellant to direct and control the upbringing of her child recognized in *Troxel v. Granville*, 530 U.S. 57 (2000). Although schools play a role in the development of children, the primary responsibility for, and authority over, the development of a "child's social and moral character" lies with parents. *Id.* at 78 (Souter, J.,

4

concurring). This right does not disappear when parents send their children to public school. Indeed, "[w]hether for good or ill, adults not only influence but may indoctrinate children." *Id.* Just as parents control their children's social companions, they also have a say in "the designation of the adults who will influence the child in school." *Id.*

This fundamental right is protected by the Fourteenth Amendment. "[A]n analysis focused on original meaning and history" is "the rule rather than some exception" when it comes to constitutional interpretation. *Kennedy v. Bremerton Sch. Dist.,* 597 U.S. 507, 536 (2022) (cleaned up) (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)). "[T]o carry th[e] burden" of justifying a law or regulation that infringes on fundamental rights, "the government must generally point to *historical* evidence . . . ." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022) (emphasis added). "[I]f earlier generations addressed [an analogous] societal problem, but did so through materially different means," that "could be evidence that a modern regulation is unconstitutional." *Id.* Or if they "attempted to enact analogous regulations," "but those proposals were rejected on constitutional grounds, that rejection surely would [also] provide some probative evidence of unconstitutionality." *Id.* at 2131. Parental rights in education—including at public schools—have long been recognized within the historically analogous legal framework.

5

The Supreme Court has long recognized the right of parents to "control the education of their own." *Meyer v. Nebraska*, 262 U.S. 390, 401 (1923). Its holdings are grounded in the historical tradition of the natural law right of parents to direct their children's upbringing. *See* S. Ernie Walton, *The Fundamental Right to Homeschool: A Historical Response to Professor Bartholet*, 25 Tex. Rev. L. & Pol. 377, 400–02 (2021). Essential to that right is the ability of parents to know about and direct their children's fundamental life choices.

## I.    Historically, Parents Controlled Their Children's Education.

Under English common law, parents had the right and responsibility to "guide their children's development." Eric A. DeGroff, *Parental Rights and Public School Curricula*, *Revisiting* Mozert *After 20 Years,* 38 J.L. & Educ. 83, 108 (2009) (citing 1 William Blackstone, *Commentaries on the Laws of England* 440–41 (1983)). In fact, Blackstone asserted that it was "the duty of parents to their children" to provide for their education. 1 Blackstone, *supra*, at 438–39. This duty, originally recognized as a moral duty, *see id.*, was quickly recognized by the Court of Chancery as a legal right. Thus, early English courts began to enforce "the right of parents to make educational choices for their children despite the wishes of the child or even the preferences of civil authorities." DeGroff, *supra*, at 110 (collecting English cases). By the nineteenth century, the right of a parent to make educational decisions for their child had become so ingrained in the common law that one scholar described

6

that right as "absolute against all the world." Robert Wolstenholme Holland, *The Law Relating to the Child: Its Protection, Education, and Employment* 60 (1914).

The English common law was especially protective of parental decisions about religious education, extending a parent's right to determine the religion in which a child would be educated beyond the father's death. *See* Lee M. Friedman, *The Parental Right to Control the Religious Education of a Child*, 29 Harv. L. Rev. 485, 488 (1916). Regarding medical care, the parents' role was more than a right; it was an obligation. By the late 1800's, English courts would routinely hold that any parent who failed to provide proper medical care for their child was guilty of manslaughter if the child died. Eric A. DeGroff and Steven W. Fitschen, *The Not-So-Silent Epidemic of Secret Gender Affirming Policies in the Nation's Schools: Parental Rights and the Promise of* Pierce v. Society of Sisters, 100 Notre Dame L. Rev. (forthcoming 2026) (manuscript at 109) (on file with the authors).

