**No. 26-475**

_____

## In the United States Court of Appeals For the Ninth Circuit

_____

AURORA REGINO,

*Appellant,*

*v.*

GREG BLAKE, in his official capacity as Superintendent of the Chico Unified School District,

*Appellee.*

_____

On Appeal from the United States District Court
for the Eastern District of California,
No. 2:23-cv-00032 (Calabretta, J.)

_____

BRIEF *AMICI CURIAE* OF
THE NATIONAL LEGAL FOUNDATION, and
PACIFIC JUSTICE INSTITUTE,
*supporting the Appellant and reversal*

_____

Steven W. Fitschen
     Counsel of Record
The National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org

## CORPORATE DISCLOSURE STATEMENT

Neither of the *Amici Curiae* has issued shares to the public, and neither has any parent company, subsidiary, or affiliate that has issued shares to the public. Thus, no publicly held company can own more than 10% of stock.

Table of Contents

Table of Authorities ................................................................... i

Statements of Interests ............................................................1

Summary of the Argument.....................................................1

Argument.................................................................................2

I.    Courts Can Cut Fundamental Rights Analysis Too Finely,
Not Just Apply It Too Broadly .................................................2

II.   Parental Rights as Historically Understood, Practiced, and Applied
by the Supreme Court Support the Parents' Right to Know What Is
Happening Socially and Sexually with Their Child at School...................4

    A.    Parental Rights Have a Long Pedigree in the Common Law,
Recognized Repeatedly by the Supreme Court .................................4

    B.    Parental Preclusion Policies Impermissibly Infringe on
Parents' Rights to Remove Their Children from Public
Schools and to Supplement Their Childrens'
Education .........................................................................8

    C.    Parental Preclusion Policies Impermissibly Declare Parents
Unfit If They Disagree with the School's Preferred Ideology
Without Providing Them with Required Due Process
Protections....................................................................10

III.   The Curriculum Exception as Applied to Public Schools
Does Not Validate Parental Preclusion Policies.....................................12

    A.    Parental Preclusion Policy Deals with Matters of
Importance to the Parent-Child Relationship Not
Relinquished by Parents to the Public Schools............................14

    B.    The Curricular Exception Does Not Sanction Hiding
Information from Parents...................................................15

C.    The Curricular Exception Primarily Focuses on What Happens at School, While a Parental Preclusion Policy Primarily Focuses on What Happens at Home ..............................16

IV.    *DeShaney*, Properly Understood, Underscores the Unconstitutionality of Parental Preclusion Policies ................................17

V.    The School Has No Legitimate Interest to Justify Hiding Information from Parents, Much Less a Compelling One .....................21

Conclusion ...........................................................................................25

Table of Authorities

Cases

*Alfonso v. Fernandez*, 195 A.D.2d 46,
606 N.Y.S.2d 259 (N.Y. App. Div. 1993) .......................................................19

*Bellotti v. Baird*, 443 U.S. 622 (1979)......................................................24

*Boddie v. Conn.*, 401 U.S. 371 (1971).......................................................7

*Croft v. Westmoreland Cnty. Children and Youth Servs.*,
103 F.3d 1123 (3d Cir. 1997)...............................................................23

*DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*,
489 U.S. 189 (1989)..................................................................2, 17-18, 21

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022).........................................................................2

*Doe 1 v. Madison Metropolitan Sch. Dist.*, 2022 Wis. 65 (2022) .........................11

*Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003)..............................................23

*Edwards v, Aguillard*, 482 U.S. 578 (1987) ...........................................19

*Fields v. Palmdale Sch. Dist.,* 427 F.3d 1197 (9th Cir. 2005)*,
amended on rehearing,* 447 F.3d 1187 (9th Cir. 2006)...............................12-13

*Ginsberg v. N.Y.,* 390 U.S. 629 (1968)...................................................24

*Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000) ........................................15

*In re Agar-Ellis*, [1883] 24 Ch. 317, 327 ................................................6

*In re Hudson*, 126 P.2d 765 (Wash. 1942) ...............................................6

*M.L.B. v. S.L.J.*, 519 U.S. 102 (1996)................................................7, 11

*Mahmoud v. Taylor*, 606 U.S. 522 (2025)........................6, 9, 12-13, 16, 18-19, 21

*May v. Anderson*, 345 U.S. 528 (1953) ...................................................7

*Meyer v. Neb.*, 262 U.S. 390 (1923) ................................................................7, 19

*Mirabelli v. Bonta*, 2026 WL 575049 (U.S. Mar. 2, 2026) ....................8, 13, 22-23

*Moore v. E. Cleveland*, 431 U.S. 494 (1977) ...........................................................7

*Morse v. Frederick,* 551 U.S. 393 (2007) ..............................................................18

*Parents 1 v. Montgomery Cnty. Bd. of Educ.*,
    78 F. 4th at 646 (4th Cir. 2023) .......................................................................23

*Parham v. J.R.*, 442 U.S 584 (1979) ...........................................................8, 11, 22

*Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925) .......................................3, 8, 17, 22

