No. 26-475

# In the United States Court of Appeals
## FOR THE NINTH CIRCUIT

AURORA REGINO,

PLAINTIFF-APPELLANT,

*v.*

GREG BLAKE, SUPERINTENDENT,

DEFENDANT-APPELLEE,

AND

KELLY STALEY, SUPERINTENDENT; CAITIN DALBY; REBECCA KONKIN; TOM LANDO; EILEEN ROBINSON; MATT TENNIS,

DEFENDANTS,

GSA NETWORK,

INTERVENOR-DEFENDANT.

On appeal from the United States District Court for the Eastern District of California, Case No. 2:23-cv-00032-DJC-DMC Honorable Daniel J. Calabretta, District Court Judge

**AMICUS BRIEF OF DR. ERICA E. ANDERSON, PhD, SUPPORTING APPELLANT AND REVERSAL**

CALIFORNIA JUSTICE CENTER

EMILY RAE
18002 Irvine Blvd., Suite 108
Tustin, CA 92780
emily@calpolicycenter.org
(949) 237-2573

WISCONSIN INSTITUTE FOR
LAW & LIBERTY

LUKE N. BERG
330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
luke@will-law.org
(414) 727-7367

*Attorneys for Amicus Curiae*

## DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 29(a)(4)(a), Dr. Erica E. Anderson states that she is a person and is not a publicly traded company or corporation.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT .......................................................i

TABLE OF AUTHORITIES .....................................................iii

IDENTITY AND INTEREST OF AMICUS ..............................1

INTRODUCTION ......................................................................2

SUMMARY OF ARGUMENT .....................................................3

ARGUMENT ...............................................................................4

    I.   A Social Transition of a Minor Child Is a Major Health-Related Decision That Requires Parental Involvement, for Many Reasons....................................................................4

    II.  Parental Decision-Making Authority Includes the Right to Decide How One's Own Minor Children Are Addressed at School. .......................................................................15

CONCLUSION ........................................................................26

CERTIFICATE OF COMPLIANCE ..........................................27

CERTIFICATE OF SERVICE ..................................................28

# TABLE OF AUTHORITIES

## Cases

*C.N. v. Ridgewood Bd. of Educ.*,
430 F.3d 159 (3d Cir. 2005) ..................................................... 17, 25

*Doe 1 v. Madison Metro. Sch. Dist.*,
2022 WI 65, 403 Wis. 2d 369, 976 N.W.2d 584 .............................. 24

*Gruenke v. Seip*,
225 F.3d 290 (3d Cir. 2000) ............................................................ 20

*John & Jane Parents 1 v. Montgomery Cty. Bd. of Educ.*,
78 F.4th 622 (4th Cir. 2023) ........................................................... 23

*Kaltenbach v. Hillard City Sch.*,
No. 24-3336, 2025 U.S. App. LEXIS 7303 (6th Cir. Mar. 27,
2025) ................................................................................................ 23

*Landerer v. Dover Area Sch. Dist.*,
No. 1:24-CV-00566, 2025 U.S. Dist. LEXIS 25782 (M.D. Pa.
Feb. 13, 2025) ................................................................................. 22

*Lee v. Poudre Sch. Dist. R-1*,
135 F.4th 924 (10th Cir. 2025) ....................................................... 23

*Mahmoud v. Taylor*,
145 S. Ct. 2332 (2025) ....................................................... 16, 17, 19

*May v. Anderson*,
345 U.S. 528 (1953) ........................................................................ 16

*Mead v. Rockford Pub. Sch. Dist.*,
800 F. Supp. 3d 836 (W.D. Mich. 2025) ......................................... 22

*Mirabelli v. Bonta*,
607 U.S. ___, No. 25A810, 2026 U.S. LEXIS 1192, (Mar. 2,
2026) ................................................................................... 3, 15, 16

*Parham v. J. R.*,
442 U.S. 584 (1979) ....................................... 16, 17, 18, 19, 24, 25

*Ricard v. USD 475 Geary Cty., KS Sch. Bd.*,
No. 5:22-cv-4015, 2022 U.S. Dist. LEXIS 83742 (D. Kan. May
9, 2022) ........................................................................................... 23

*Skinner v. Oklahoma*,
316 U.S. 535 (1942) ........................................................ 16