The English common law built on even older canonical laws dating back to the ninth century. Under those laws, too, parents had a right to direct the education and upbringing of their children. For example, if a child decided to join a monastery before reaching legal age, "the parents ha[d] up to a year to demand that the child be returned to their custody." *Id.* at 119 (quoting Aviad M. Kleinberg, *A Thirteenth-Century Struggle Over Custody: The Case of Catherine of Par-aux-Dames*, 20 Bull. Medieval Canon L. 51, 58 (1990)). The ecclesiastical courts likewise supported

parents' right to choose how to raise their children even when the courts strenuously disagreed with the wisdom of the parents' decisions. *Id.* Thus, the right of parents to direct their children's development is evident in both the common law and the canonical law that heavily influenced American traditions. That right might be exercised either by educating their children themselves at home or by delegating *limited* authority to a third party.

## II.   *In Loco Parentis* Is Limited in U.S. Law.

Blackstone recognized that while parents had the primary right and duty to ensure their children were educated, some parental authority over that education could be delegated to a third party. 1 Blackstone, *supra*, at 453. In doing so, the parent authorized the third-party educator to stand *in loco parentis,* i.e., "in the place of the parent." *Id.* From the outset, this delegation of authority was limited. Tutors or schoolmasters exercised only "that portion of the power of the parent . . . as may be necessary to answer the purposes for which he is employed." *Id.* This limitation was echoed by American jurists such as Chancellor James Kent: "[T]he power allowed by law to the parent over . . . the child, may be delegated to a tutor or instructor, the better to accomplish the purposes of education." James Kent, *Commentaries On American Law,* Lecture 29 (1826–30).

*In loco parentis*—a third party's limited exercise of delegated parental authority—has long been recognized by American courts, both before and after the

8

rise of public schools in American culture. *See* S. Ernie Walton, In Loco Parentis, *The First Amendment, and Parental Rights–Can They Coexist in Public Schools?*, 55 Tex. Tech L. Rev. 461, 469–76 (2023). Historically, the familial freedom to educate overrode "state-mandated education about civic values." Noa Ben-Asher, *The Lawmaking Family*, 90 Wash. U. L. Rev. 363, 377 (2012). The home was "considered as the keystone of the governmental structure," with parents ruling "supreme during the minority of their children." *Sch. Bd. Dist. No. 18 v. Thompson*, 103 P. 578, 581 (Okla. 1909).

In the nineteenth century, state courts applied *in loco parentis* to public schools primarily to justify corporal punishment. Walton, In Loco Parentis, *supra*, at 472. For example, in 1837 the North Carolina Supreme Court opined that "the authority of the teacher is regarded as a delegation of parental authority." *State v. Pendergrass*, 19 N.C. 365, 365–366 (1837). Vermont's Supreme Court issued a similar ruling in 1859, with the qualification that a schoolmaster's authority to inflict discipline is more limited than a parent's, given the absence of "natural affection." *Lander v. Seaver*, 32 Vt. 114, 122 (1859). The authority of a school to act in lieu of a parent wanes even further when the decisions in question do not involve discipline, but extend to issues of moral values, life choices, or medical care.

9

**A. Courts routinely constrained school authority in favor of parents.**

Starting with *Meyer*, the Supreme Court grounded the power and duty to educate children in parents. 262 U.S. at 400. Recognizing that students are often educated at school rather than at home, the Court acknowledged that schools exercise power to educate children only to the extent that parents have delegated that power and declared that the right of parents to control the education of their children was protected by the Fourteenth Amendment. *Id.* at 400. Referencing the practice of Sparta whereby children were removed from their parents at an early age and educated solely by "guardians," the Court observed that any practice which empowers agents of the state above a child's parents in matters of character development rests upon ideas regarding "the relationship between individual and state" that would do "violence to both letter and spirit of the Constitution." *Id.* at 402. Just two years, *Pierce v. Society of Sisters* affirmed the right of parents to direct the education of their children and pointed out that a child "is not the mere creature of the State." 268 U.S. 510, 534–35 (1925).