*Prince v. Mass.,* 321 U.S. 158 (1944) .......................................................7, 9, 17, 24

*Regino v. Blake*, 2026 WL 121667 (E.D. Cal. Jan. 15, 2026) ....................16, 21-22

*Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*,
    2022 WL 1471372 (D. Kan., May 9, 2022) ............................................9-11, 25

*Roe v. Wade*, 410 U.S. 113 (1973) ....................................................................2, 24

*Santosky v. Kramer,* 455 U.S. 745 (1982) ..............................................................11

*State v. Loe*, 692 S.W.3d 215 (Tex. 2024) ...............................................................21

*Stanley v. Ill.,* 405 U.S. 645 (1972) ..................................................................11, 17

*Troxel v. Granville*, 530 U.S. 57 (2000) .....................................................7, 9, 17, 24

*United States v. Skrmetti*, 605 U.S. 495 (2025) ......................................................21

*Wash. v. Glucksberg*, 521 U.S. 702 (1997) .........................................................2, 13

*Winkelman v. Parma City Sch. Dist.,* 550 U.S. 516 (2007) .......................................9

*Wis. v. Yoder*, 406 U.S. 205 (1972) ....................................................................9, 19

*Wyatt v. Fletcher*, 718 F.3d 496 (5th Cir. 2013) .....................................................22

iv

<u>Statutes</u>

Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g............................22

<u>Other Authorities</u>

3 Matthew Bacon, A New Abridgment of the Law (4th ed. 1778) ..........................4

1 Wm. Blackstone, Commentaries 440 ....................................................................6

Eric A. DeGroff, *Parental Rights and Pub. Sch. Curricula: Revisiting Mozert after 20 Years*, 38 J. of Law & Educ. 83 (2009)...................................21

Eric A. DeGroff & Steven W. Fitschen, *The Not-So-Silent Epidemic of Secret Gender-Affirming Policies in the Nation's Schools: Parental Rights and the Promise of* Pierce v. Society of Sisters, forthcoming in 100 Notre Dame L. Rev. 101 (2026) ............................................................4, 7

Wm. Forsyth, A Treatise on the Law Relating to the Custody of Infants (1850) .....6

1 Richard Hooker, Of the Laws of Ecclesiastical Polity (1593), *reprinted in* 1 Richard Hooker, The Works of That Learned and Judicious Divine, Mr. Richard Hooker (1875)...................................................................................5

Douglas Laycock, *High-value Speech and the Basic Educ. Mission of a Pub. Sch.: Some Prelim. Thoughts*, 12 Lewis & Clark L. Rev. 111 (2008)................................................................................................................20

John Locke, Second Treatise on Civil Govt. (1690), *reprinted in* John Locke, On Politics and Educ. (1947) ..............................................................................5

1 T. Rutherforth, Institutes of Nat'l Law (1754)......................................................7

John Sheridan, The Present Practice of the Court of King's Bench (1792).......... 4-5

John Taylor, Elements of the Civ. Law (1755).........................................................5

Statements of Interests[1]

The **Pacific Justice Institute** and the **National Legal Foundation** are non-profit, public interest law firms dedicated to the defense of First Amendment liberties and parental rights. They have both represented parents in litigation concerning Parental Preclusion Policies such as the one involved in this case. Thus, they and their donors have an interest in the instant case, one that will impact their own litigation.

Summary of the Argument

The district court, professing to avoid an unwarranted extension of fundamental rights, instead allowed violations of parental rights as understood historically, rights validated repeatedly by the Supreme Court. When the rights being violated are themselves well established, it is no defense to say that the attack is novel. Here, the Parental Preclusion Policy of the school violates parents' well-established rights to remove their children from public school, to supplement the education of their children by their own values, to decide what is in the best interests of their minor children, and not to have their parental rights encroached

---

[1] No counsel for any party authored this brief in whole or in part. No counsel for any party and no party contributed money intended to fund this brief. No person or entity other than *Amici*, their members*,* and their counsel made a monetary contribution intended to fund the preparation or submission of this brief. Appellants consented to the filing of this brief. Appellees did not; thus, this brief is accompanied by a motion for leave to file.

without procedural due process protections being satisfied. The "curricular exception" for public schools does not apply to Parental Preclusion Policies, and the district court's reliance on *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), was ill founded, as *DeShaney*, properly understood, supports Ms. Regino. Moreover, the school district has no legitimate interests in arrogating to itself the decision reserved to fit parents as to what is in their own children's best interests concerning whether, when, and how their children should exhibit as another gender.

Argument

I.  Courts Can Cut Fundamental Rights Analysis
    Too Finely, Not Just Apply It Too Broadly

The district court repeatedly alluded to the Supreme Court's admonition in *Washington v. Glucksberg*, 521 U.S. 702, 719-21 (1997), that, in analyzing whether a fundamental right is protected under the Fourteenth Amendment, a court should not define the right so broadly that it violates, rather than tracks, historical practice. A recent example is the Court's repudiation of its own precedent in *Roe v. Wade*, 410 U.S. 113 (1973), in which the Court itself had discerned in a generalized "privacy" interest a right to abort when, historically and under the common law, abortion had not been a right, but a crime. *See Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 241 (2022).