*T.F. v. Kettle Moraine Sch. Dist.*,
No. 21-CV-1650, 2023 WL 6544917 (Wis. Cir. Ct. Oct. 3,
2023) ................................................................................ 21, 22

*Troxel v. Granville*,
530 U.S. 57 (2000) .................................................... 15, 16, 17, 19

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) ...................................................... 16, 17, 18

**Other Authorities**

Elie Vandenbussche, *Detransition-Related Needs and Support: A
Cross-Sectional Online Survey*, 69(9) Journal of
Homosexuality 1602–1620 (2022) .................................... 13

*Guidelines for Psychological Practice With Transgender and
Gender Nonconforming People*, American Psychological
Association, 70(9) APA 832–64 (2015) ........................... 11, 14

Hilary Cass, *Independent review of gender identity services for
children and young people: Final report* (April 2024), ................... 6

James M. Cantor, *Transgender and Gender Diverse Children and
Adolescents: Fact-Checking of AAP Policy*, 46(4) Journal of
Sex & Marital Therapy 307–313 (2019) .......................... 5

James R. Rae, et al., *Predicting Early-Childhood Gender
Transitions*, 30(5) Psychological Science 669–681 (2019) .......... 5, 8

Jesse Singal, *How the Fight Over Transgender Kids Got a Leading
Sex Researcher Fired*, The Cut (Feb. 7, 2016) .................... 7

Kenneth J. Zucker, *The myth of persistence: Response to "A critical
commentary on follow-up studies and 'desistance' theories
about transgender and gender non-conforming children" by
Temple Newhook et al.*, 19(2) International Journal of
Transgenderism 231–245 (2018) ...................................... 8

Kristina R. Olson, et al., *Gender Identity 5 Years After Social
Transition*, 150(2) Pediatrics (Aug. 2022) ....................... 6

*Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, WPATH, 23 International J. Trans. Health 2022 S1–S258 (2022)......................................passim

*Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People,* The World Professional Association for Transgender Health (Version 7, 2012) ........5, 9, 11

T. D. Steensma, et al., *Factors Associated with Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, 52(6) Journal of the American Academy of Child & Adolescent Psychiatry 582–590 (2013)..........................6, 8

*What is Gender Dysphoria?* American Psychiatric Association, https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria ..............................................13

Wylie C. Hembree, et al., *Endocrine Treatment of Gender-Dyshporic / Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, Endocrine Society 102(11) J Clin. Endocrinol. Metab. 3869–3903 (2017) .............9, 14

## IDENTITY AND INTEREST OF AMICUS[1]

Dr. Erica E. Anderson, PhD, is a transgender, clinical psychologist practicing in California and Minnesota with over 45 years of experience. Between 2019 and 2021, Dr. Anderson served as a board member for the World Professional Association for Transgender Health (WPATH) and as the President of USPATH (the United States arm of WPATH). Since 2016, Dr. Anderson's work has focused primarily on children and adolescents dealing with gender-identity-related issues, at the Child and Adolescent Gender Clinic at Benioff Children's Hospital at the University of California, San Francisco (2016 to 2021), and at her private consulting and clinical psychology practice (2016 to present). She has seen hundreds of children and adolescents for gender-identity-related issues in that time, many of whom transition, with her guidance and support.

As a practitioner serving children and adolescents experiencing gender incongruence, Dr. Anderson has a strong interest in ensuring the

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person—other than the amicus curiae or her counsel—contributed money that was intended to fund preparing or submitting this brief.

best possible support and assistance for those children. In her view, appropriate care requires parental involvement.

## STATEMENT OF THE ISSUE

Whether the District Court erred in dismissing Appellant's complaint, which alleges a violation of her fundamental right to parent her child.

## INTRODUCTION

The Chico Unified School District requires all staff to abide by any student's request to adopt a new gender identity without parental consent or notice. Staff are even directed to conceal the new public gender identity from parents. Many mental-health professionals believe that a gender-identity transition during childhood is a profound and difficult treatment decision, and that parental involvement is critical for many reasons: to properly assess the underlying sources of the child's feelings; to evaluate the risks and benefits of a transition; to identify and address any coexisting issues; to provide ongoing support; and ultimately, to decide whether a transition will be in their child's best interests.