Likewise, in *Wisconsin v. Yoder*, the Court held that although states have authority to impose "reasonable regulations for the control and duration of basic education," that authority was limited by the "fundamental rights and interests" of parents. 406 U.S. 205, 213–14 (1972). The Court noted that Western civilization includes a "strong tradition of parental concern for the nurture and upbringing of

10

their children" and that the "primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Id.* at 232.

Because of our strong national tradition of the primacy of a fit parent in directing the upbringing of children, *public schools standing in loco parentis are limited in their authority*. State courts have historically recognized significant parental authority in disputes over curriculum, activities, and health care. In *Morrow v. Wood*, for instance, the Supreme Court of Wisconsin resolved a disagreement between a parent and a teacher regarding the child's course selection. 35 Wis. 59, 62–63 (1874). The parent wanted his child to focus on orthography, reading, writing, and arithmetic at the expense of geography. *Id.* His teacher disagreed. *Id.* The court ruled for the parent and held that the teacher "does not have an absolute right to prescribe and dictate what studies a child shall pursue." *Id.* at 64. Instead, the court held that the father had "the right to direct what studies, included in the prescribed course, his child shall take." *Id.* "[I]n case of a difference of opinion between the parent and teacher upon the subject, [the court] see[s] no reason for holding that the views of the teacher must prevail." *Id.* at 66.

Several cases in the late nineteenth century and early twentieth century in Nebraska likewise affirmed the right of parents to direct the details of their children's education in public schools. Two cases involved parents' attempts to opt their

11

children out of classes in the public-school curriculum. *State v. Sch. Dist.*, 48 N.W. 393, 394 (Neb. 1891) (attempting to remove the child from grammar class); *State v. Ferguson*, 144 N.W. 1039, 1042 (Neb. 1914) (attempting to remove the child from home economics). The Supreme Court of Nebraska resolved both cases with a basic maxim: "the right of the parent . . . is superior to that of the school officers and the teachers." *Ferguson*, 144 N.W. at 1042 (quoting *Sch. Dist.*, 48 N.W. at 394). To rule for the school, the court reasoned, would "destroy both the God-given and constitutional right of a parent to have some voice in the bringing up and education of his children." *Ferguson*, 144 N.W. at 1043. "In this age of agitation" surrounding World War I, the Supreme Court of Nebraska refused to allow "the doctrine of governmental paternalism [to go] too far, for, after all is said and done, the prime factor in our scheme of government is the American home." *Id.* at 1044.

Nebraska was not the only state to affirm that parents have the right to veto a school's actions regarding their child. In *Hardwick v. Bd. of Sch. Trs.*, 205 P. 49, 50 (Cal. App. 1921), the California Appeals Court determined that granting the school an "overreaching power" that would deny parents "their natural as well as their constitutional right to govern or control" their children was a step too far. 205 P. at 709. Thus, the court allowed the parents to opt their children out of portions of physical education classes that included dancing, which violated the family's religion. *Id.* at 714.

All of these decisions reflect a longstanding tradition that parents have the authority to limit a school's influence over their children. *In loco parentis* does not mean that parents delegate all decision-making to schools the moment they drop their child at the schoolhouse door. And the limits on a school's delegated powers are stronger, and parental authority is even greater, when the question turns to decisions involving fundamental life choices or medical care.

## B. *In loco parentis* rarely extends to medical decisions.

Since the early twentieth century, both state and federal courts have recognized the supremacy of parental authority over their children's education and health care. A school's delegated power to act *in loco parentis* does not extend to administering medical care without parental consent.

The requirement that schools defer to parents before providing medical care is an extension of the basic principle that providers must obtain informed consent from a parent before performing any medical procedure on a minor. Courts have always recognized that parents have the ultimate authority over administration of medical care for their children. *See, e.g., Bonner v. Moran*, 126 F.2d 121 (D.C. Cir. 1941) (holding that a mother's consent was necessary prior to performing a skin graft operation on her minor son, regardless of the child's wishes and despite the fact that the child's aunt, with whom he was staying, had approved the operation), *and Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396 (6th Cir. 2019)

(holding that a parents' due-process challenge to a state program that took, and stored, blood samples from newborns without parental consent must be evaluated under strict scrutiny, because it infringed on the parents' "fundamental right to make decisions concerning the medical care of their children").