But it is also possible to err by cutting matters too finely, eliminating any

2

application of an historically accepted right because the particular application is new and so there is no direct precedent for that application. For instance, the Supreme Court in *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), was confronted with a state law dictating that all children had to attend public schools. The Supreme Court was not hamstrung by the fact that this was a novel law. It applied the historically established right of parents to direct their children's education to this new situation. Nor are courts now left with a foreordained conclusion about whether Parental Preclusion Policies violate constitutionally protected parental rights just because gender transition policies have only sprung up at public schools in the last decade and their constitutionality has not yet been adjudicated by the Supreme Court. Newly occurring events can violate long-established rights and responsibilities.

Cutting things too fine is the vice of the district court here. It is well established that parents have a fundamental right to control the upbringing of their minor children. The fact that the state for the first time in the last decade has decided to hide what is happening at school from parents when it comes to sexual matters—matters that reside at the heart of parental care and concern for their children—does not give the schools immunity from parental rights as historically understood. The question, instead, is whether the school's practice to aid and abet a child's desire to exhibit as transgender by keeping that undisclosed to parents

3

violates parental rights as historically understood. It most certainly does.

II.  Parental Rights as Historically Understood, Practiced, and Applied by the Supreme Court Support the Parents' Right to Know What Is Happening <u>Socially and Sexually with Their Child at School</u>

Parental rights as understood under the common law and applied by the Supreme Court undergird that Parental Preclusion Policies violate those rights. We will first outline the relevant common law and then analyze how it applies more particularly here in two respects: (a) the acknowledged right of parents to remove their children from public school (and to supplement their children's education even when they do not), and (b) the established right of parents not to be denied decision making for their children without notice and procedural protections being satisfied.

A. Parental Rights Have a Long Pedigree in the Common Law, <u>Recognized Repeatedly by the Supreme Court</u>

The common law recognized the obvious: minor children are not mature enough to regulate and protect themselves from harm and predators, and parents have the natural right and responsibility to act on their behalf.[2] *See, e.g.*, 3 Matthew Bacon, A New Abridgment of the Law 136 (4th ed. 1778); John

---

[2] The historical material provided here is taken from Eric A. DeGroff & Steven W. Fitschen, *The Not-So-Silent Epidemic of Secret Gender-Affirming Policies in the Nation's Schools: Parental Rights and the Promise of* Pierce v. Society of Sisters, forthcoming in 100 Notre Dame L. Rev. 101 (2026) (hereinafter "DeGroff & Fitschen").

Sheridan, The Present Practice of the Court of King's Bench 559 (1792); 1 Richard Hooker, Of the Laws of Ecclesiastical Polity (1593), *reprinted in* 1Richard Hooker, The Works of That Learned and Judicious Divine, Mr. Richard Hooker 168 (1875).

> John Locke in 1690 put it this way:
>
> [Adam's descendants] are all born infants, weak and helpless, without knowledge or understanding. But to supply the defects of this imperfect state till the improvement of growth and age had removed them, . . . all parents were, by the law of Nature, under an obligation to preserve, nourish, and educate the children they had begotten . . . .

John Locke, Second Treatise on Civil Govt. § 56 (1690), *reprinted in* John Locke, On Politics and Educ. 101 (1947) (hereinafter, "Locke"); *id.* § 59 (elaborating that children lack capacity before age twenty-one and must be guided by parents). Central to these parental obligations was to care for their children's bodily health. *See id.* at § 61 (stressing the duty to provide "[t]he necessities of [the child's] life, the health of his body, and the information of his mind"); *see also* John Taylor, Elements of the Civ. Law 383 (1755) (noting the possibility of civil liability for a parent who failed to provide for his child's "Bodily Health and Preservation"). To fulfill their obligations, the English common law recognized that parents have a right to make the decisions necessary to that end: "The power . . . that parents have over their children arises from that duty which is incumbent on them, to take care of their offspring during the imperfect state of childhood." Locke § 58.

As Blackstone put it, "The *power* of parents over their children is derived from the former consideration, their duty; this authority being given them, partly to enable the parent more effectually to perform his duty, and partly as a recompence for his . . . trouble in the faithful discharge of it." 1 Wm. Blackstone, Commentaries *440. The English courts expressly recognized these duties and rights of parents. *See, e.g.*, *In re Agar-Ellis*, [1883] 24 Ch. 317, 327; *see also In re Hudson*, 126 P.2d 765, 771 (Wash. 1942) (discussing parental rights at common law and *In re Agar-Ellis*). Thus, for more than three centuries, the common law has posited in parents the right to provide for their children's nurture and support in the way they consider best. *See* Wm. Forsyth, A Treatise on the Law Relating to the Custody of Infants 9 (1850). These concerns reach their apex with sexuality, sociality, and family dynamics. *See, e.g.*, *Mahmoud v. Taylor*, 606 U.S. 522 (2025).