The District applied its Policy to Appellant's child, facilitating a social transition at school without her notice or consent, in violation of her fundamental interest to oversee the care, custody, and education of her

minor child, including the right to make health-related decisions. Yet the District Court dismissed her complaint on the grounds that the school policy at issue "does not violate a parent's right to consent to healthcare treatment," ER-20, "does not violate a parent's right to make important decisions on behalf of their children," ER-25, "does not violate a parent's right to family integrity," ER-28, "does not violate a substantive due process right to choose a child's name," ER-29, and because Appellant "failed to establish a fundamental parental right to notice," ER-32.

Because the policy does, in fact, violate these established rights, this Court should reverse. *See Mirabelli v. Bonta*, 607 U.S. ___, No. 25A810, 2026 U.S. LEXIS 1192, at *6, (Mar. 2, 2026) ("The right [to parent] protected by these precedents includes the right not to be shut out of participation in decisions regarding their children's mental health.").

## SUMMARY OF ARGUMENT

I. A social transition to a different gender identity during childhood or adolescence is a significant and psychologically impactful health-related decision. And social transition is not the best approach for all children experiencing gender incongruence. A child or adolescent who exhibits a desire to change name and pronouns should receive a careful professional

assessment prior to transitioning. Given the significance of this decision, parents must be involved and must ultimately decide what is best for their child.

II. Parents have a well-established, fundamental right under the Fourteenth Amendment to make decisions for their minor children. A school district violates that right when it usurps the parents' role in significant, health-related decisions, like how their child will be addressed at school.

## ARGUMENT

### I. A Social Transition of a Minor Child Is a Major Health-Related Decision That Requires Parental Involvement, for Many Reasons.

When children and adolescents express a desire to socially transition to a different gender identity (*i.e.*, to change their name and pronouns to ones at odds with their natal sex), there is a major fork in the road—a decision to be made about whether a transition will be in the youth's best interests. Parents must be involved in this decision, for many reasons.

First, there is an ongoing debate in the mental health community about how quickly and under what conditions children and adolescents who experience gender incongruence (a mismatch between their natal

sex and perceived or desired gender identity) should transition socially. Childhood social transitions were "[r]elatively unheard-of 10 years ago," but have become far more frequent in recent years.[2] Before the recent trend in some circles to immediately "affirm" every child's and adolescent's expression of a desire for an alternate gender identity, a robust body of research had found that, for the vast majority of children (roughly 80-90%), gender incongruence does not persist.[3] As one researcher summarized, "*every* follow-up study of GD [gender diverse] children, without exception, found the same thing: Over puberty, the majority of GD children cease to want to transition."[4]

These studies were conducted before the recent trend to quickly transition, whereas some newer studies of youth who *have* socially

---

[2] Rae, James R., et al., *Predicting Early-Childhood Gender Transitions*, 30(5) Psychological Science 669–681, at 669–70 (2019), https://doi.org/10.1177/0956797619830649.

[3] *See, e.g.*, The World Professional Association for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* ("WPATH SOC7") at 11 (Version 7, 2012), https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_ English.pdf.

[4] Cantor, James M., *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, 46(4) Journal of Sex & Marital Therapy 307–313 (2019), https://doi.org/10.1080/0092623X.2019.1698 481.

transitioned show much higher rates of persistence. A study in 2013 found that "[c]hildhood social transitions were important predictors of persistence, especially among natal boys."[5] Another recent study of 317 transgender youth found that 94% continued to identify as transgender 5 years after transitioning.[6]

Considering the vastly different rates of persistence between youth who transition and those who do not, many experts in the field are concerned that a social transition may causally affect the likelihood that a child's or adolescent's experience of gender incongruence will persist.

In the UK, for example, a recent, comprehensive review of the evidence by the National Health Service concluded that "social transition in childhood may change the trajectory of gender identity development for children with early gender incongruence."[7] This review also found that

---

[5] Steensma, T. D., et al., *Factors Associated with Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, 52(6) Journal of the American Academy of Child & Adolescent Psychiatry 582–590, at 588 (2013), https://doi.org/10.1016/j.jaac.2013.03.016.

[6] Olson, Kristina R., et al., *Gender Identity 5 Years After Social Transition*, 150(2) Pediatrics (Aug. 2022), https://doi.org/10.1542/peds.2021-056082.