Recognizing that fit parents must consent to medical care for their children, and that the authority of school officials to act *in loco parentis* is limited, courts have consistently ruled that schools cannot make health care decisions for children without parental consent. In 1935, the Supreme Court of Michigan found it unlawful to operate on a student without his parents' permission. *Zoski v. Gaines*, 260 N.W. 99 (Mich. 1935). A teacher suspected the student, a nine-year-old boy, had infected tonsils and took the boy from school to the city physician for an exam. *Id*. at 100. Without consulting the boy's parents, the teacher and doctor transported the boy to a hospital, and the doctor ordered surgery. *Id*. After the parents found out about the procedure and sued, the court stated that except in the most extreme cases, parental consent is required before a surgeon can operate on a child. *Id*.

This principle extends well beyond surgery and other direct physical treatment, even applying to procedures as minor as routine exams. In *Dubbs v. Head Start, Inc.*, the Tenth Circuit found that physical exams administered by a Head Start program were an infringement on parental authority. 336 F.3d 1194, 1197 (10th Cir. 2003). The exams were conducted without parental consent, and the parents sued on

14

a theory that non-consensual medical exams violated their Fourteenth Amendment rights. *Id*. The district court dismissed the case, but the Tenth Circuit reversed, holding that the parents' claim was at least plausible and that the district court erred by applying a "shocks the conscience" standard to evaluate the claim. *Id*. at 1203.

More recently, courts have gone even further to respect parents' wishes about simple medical examinations in schools and the parents' right to be involved in the process. In *Kennedy v. School District of Lebanon*, the school district had a policy requiring all students to receive physical exams administered by a specific provider. No. 11-cv-00382, 2011 U.S. Dist. LEXIS 157416 (M.D. Pa., Dec. 21, 2011). The district provided a schedule and informed parents so they could be present during the exams if they wished. *Id*. at *4. The school then modified the schedule without notice and completed an exam on one student whose parents were unable to attend because of the change. *Id*. Although they had originally consented to the exam, the parents sued because the schedule change prevented them from accompanying their child during the exam. *Id*. The district court held that the school had violated the parents' Fourteenth Amendment right to be involved in the provision of health care for their child. *Id.* at *12–13 (citing *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents . . . .")).

15

**C.** **A school's authority to act *in loco parentis* cannot infringe on parents' rights.**

These cases, involving both curricular issues and health care, show that parents retain their right to direct their children's upbringing and education at public schools, and to have the final say in decisions as insignificant as routine physical exams. Accordingly, while public schools stand *in loco parentis*, they do so only with respect to traditional curricular subjects and non-ideological matters. Walton, In Loco Parentis, *supra* at 499. "In other words, education in 'matters of public concern' should be deemed to fall outside the scope of the parental delegation of authority[.]" *Id.* Likewise, the provision of health care should, in all but the most extreme life-threatening cases, be subject to parental control. *See* DeGroff and Fitschen, *supra* at 135–38 (providing a more detailed explanation of how secret gender-transition policies violate the principle that parents possess the ultimate authority over children's health care).

Affirmation of parental authority over curriculum and medical care in school is even more important given the changes in public education occurring over the last two centuries—changes including compulsory education, the inability of parents to sign employment contracts with the state, the coercive economic power of the state in public education, and state-mandated educational agendas. *Id.* at 489–92; *Mahanoy Area Sch. Dist. v. B. L.,* 141 S. Ct. 2048, 2051–52 (2021) (Alito, J., concurring). These changes mandate that courts construe the delegation of authority

from parents to public schools "much more narrowly than was done in the early days of the Republic." Walton, In Loco Parentis, *supra* at 492. The history and tradition of parental rights and authority in America does not support a delegation so broad as to allow schools to provide health-related services *contrary* to parents' express wishes or without their knowledge and consent.