A right is of not much utility if the holders are unaware of the relevant circumstances in which it might come into play or if material information is withheld from them; the rights holders need reasonable access to relevant information in order to make informed decisions. The common law recognized these logical propositions in the context of parental rights. To enable them to fulfill their natural obligations of care and protection of their minor children, parents had a correlative right to know everything about them: "[S]ince nature cannot be

6

supposed to prescribe a duty to the parents, without granting them the means, which are necessary for the discharge of such duty; [sic] it follows, that nature has given the parents all the authority, which is necessary for bringing up the child in a proper manner." 1 T. Rutherforth, Institutes of Nat'l Law 31, 160 (1754).[3]

The Supreme Court is well aware of the historical underpinnings of parental rights, having labelled them *fundamental*. It has provided constitutional protection for them for over a century, and it has variously described those rights as "precious," *May v. Anderson*, 345 U.S. 528, 533 (1953); "deeply rooted in [our] Nation's history," *Moore v. E. Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion); "essential to the orderly pursuit of happiness by free men," *Meyer v. Neb.*, 262 U.S. 390, 399 (1923); and "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion). "Choices about . . . the upbringing of children are among the associational rights this Court has ranked as 'of basic importance in our society'" and are "sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) (quoting *Boddie v. Conn.*, 401 U.S. 371, 376 (1971)). *Any* infringement or hindrance of fundamental, parental rights violates them. *See Prince v. Mass.,* 321

---

[3] DeGroff & Fitschen in § B.2 of their article also explain the broader Western tradition that gives rise to the common law of parental rights and responsibilities, both in Roman and ecclesiastical law.

U.S. 158, 166 (1944). We now turn to some of the ways in which Parental

Preclusion Policies like that in this case violate fundamental parental rights as

already applied by the Supreme Court.

### B. Parental Preclusion Policies Impermissibly Infringe on Parents' Rights to Remove Their Children from Public Schools and to Supplement Their Childrens' Education

Over a century ago, the Supreme Court recognized that, as part of their

fundamental rights, parents decide whether their child should attend, or continue to

attend, a public school. *See Pierce*, 268 U.S. at 534-35. Obviously, a key reason

parents may wish to remove their child from public school is if the school is not

cooperating with the parents on the issue of their child exhibiting as transgender.

When a school keeps secret from parents that their child is transitioning, the school

is preventing the parents from exercising their traditional responsibilities. *See*

*Mirabelli v. Bonta*, 2026 WL 575049 at *3 (U.S. Mar. 2, 2026) (holding that

parents have a fundamental right "not to be shut out of participation in decisions

regarding their children's mental health") (citing *Parham*, 442 U.S. at 602). Thus,

the school must provide *timely*, contemporaneous notification to them.

Parents do not have the burden to keep asking the school if their child is

exhibiting as transgender (which the school by policy is hiding from them in any

event). When parents register their child, they tell the school what to call their

child and the sex of their child. The school violates those parental instructions in

8

this critically important, life-changing area when it starts honoring a child's desire to exhibit as transgender and to hide that from the parents. Parents cannot carry out their constitutional responsibilities to decide whether their child should continue to attend the school without this basic information. *See Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*, 2022 WL 1471372 at *8 (D. Kan., May 9, 2022).

Second, the right of parents to direct their children's education does not end with a right to remove their child from the school. Parents also have a constitutional right to supplement their children's education by instruction of their own. *See Mahmoud*, 606 U.S. at 546; *Wis. v. Yoder*, 406 U.S. 205 (1972). This is especially so about subject matters like alternative sexual lifestyles, and parents have a right to do so with specificity, knowing when and what their child is being taught and how their child is being counseled at school. *See Winkelman v. Parma City Sch. Dist.,* 550 U.S. 516, 529 (2007) ("It is not a novel proposition to say that parents have a recognized legal interest in the education and upbringing of their child."); *Troxel*, 530 U.S. at 65-66; *Yoder,* 406 U.S. at 213-14; *Prince v. Mass.,* 321 U.S. 158, 166 (1944)*.* They can only properly fulfill these fundamental responsibilities if they know what is happening at school in a timely manner.

Of course, sufficient information on this score is unavailable from the children themselves. Any parent knows that most children are neither capable nor willing to provide a play-by-play of the school day to their parents. *See Mahmoud*,

606 U.S. at 560. Family relations are also affected when parents have to probe their children repeatedly about sexual subjects. Plus, such probing is difficult on subjects concerning matters to which the parents do not wish to expose their children or if it suggests that parents question whether their children may be disrespecting the parents' wishes, whether they actually are or not.

It is as simple as this: to be able to exercise their rights and responsibilities intelligently, parents need to know what is going on at school. "[I]t is illegitimate to conceal information from parents for the purpose of frustrating their ability to exercise a fundamental right." *Ricard,* 2022 WL 1471372 at *8. A school hiding the ball by failing to disclose that it is no longer following the instructions parents have given about the name and gender of their child is an unconstitutional infringement of parental rights. This is a direct application of centuries-old, common law principles.