[7] Hilary Cass, *Independent review of gender identity services for children and young people: Final report* at 31–32 (April 2024), https://cass.independent-review.uk/home/publications/final-report/.

"those who had socially transitioned at an earlier age and/or prior to being seen in clinic were more likely to proceed to a medical pathway," with all the associated risks and complications. In view of this evidence, the report concluded that "parents should be actively involved in decision making" about a social transition.[8]

Dr. Kenneth Zucker, who for decades led "one of the most well-known clinics in the world for children and adolescents with gender dysphoria," has argued publicly that a social transition can "become[ ] self-reinforcing," because "messages from family, peers, and society do a huge amount of the work of helping form, reinforce, and solidify gender identities."[9] Dr. Zucker elsewhere has written that, in his view, "parents who support, implement, or encourage a gender social transition (and clinicians who recommend one) are implementing a psychosocial treatment that will increase the odds of long-term persistence."[10]

---

[8] *Id.* at 163.

[9] Singal, Jesse, *How the Fight Over Transgender Kids Got a Leading Sex Researcher Fired*, The Cut (Feb. 7, 2016), https://www.thecut.com/2016/02/fight-over-trans-kids-got-a-researcher-fired.html.

[10] Zucker, K., *The myth of persistence: Response to "A critical commentary on follow-up studies and 'desistance' theories about transgender and gender non-conforming children" by Temple Newhook et al.*, 19(2)

- 7 -

The authors of the 2013 study referenced above expressed concern that "the hypothesized link between social transitioning and the cognitive representation of the self" may "influence the future rates of persistence," while noting that this "possible impact of the social transition itself on cognitive representation of gender identity or persistence" had "never been independently studied," Steensma (2013), *supra* n.5, at 588–89.

Another group of researchers recently wrote that "early childhood social transitions are a contentious issue within the clinical, scientific, and broader public communities. [citations omitted]. Despite the increasing occurrence of such transitions, we know little about who does and does not transition, the predictors of social transitions, and whether *transitions impact children's views of their own gender*." Rae (2019), *supra* n.2, at 669–70 (emphasis added).

The Endocrine Society's guidelines similarly recognize that:

> "Social transition is associated with the persistence of GD/gender incongruence as a child progresses into adolescence. It may be that the presence of GD/gender incongruence in prepubertal children is the earliest sign that a child is destined to be transgender as an adolescent/adult (20). However, social transition (in addition to GD/gender

International Journal of Transgenderism 231–245 (2018), https://www.researchgate.net/publication/325443416.

incongruence) has been found to contribute to the likelihood of persistence."[11]

The World Professional Association for Transgender Health (WPATH), which takes a decidedly pro-transitioning stance, has acknowledged that "[s]ocial transitions in early childhood" are "controversial," that "health professionals" have "divergent views," that "[f]amilies vary in the extent to which they *allow* their young children to make a social transition to another gender role," and that there is insufficient evidence "to predict the long-term outcomes of completing a gender role transition during early childhood." WPATH SOC7, *supra* n.3, at 17.[12] WPATH encourages health professionals to *defer to parents* "as they work through the options and implications," *even* "[i]f parents do not allow their young child to make a gender role transition." *Id.*

---

[11] Hembree, Wylie C., et al., *Endocrine Treatment of Gender-Dyshporic/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, Endocrine Society, 102(11) J Clin. Endocrinol. Metab. 3869–3903, at 3879 (2017), https://doi.org/10.1210/jc.2017-01658.

[12] The latest version of WPATH's standards of care guidelines (version 8), which was released last fall, continues to acknowledge that "there is a dearth of empirical literature regarding best practices related to the social transition process." *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, WPATH, 23 International J. Trans. Health 2022 S1–S258, S76 (2022), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644.

In short, when a child or adolescent expresses a desire to change name and pronouns to an alternate gender identity, mental health professionals do not universally agree that the best decision, for *every such* child or adolescent, is to immediately "affirm" their desire and begin treating that child or adolescent as the opposite sex. And whether transitioning will be helpful or harmful likely depends on the individual child or adolescent. As WPATH emphasizes, "an individualized approach to clinical care is considered both ethical and necessary." WPATH SOC8, *supra* n.12, at S45.