## III. The School's Actions Exceeded any Reasonable Delegated Authority.

Gender identity ideology is a "matter of public concern." *See Janus v. Am. Fed. of State, Cnty., and Mun. Employees*, 138 S. Ct. 2448, 2476 (2018) (referring to sexual orientation and gender identity, among other things, as "sensitive political topics" and "matters of profound 'value and concern to the public'"). Courts should therefore not construe parents to have delegated their authority over their children's gender-related choices and beliefs to public schools. *See* S. Ernie Walton, *Gender Identity Ideology: The Totalitarian, Unconstitutional Takeover of America's Public Schools*, 34 Regent U. L. Rev. 219, 261 (2022). Gender ideology is rooted in a worldview called "expressive individualism," which holds that human identity is primarily sexual and is rooted in a person's own psychological and subjective view of oneself. S. Ernie Walton, *No Judge Hinkle, Gender Identity Is Not Real, Nor Legally Relevant*, The American Spectator, June 12, 2023, https://spectator.org/no-judge-hinkle-gender-identity-is-not-real-nor-legally-relevant/.        Expressive individualism "touches on the deepest moral, social, and religious questions, even

17

going to the heart of what it means to be human." Walton, *Gender Identity Ideology*, *supra,* at 261.

Accordingly, decisions related to children's gender choices are reserved for parents, and "the state has no right to facilitate a child's social gender transition or hide it" from them. *Id.* at 261–62. Whether the parents' ideas about gender identity are grounded in a religious belief system or not, the topic is still extremely sensitive, far more so than simple matters of curriculum, extra-curricular activities, or a physical exam. Because courts have historically recognized parents' rights to control both the religious development of their children and the administration of health care, courts must also recognize the superiority of a parent's authority over that of educators when it comes to gender identity and the treatment of conditions such as gender dysphoria. Regardless of their reasons for wanting to pursue a particular course of treatment, enabling and encouraging children to act contrary to their parents' instructions or even without their knowledge and involvement, exceeds the authority delegated by parents to the state for the purpose of educating their children. *See id.* at 270–73.

The District's actions in this case were not just overreach or pushing the limits of the Plaintiff-Appellant's delegated authority. The District took overt action to isolate Plaintiff-Appellants from her child with respect to the development of core concepts of individual identity. Such usurpation of parental authority cannot stand

18

absent clear evidence of child abuse. *See Parham v. J.R.*, 442 U.S. 584, 603 (1979)

("The statist notion that governmental power should supersede parental authority in

*all* cases because *some* parents abuse and neglect children is repugnant to American

tradition."). Reversing the lower court will realign the relationship between parents

and schools with the longstanding history and tradition of this Nation respecting

parents' authority to direct their children's upbringing and education.

## CONCLUSION

This Court should reverse the judgment below.

Respectfully submitted,

Laura B. Hernandez
*Counsel of Record*
Christian B. Edmonds
Robertson Center for
Constitutional Law
1000 Regent Univ. Drive
Suite 303
Virginia Beach, VA 23464
(757) 676-2037
lhernandez@regent.edu

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____ **No. 26-475** _____

I am the attorney or self-represented party.

**This brief contains** 4,223__ **words,** including _____ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties.
    [  ] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** s/ Laura B. Hernandez _____ **Date** March 13, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* [http://www.ca9.uscourts.gov/forms/form15instructions.pdf](http://www.ca9.uscourts.gov/forms/form15instructions.pdf)

**9th Cir. Case Number(s)** _____No. 26-475_____

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[X] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**
[ ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

**Signature** ____s/ *Laura B. Hernandez*_____ **Date** __March 13, 2026_____
*(use "s/[typed name]" to sign electronically-filed documents)*