### C. Parental Preclusion Policies Impermissibly Declare Parents Unfit If They Disagree with the School's Preferred Ideology Without Providing Them <u>with Required Due Process Protections</u>

Another infirmity of this and other Parental Preclusion Policies is that they allow school officials to restrict parental rights upon a finding that parents may be "unsupportive" of their child exhibiting as transgender. This, in essence, is a finding by a State official that the parents are unfit to handle this aspect of their child's life. But, due to the fundamental nature of parental rights as established

10

historically, the Supreme Court has mandated due process safeguards before the State can inhibit parental authority over their children.

In *Santosky v. Kramer,* 455 U.S. 745 (1982), the Court held that the State must find that a parent is guilty of neglect by clear and convincing evidence, *id.* at 747-48; in *Stanley v. Illinois,* 405 U.S. 645 (1972), the Court held that due process requires a natural parent to be given a hearing prior to a determination of neglect, *id.* at 656-58; and in *M.L.B.*, the Court ruled that an indigent parent's appeal rights of a parental termination order could not be thwarted because she lacked funds to pay court expenses. 519 U.S. at 107. These cases establish that notification and due process are required for deprivation of parents' fundamental liberty interest in the care of their children. Their liberty cannot be eliminated in secret or on a child's request. *See Parham v. J.R.*, 442 U.S. 584, 603 (1979) (rejecting contention that minor child could override his parents' decision to institutionalize him).

As the court stated in *Ricard*, the only interest that would be compelling enough to justify a school withholding information about their children is if there was a need to protect against particularized, illegal parental behavior "as the law defines it, and not simply as an administrator might subjectively perceive it." 2022 WL 1471372 at *8. The justices of the Wisconsin Supreme Court who reached the issue in *Doe 1 v. Madison Metropolitan School District*, 2022 Wis. 65 (2022), agreed:

> Both the United States Constitution and the Wisconsin Constitution support the conclusion that [the school district's Parental Preclusion] Policies cannot deprive parents of their constitutional rights without proof that parents are unfit, a hearing, a court order, and without according parents due process. Instead, under [the school district]'s explicit guidelines, parents are affirmatively excluded from decision-making unless their child consents.

*Id.* ¶ 89 (Roggensack, J., dissenting).[4]

All these concerns come sharply into play here. The school district becomes prosecutor, judge, and jury, finding parents guilty when the school or their child suspects that the parents may not conform to the school's preferred ideology. That is not only dangerous to the child, it violates historically entrenched rights that may only be suspended after procedural due process that is wholly lacking in Parental Preclusion Policies.

III.    The Curriculum Exception as Applied to Public Schools Does Not Validate Parental Preclusion Policies

The district court repeatedly relied on cases like *Fields v. Palmdale School District,* 427 F.3d 1197, 1207 (9th Cir. 2005)*, amended on rehearing,* 447 F.3d 1187 (9th Cir. 2006), in positing that the parents' fundamental rights with respect to their children at school are to be accorded somewhat less protection than other fundamental rights.[5] This unduly inflated an exception into the overriding rule. As

---

[4] The majority in *John Doe 1* did not reach the merits, resolving the case on a procedural point.

[5] *Field*'s broad language articulating the curricular exception on which the district court repeatedly relied did not survive *Mahmoud*. When (continued next page)

the Supreme Court noted in *Glucksberg*, abridgement of parental rights, like other fundamental rights protected by the Fourteenth Amendment, are typically afforded heightened scrutiny. 521 U.S. at 720-22. When parents voluntarily send their child to public school, the one exception is that, because many other parents will do the same, the school will be primarily responsible to determine the curriculum and generally applicable administrative rules. Even then, parents are entitled to notice of the school's decisions in those regards.

The curricular carve-out does not extend to Parental Preclusion Policies for three major reasons. First, the curricular exception deals with matters delegated to the school, and parents do not delegate the decisions of whether, when, and how their children exhibit as another gender to schools. Second, the curricular exception does not justify keeping secrets from parents, the very purpose of a Parental Preclusion Policy. Third, Parental Preclusion Policies targets what happens at home, while the curricular exception deals with group functions at school.

---

parents have a right to notice when schools are using books with their children reflecting transgender behavior by *others*, 606 U.S. at 569, they certainly have a right to notice when their children are *themselves* exhibiting transgender behavior at school. *Cf. Mirabelli*, 2026 WL 575049 at *3 (finding that schools hiding from parents that a child is transitioning genders is a much greater intrusion than that found unconstitutional in *Mahmoud*).

A. A Parental Preclusion Policy Deals with Matters of Importance
   to the Parent-Child Relationship Not Relinquished by Parents
   <u>to the Public Schools</u>

The cases that discuss the curricular exception do not require individualized attention, as they are generically irrelevant. They deal solely with internal school choices that must be applied uniformly to allow a school to function, such as the substance of classroom instruction and hours of operation. They are developed by the school itself; by contrast, the child's birth gender and name was not a school creation. Moreover, Ms. Regino is not attempting to dictate a curriculum about transgenderism or to change the school district's policy. She is only insisting that she be informed of her own, individual child's behavior when it deviates from her prior instruction to the school about their naming and gender—and not lied to about it by school personnel.