While the mental health community continues to debate whether socially transitioning is generally beneficial or not, it is beyond dispute that there is currently little solid evidence about who is right, given how recent a trend this is. *See supra* n.15.

Even setting aside the debate about socially transitioning, there is near universal agreement that, when a child or adolescent exhibits signs of gender incongruence (and a request to change name/pronouns would qualify), each should be considered separately and individually and can benefit from the assistance of a mental health professional, for multiple reasons.

Every major professional association recommends a thorough professional evaluation to assess the underlying causes of the gender incongruence and whether a transition will be beneficial. The American Psychological Association ("APA"), for example, recommends a "comprehensive evaluation" and consultation with the parents and youth to discuss, among other things, "the advantages and disadvantages of social transition during childhood and adolescence."[13] The Endocrine Society likewise recommends "a complete psychodiagnostic assessment." *Supra* n.11, at 3877. WPATH, too, recommends a comprehensive "psychodiagnostic and psychiatric assessment," covering "areas of emotional functioning, peer and other social relationships, and intellectual functioning/school achievement," "an evaluation of the strengths and weaknesses of family functioning," any "emotional or behavioral problems," and any "unresolved issues in a child's or youth's environment." WPATH SOC7, *supra* n.3, at 15.[14] WPATH also

---

[13] APA, *Guidelines for Psychological Practice With Transgender and Gender Nonconforming People*, 70(9) APA 832–64, at 843 (2015), https://www.apa.org/practice/guidelines/transgender.pdf.

[14] WPATH SOC8, *supra* n. 12, at S45, likewise states that "a comprehensive clinical approach is important and necessary," "[s]ince it

recommends that mental health professionals "discuss the potential benefits and risks of a social transition with families who are considering it." WPATH SOC8, *supra* n.12, at S69.

A professional assessment is especially important given the "sharp increase in the number of adolescents requesting gender care" recently, particularly among adolescent girls ("2.5-7.1 times" adolescent boys). WPATH SOC8, *supra* n.12, at S43. As WPATH acknowledges, an increasing number of "adolescents [are] seeking care who have not seemingly experienced, expressed (or experienced and expressed) gender diversity during their childhood years," indicating that "social factors also play a role," including "susceptibility to social influence." *Id.* at S44–S45.

There is also growing awareness of adolescents who come to "regret gender-affirming decisions made during adolescence" and later "detransition," which many find to be a "difficult[ ]" and "isolating experience." *Id.* at S47. In one recent survey of 237 detransitioners (over 90% of which were natal females), 70% said they realized their "gender

---

is impossible to definitively delineate the contribution of various factors contributing to gender identity development for any given young person."

dysphoria was related to other issues," and half reported that transitioning did not help.[15]

Another reason for professional involvement is to assess whether the child or adolescent needs mental-health support. Many transgender youth experience dysphoria—psychological distress—associated with the mismatch between their natal sex and perceived or desired gender identity. Indeed, the APA's Diagnostic and Statistical Manual of Mental Disorders' (DSM-V) official diagnosis for "gender dysphoria" is *defined by* "clinically significant distress" associated with the mismatch.[16]

Gender incongruence is also frequently associated with other mental-health issues. WPATH's SOC8 shows that transgender youth have higher rates of depression, anxiety, self-harm, suicide attempts, eating disorders, autism spectrum disorders, and other emotional and behavioral problems than the general population. *Supra* n.12, at S62–63. All major professional organizations recommend screening for these

---

[15] Vandenbussche, E., *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, 69(9) Journal of Homosexuality 1602–1620, at 1606 (2022), https://doi.org/10.1080/00918369.2021.1919479.

[16] APA, *What is Gender Dysphoria?* https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria.

coexisting issues and treating them, if needed. *Id.*; APA Guidelines, *supra* n.13, at 845; Endocrine Society Guidelines, *supra* n.11, at 3876.

Finally, professional support can be vital during any transition. A transition can "test [a young] person's resolve, the capacity to function in the affirmed gender, and the adequacy of social, economic, and psychological supports," and "[d]uring social transitioning, the person's feelings about the social transformation (including coping with the responses of others) is a major focus of [ ] counseling." Endocrine Society Guidelines, *supra* n.11, at 3877.