Transgenderism, like other medical or psychological conditions, although it may need to be addressed while the child is in school, is not part of the primary educational mission for which parents have entrusted their children to the public schools. It is a core parental issue involved in the care, health, and welfare of their children. Thus, precedents that deal directly with matters involving the educational mission and administration of public schools and that must be applied uniformly for the school to function in a reasonable manner are inapposite.

Of course, there is a limit to the curriculum exception, even as to the matters

14

directly affecting education. For example, grades are central to the educational function of the school, but a school certainly could not refuse to disclose a student's grades to her parents because she feared the parents' reaction and wanted to keep them secret. Much less can a school withhold information from parents about their child's transgender behavior, which is not part of the school's delegated education function.

The words of the Third Circuit in an analogous case are apt here:

> School-sponsored counseling and psychological testing that pry into private family activities can overstep the boundaries of school authority and impermissibly usurp the fundamental rights of parents to bring up their children, as they are guaranteed by the Constitution. Public schools must not forget that *"in loco parentis"* does not mean "displace parents."

> It is not educators, but parents who have primary rights in the upbringing of children. School officials have only a secondary responsibility and must respect these rights. State deference to parental control over children is underscored by the [Supreme] Court's admonitions that the child is not the mere creature of the State, and that it is the parents' responsibility to inculcate moral standards, religious beliefs, and elements of good citizenship.

*Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000) (internal citations and quotations omitted).

B. The Curricular Exception Does Not Sanction
   Hiding Information from Parents

Second, Ms. Regino is not challenging all parts of the school district's transgender policy, but only those parts that require school personnel to disregard her instructions, to hide information from her, and to dissemble to do so. The

15

curricular exception does not sanction such bureaucratic behavior. Parents are fully entitled to know what and how their children are being instructed at school and what general administrative rules they must follow. No curricular exception case cited by the district court or known by *Amici* involves the school hiding matters from parents, but that is the essence of the problem here. Parents have a right to *know* what transpires in school, even if they have ceded their right to the school to determine general curricular affairs. *See Mahmoud*, 606 U.S. at 568-69.  Without notice, parents cannot exercise their right to remove their child from public school if they think it appropriate due to the school's decisions and their own child's particular needs and circumstances.

C.  The Curricular Exception Primarily Focuses on What Happens at School, While a Parental Preclusion Policy Primarily Focuses on <u>What Happens at Home</u>

Third, the curricular carve-out deals with what happens at school and does not involve direct regulation of what happens at home. Here, the thrust of the challenged Parental Preclusion Policy is to regulate what happens at home, keeping "secrets" from the parents so that their children can stay "safe" there. *See Regino v. Blake*, 2026 WL 121667 at *15 (E.D. Cal., Jan. 15, 2026).

The curricular exception is not properly used to regulate the parent-child relationship in the home. And there can be no doubt that a Parental Preclusion Policy affects familial relationships. Just by asking the questions, "Do you want to

16

tell your parents?" and "Are your parents supportive of you?," as a Parental Preclusion Policy requires, school personnel encourage children to distrust their parents. It is just as obvious that a child living a "double life," exhibiting as transgender at school and not at home, creates an emotional distance from the parents and threatens alienation from them after the parents discover that this behavior has been kept secret from them. This is not just a "school matter."

The Supreme Court has repeatedly opined that it is *parents* who have primary responsibility for the care and education of their children (not the public schools). *See, e.g.*, *Troxel*, 530 U.S. at 65-66; *Stanley*, 405 U.S. at 651; *Prince*, 321 U.S. at 166; *Pierce*, 268 U.S. at 535. The proper question, then, is whether this school policy attempts to manage the parent-child relationship at home. And the purpose of a Parental Preclusion Policy is exactly that—to intrude on what happens in the home. That manifestly exceeds the school's legitimate control and violates the parents' fundamental rights. It is not excused by the curricular carve-out.

IV.    *Deshaney*, Properly Understood, Underscores the Unconstitutionality of Parental Preclusion Policies

The district court finds support for its ruling in *DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189 (1989). That only shows the district court's misconception of the role of public schools. *DeShaney*, properly understood, supports Ms. Regino here.

In *DeShaney*, a county's social service agency, despite indications that a

17

child might be suffering abuse from his father, did not promptly intervene, and the child suffered additional harm at his father's hand. The child claimed this was a substantive due process violation, but the Supreme Court disagreed because "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." 489 U.S. at 195. The Court distinguished the abuse situation before it from a setting in which the State had compelled attendance, noting that the latter circumstance creates a special relationship between the State and the individuals involved. *Id.* at 199-200.