It should go without saying, but parents cannot obtain a professional evaluation, screen for dysphoria and other coexisting issues, or provide professional mental-health support for their children, if their school maintains a policy of deception regarding their children.

To summarize, no professional association recommends that teachers and school officials—who lack any expertise in these issues—should facilitate a social transition at school while preventing parents from accessing information needed to care for their children.

## II.    Parental Decision-Making Authority Includes the Right to Decide How One's Own Minor Children Are Addressed at School.

"Gender dysphoria is a condition that has an important bearing on a child's mental health, but when a child exhibits symptoms of gender dysphoria at school, California's policies conceal that information from parents and facilitate a degree of gender transitioning during school hours. These policies likely violate parents' rights to direct the upbringing and education of their children." *Mirabelli v. Bonta*, 607 U.S. ___, No. 25A810, 2026 U.S. LEXIS 1192, at *6, (Mar. 2, 2026).

On March 2, 2026—in vacating the Ninth Circuit's stay of a permanent injunction requiring schools inform California parents if their child requests to socially transition at school—the U.S. Supreme Court relied on a long line of its cases establishing that parents have constitutional parental rights and found that secrecy policies "likely violate" those parental rights. *Id.* at *5–6; *see also Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.) (quoting *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925)). The Court further found that the lower court's injunction, which requires a school to tell parents if their child is socially transitioning, "promotes child safety by guaranteeing fit parents

a role in some of the most consequential decisions in their children's lives." *Mirabelli*, 2026 U.S. LEXIS 1192, at *7.

This is "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court," *Troxel*, 530 U.S. at 65 (plurality op.), and is "established beyond debate as an enduring American tradition," *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). Indeed, it is a "basic civil right[ ] of man," *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942), "far more precious . . . than property rights," *May v. Anderson*, 345 U.S. 528, 533 (1953).

This line of cases establishes four important principles with respect to parents' rights. *See Mahmoud v. Taylor*, 145 S. Ct. 2332, 2357 (2025) (holding that "[w]e have never confined *Yoder* to its facts"); *Mirabelli*, 2026 U.S. LEXIS 1192, at *6 ("California's policies will likely not survive the strict scrutiny that *Mahmoud* demands. . . . The same is true for the subclass of parents who object to those policies on due process grounds.").

*First,* parents are the primary decision-makers with respect to their minor children—not their school, or even the children themselves. *Parham v. J. R.*, 442 U.S. 584, 602 (1979) ("Our jurisprudence historically has reflected . . . broad parental authority over minor children."); *Troxel*,

530 U.S. at 66 (plurality op.) ("[W]e have recognized the fundamental right of parents to *make decisions* concerning the care, custody, and control of their children." (emphasis added)); *Yoder*, 406 U.S. at 232 (emphasizing the "primary role of the parents in the upbringing of their children"); *Mahmoud*, 145 S. Ct. at 2351 (parental authority "extends to the choices that parents wish to make for their children outside the home.").

Parental decision-making authority rests on two core presumptions: "that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions," *Parham*, 442 U.S. at 602, and that "natural bonds of affection lead parents to act in the best interests of their children," far more than anyone else. *Parham*, 442 U.S. at 602; *Yoder*, 406 U.S. at 232 ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children.")

*Second*, parental rights reach their peak, and thus receive the greatest constitutional protection, on "matters of the greatest importance." *See C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005) (calling this "the heart of parental decision-making authority"); *Yoder*, 406 U.S.

at 233–34. Among those important matters are medical and health-related decisions: "Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments." *Parham*, 442 U.S. at 603.

*Third*, a child's disagreement with a parent's decision "does not diminish the parents' authority to decide what is best for the child." *Parham*, 442 U.S. at 603–04. *Parham* illustrates how far this principle goes. That case involved a Georgia statute that allowed parents to voluntarily commit their minor children to a mental hospital (subject to review by medical professionals). *Id.* at 591–92. A committed minor argued that the statute violated his due process rights by failing to provide him with an adversarial hearing, instead giving his parents substantial authority over the commitment decision. *Id.* at 587. The Court rejected the minor's argument, confirming that parents "retain a substantial, if not the dominant, role in the [commitment] decision." *Id.* at 603–04. "The fact that a child may balk at hospitalization or complain about a parental refusal to provide cosmetic surgery does not diminish the parents' authority." *Id.* at 604.