Here, the situation is very different from that in *DeShaney*, at several levels. First, the State has not been passive; it has acted affirmatively to deprive the parent of his fundamental rights. The school is not just leaving matters alone; if it did that, it would continue to let parents decide the naming of their children and whether children should exhibit as transgender. Instead, the school is taking affirmative steps to shield children from parental authority and decision making.

Second, the State has acted in its compulsory education laws to require that the child attend school. While some parents have the wherewithal to put their children in private schools or to home school them, not all parents do. *See Mahmoud*, 606 U.S. at 561-62; *Morse v. Frederick,* 551 U.S. 393, 424 (2007) (Alito, J., concurring). As a result, their only way to comply with the compulsory

18

education laws is to send them to public school, and that, in turn, generates an affirmative obligation of the State to keep parents in the know about what is happening at school. This is in full accord with *Edwards v. Aguillard*, 482 U.S. 578 (1987), in which the Supreme Court emphasized that public schools and families are in a special relationship:

> Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary.

*Id.* at 584; *see also Alfonso v. Fernandez*, 195 A.D.2d 46, 606 N.Y.S.2d 259 (N.Y. App. Div. 1993) (noting compulsory nature of schooling and finding the school violated parental rights when it distributed condoms to students upon their request without giving parents notice).

Third, a public school's authority is best understood as a restricted consent or delegation from parents. Parents are primarily responsible for their children's education, particularly when religious beliefs come into play. *See Mahmoud*, 606 U.S. at 543; *Yoder*, 406 U.S. at 413-18; *Meyer*, 262 U.S. at 401. When they send their children to public school along with the children of other parents who may well have other philosophical and religious beliefs, they consent in the main to a generalized, common instruction for their children. But that does not give the school *carte blanche* to treat their children however the school wishes. It is also

19

commonly understood that parental consent is conditioned on the school staying in its lane, teaching in accord with its central mission. *See generally* Douglas Laycock, *High-value Speech and the Basic Educ. Mission of a Pub. Sch.*: *Some Prelim. Thoughts*, 12 Lewis & Clark L. Rev. 111 (2008).

Professor Laycock gives an "outside-its-lane" example of a public school teaching its students that they should all support the Democratic Party. *Id.* at 117. This would be improper even if the district's populace is heavily Democratic. The stakes are even higher with topics that implicate appropriate sexual lifestyles and the religious beliefs concerning them and also when behavioral, rather than curricular, matters are involved. What Professor Laycock says resonates here:

> Parents entrust the public schools with their children for important but particular purposes. Parents may expect the school to teach skills and values conducive to success in later life, and they may expect the schools to teach fundamental democratic values. But they do not expect the schools to indoctrinate their children on current political or religious questions that may be the subject of substantial disagreement among the parents themselves, either locally or nationally. Indoctrination on that sort of question is not part of the school's basic educational mission . . . .

*Id.* at 119.

Parental consent to having the public school set behavioral policies is not unconditional. Schools can go too far and exceed that consent (or delegation). The school district has done so here, wading into a debate that is roiling our country and encroaching on the fundamental rights of parents to make life-changing

decisions for their minor children.[6] Schools cannot leverage compulsory school attendance laws into permission to trample parental and religious rights at will. *See Mahmoud*, 606 U.S. at 543; *see generally* Eric A. DeGroff, *Parental Rights and Pub. Sch. Curricula: Revisiting* Mozert *after 20 Years*, 38 J. of Law & Educ. 83 (2009) (arguing that parental rights are fundamental and require public schools to provide an opt-out when the curriculum violates religious beliefs).

Parental Preclusion Policies like the one at issue here are not validated by *DeShaney*. That decision's rationale instead underscores that such policies violate parental rights and the special relationship parents form with the schools when they give them the limited responsibility to educate their children.

## V.    The School Has No Legitimate Interest to Justify Hiding Information from Parents, Much Less a Compelling One

The district court applied (wrongly) a rational basis test and found that the stated purposes of "protect[ing] student privacy and creat[ing] a zone of protection from potential domestic abuse" adequately justify the school's policy to hide from the parent the fact that her children are socially transitioning. 2026 WL 121667 at

---

[6] Justice Blacklock of the Texas Supreme Court has described the two sides in the great national debate over the wisdom and propriety of minors exhibiting as transgender as those holding to either the "Transgender Vision" or the "Traditional Vision." He notes that, at their core, the differences reflect moral, religious, and political beliefs. *State v. Loe*, 692 S.W.3d 215, 239-40 (Tex. 2024) (Blacklock, J., concurring). Of course, the differences between the views also involve contested social science, as discussed by the Supreme Court in *United States v. Skrmetti*, 605 U.S. 495 (2025).

*15. These interests are illegitimate supports for a Parental Preclusion Policy.

First, a minor child has no privacy interest vis-à-vis the parents. *See* Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g (requiring schools to make available to parents all records regarding their children); *Wyatt v. Fletcher*, 718 F.3d 496, 505 (5th Cir. 2013). Second, the fact that some parents may abuse their child does not sanction a policy to disenfranchise all fit parents, a result explicitly foreclosed by the Supreme Court in *Parham*: "The statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition." 442 U.S. at 603 (emphasis in original). As the Supreme Court just emphasized in *Mirabelli*, "Under long-established precedent, parents—not the State—have primary authority with respect to 'the upbringing and education of children.'" 2026 WL 575049 at *3 (quoting *Pierce*, 268 U.S. at 534-35).