*Fourth*, the fact that "the decision of a parent is not agreeable to a child or . . . involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Parham,* 442 U.S. at 603; *cf. Mahmoud*, 145 S. Ct. at 2377 (Thomas, J., concurring). Likewise, the unfortunate reality that some parents "act[ ] against the interests of their children" does not justify "discard[ing] wholesale those pages of human experience that teach that parents generally do act in the child's best interests." *Parham*, 442 U.S. at 602–03.

The "notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children" is "statist" and "repugnant to American tradition." *Id*. at 603 (emphasis in original). Thus, if a parent is fit, "there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel*, 530 U.S. at 68–69 (plurality op.).

In accordance with these principles, courts have recognized that a school violates parents' constitutional rights if it usurps their role in

- 19 -

significant decisions. In *Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000), for example, a high school swim coach suspected that a team member was pregnant, and, rather than notifying her parents, discussed the matter with other coaches, guidance counselors, and teammates, and eventually pressured her into taking a pregnancy test. *Id.* at 295–97, 306. The mother sued the coach for a violation of parental rights, explaining that, had she been notified, she would have "quietly withdrawn [her daughter] from school" and sent her to live with her sister until the baby was born. *Id.* at 306. "[M]anagement of this teenage pregnancy was a family crisis," she argued, and the coach's "failure to notify her" "obstruct[ed] the parental right to choose the proper method of resolution." *Id.* at 306. The court found that the mother had "sufficiently alleged a constitutional violation" against the coach and condemned his "arrogation of the parental role": "It is not educators, but parents who have primary rights in the upbringing of children. School officials have only a secondary responsibility and must respect these rights." *Id.* at 306–07.

Other courts and judges are beginning to recognize that policies to exclude parents from gender transitions at school violate parents' constitutional rights. In Wisconsin, parents were forced to remove their

12-year-old daughter, who was struggling with various mental health issues, from a school that refused to respect their decision about how their daughter should be addressed. After being removed from that environment, the daughter changed her mind about wanting to transition, realizing that her struggle with her gender was related to other issues. The parents sued their school district, and a Wisconsin court held that the district violated their parental rights. *T.F. v. Kettle Moraine Sch. Dist.*, No. 21-CV-1650, 2023 WL 6544917 (Wis. Cir. Ct. Oct. 3, 2023).

As the Court put it, "The School District could not administer medicine to a student without parental consent. The School District could not require or allow a student to participate in a sport without parental consent. Likewise, the School District [cannot] change the pronoun of a student without parental consent without impinging on a fundamental liberty interest of the parents." *Id.* The Court enjoined the District from "allowing or requiring staff to refer to students using a name or pronouns at odds with the student's biological sex, while at school, without express parental consent." *Id.*

Further, several federal district courts have denied motions to dismiss in similar cases. A case out of the Western District of Michigan found

that one of these policies plausibly "infringed upon Plaintiffs' fundamental parental rights," by, among other things, "allow[ing] school officials to deceive the child's parents, . . . undermin[ing] their ability to choose appropriate medical treatment for their child." *Mead v. Rockford Pub. Sch. Dist.*, 800 F. Supp. 3d 836, 850 (W.D. Mich. 2025). Another, in the Middle District of Pennsylvania, concluded that "allegations that social transition counseling was provided to [a child] and not disclosed to [the parents]" were "enough to state a claim for a violation of [the parent's] right to direct the medical and mental health care of her children." *Landerer v. Dover Area Sch. Dist.*, No. 1:24-CV-00566, 2025 U.S. Dist. LEXIS 25782, at \*16–33 (M.D. Pa. Feb. 13, 2025).

Another district court granted a preliminary injunction against such a policy, after which the case settled. As that court put it, a parent's "constitutional right includes the right . . . to have an opinion and to have a say in what a minor child is called and by what pronouns they are referred." *Ricard v. USD 475 Geary Cty., KS Sch. Bd.*, No. 5:22-cv-04015, 2022 U.S. Dist. LEXIS 83742, at \*21 (D. Kan. May 9, 2022).