Both interests on which the school district relies have at their base the assumption that the schools may override the judgment of fit parents about how best to raise their children. As Judge Niemeyer of the Fourth Circuit observed about a similar Parental Preclusion Policy, incantations of children's "privacy" and "well-being" cannot be used to nullify parents' fundamental rights:

> [T]he district court erred in its strict scrutiny analysis by relying on the students' well-being and privacy interests to defeat the Parents' fundamental substantive due process right. Just as it is no defense to an alleged infringement of a plaintiff's First Amendment right to claim a compelling

interest in not hearing disagreeable viewpoints, so also is it no defense to an alleged infringement of parental substantive due process rights to claim a compelling interest that is premised on a rejection of that right—in this case, the Board's claimed interest in having matters central to the child's well-being kept secret from and decided by a party other than the parents. In other words, the district court failed to recognize that its analysis was akin to holding there to be a *per se* interest in infringing on the Parents' rights by granting students a superior right to privacy and granting the school the prerogative to decide what kinds of attitudes are not sufficiently supportive for parents to be permitted to have a say in a matter of central importance in their child's upbringing. But that is effectively a nullification of the constitutionally protected parental rights.

*Parents 1*, 78 F.4th at 646 (Niemeyer, J., dissenting).[7] Indeed, the Supreme Court in *Mirabelli* echoed Judge Neimeyer's analysis, summarizing that the interests of "student safety and privacy" when advanced by schools "cut out the primary protectors of children's best interests: their parents." 2026 WL 575049 at *3.

And other circuits have also held in related contexts that the State's second-guessing of the decision of fit parents about what is best for their children is illegitimate and, no matter how the State words its motivating interest, is entitled to no weight. As the Third Circuit stated in *Croft v. Westmoreland County Children and Youth Services*, 103 F.3d 1123, 1126 (3d Cir. 1997), the government "has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Accord Doe v. Heck,* 327 F.3d 492, 521

---

[7] The majority in *Parents 1* did not reach the merits, but dismissed on standing grounds.

23

(7th Cir. 2003).

The Supreme Court in *Bellotti v. Baird*, 443 U.S. 622 (1979), after repeating its admonition in *Prince* that it "is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations *the state can neither supply nor hinder*," 321 U.S. at 166 (emphasis added), in the context of a minor's desire to abort, emphasized that parents have a constitutional role in making critical life decisions of a sexual nature for their children:

> Unquestionably, there are many competing theories about the most effective way for parents to fulfill their central role in assisting their children on the way to responsible adulthood. While we do not pretend any special wisdom on this subject, we cannot ignore that central to many of these theories, and deeply rooted in our Nation's history and tradition, is the belief that the parental role implies a substantial measure of authority over one's children. Indeed, "constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." *Ginsberg v. New York, supra*, [390 U.S. 629], at 639 [(1968)].

433 U.S. at 637-39.[8]

*Troxel* is also instructive. The Supreme Court held that, even after an evidentiary hearing, courts have no right to override the determination of fit parents about whether it would be in their children's best interests to see their

---

[8] In *Bellotti*, the Supreme Court was operating under the regime of *Roe*, requiring it to balance against parental rights the "need to preserve the constitutional right and the unique nature of the abortion decision." 433 U.S. at 642. The Supreme Court upheld a parental notification law, provided it had a judicial bypass. *Id.* at 643.

24

grandparents; minor children do not get a "vote" on such matters. 530 U.S. at 64-70. If that is so, school boards certainly have no right to shield from parents the determination of whether their children should "change genders," a decision with much greater complexity and risk for the children. *See id.* at 80 (Thomas, J., concurring) (stating that the State "lacks even a legitimate governmental interest—to say nothing of a compelling one—in second-guessing a fit parent's decision").

The district court in *Ricard* put it this way: "It is difficult to envision why a school would even claim—much less how a school could establish—a generalized interest in withholding or concealing from the parents of minor children[] information fundamental to a child's identity, personhood, and mental and emotional well-being such as their preferred name and pronouns." 2022 WL 1471372 at *8 (footnote omitted). The short answer is that a school can't establish any such interest.

## Conclusion

Parental Preclusion Policies such as the one that gave rise to this case trample on the fundamental rights of the parents to direct the care and upbringing of their minor children. Parental rights do not stop at the schoolhouse gate, and the naming and gender of a child are not educational matters, but familial ones. This Court should reverse the judgment below.

25

Respectfully submitted,
this 13th day of March, 2026

/s/ Steven W. Fitschen
Steven W. Fitschen
    Counsel of Record
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 26-475

I am the attorney or self-represented party.

**This brief contains** 6,437 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Steven W. Fitschen    **Date** March 13, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**            *Rev. 12/01/22*