There is also a growing chorus of appellate judges who have criticized similar policies in cases where the majority resolved the case on some

ground other than the merits. Judge Niemeyer, for example, wrote that a similar policy was "effectively a nullification of the constitutionally protected parental rights," by "granting the school the prerogative to decide what kinds of attitudes are not sufficiently supportive for parents to be permitted to have a say in a matter of central importance in their child's upbringing." *John & Jane Parents 1 v. Montgomery Cty. Bd. of Educ.*, 78 F.4th 622, 646 (4th Cir. 2023) (Niemeyer, J., dissenting) (the majority concluded the parents lacked standing). Judge Thapar, in an appeal dismissed solely for lack of a final, appealable order, called a similar policy "beyond troubling." *Kaltenbach v. Hillard City Sch.*, No. 24-3336, 2025 U.S. App. LEXIS 7303, at *3 (6th Cir. Mar. 27, 2025) (Thapar, J., concurring).

Judge McHugh wrote that a school policy "to help students conceal their gender identities from their parents" "impedes parents' longstanding, fundamental right." *Lee v. Poudre Sch. Dist. R-1*, 135 F.4th 924, 936–38 (10th Cir. 2025) (McHugh, J., concurring). "While the district may disagree with how some parents may react when they learn about their children's gender identities, the district may not seize control of a child's upbringing based on a 'simple disagreement' about what is in the

child's best interests." *Id.* (Judge McHugh concurred with the majority, however, that the policy was not a sufficient cause of the plaintiff's injuries to support a *Monell* claim.)

Three Justices of the Wisconsin Supreme Court, in yet another case similar to this one, reasoned that "social transitioning is a healthcare choice for parents to make," and that putting a school district "in charge of enabling healthcare choices without parental consent" deprives parents of their constitutionally protected "decision-making [authority] for their children." *Doe 1 v. Madison Metro. Sch. Dist.*, 2022 WI 65, ¶¶ 89, 92, 94, 403 Wis. 2d 369, 976 N.W.2d 584 (Roggensack, J., dissenting) (again, the majority did not reach or discuss the merits).

The District's actions alleged in this case violated Appellant's constitutional right to make the major decision about whether a social transition was in her child's best interest. The empirical evidence and legal precedent discussed above establishes that when children or adolescents experience gender incongruence, whether they should socially transition is a significant and impactful healthcare-related decision that falls squarely within "the heart of parental decision-making authority," *C.N.*, 430 F.3d at 184; *Parham*, 442 U.S. at 603.

The District took this life-altering decision out of the parents' hands and placed it with their minor child, who lacks the "maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham*, 442 U.S. at 602. By enabling the Appellant's child's social transition at school without her knowledge or involvement, the District effectively made a treatment decision without requisite legal authority or informed consent. Given the significance of changing gender identity, especially at a young age, parents "can and must" make this decision. *Parham*, 442 U.S. at 603.

Teachers and staff do not have the training and experience necessary to properly diagnose children with gender dysphoria or to opine and advise on the treatment options. They cannot provide professional assistance for children dealing with these issues, and they undermined the professional assistance the Appellant was providing by facilitating a transition at school.

A child's fear that his or her parents might not support a transition is not sufficient to override their decision-making authority. Parents' role is sometimes to say "no" to protect their children from decisions against their long-term interests.

## CONCLUSION

This Court should reverse the judgment of the District Court.

Dated: March 13, 2026

Respectfully Submitted,

CALIFORNIA JUSTICE CENTER

/s/ Emily Rae
Emily Rae
18002 Irvine Blvd., Suite 108
Tustin, CA 92780
emily@calpolicycenter.org
(949) 237-2573

WISCONSIN INSTITUTE FOR
LAW & LIBERTY

/s/ Luke N. Berg
LUKE N. BERG
330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
luke@will-law.org
(414) 727-7367

*Attorneys for Amicus Curiae*
*Dr. Erica E. Anderson, PhD*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(G), I certify the following:

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 4,883 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionately spaced typeface using the 2013 version of Microsoft Word in 14-point Century Schoolbook font.

Dated: March 13, 2026

/s/ Emily Rae
EMILY RAE

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2026, I filed the foregoing Amicus

Brief with the Clerk of the Court using the CM/ECF System, which will

send notice of such filing to all registered CM/ECF users.

Dated: March 13, 2026

/s/ Emily Rae

EMILY RAE