**No. 26-475**

---

## IN THE UNITED STATES COURT OF APPEAL
## FOR THE NINTH CIRCUIT

---

AURORA REGINO,

*Plaintiff–Appellant,*

v.

Superintendent GREG BLAKE, in his official capacity as Superintendent of the Chico Unified School District,

*Defendant–Appellee.*

On Appeal from the United States District Court
for the Eastern District of California
No. 2:23-cv-00032-DJC-DMC
Hon. Daniel J. Calabretta

---

## APPELLEE'S ANSWERING BRIEF

---

BRIAN A. DUUS, ESQ. (SBN: 263403)
JIMMIE E. JOHNSON, ESQ. (SBN: 223344)
**LEONE ALBERTS & DUUS, APC**
1390 Willow Pass Road, Suite 700
Concord, CA 94520
Telephone: (925) 974-8600
Facsimile: (925) 974-8601

*Attorneys for Defendant-Appellee*
GREG BLAKE

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION................................................................ 1

STATEMENT OF JURISDICTION ................................................. 3

STATEMENT OF THE ISSUES ..................................................... 3

PERTINENT AUHTORITIES........................................................ 4

STATEMENT OF CASE................................................................ 5

A.    The Parties ................................................................ 5

B.    Pertinent Legislative Background ................................... 5

C.    Pertinent Procedural Background.................................. 7

D.    Pertinent Allegations .................................................. 8

SUMMARY OF ARGUMENT....................................................... 11

I.    The SAC Fails to State Facts Constituting "Facial" Coercive Interference by the District into Regino's Intimate Human Relationship with Her Daughter (Count One)............................ 11

II.    The SAC Fails to State Facts Constituting "As-Applied" Coercive Interference by the District into Regino's Intimate Human Relationship with Her Daughter (Count Two) ............... 12

III.    The SAC Fails to Plead Allegations Establishing that the AR 5145.3 Transgender Provision Violates Substantive Due Process Rights in All Circumstances (Count Three).................... 14

    A.    Parental Rights Under the Constitution Do Not Extend to Adult Children ................................................................ 14

    B.    Parental Rights Under the Constitution Do Not Extend to Minor Children Who Have Attained Competency to Make Their Own Decisions ................................................................ 15

1.     Supreme Court Precedent Concerning Minors Having Abortions Without Parental Notice and Consent Illustrates the Right of Competent Minors to Make Their Own Decisions Regarding Privacy Concerns.................. 15

2.     Maintaining the Confidentiality of One's Gender Identity Is a Privacy Right Protected by the Constitution.............. 16

C.     Parents Do Not Hold a Fundamental "Notice" and "Consent" Right of the Type Sought by Regino...................................... 17

    1.     Regino's "Facial" Challenge Concerns a Legislative Act   17

    2.     Regino Seeks Recognition of a New Fundamental Right of Parents to Proactive "Notice" and "Consent" by a Government Agency ........................................... 18

    3.     The SAC Fails to Raise Factual Allegations Establishing a Deeply Rooted History of Parents Holding Notice and Consent Rights Concerning the Transgender Identities of their Children ................................... 18

    4.     The Right to Direct the Upbringing and Education of One's Child Does Not Include the Right to Compel State Action................................................... 20

    5.     The AR 5145.3 Transgender Provision Does Not Facially Violate the Parental Right to Direct the Medical Care of Children................................................... 20

    6.     The AR 5145.3 Transgender Provision Satisfies Rational Basis Review................................................... 21

IV.     The SAC Fails to Plead Factual Allegations Establishing that the Manner in which the District Applied the AR 5145.3 Transgender Provision to Regino "Shocks the Conscience" (Count Four) ................................................... 21

A.     Regino's "As-Applied" Challenge Concerns an Executive Act ................................................... 21

B.     The SAC Fails to Plead Factual Allegations Which "Shock the Conscience"................................................... 22

V.     Regino Is Not Entitled to Any Individual, Procedural Due Process in Connection with the District's Legislative Act of Adopting the AR 5145.3 Transgender Provision (Counts Five and Six) .................................................................................... 23

**ARGUMENT** ............................................................................. 24

I.     The SAC Fails to State Facts Constituting "Facial" Coercive Interference by the District into Regino's Intimate Human Relationship with Her Daughter (Count One) ............................ 24

II.     The SAC Fails to State Facts Constituting "As-Applied" Coercive Interference by the District into Regino's Intimate Human Relationship with Her Daughter (Count Two) ............. 28

III.     The SAC Fails to Plead Allegations Establishing that the AR 5145.3 Transgender Provision Violates Substantive Due Process Rights in All Circumstances (Count Three) .............................. 31

    A.     Parental Rights Under the Constitution Do Not Extend to Adult Children ..................................................................... 31

    B.     Parental Rights Under the Constitution Do Not Extend to Minor Children Who Have Attained Competency to Make Their Own Decisions .................................................................. 33

       1.     Supreme Court Precedent Concerning Minors Having Abortions Without Parental Notice and Consent Illustrates the Right of Competent Minors to Make Their Own Decisions Regarding Privacy Concerns ................... 33

       2.     Maintaining the Confidentiality of One's Gender Identity Is a Privacy Right Protected by the Constitution .............. 36

    C.     Parents Do Not Hold a Fundamental "Notice" and "Consent" Right of the Type Sought by Regino ...................................... 37

       1.     Regino's "Facial" Challenge Concerns a Legislative Act    37

       2.     Regino Seeks Recognition of a New Fundamental Right of Parents to Proactive "Notice" and "Consent" by a Government Agency ....................................................... 39

3. The SAC Fails to Raise Factual Allegations Establishing a Deeply Rooted History of Parents Holding Notice and Consent Rights Concerning the Transgender Identities of their Children ............................................................................ 42

4. The Right to Direct the Upbringing and Education of One's Child Does Not Include the Right to Compel State Action ............................................................................ 45

5. The AR 5145.3 Transgender Provision Does Not Facially Violate the Parental Right to Direct the Medical Care of Children ............................................................................ 48

6. The AR 5145.3 Transgender Provision Satisfies Rational Basis Review ............................................................................ 53

IV. The SAC Fails to Plead Factual Allegations Establishing that the Manner in which the District Applied the AR 5145.3 Transgender Provision to Regino "Shocks the Conscience" (Count Four) ............................................................................ 53

A. Regino's "As-Applied" Challenge Concerns an Executive Act ............................................................................ 53

B. The SAC Fails to Plead Factual Allegations Which "Shock the Conscience" ............................................................................ 54

V. Regino Is Not Entitled to Any Individual, Procedural Due Process in Connection with the District's Legislative Act of Adopting the AR 5145.3 Transgender Provision (Counts Five and Six) ............................................................................ 57

CONCLUSION ............................................................................ 58

STATEMENT OF RELATED CASE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Federal Cases**                                                               **Page(s)**

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999) ..................................................................................23, 57

*Anspach v. City of Phila.*,
503 F.3d 256 (3d Cir. 2007) ...............................................................20, 46, 47

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................................50

*Bellotti v. Baird*,
443 U.S. 622 (1979) .................................................................................15, 34

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
239 U.S. 441 (1915) .................................................................................23, 57

*Brandt v. Griffin*,
147 F.4th 867 (8th Cir. 2025) ...................................................................40, 41

*C.N. v. Wolf*,
410 F. Supp. 2d 894 (C.D. Cal. 2005) ..........................................................53

*Cnty. of Sacramento v. Lewis*,
523 U.S. 833 (1998) ............................................................22, 53, 54, 55, 56

*Crowe v. Cnty. of San Diego*,
608 F.3d 406 (9th Cir. 2010) ....................................................................11, 25

*Cruzan ex rel. Cruzan v. Dir., Dep't of Health*,
497 U.S. 261 (1990) .................................................................................40, 57

*Deshaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
489 U.S. 189 (1989) .................................................................................25, 46

*Dubbs v. Head Start, Inc.*,
336 F.3d 1194 (10th Cir. 2003) ....................................................................49

*Glick v. McKay*,
937 F.2d 434 (9th Cir. 1991) ........................................................................35

*Halverson v. Skagit Cnty.*,
42 F.3d 1257 (9th Cir. 1994) ........................................................................57

*Harris v. McRae*,
448 U.S. 297 (1980) .......................................................................................47

*Hoye v. City of Oakland*,
   653 F.3d 835 (9th Cir. 2011) ...............................................................................28

*John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.* ,
   622 F. Supp. 3d 118 (D. Md. 2022) ...............................................16, 47, 54

*Kanuszewski v. Mich. HHS*,
   927 F.3d 396 (6th Cir. 2019) ...............................................................................49

*Keates v. Koile*,
   883 F.3d 1228 (9th Cir. 2018) ...............................................................................25

*Kerby v. Sheridan*,
   No. 2:12-cv-00544-MO, 2015 U.S. Dist. LEXIS 26963 (D. Or. Mar. 5, 2015) ........................26

*Khachatryan v. Blinken*,
   4 F.4th 841 (9th Cir. 2021) ...............................................................................18, 42

*Legal Aid Servs. of Or. v. Legal Servs. Corp.*,
   608 F.3d 1084 (9th Cir. 2010) ...............................................................................28

*Lehman v. Lycoming Cnty. Child.'s Servs. Agency*,
   648 F.2d 135 (3d Cir. 1981) ...............................................................................34

*Linsangan v. United States*,
   No. 20-17024, 2021 U.S. App. LEXIS 37902 (9th Cir. Dec. 22, 2021) ...................................42

*Littlejohn v. Sch. Bd. of Leon Cnty.*,
   132 F.4th 1232 (11th Cir. 2025) ...............................................................23, 55, 56

*Mann v. City of Sacramento*,
   748 F. App'x 112 (9th Cir. 2018) ...............................................................................25

*Manzarek v. St. Paul Fire & Marine Ins. Co.* ,
   519 F.3d 1025 (9th Cir. 2008) ...............................................................................24

*Marsh v. County of San Diego*
   680 F.3d (9th Cir. 2012) ...............................................................................38

*McCue v. S. Fork Union Elem. Sch.*,
   766 F. Supp. 2d 1003 (E.D. Cal. 2011) ...............................................................................26

*McKinney v. Pate*,
   20 F.3d 1550 (11th Cir. 1994) ...............................................................17, 22, 54, 55

*Mueller v. Auker*,
   700 F.3d 1180 (9th Cir. 2012) ...............................................................................21, 53

*Munoz v. U.S. Dep't of State*,
   73 F.4th 769 (9th Cir. 2023) ...............................................................................42

vi

*Nelson v. NASA,*
   568 F.3d 1028 (9th Cir. 2009) ...............................................53

*Nev. Rest. Servs. v. Clark Cnty.,*
   638 F. App'x 590 (9th Cir. 2016) ...........................................57

*Nguon v. Wolf,*
   517 F. Supp. 2d 1177 (C.D. Cal. 2007) .................................53

*Nunez by Nunez v. City of San Diego,*
   114 F.3d 935 (9th Cir. 1997) .................................................34

*Ohio v. Akron Ctr. for Reprod. Health,*
   497 U.S. 502 (1990) ..............................................................47

*Oklevueha Native Am. Church of Haw., Inc. v. Holder,*
   676 F.3d 829 (9th Cir. 2012) ...........................................24, 44

*Parham v. J.R.,*
   442 U.S. 584 (1979) ..............................................................49

*Planned Parenthood of Idaho, Inc. v. Wasden,*
   376 F. Supp. 2d 1012 (D. Idaho 2005) .................................46

*Planned Parenthood v. Danforth,*
   428 U.S. 52 (1976) ...........................................................33, 45

*Planned Parenthood v. Miller,*
   63 F.3d 1452 (8th Cir. 1995) ...........................................16, 46

*Porter v. Osborn,*
   546 F.3d 1131 (9th Cir. 2008) .........................................22, 54

*Raich v. Gonzales,*
   500 F.3d 850 (9th Cir. 2007) ...........................................18, 40

*Regino v. Staley,*
   133 F.4th 951 (9th Cir. 2025) ...........................................8, 25

*Roberts v. U.S. Jaycees,*
   468 U.S. 609 (1984) .........................................................11, 25

*Smith v. City of Fontana,*
   818 F.2d 1411 (9th Cir. 1987) ...............................................25

*Sterling v. Borough of Minersville,*
   232 F.3d 190 (3d Cir. 2000) .........................................16, 21, 53

*Stormans, Inc. v. Wiesman,*
   794 F.3d 1064 (9th Cir. 2015) .............17, 18, 21, 43, 44, 53, 54, 57

*Strandberg v. Helena*,
  791 F.2d 744 (9th Cir. 1986) .................................................................15, 32

*United States v. Salerno*,
  481 U.S. 739 (1987) ...............................................15, 17, 25, 32, 52, 57

*Wallis v. Spencer*,
  202 F.3d 1126 (9th Cir. 1999) ...............................................................11, 25

*Wash. v. Glucksberg*,
  521 U.S. 702 (1997) .................................................................19, 21, 43, 53

*Whalen v. Roe*,
  429 U.S. 589 (1977) .............................................................................34, 53

*Whitaker v. Tesla Motors, Inc.*,
  985 F.3d 1173 (9th Cir. 2021) ....................................................................24

**Federal Statutes**

42 U.S.C. § 1983 ...............................................................................10, 11, 24

**State Statutes**

Cal. Educ. Code § 33308.5 ...............................................................................5

**Other**

Fed. R. Civ. P. 12 ............................................................................................8

*Foote v. Ludlow Sch. Comm.*,
  128 F.4th 336 (1st Cir. 2025) ...........................12, 17, 21, 26, 27, 48, 50, 52, 54, 56

U.S. Const. amend. I ........................................................................................4

U.S. Const. amend. XIV ...................................................................................4

viii

## INTRODUCTION

Fifty years ago, in the context of minors seeking to maintain the confidentiality of private information from their parents,[1] the Supreme Court of the United States ("Supreme Court") recognized that (1) while parents do have a constitutional right to direct the upbringing and education of their children; (2) their children independently have competing, constitutional rights of privacy; and (3) said privacy interests supersede any applicable, parental interest, where the child is an adult or a minor competent to make their own decisions. Here, Plaintiff-Appellant AURORA REGINO ("Regino") challenges an administrative regulation adopted by the Chico Unified School District ("District") which permits students to decide for themselves whether District personnel will reveal their private, gender identity information to parents. Regino brings this litigation, in part, as a "facial" challenge to the regulation – meaning she must establish that the enactment is unconstitutional in every possible circumstance. However, first, not all students are minors. It is beyond debate that those students who have reached the age of majority hold the right to maintain the confidentiality of their private, gender identity information from anyone and everyone – including their own parents; and in turn, public school districts have a duty to maintain that

---

[1] For the purposes of this appeal, any reference by the District to "parents" includes both parents and legal guardians.

1

confidentiality. Second, consistent with the precedent set a half-century ago, those minor students who have attained the level of competency to make their own decisions also have the constitutional right to maintain the privacy of their gender identity.

In short, the question at issue is not whether parents have a right to direct the upbringing and education of their children based upon their own secular and/or religious preferences. Rather, the question is whether that interest permits parents to pierce the independent, constitutional, privacy rights of their children who have reached the age of majority or attained competency. In both instances, the long-standing precedent of the Supreme Court provides that the answer is a definitive, No. Accordingly, Regino cannot establish her facial challenge.

Next, Regino also challenges the administrative regulation in the specific, "as-applied" manner District personnel followed its direction in connection with her and her daughter. However, given that the pleading fails to allege that District personnel physically harmed anyone, separated Regino from her children, nor did anything other than accept the *sua sponte* request of Regino's daughter to adopt an alternative name and pronouns, the pleading fails to establish that the District acted in any manner which satisfies the "shock the conscience" legal standard.

For these reasons, and others, as addressed in greater detail below, this Court should affirm the decision of the United States District Court for the Eastern

//

2

District of California ("District Court") dismissing each cause of action raised by Regino in the instant litigation.

## STATEMENT OF JURISDICTION

Defendant-Appellee Superintendent GREG BLAKE ("Superintendent Blake") agrees with the jurisdictional statement provided by Regino in her Appellant's Opening Brief ("AOB").

## STATEMENT OF THE ISSUES

1. Did Regino fail to plead factual allegations constituting Constitutionally-infirm, coercive conduct by the District interfering in the intimate human relationship she had with her daughters?

2. Do students who have reached the age of majority hold a Constitutionally-protected privacy right to maintain the confidentiality of their gender identity information from their parents?

3. Do students who have attained the competency to make their own decisions hold a Constitutionally-protected privacy right to maintain the confidentiality of their gender identity information from their parents?

4. Did Regino fail to plead factual allegations establishing that parents have a fundamental right in all circumstances to proactive notice and consent of a public school district agreeing to a student's *sua sponte* request to employ their preferred names and pronouns?

//

3

5.  Does the District regulation in question satisfy rational basis review?

6.  Did Regino fail to plead factual allegations constituting Constitutionally-infirm conduct by the District interfering in her ability to direct the upbringing and education of her children in a manner that "shocks the conscience"?

7.  Did Regino fail to plead factual allegations establishing entitlement to procedural due process rights beyond the standard, regulation-making process?

## PERTINENT AUHTORITIES

The following authorities are reproduced in the addendum to the AOB:

-  The First Amendment to the United States Constitution ("First Amendment"); and

-  The Fourteenth Amendment to the United States Constitution ("Fourteenth Amendment").

The following authorities are reproduced in the addendum to this brief:

-  District Administrative Regulation 5145.3 ("AR 5145.3").

//

//

//

4

**STATEMENT OF CASE**[2]

## A. The Parties

The District is a public school district based in Chico, California. It operates twenty-three campuses, including Sierra View Elementary School ("Sierra View"). ER[3] 115, 122 (Second Amended Complaint ("SAC"), ¶¶ 16, 55). Although not named as a defendant, the District is the real party in interest in this litigation.

Regino is the mother of "A.S." and "C.S.," minor students who attend District schools. In particular, during the 2021-2022 school year, A.S. attended Sierra View. ER 113, 115, 122 (SAC, ¶¶ 5, 14, 55).

Kelly Staley ("Former Superintendent Staley") was the District's Superintendent at the time Regino filed her Second Amended Complaint in the underlying litigation ("SAC"). ER 115 (SAC, ¶ 17). Since that time, however, the District has newly appointed Superintendent Blake to that position.

## B. Pertinent Legislative Background

California Education Code section 33308.5 ("Section 33308.5") authorizes the California Department of Education ("CDE") to provide public school districts guidance for complying with those laws under its jurisdiction. Cal. Ed. Code, §

---

[2] For the special purposes of this appeal, the District adopts the factual allegations pled by Regino. However, in doing so, the District does not admit to their accuracy.

[3] Citations to "ER" are references to Appellant's Excerpts of Record.

33308.5, subd. (a). Based upon this authority, the CDE issued directives concerning compliance with California Assembly Bill No. 1266 (2013) ("AB 1266") and other transgender-related legal authorities. SER[4] 319-331 (District's Request for Judicial Notice ("District RJN"), Ex. A). Thereafter, like numerous other public school districts, the District incorporated that CDE guidance into its administrative regulations. Specifically, the District maintains an Administrative Regulation 5145.3 ("AR 5145.3") which addresses most, if not all, forms of unlawful harassment – e.g., racial, sexual, disability, etc. After the aforementioned CDE guidance, the District added a provision to that regulation concerning transgender-based harassment. As of the 2021-2022 school year, that portion of AR 5145.3 addressing transgender-based harassment (the "AR 5145.3 Transgender Provision") read, in pertinent part:

> **Transgender and Gender-Nonconforming Students**
> …
> To ensure that transgender and gender-nonconforming students are afforded the same rights, benefits, and protections provided to all students by law and Board policy, *the district shall address each situation on a case-by-case basis, in accordance with the following guidelines:*
>
> 1. Right to privacy: A student's transgender or gender-nonconforming status is the student's private information and *the district shall only disclose the information to others with the student's prior written consent, except when the disclosure is otherwise required by law or when the district has compelling evidence that disclosure is necessary to preserve the student's physical or mental well-being.* … As appropriate given the student's need for support, the

_____

[4] Citations to "SER" are references to the Supplemental Excerpts of Record.

6

compliance officer may discuss with the student any need to disclose the student's transgender or gender-nonconformity status or gender identity or gender expression to the student's parents/guardians and/or others, including other students, teacher(s), or other adults on campus. The district shall offer support services, such as counseling, to students who wish to inform their parents/guardians of their status and desire assistance in doing so.

…

6. Names and Pronouns: If a student so chooses, *district personnel shall be required to address the student by a name and the pronoun(s) consistent with the student's gender identity*, without the necessity of a court order or a change to the student's official district record. …

SER 319-321, 344-346 (District RJN, Ex. C).

## C. Pertinent Procedural Background

On April 10, 2023, Regino filed a First Amended Complaint in the underlying litigation. ER 205 (District Court ECF 42); SER 190-219 ("FAC").

On April 25, 2023, Former Superintendent Staley filed a motion to dismiss the FAC. ER 206 (District Court ECF 50, 51); SER 220-241 (motion).

On July 11, 2023, after the parties had fully briefed the matter and presented their oral arguments, ER 206 (District Court ECF 50-54, 56); the District Court granted the dismissal motion with prejudice, ER 206 (District Court ECF 57); and entered its judgment on the matter, ER 207 (District Court ECF 58).

On July 20, 2023, Regino served notice of her appealing to this Court the FAC dismissal. ER 207 (District Court ECF 59).

On April 4, 2025, after the parties had fully briefed the matter and presented

7

their oral arguments; this Court vacated the District Court's judgment, and afforded Regino an opportunity to file another amended complaint. *Regino v. Staley*, 133 F.4th 951 (9th Cir. 2025); ER 208 (District Court ECF 69).

On June 4, 2025, Regino filed the SAC. The pleading named Former Superintendent Staley as the sole defendant to the litigation. ER 111-141 (pleading), 209 (District Court ECF 84).

On June 27, 2025, Former Superintendent Staley filed a motion to dismiss each cause of action raised in the pleading under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). ER 81-110 (motion), 210 (District Court ECF 88).

On September 4, 2025, Superintendent Blake substituted into the matter for Former Superintendent Staley. ER 210 (District Court ECF 94).

On January 15, 2026, after the parties had fully briefed the matter and presented their oral arguments, ER 210 (District Court ECF 88, 90-95); the District Court granted the dismissal motion, in total, with prejudice, ER 4-36 (District Court order), ER 210 (District Court ECF 96). Later that same day, the District Court entered its judgment. ER 210 (District Court ECF 97).

The next day, January 16, 2026, Regino filed her notice of the instant appeal. ER 194-195 (notice), 210 (District Court ECF 98).

### D. Pertinent Allegations

The SAC includes the following allegations:

55. During the 2021-2022 school year, Ms. Regino's oldest daughter –

A.S. – attended fifth grade at [Sierra View]….

…

59. Around December 2021, A.S. began feeling like she was a boy. …

60.  In December 2021, before the winter break, A.S. met with the counselor to discuss feelings of anxiety and depression.  … The counselor encouraged A.S. to join a small group of other girls around her age that she (the counselor) would be organizing when school resumed the following month (the "Girls Group").  The counselor told A.S. that the Girls' Group would be primarily focused on arts and crafts….

…

63.  [Around January 2022], A.S. went to the counselor's office to tell the counselor that she 'felt like a boy' or words of similar effect.  The counselor asked A.S. if she had a boy's name that she would like to be called and whether she would like to be referred to by male pronouns.  A.S. told the counselor her boy's name was "J.S."  A.S. was unsure whether she wanted others at school to start calling her by a male name and pronouns, but she believed if she did not say "yes" the counselor would not take her feelings seriously, so she said that she did.  The counselor asked A.S. if she wanted her mother to be informed about her new identity at school, and A.S. said she did not.  While A.S. did not provide the counselor a reason she did not want her mother to know, at the time, A.S. … thought that her mother would be 'mad' at her for wanting to be a boy.

…

65.    After the meeting, the counselor walked A.S. to her class and told her teacher that A.S. was now going by the name "J.S." and male pronouns, and her teacher immediately began calling to her as such.  In addition, pursuant to [the AR 5145.3 Transgender Provision], the counselor and/or A.S.'s teacher arranged for other school personnel and students to begin calling A.S. by "J.S." and referring to her by male pronouns, which they did.

…

67.    Once A.S. told the counselor she 'felt lie a boy,' the Girls Group meetings changed substantially.  Instead of arts-and-crafts projects, the counselor now led A.S. and her female classmates in discussions regarding identity. …

9

68.     Over the course of the spring semester of 2022, A.S. had approximately two additional one-on-one meetings with the counselor.  At these meetings, the counselor provided A.S. with additional resources regarding her supposed new male identity, such as referring A.S. to a local community group that advocates for LGBTQ+ causes and discussing "breast binding" and "top surgery" with her.

69. A.S. told the counselor that she wanted to tell her mother about her new male identity, but the counselor was not supportive of this course of action.  The counselor brushed off A.S.'s request and told her that if she wanted to 'come out' to her family, she should notify other family members first.[5]

70. During this time, pursuant to [AR 5145.3 Transgender Provision], school personnel and students continued calling A.S. by her new name and referring to her by her new pronouns.  …
…

72. On or about April 8, 2022, A.S. told her grandmother about her new gender identity.  A.S.'s grandmother informed Ms. Regino of the news later that day.

ER 122-125 (SAC, ¶¶ 55, 59, 60, 63, 65, 67-70, 72; footnote omitted).

Based upon these allegations, the SAC raises six causes of action – all under

title 42, United States Code section 1983 ("Section 1983"):

- Count One: 42 U.S.C. § 1983 – First Amendment (Facial Challenge…), ER 129-132 (SAC, ¶¶ 93-104);

- Count Two: 42 U.S.C. § 1983 – First Amendment (As-Applied

---

[5] In the FAC, Regino described this exchange as the counselor "*encourag[ing]* [A.S.] to speak with other family members *before telling her mother*."  SER 204 (FAC, ¶ 69, emphasis added).  However, after the District highlighted in its motion to dismiss the FAC that the pleading established that the counselor did not discourage A.S. from notifying her mother, but only encouraged her to first tell others to soothe A.S.'s fears, see e.g., SER 238 (motion at 19:6-22); Regino changed the language.

Challenge…), ER 132-133 (SAC, ¶¶ 105-111);

- Count Three: 42 U.S.C. § 1983 – Fourteenth Amendment (Substantive Due Process) (Facial Challenge…), ER 133-137 (SAC, ¶¶ 112-127);

- Count Four: 42 U.S.C. § 1983 – Fourteenth Amendment (Substantive Due Process) (As-Applied Challenge…), ER 137-138 (SAC, ¶¶ 128-134);

- Count Five: 42 U.S.C. § 1983 – Fourteenth Amendment (Procedural Due Process) (Facial Challenge…), ER 138-139 (SAC, ¶¶ 135-140); and

- Count Six: 42 U.S.C. § 1983 – Fourteenth Amendment (Procedural Due Process) (As Applied Challenge…), ER 139 (SAC, ¶¶ 141-145).

## SUMMARY OF ARGUMENT

### I. The SAC Fails to State Facts Constituting "Facial" Coercive Interference by the District into Regino's Intimate Human Relationship with Her Daughter (Count One)

The Supreme Court has recognized an interest to "enter into and maintain certain intimate human relationships" free from "undue intrusion by the State…." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984). The parent-child relationship is one such protected association. *Wallis v. Spencer*, 202 F.3d 1126, 1136-37 (9th Cir. 2000). To prevail on a Section 1983 claim alleging an unconstitutional violation of an intimate human relationship, the plaintiff must establish "unwarranted interference" by the government. *Crowe v. County of San Diego*, 608 F.3d 406, 441 & n.23 (9th Cir. 2010).

The United States Court of Appeals for the First Circuit ("First Circuit")

11

recently held that a regulation similar to the AR 5145.3 Transgender Provision did not constitute an unwarranted interference into the parent-child relationship. *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 342-43 (1st Cir. 2025). "…Ludlow's Protocol of deference to a student's decision about whether to disclose their gender identity to their parents lacks the 'coercive' or 'restraining' conduct that other courts have found to restrict parental rights in this context. … Here, by contrast, there are no allegations of coercive conduct towards the Student. … The Parents remain free to strive to mold their child according to the Parents' own beliefs, whether through direct conversations, private educational institutions, religious programming, homeschooling, or other influential tools." *Id.* at 347 n.15, 353, 355 (citations omitted).

Likewise, here, Regino does not allege that the District engages in coercion; but, rather, simply complains that the District (1) accepts a student's own request to be identified with their own preferred name and pronouns; and (2) maintains the confidentiality of those preferences based upon the student's own wishes. ER 120-122 (SAC, ¶¶ 48-54).

## II. The SAC Fails to State Facts Constituting "As-Applied" Coercive Interference by the District into Regino's Intimate Human Relationship with Her Daughter (Count Two)

The SAC raises the following allegations as to how the District applied the AR 5145.3 Transgender Provision in connection with Regino: (1) "…A.S. went to the counselor's office to tell her that she 'felt like a boy' or words of similar effect.

12

The counselor asked A.S. if she had a boy's name that she would like to be called and whether she would like to be referred to by male pronouns. A.S. told the counselor her boy's name was 'J.S.' … The counselor asked A.S. if she wanted her mother to be informed about her new identity at school, and A.S. said she did not," ER 123 (SAC, ¶ 63); (2) "After the meeting, the counselor … told her teacher that A.S. was now going by the name 'J.S.' and male pronouns, and her teacher immediately began calling her as such. In addition, pursuant to [the AR 5145.3 Transgender Provision], the counselor and/or A.S.'s teacher arranged for other school personnel and students to begin calling A.S. by 'J.S.' and referring to her by male pronouns, which they did," ER 124 (SAC, ¶ 65); (3) "Once A.S. told the counselor she 'felt like a boy,' … the counselor now led A.S. and her female classmates in a discussion regarding gender identity," ER 124 (SAC, ¶ 67); (4) "Over the course of the spring semester of 2022, A.S. had approximately two additional one-on-one meetings with the counselor. At these meetings, the counselor provided A.S. with additional resources regarding her supposed new male identity, such as referring A.S. to a local community group that advocates for LGBTQ+ causes and discussing 'breast binding' and 'top surgery' with her," ER 124 (SAC, ¶ 68, footnote omitted); and (5) "A.S. [later] told the counselor that she wanted to tell her mother about her new male identity, but the counselor was not supportive of this course of action. The counselor … told her that if she wanted to 'come out' to her family, she should notify other family members first," ER 124

13

(SAC, ¶ 69).

In short, (1) and (2) merely recount Regino's daughter approaching the District about her preferred name and pronouns – not vice-versa, and the agency complying with those requests. Next, (3) and (4) allege that the District provided Regino's daughter with materials regarding transgender issues *after* the daughter had already notified the District of her transgender status. Finally, (5) merely recounts the District suggesting to Regino's daughter that she first "come out" to other members of her family *after* the daughter had previously directed the agency to keep her transgender status confidential from her mother. None of these factual allegations establish coercion by District personnel, nor proactive conduct by the agency to intrude upon the relationship between Regino and her daughter. The daughter was the protagonist in this matter, not the District.

## III. The SAC Fails to Plead Allegations Establishing that the AR 5145.3 Transgender Provision Violates Substantive Due Process Rights in All Circumstances (Count Three)

### A. Parental Rights Under the Constitution Do Not Extend to Adult Children

Regino alleges that the AR 5145.3 Transgender Provision facially violates the right of parents to direct the upbringing and education of their children. ER 113, 133-137 (SAC, ¶¶ 4, 112-127). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be

14

valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

To that end, the portion of AR 5145.3 at issue applies to all "students" – not merely those who are "minors." SER 319-321, 344-346 (District RJN, Ex. C, paras. 1, 6). In turn, any constitutional right to direct the upbringing and education of a child extinguishes upon that child reaching the age of majority. *Strandberg v. City of Helena*, 791 F.2d 744, 748 n.1 (9th Cir. 1986). On this ground alone, Regino's facial challenge to the AR 5145.3 Transgender Provision fails.

**B. Parental Rights Under the Constitution Do Not Extend to Minor Children Who Have Attained Competency to Make Their Own Decisions**

1. Supreme Court Precedent Concerning Minors Having Abortions Without Parental Notice and Consent Illustrates the Right of Competent Minors to Make Their Own Decisions Regarding Privacy Concerns

Similarly, as addressed in case precedent dating a half-century concerning minor children having abortions without parental notice and consent, any constitutional right to direct the upbringing and education of a minor child extinguishes upon that child attaining the competency to make their own decisions. "[E]very minor must have the opportunity … to go directly to a court without first consulting or notifying her parents. If she satisfies the court that she is mature and well enough informed to make intelligently the abortion decision on her own, the court must authorize her to act without parental consultation or consent." *Bellotti v. Baird*, 443 U.S. 622, 647 (1979). "The State runs afoul of the Constitution …

15

when it attempts to give that same power [of consent] to parents of mature daughters capable of making their own informed choices. Because maturity does not always correspond to the age of majority, minors must have the chance to demonstrate their maturity." *Planned Parenthood v. Miller*, 63 F.3d 1452, 1460 (8th Cir. 1995) (citations omitted).

2. Maintaining the Confidentiality of One's Gender Identity Is a Privacy Right Protected by the Constitution

In turn, maintaining the confidentiality of one's gender identity is a privacy right protected by the Constitution. "It is difficult to imagine a more private matter than one's sexuality and a less likely probability that the government would have a legitimate interest in disclosure of sexual identity." *Sterling v. Borough of Minersville*, 232 F.3d 190, 196 (3d Cir. 2000). Maintaining a "student's gender identity confidential unless and until that student consents to disclosure … both protect[s] the student's privacy and create[s] …a zone of protection . . . in the hopefully rare circumstance when disclosure of the student's gender expression while at school could lead to serious conflict within the family, and even harm." *John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 622 F.Supp.3d 118, 138-39 (D. Md. 2022) (vacated on lack of standing grounds).

Thus, those children who have reached the age of majority or attained competency have the Constitutional right to maintain the confidentiality of their gender identity from their parents.

16

**C. Parents Do Not Hold a Fundamental "Notice" and "Consent" Right of the Type Sought by Regino**

1. Regino's "Facial" Challenge Concerns a Legislative Act

In addition, the interest of parents to direct the upbringing and education of their children does not include a fundamental right to the type of proactive notice and consent sought by Regino. To that end, before analyzing whether governmental conduct violates the "substantive due process" clause of the Fourteenth Amendment ("Substantive Due Process Clause"), one must first determine if the conduct at issue is legislative or executive in nature. "Legislative acts … generally apply to a larger segment of--if not all of--society; laws and broad-ranging executive regulations are the most common examples." *McKinney v. Pate*, 20 F.3d 1550, 1557 n.9 (11th Cir. 1994); and are subject to a sliding scale of judicial scrutiny depending upon the interest at issue, *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1085 (9th Cir. 2015). "Although administrative regulations and executive orders are both forms of executive policymaking, they have nonetheless been classified as legislative in nature when they are broadly applicable." *Foote*, 128 F.4th at 345. Here, Regino's "facial" challenge concerns the application of the AR 5145.3 Transgender Provision to the entire student populace. *Salerno*, 481 U.S. at 745 (facial challenge "must establish that no set of circumstances exists under which the Act would be valid…."). Accordingly, Count Three concerns a legislative act.

17

2. Regino Seeks Recognition of a New Fundamental Right of Parents to Proactive "Notice" and "Consent" by a Government Agency

"Laws that do not infringe a fundamental right survive substantive-due-process scrutiny so long as they are rationally related to legitimate government interests." *Stormans*, 794 F.3d at 1085 (grammatical marks and citations omitted). To that end, "the right must be carefully stated and narrowly identified before the ensuing analysis can proceed." *Raich v. Gonzales*, 500 F.3d 850, 864 (9th Cir. 2007).

Here, the SAC asserts a fundamental right of parents to proactive "notice" and "consent" by a public school district before it may "call[] children by a new name and/or pronouns associated with a new asserted gender identity or by the school requiring others in the school environment to call children by a new name and/or pronouns…." ER 113 (SAC, ¶ 4); see also ER 133-137 (SAC, ¶¶ 112-127). This Court should define the scope of the proposed, fundamental right, in-kind.

3. The SAC Fails to Raise Factual Allegations Establishing a Deeply Rooted History of Parents Holding Notice and Consent Rights Concerning the Transgender Identities of their Children

A court may not recognize a newly-proposed fundamental right unless "it is objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if it were sacrificed." *Khachatryan v. Blinken*, 4 F.4th 841, 858 (9th Cir. 2021) (grammatical marks and citation omitted). Moreover, the Supreme Court has

18

emphasized that it "ha[s] always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (grammatical marks and citation omitted). As such, any historical evidence proffered in support of recognizing a new fundamental right must be directly on point.

Here, none of the exhibits to the SAC proffered any historical support for the new, fundamental right proposed by Regino. ER 142-182 (ECF 84.5-84.7, 84.9, 84.10); SER 242-318 (ECF 84.1-84.4, 84.8). As for the pleading, itself, only Paragraph 121 attempted to present any such support, and said paragraph mostly consisted of bald, legal conclusions rather than factual allegations establishing an actual historical practice by the schools of this nation to provide the type of proactive notice and consent sought by Regino. ER 136 (SAC, ¶ 121). Even where Paragraph 121 did attempt to proffer some semblance of historical context, it failed to specifically address transgender identity in any sense – let alone provide a historical record of schools providing the type of proactive notice and consent for which Regino claims she is entitled. ER 136 (SAC, ¶ 121).

As such, Regino failed to raise a single, factual allegation establishing that the public school districts of this nation – or any other government agency – have historically provided parents the type of proactive, gender identity notice and consent she is seeking in this litigation.

19

4. <u>The Right to Direct the Upbringing and Education of One's Child Does Not Include the Right to Compel State Action</u>

The Supreme Court has long determined that the Substantive Due Process Clause only bars state action, not inaction. *Deshaney v. Winnebago Cnty. Dep't. of Social Servs.*, 489 U.S. 189, 196 (1989). With regard to regulations similar to the AR 5145.3 Transgender Provision, the United States Court of Appeals for the Third Circuit ("Third Circuit") recently explained that "[t]he real problem alleged by Plaintiffs is not that the state actors *interfered* with the … parents; rather, it is that the state actors did not *assist* the … parents or affirmatively *foster* the parent/child relationship. However, the [parents] are not entitled to that assistance under the Due Process Clause." *Anspach v. City of Philadelphia*, 503 F.3d 256, 266 (3d Cir. 2007) (emphasis in original, grammatical marks and citations omitted).

5. <u>The AR 5145.3 Transgender Provision Does Not Facially Violate the Parental Right to Direct the Medical Care of Children</u>

Finally, despite applicable precedent providing that fundamental rights must be narrowly identified, Regino argues that the Court should review this matter based upon a generalized right of parents to direct the medical care of their children. AOB 17 et seq. However, even doing so, the SAC still fails to state a cause of action. Cases finding a violation of the parental right to direct medical decisions "involved intrusions upon the bodily integrity of the child or other conduct with clinical significance -- whether through a medical procedure,

20

examination, or hospitalization. … [T]he allegations here do not involve clinical conduct at all.  Solely as pled here, we do not believe that using the Student's chosen name and pronouns -- something people routinely do with one another, and which requires no special training, skill, medication, or technology -- without more, can be reasonably viewed as evidencing some indicia of medicalization."  *Foote*, 128 F.4th at 350 (citations omitted).

6. The AR 5145.3 Transgender Provision Satisfies Rational Basis Review

Whereas the AR 5145.3 Transgender Provision does not infringe upon any fundamental right, rational basis review applies.  *Stormans*, 794 F.3d at 1085.  Such review only requires the rule in question to bear a "reasonable relation to a legitimate state interest."  *Glucksberg*, 521 U.S. at 722.  Here, the District has a legitimate state interest to protect student privacy and create a zone of protection from potential domestic abuse.  *Sterling*, 232 F.3d at 193-97 (child privacy); *Mueller v. Auker*, 700 F.3d 1180, 1186-87 (9th Cir. 2012) (domestic abuse).

**IV. The SAC Fails to Plead Factual Allegations Establishing that the Manner in which the District Applied the AR 5145.3 Transgender Provision to Regino "Shocks the Conscience" (Count Four)**

**A. Regino's "As-Applied" Challenge Concerns an Executive Act**

With regard to the legislative/executive act dichotomy previously noted, "[e]xecutive acts characteristically apply to a limited number of persons (and often to only one person); executive acts typically arise from the ministerial or

21

administrative activities of members of the executive branch." *McKinney*, 20 F.3d at 1557 n.9. Here, Regino's "as-applied" challenge concerns the specific manner in which District personnel applied the AR 5145.3 Transgender Provision to her. Accordingly, Count Four concerns an executive act.

**B.** **The SAC Fails to Plead Factual Allegations Which "Shock the Conscience"**

The Supreme Court has found that "for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). To satisfy this "shocks the conscience" standard, the plaintiff must establish that the defendant either (1) acted with "deliberate indifference" or (2) with a "purpose to harm" for reasons unrelated to a legitimate governmental objective. *Porter v. Osborn,* 546 F.3d 1131, 1137 (9th Cir. 2008).

Here, nothing in the legislative history of AR 5145.3 evidences an intentional purpose to harm parents, as opposed to protect the privacy rights of transgender students, and to protect that population from unwarranted harassment. SER 319-346 (District RJN). Moreover, "[t]he child was not physically harmed, much less permanently so. Defendants did not remove the … child from their [parents'] custody. And Defendants did not force the child to attend a Student Support Plan meeting, to not invite the [parents] to that meeting, or to socially transition at school. In fact, Defendants did not force the … child to do anything at

22

all. And perhaps most importantly, Defendants did not act with intent to injure. To the contrary, they sought to help the child. Under these circumstances, … the mere fact that the school officials acted contrary to the [parents'] wishes does not mean that their conduct 'shocks the conscience' in a constitutional sense." *Littlejohn v. School Board of Leon Cnty.*, 132 F.4th 1232, 1245 (11th Cir. 2025) (citations omitted).

**V.  Regino Is Not Entitled to Any Individual, Procedural Due Process in Connection with the District's Legislative Act of Adopting the AR 5145.3 Transgender Provision (Counts Five and Six)**

"The first inquiry in every [procedural] due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). To that end, as discussed above, the SAC fails to raise factual allegations establishing the deprivation of any protected interest.

Second, the Supreme Court has long held that when a public entity deprives a person of a liberty interest through legislative action, that person is not entitled to any procedural due process beyond the standard, regulation-making process. *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445-46 (1915). Here, the SAC lacks any allegation that the District adopted the AR 5145.3 Transgender Provision in an improper manner. ER 111-141 (SAC).

//

//

23

**ARGUMENT**

I. **The SAC Fails to State Facts Constituting "Facial" Coercive Interference by the District into Regino's Intimate Human Relationship with Her Daughter (Count One)**

As noted above, the District Court dismissed each cause of action raised in the SAC under Rule 12(b)(6). ER 4-36. "A defendant may move to dismiss a claim for relief pursuant to Rule 12(b)(6) if the claim 'fail[s] to state a claim upon which relief can be granted.'" *Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1175 (9th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). In reviewing a Rule 12(b)(6) motion, the court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party," *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008); however, "conclusory allegations and unwarranted inferences are insufficient to defeat a motion to dismiss," *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 834 (9th Cir. 2012).

Here, Count One raised a claim under Section 1983 alleging that the AR 5145.3 Transgender Provision facially violates a parent's intimate human relationship rights with their children. ER 129-132 (SAC, ¶¶ 93-104.) To that end, as this Court recounted in the previous appeal, "[t]o prevail under 42 U.S.C. § 1983, a plaintiff must prove that he was 'deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law.' *Marsh v. County of San Diego*, 680 F.3d

24

1148, 1152 (9th Cir. 2012) (quoting [] *Sullivan*, 526 U.S. [at] 49-50[]).” *Regino*, 133 F.4th at 959. In addition, “[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.” *Salerno*, 481 U.S. at 745.

With regard to the alleged deprivation of a constitutional right, the Supreme Court has recognized an interest to “enter into and maintain certain intimate human relationships” free from “undue intrusion by the State….” *Roberts*, 468 U.S. at 617-18. The parent-child relationship is one such protected association. *Wallis*, 202 F.3d at 1136-37. This intimate relationship right is protected by both the First Amendment and the Substantive Due Process Clause. *Keates v. Koile*, 883 F.3d 1228, 1235-36 (9th Cir. 2018). However, this Court has determined that the same elements apply to intimate human relationship claims regardless of whether the action is brought under the First or Fourteenth Amendments. *Mann v. City of Sacramento*, 748 Fed.Appx. 112, 115 (9th Cir. 2018). Specifically, in this Circuit, to prevail on a Section 1983 claim alleging an unconstitutional violation of an intimate human relationship, the plaintiff must establish “unwarranted interference” by the government. *Crowe*, 608 F.3d at 441 & n.23; see also *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987) (“[T]his constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents.”).

25

In turn, "[i]nterference with the familial relationship is 'unwarranted' when it is effected for the purposes of oppression." *McCue v. S. Fork Union Elem. Sch.*, 766 F.Supp.2d 1003, 1008-09 (E.D. Cal. 2011) (citing *Smith* at 1420, *Daniels v. Williams*, 474 U.S. 327 (1986)); see also *Kerby v. Sheridan*, 2015 U.S. Dist. LEXIS 26963, *11 (D. Or. Mar. 5, 2015) (unpublished).

The First Circuit recently reviewed whether a regulation similar to the AR 5145.3 Transgender Provision constituted an unwarranted interference into the parent-child relationship. Specifically, in *Foote*, 128 F.4th at 342-43, the Ludlow School Committee ("Ludlow") had instituted a protocol requiring its staff to use a student's requested name and gender pronouns without notifying their parents absent the student's consent. The parents of a Ludlow student then sued, alleging, in pertinent part, that the protocol infringed upon their parental rights to familial privacy. *Id.* at 344. However, the First Circuit affirmed the lower court's dismissal of the action. "For starters, Ludlow's Protocol of deference to a student's decision about whether to disclose their gender identity to their parents lacks the 'coercive' or 'restraining' conduct that other courts have found to restrict parental rights in this context. … Here, by contrast, there are no allegations of coercive conduct towards the Student. The Parents object to Ludlow employees sharing resources about gender expression…. But providing educational resources about LGBTQ-related issues to a child who has shown interest imposes no more compulsion to identify as genderqueer than providing a book about brick laying

26

could coerce a student into becoming a mason." *Id.* at 347 n.15, 353 (citations omitted). In short, regardless of the protocol, "the Parents remain free to strive to mold their child according to the Parents' own beliefs, whether through direct conversations, private educational institutions, religious programming, homeschooling, or other influential tools." *Id.* at 355.Likewise

, here, Regino does not allege that the District engages in coercion; but, rather, simply complains that the District (1) accepts a student's own request to be identified with their own preferred name and pronouns, and (2) maintains the confidentiality of those preferences based upon the student's own wishes. ER 120-122 (SAC, ¶¶ 48-54). Given this lack of coercion, Regino cannot establish an "unwarranted interference" in the parent-child relationship. Indeed, focusing on the term "interference," it is again critical to note that the student is the one approaching the District with these requests, not vice-versa – as readily admitted in the SAC. ER 120-122 (SAC, ¶¶ 48-54).

Thus, whereas the SAC fails to raise factual allegations of a proactive, coercive intrusion by the District into the parent-child relationship, the District Court correctly dismissed Count One. "[W]hile Plaintiff is correct that there is a substantive due process right to maintain family integrity, that right is implicated where state officials separate a parent and child either through death or for a substantial length of time. None of the cases cited by Plaintiff come remotely close to extending that right to the names or pronouns used by a school district. …

27

While Plaintiff may be able to cherry-pick language from these cases that discuss the right to maintain the integrity of her family or the familial bond, these cases and the Supreme Court decisions on which they ultimately rely are properly understood as protecting against the state physically separating a parent and child or terminating the legal relationship between them. That right is simply not implicated in this case." ER 27 (District order, at 24:8-25).

## II. The SAC Fails to State Facts Constituting "As-Applied" Coercive Interference by the District into Regino's Intimate Human Relationship with Her Daughter (Count Two)

In a similar vein, Count Two raises a claim under Section 1983 alleging that the regulation, as-applied specifically by District personnel in connection with Regino and her daughter, violated Regino's constitutional right to an intimate human relationship. ER 132-133 (SAC, ¶¶ 105-111). An "as-applied attack … challenges only … a subset of the statute's applications, or the application of the statute to a specific factual circumstance, under the assumption that a court can separate valid from invalid subrules or applications." *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) (internal grammatical marks and citations omitted). "The underlying constitutional standard, however, is no different then [sic] in a facial challenge." *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010). In other words, Regino was required to plead factual allegations establishing a coercive, proactive act by District personnel specifically

//

28

interfering in Regino's relationship with her daughter to state a valid "as-applied" cause of action.

To that end, the SAC raises the following allegations as to how the District applied the AR 5145.3 Transgender Provision in connection with Regino: (1) "…A.S. went to the counselor's office to tell her that she 'felt like a boy' or words of similar effect.  The counselor asked A.S. if she had a boy's name that she would like to be called and whether she would like to be referred to by male pronouns. A.S. told the counselor her boy's name was 'J.S.'  … The counselor asked A.S. if she wanted her mother to be informed about her new identity at school, and A.S. said she did not," ER 123 (SAC, ¶ 63); (2) "After the meeting, the counselor … told her teacher that A.S. was now going by the name 'J.S.' and male pronouns, and her teacher immediately began calling her as such.  In addition, pursuant to [the AR 5145.3 Transgender Provision], the counselor and/or A.S.'s teacher arranged for other school personnel and students to begin calling A.S. by 'J.S.' and referring to her by male pronouns, which they did," ER 124 (SAC, ¶ 65); (3) "Once A.S. told the counselor she 'felt like a boy,' … the counselor now led A.S. and her female classmates in a discussion regarding gender identity," ER 124 (SAC, ¶ 67); (4) "Over the course of the spring semester of 2022, A.S. had approximately two additional one-on-one meetings with the counselor.  At these meetings, the counselor provided A.S. with additional resources regarding her supposed new male identity, such as referring A.S. to a local community group that

29

advocates for LGBTQ+ causes and discussing 'breast binding' and 'top surgery' with her," ER 124 (SAC, ¶ 68, footnote omitted); and (5) "A.S. [later] told the counselor that she wanted to tell her mother about her new male identity, but the counselor was not supportive of this course of action. The counselor … told her that if she wanted to 'come out' to her family, she should notify other family members first," ER 124 (SAC, ¶ 69).

In short, (1) and (2) merely recount Regino's daughter approaching the District about her preferred name and pronouns – not vice-versa, and the agency complying with those requests. Next, (3) and (4) allege that the District provided Regino's daughter with materials regarding transgender issues *after* the daughter had already notified the District of her transgender status. Finally, (5) merely recounts the District *suggesting* to Regino's daughter that she first "come out" to other members of her family *after* the daughter had previously directed the agency to keep her transgender status confidential from her mother.[6] None of these factual allegations establish coercion by District personnel, nor proactive conduct by the agency to intrude upon the relationship between Regino and her daughter to the extent of physically or legally separating the two. Accordingly, the District Court correctly dismissed Count Two, as well.

---

[6] Again, the FAC previously described this exchange as the counselor "*encourag[ing]* [A.S.] to speak with other family members *before telling her mother.*" SER 205 (FAC, ¶ 69, emphasis added).

### III. The SAC Fails to Plead Allegations Establishing that the AR 5145.3 Transgender Provision Violates Substantive Due Process Rights in All Circumstances (Count Three)

#### A. <u>Parental Rights Under the Constitution Do Not Extend to Adult Children</u>

Count Three raises a Section 1983 claim alleging that the AR 5145.3 Transgender Provision facially violates a purported right protected by the Substantive Due Process Clause.  ER 133-137 (SAC, ¶¶ 112-127).  Specifically, the SAC alleges that parents hold a fundamental right to "notice" and "consent" before public schools "call[] children by a new name and/or pronouns associated with a new asserted gender identity or by the school requiring others in the school environment to call children by a new name and/or pronouns…."  ER 113 (SAC, ¶ 4); see also ER 133-137 (SAC, ¶¶ 112-127).  In her previous pleading, Regino referred to this alleged notice and consent requirement as a parent being "the ultimate decision-maker regarding their children's … decisions related to gender identity…."  SER 210 (FAC, ¶¶ 101.f, 101.g).  Regino argues that this purported, "ultimate decision-maker" authority, derives from the Constitutional right of parents to direct the upbringing and education of their children.  AOB 16-17, 23-29.

Again, "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that

no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745. To that end, as noted above, the AR 5145.3 Transgender Provision reads, in pertinent part: "To ensure that transgender and gender-nonconforming *students* are afforded the same rights, benefits, and protections provided to all students … [a] *student's* transgender or gender-nonconforming status is the *student's* private information and the district shall only disclose the information to others with the *student's* prior written consent, except when the disclosure is otherwise required by law or when the district has compelling evidence that disclosure is necessary to preserve the student's physical or mental well-being. …" SER 319-321, 344 (District RJN, Ex. C, emphasis added). In other words, the portion of AR 5145.3 at issue applies to all "students" – not merely those who are "minors." In turn, as a multitude of case precedents provide – as well as this Court's own Manual of Model Civil Jury Instructions – any constitutional right to direct the upbringing and education of a child extinguishes upon that child reaching the age of majority. *Strandberg*, 791 F.2d at 748 n.1; 9th Cir. Model Civ. Jury Instr. 9.36.

In short, even assuming *arguendo* that the Constitutional right of parents to direct the upbringing and education of children does require the type of "notice" and "consent" sought by Regino, that right does not apply to students who have reached the age of majority. On this ground alone, Regino's facial challenge to the AR 5145.3 Transgender Provision fails.

32

**B. Parental Rights Under the Constitution Do Not Extend to Minor Children Who Have Attained Competency to Make Their Own Decisions**

1. Supreme Court Precedent Concerning Minors Having Abortions Without Parental Notice and Consent Illustrates the Right of Competent Minors to Make Their Own Decisions Regarding Privacy Concerns

Similarly, as addressed in case precedent dating a half-century, any constitutional right to direct the upbringing and education of a minor child extinguishes upon that child attaining the competency to make their own decisions. "[I]t is important to recognize that parents and children do not have identical interests. Clearly, the parental interest in the companionship, care and custody of the children is a strong one and is reciprocated by the child's equally weighty interest in the nurture, love and instruction of the parents. However, the children have independent, private interests not necessarily shared by the parents…. [¶] For example, in Planned Parenthood of Missouri v. Danforth, 428 U.S. 52 [] (1976), which held that the state may not impose a blanket provision conditioning an unmarried minor's abortion decision on parental consent, the Supreme Court recognized the existence of a child's privacy interest which the parent could not purport to represent. The Court noted that 'any independent interest the parent may have in the termination of the minor daughter's pregnancy is no more weighty than the right of privacy of the competent minor mature enough to have become pregnant.' 428 U.S. at 75[]. Although an independent parental authority does exist

33

which can be exercised for the sake of the parent rather than the child, the judiciary should be cautious in unquestioningly reinforcing such authority…." *Lehman v. Lycoming Cnty. Children's Servs. Agency*, 648 F.2d 135, 152-53 (3rd Cir. 1981) (footnotes omitted).

Indeed, three years after its *Danforth* decision, the Supreme Court articulated in *Bellotti*, 443 U.S. at 647 that "every minor must have the opportunity … to go directly to a court without first consulting or notifying her parents. If she satisfies the court that she is mature and well enough informed to make intelligently the abortion decision on her own, the court must authorize her to act without parental consultation or consent." Quoting *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977) (footnotes omitted), the concurrence of Justices John Paul Stevens, William Brennan, Thurgood Marshall, and Harry Blackmun further articulated that "[t]he constitutional right to make the abortion decision affords protection to both of the privacy interests recognized in this Court's cases: 'One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions.'" *Bellotti*, 443 U.S. at 655 (J. Stevens concurring).

Later, this Court, itself, specifically recognized that "Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights." *Nunez by Nunez v. City of San Diego*, 114 F.3d 935,

34

945 (9th Cir. 1997). "A judicial bypass procedure … must allow the minor 'to show that she possess the maturity and information to make the abortion decision, in consultation with her physician, without regard to her parents' wishes.'" *Glick v. McKay*, 937 F.2d 434, 438 (9th Cir. 1991) (quoting *Ohio v. Akron Ctr. for Reproductive Health*, 497 U.S. 502, 511 (1990), overruled on other grounds). Likewise, the United States Court of Appeals for the Eighth Circuit ("Eighth Circuit") has expressly held that "[t]he State runs afoul of the Constitution … when it attempts to give that same power [of consent] to parents of mature daughters capable of making their own informed choices. Because maturity does not always correspond to the age of majority, minors must have the chance to demonstrate their maturity." *Miller*, 63 F.3d at 1460 (citations omitted). More bluntly, from this Circuit, the United States District Court for the District of Idaho determined that "when the minor is mature enough to make her own [medical] decisions independent of her parents, the State has no more interest in notifying her parents than it would in notifying the parents of an adult woman -- namely, none." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F. Supp. 2d 1012, 1019 (D. Idaho 2005).

In short, time and again, the Supreme Court, this Court, sister United States Courts of Appeals, and United States District Courts of this Circuit have determined that minors who have attained the competency to make their own

//

35

decisions have the right to make important decisions concerning their own privacy rights "without regard to [their] parents' wishes." *Akron Ctr.*, 497 U.S. at 511.

2. Maintaining the Confidentiality of One's Gender Identity Is a Privacy Right Protected by the Constitution

Given that competent minors have the Constitutional right to make their own decisions concerning their own privacy interests, the question is whether maintaining the confidentiality of one's gender identity is a privacy right protected by the Constitution. The well-worn precedent of the Supreme Court, this Circuit, sister United States Courts of Appeals, and United States District Courts of this Circuit provide that the answer is a definitive, Yes.

To that end, the Supreme Court has long recognized that the Constitution provides individuals a right of privacy concerning their personal information. *Whalen*, 429 U.S. at 591-93. In turn, this Circuit and its sisters have long considered one's sexual identity as personal information subject to the right of privacy. "It is difficult to imagine a more private matter than one's sexuality and a less likely probability that the government would have a legitimate interest in disclosure of sexual identity." *Sterling*, 232 F.3d at 196; see also *Nelson v. NASA*, 568 F.3d 1028, 1037-38 (9th Cir. 2009) (J. Wardlaw concurring). Indeed, in *C.N. v. Wolf,* 410 F.Supp.2d 894, 903 (C.D. Cal. 2005), the United States District Court for the Central District of California found that a minor student had raised a valid claim for invasion of privacy by asserting that the school district had disclosed her

36

sexual orientation to a parent without the student's consent. See also, *Nguon v. Wolf*, 517 F.Supp.2d 1177, 1191-96 (C.D. Cal. 2007). Even more on point, in *John & Jane Parents 1*, 622 F.Supp.3d, at 137-39, the United States District Court for the District of Maryland determined that minor students have a privacy right to maintain their gender identities a secret from their parents. Specifically, the court found that maintaining a "student's gender identity confidential unless and until that student consents to disclosure … both protect[s] the student's privacy and create[s] …a zone of protection . . . in the hopefully rare circumstance when disclosure of the student's gender expression while at school could lead to serious conflict within the family, and even harm." *Id.* at 138-39.

Thus, maintaining the confidentiality of one's gender identity is, in fact, a privacy right protected by the Constitution. In turn, those minors who have reached the age of majority or attained competency have the Constitutional right to maintain the privacy of that information from their parents, regardless of any parental interest to direct their upbringing and education. On this second ground, Regino's facial challenge to the AR 5145.3 Transgender Provision fails.

### C. Parents Do Not Hold a Fundamental "Notice" and "Consent" Right of the Type Sought by Regino

#### 1. Regino's "Facial" Challenge Concerns a Legislative Act

In addition, the interests of parents to direct the upbringing and education of their children does not include a fundamental right to the type of proactive notice

37

and consent sought by Regino. To that end, the Fourteenth Amendment generally "limits what the government may do in both its legislative, and its executive capacities," and the "criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue." *Lewis*, 523 U.S. at 846 (citations omitted). With regard to executive action, "for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Id.* On the other hand, acts of legislation are subject to a sliding scale of judicial scrutiny depending upon the interest at issue. *Stormans*, 794 F.3d at 1085.

"Executive acts characteristically apply to a limited number of persons (and often to only one person); executive acts typically arise from the ministerial or administrative activities of members of the executive branch." *McKinney*, 20 F.3d at 1557 n.9; see also *Lewis*, 523 U.S. at 846 (executive acts generally concern "a specific act of a governmental officer that is at issue"). On the other hand, "[l]egislative acts … generally apply to a larger segment of--if not all of--society; laws and broad-ranging executive regulations are the most common examples." *McKinney*, at 1557 n.9. Accordingly, "[a]lthough administrative regulations and executive orders are both forms of executive policymaking, they have nonetheless been classified as legislative in nature when they are broadly applicable." *Foote*, 128 F.4th at 345 (citing *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 n.1 (3d Cir. 2000) (Alito, J.)). "Same has been deemed true for concerted actions by multiple

38

government employees if taken 'pursuant to broad governmental policies' -- such actions are closer to legislative conduct." *Id.* (quoting *Abdi v. Wray*, 942 F.3d 1019, 1027-28 (10th Cir. 2019)).

Here, Regino's "facial" challenge concerns the application of the AR 5145.3 Transgender Provision to the entire student populace. *Salerno*, 481 U.S. at 745 (facial challenge "must establish that no set of circumstances exists under which the Act would be valid…."). Accordingly, Count Three concerns a legislative act.

2. Regino Seeks Recognition of a New Fundamental Right of Parents to Proactive "Notice" and "Consent" by a Government Agency

In *Stormans*, this Court explained the "legislative action" analysis as a simple binary question. "Laws that infringe a 'fundamental' right protected by the Due Process Clause are constitutional only if the infringement is narrowly tailored to serve a compelling state interest. Laws that do not infringe a fundamental right survive substantive-due-process scrutiny so long as they are rationally related to legitimate government interests." 794 F.3d at 1085 (grammatical marks and citations omitted). To that end, "[t]he Supreme Court 'requires in substantive-due-process cases a "careful description" of the asserted fundamental liberty interest.' Accordingly, we must formulate the asserted right by carefully consulting both the scope of the challenged regulation and the nature of Plaintiffs' allegations." *Id.* (quoting *Glucksberg*, 521 U.S. at 721, citations omitted).

//

39

"[T]he right must be carefully stated and narrowly identified before the ensuing analysis can proceed." *Raich*, 500 F.3d at 864. For example, in *Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 277-79 (1990), the Supreme Court rejected a proposed fundamental right described as the "right to die," and determined the actual proffered right was the "right to refuse lifesaving hydration and nutrition." Similarly, in *Raich*, this Court rejected a proposed fundamental right described as the "right to make life-shaping medical decisions that are necessary to preserve the integrity of her body, avoid intolerable physical pain, and preserve her life;" finding that the description needed to be further qualified as "the right to make a life-shaping decision on a physician's advice to use medical marijuana to preserve bodily integrity…." *Raich*, at 864. This Court expressly noted that "[t]his degree of specificity is required." *Id.* at 864 n.12.

Nor, as recently explained by the Eighth Circuit, may Regino escape this need for specificity on account that a general right to direct the upbringing and education of children has already been established. Like all other general, broad-based, constitutional rights, it is subject to exceptions; and, in turn, "[t]he [Supreme] Court has rejected recognizing a more specific right as 'an integral part of a broader entrenched right' when that broader right itself is not absolute." *Brandt v. Griffin*, 147 F.4th 867, 885-86 (8th Cir. 2025) (quoting *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 255-56 (2022)). In other words, granularity is still necessary to determine if the newly-proposed, specific right is actually

40

protected by the more general interest from which it purportedly flows. For example, in *Brandt*, parents argued that their general interest in directing upbringing and medical decisions afforded them the right to authorize gender transitioning procedures for their minor children despite state laws prohibiting such treatment. The Eighth Circuit rejected the position. After first finding that the right to direct the upbringing and medical decisions of children was not absolute, the *Brandt* court then engaged in a *Glucksberg* "careful description" analysis of the newly-proposed, specified right; and determined that the history and traditions of this nation did not give rise to a deeply-rooted interest to health care treatments banned by the applicable, state legislature. *Id.* at 884-87.He

re, again, the SAC asserts that parents are entitled to proactive "notice" and "consent" by a public school district before it may "call[] children by a new name and/or pronouns associated with a new asserted gender identity or by the school requiring others in the school environment to call children by a new name and/or pronouns…." ER 113 (SAC, ¶ 4); see also ER 133-137 (SAC, ¶¶ 112-127). For the purposes of its *Glucksberg* "careful description" analysis, this Court should define the scope of the proposed, fundamental right, in-kind. In other words, the fundamental right at issue is not a generalized right of parents to direct the upbringing and education of their children. Rather, the fundamental right at issue is a newly-proposed, specific right of parents to notice and consent before a public

//

41

school district can agree to recognize preferred names and pronouns requested by their students.

3. <u>The SAC Fails to Raise Factual Allegations Establishing a Deeply Rooted History of Parents Holding Notice and Consent Rights Concerning the Transgender Identities of their Children</u>

A court may not recognize a newly-proposed fundamental right unless "it is objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if it were sacrificed." *Khachatryan*, 4 F.4th at 858 (quoting *Glucksberg,* 521 U.S. at 720-21, grammatical marks and citation omitted). In turn, reviewing whether an asserted fundamental right is "deeply rooted in this Nation's history and tradition" does not include turning a blind eye to the legislative, jurisprudent, and morality shifts that have occurred over time; and where history shows that the law on a particular matter has changed through the years, such impermanence "demonstrates, at a minimum, that any liberty interest [concerning the matter] has shallow roots. And given the deep foundation of the political branches' plenary authority…, we shouldn't let such sparse evidence define a new substantive right." *Munoz v. United States Dep't of State*, 73 F.4th 769, 784 (9th Cir. 2019) (J. Bumatay, joined by J. Callahan, J. Ikuta, J. Bennett, J. Nelson, J. Bade, J. Vandyke, dissenting denial of en banc review); see also *Linsangan v. United States*, 2021 U.S. App. LEXIS 37902, *2-3 (9th Cir. 2021) (unpublished). In other words,

//

when reviewing this nation's history and tradition, the stories of the twentieth and twenty-first centuries are as relevant as those of the eighteenth century and prior.

Moreover, the Supreme Court has emphasized that it "ha[s] always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the members of this Court." *Glucksberg*, 521 U.S. at 720 (grammatical marks and citations omitted). As such, any historical evidence proffered in support of recognizing a new fundamental right must be directly on point.

For example, in *Stormans*, two pharmacists challenged a state law requiring delivery of prescribed, emergency contraceptives, alleging they had a fundamental right not to engage in conduct that leads to the taking of a human life. 794 F.3d at 1071-73, 1085. However, after first narrowing the proposed fundamental right to "the right to own, operate, or work at a licensed professional business free from regulations requiring the business to engage in activities that one sincerely believes lead to the taking of a human life," this Court then rejected the proffer of historical evidence concerning legal protections afforded those not wanting to participate in

military service, capital punishment, and assisted suicide, because "those topics concern non-participation in events that *objectively* cause the taking of human life. Accordingly, they have little, if any, probative weight on the topic whether our Nation has deep tradition of protecting the non-participation of persons who *subjectively* believe that an event leads to the taking of human life." *Id.* at 1087 (emphasis in original).

Here, none of the exhibits to the SAC proffered any historical support for the new, fundamental right proposed by Regino. ER 142-182 (ECF 84.5-84.7, 84.9, 84.10); SER 242-318 (ECF 84.1-84.4, 84.8). As for the pleading, itself, only Paragraph 121 attempted to present any such support. However, the paragraph mostly consisted of bald, legal conclusions rather than factual allegations establishing an actual historical practice by the schools of this nation to provide the type of proactive notice and consent of gender identity sought by Regino. "…*Under the common law*, parents *had the right not merely to be notified*…. [No authority citation.] *Under the common law*, parents *would have had the right to consent*…. [No authority citation.] …" ER 136 (SAC, ¶ 121 (emphases added)). To that end, as noted above, "conclusory allegations and unwarranted inferences are insufficient to defeat a motion to dismiss." *Holder*, 676 F.3d at 834. Moreover, even where Paragraph 121 did attempt to proffer some semblance of historical context, it failed to specifically address transgender identity in any sense – let alone provide a historical record of schools providing the type of proactive

44

notice and consent for which Regino claims she is entitled. ER 136 (SAC, ¶ 121). Indeed, as detailed above, the Supreme Court, this Court, sister United States Courts of Appeals, and United States District Courts of this Circuit have long rejected arguments that parents hold an unqualified, fundamental right to notice and consent over the decisions of their adult and competent minor children. See e.g., *Danforth*, 428 U.S. at 72-75.

As such, Regino failed to raise a single, factual allegation establishing that the public school districts of this nation – or any other government agency – have historically provided parents the type of proactive, gender identity notice and consent she is seeking in this litigation. Thus, on this third ground, Regino cannot establish that the AR 5145.3 Transgender Provision facially infringes upon a fundamental, constitutional right.

4. The Right to Direct the Upbringing and Education of One's Child Does Not Include the Right to Compel State Action

A fourth ground for why Regino has failed to adequately plead a facial Substantive Due Process Clause cause of action is that the Supreme Court has long determined that said clause only bars state action, not inaction. "Like its counterpart in the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing its power, or employing it as an instrument of oppression. Its purpose was to protect the people from the State, not to ensure that the State protected them from each other. The

Framers were content to leave the extent of governmental obligation in the latter area to the democratic political processes." *Deshaney*, 489 U.S. at 196 (grammatical marks and citations omitted).

For example, in *Anspach*, 503 F.3d at 259-60, a minor visited a city health center requesting emergency contraception after engaging in sexual intercourse. Thereafter the minor's parents sued the city, alleging that it had violated their parental rights by failing to notify them of the requested treatment, and also by failing to encourage the minor to seek parental guidance before accepting the contraception. *Id.* at 258-59. The Third Circuit affirmed dismissal of the claim. "The type of 'interference' that the Anspachs assert would impose a *constitutional* obligation on state actors to contact parents of a minor or to encourage minors to contact their parents. Either requirement would undermine the minor's right to privacy and exceed the scope of the familial liberty interest protected under the Constitution. [¶] Courts have recognized the parental liberty interest only where the behavior of the state actor compelled interference in the parent-child relationship. These cases involve coercion that is absent from the allegations in Plaintiffs' Complaint. … The real problem alleged by Plaintiffs is not that the state actors *interfered* with the Anspachs as parents; rather, it is that the state actors did not *assist* the Anspachs as parents or affirmatively *foster* the parent/child relationship. However, the Anspachs are not entitled to that assistance under the Due Process Clause. Plaintiffs' arguments to the contrary ignore that the

46

Constitution does not require the Government to assist the holder of a constitutional right in the exercise of that right. As the Supreme Court recognized in *Harris* [*v. McRae*, 448 U.S. 297, 317-18 (1980)]: 'Although the liberty protected by the Due Process Clause affords protection against unwarranted government interference..., it does not confer an entitlement to such governmental aid as may be necessary to realize all the advantages of that freedom.'" *Anspach*, 503 F.3d at 262, 266-67 (emphasis in original, grammatical marks and citations omitted).

In short, where the actions of a minor are taken *sua sponte*, rather than at the coercion of a government actor, there is no right to proactive notice and consent from the government agency. As the District Court correctly recognized, "As previously discussed, parental rights are not without limitation. … [T]he Supreme Court has stated that the Due Process Clause, 'cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.' *DeShaney*[]*,* 489 U.S. [at] 195[]. Considering these cases together, Plaintiff has not established a fundamental parental right to notice prior to the school using a different name or pronouns to refer to a student nor have they established that such a right is encompassed within a recognized fundamental right." ER 31 (District Court Order, at 28:10-23).

Here, the AR 5145.3 Transgender Provision concerns situations where the minor approaches the school district regarding the use of a preferred name and pronouns, not vice-versa. As such, there is no fundamental right of proactive

47

notice and consent by the government agency to parents.

    5.  <u>The AR 5145.3 Transgender Provision Does Not Facially Violate the
Parental Right to Direct the Medical Care of Children</u>

Finally, despite the precedent of both the Supreme Court and this Court, Regino argues that the Court should review this matter based upon a more broad-in-scope right. Specifically, Regino contends that this Court should determine whether the AR 5145.3 Transgender Provision violates a generalized right of parents to direct the medical care of their children. AOB 17 et seq. Setting aside the issues discussed above concerning adult and competent minor children, and setting aside the precedent that fundamental rights must be defined at the granular level, the SAC still fails to establish that the regulation in question violates any broad-based, parental interest to direct the medical care decisions of their children.

To that end, splitting from this Circuit, the First Circuit does consider fundamental rights of a broader-based scope when reviewing Substantive Due Process Clause claims. Of note, in *Foote*, the First Circuit reviewed whether the AR 5145.3-like protocol in that case violated a general right of parents "to direct the upbringing of one's child." 128 F.4th at 348. In doing so, nonetheless, the *Foote* court still found that the protocol did not infringe upon that broader-scope interest. Specifically, with regard to the argument that the protocol violated a parent's right to direct the medical treatment of one's child, the First Circuit held that the simple adoption of alternative names and pronouns outside the context of a

medical plan does not constitute medical treatment because it does not require any specialized skill. "The Parents … failed to allege that Ludlow's use of the Student's requested pronouns involved a "treatment plan" of any sort. … [W]hile the Supreme Court has never specifically defined the scope of a parent's right to direct her child's medical care, the Parents fail to state a claim because their allegations as stated do not suffice to describe medical treatment at all. The leading Supreme Court decision on parental control of medical care, *Parham* [*v. J.R.*, 442 U.S. 584, 615 (1979)], involved a child's institutionalization at a mental health hospital. The Sixth Circuit's decision in *Kanuszewski v. Michigan Department of Health and Human Services*[, 927 F.3d 396, 420 (6th Cir. 2019)] suggested that a state actor's retention of blood samples from children without parental consent violated substantive due process. And the Tenth Circuit, in *Dubbs v. Head Start, Inc.*[, 336 F.3d 1194, 1203-04 (10th Cir. 2003)], suggested that a government-funded preschool program violated parents' right to direct their children's medical care where a nurse performed physical examinations and blood tests on children without parental notice or consent. [¶] Each of those cases involved intrusions upon the bodily integrity of the child or other conduct with clinical significance -- whether through a medical procedure, examination, or hospitalization. Thus, although precedent indicates that parents have the right to direct their children's medical treatment, whether that treatment is complex or more routine, the allegations here do not involve clinical conduct at all. Solely as pled

49

here, we do not believe that using the Student's chosen name and pronouns -- something people routinely do with one another, and which requires no special training, skill, medication, or technology -- without more, can be reasonably viewed as evidencing some indicia of medicalization. … As the Supreme Court reminds us, we need not abandon our 'judicial experience and common sense' in our scrutiny of allegations pled. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 [] (2009)." *Foote*, 128 F.4th at 349-50 (citations omitted).

Here, in rejecting the *Foote* decision, Regino argues that acknowledging the preferred names and pronouns of a transgender student constitutes "social transitioning;" and, in turn, "social transitioning" constitutes medical treatment for those suffering from gender dysphoria. AOB 5-7, 17-23. However, the AR 5145.3 Transgender Provision applies to all transgender students, SER 319-321, 344-346 (District RJN, Ex. C, paras. 1, 6); and, as the SAC itself admits, not all transgender students suffer gender dysphoria or other psychological maladies for which "social transitioning" would be a form of treatment:

A person's "*gender identity*" is the person's internal, felt experience of gender. … *"Gender dysphoria"* refers to a psychiatric condition in which the mismatch between an individual's *gender identity* and *sex* produces clinically significant psychological distress in the individual. … *A person can have a transgender identity without the threshold of associated psychological distress*. … There are four general approaches to treating

*gender dysphoria* in minors[, including] … *the 'affirmation' model*. … The 'affirmation' model … holds that any expression of a transgender identity in the minor should be immediately accepted as decisive and permanent, and that the minor's psychological condition will improve with 'affirmation' of that identity. *Social transitioning is a primary pillar of the 'affirmation' model.* [Social transitioning is the active affirmation of a person's transgender identity. In the school setting, it primarily refers to calling students by a new name and / or pronouns associated with their asserted transgender identity.] …

ER 112, 116-118 (SAC, ¶¶ 2 n.2, 20, 22-23, 27, 31, 32, emphasis added). In other words, remembering that Regino is raising a facial challenge, recognizing a person's transgender name *can sometimes potentially* be a form of treatment *if* a transgender person suffers from gender dysphoria. However, *if* a transgender person does *not* suffer from that psychiatric condition, their choice to use alternative names and pronouns is simply a life choice – as is any other person's choice to use their middle name, nickname, or pseudonym as their primary calling. In a similar fashion, *if* a person suffers from emotional distress, a support animal *can sometimes potentially* be a form of treatment. However, not every adoption of a pet in every circumstance constitutes "medical treatment" – sometimes, it is simply a life choice. As the District Court correctly noted, "In this case, simply because Plaintiff asserts that utilizing a student's name and preferred pronouns

51

constitutes medical treatment does not make it so. [Citation.] While the Court accepts as true the allegation that social transitioning "is a primary pillar of the 'affirmation' model" of care for treating gender dysphoria [citation], it is simply not plausible that acquiescing to a minor's request to use a particular name or gender pronoun — without more — constitutes medical treatment. [Citation.]"  ER 16 (District Order at 13:11-20).

In sum, given that (1) Count Three constitutes a "facial" challenge to the AR 5145.3 Transgender Provision – meaning Regino must "establish that no set of circumstances exists under which the Act would be valid," *Salerno*, 481 U.S. at 745; and (2) Regino admits that adopting preferred names and pronouns only sometimes potentially constitutes treatment to those suffering from gender dysphoria; and (3) Regino admits that not all transgender students suffer from gender dysphoria; and (4) the AR 5145.3 Transgender Provision applies to all transgender students regardless of the existence of any treatment plan or gender dysphoria diagnosis; and (5) "using [a] Student's chosen name and pronouns -- something people routinely do with one another, … requires no special training, skill, medication, or technology," *Foote*, 128 F.4th at 350; a public school recognizing a transgender student's preferred name and pronouns does not constitute medical treatment in every circumstance – if ever.

Accordingly, even should this Court adopt a broader definition of the fundamental right in question, the SAC still fails to raise factual allegations

sufficient to establish Regino's facial challenge.

6. The AR 5145.3 Transgender Provision Satisfies Rational Basis Review

Whereas, for the reasons stated above, the AR 5145.3 Transgender Provision does not infringe upon any fundamental right of parents, rational basis review applies to the regulation. *Stormans*, 794 F.3d at 1085. Such review only requires the rule in question to bear a "reasonable relation to a legitimate state interest." *Glucksberg*, 521 U.S. at 722. Here, the District has a legitimate state interest to protect student privacy and create a zone of protection from potential domestic abuse. *Sterling*, 232 F.3d at 193-97 (child privacy); *Mueller*, 700 F.3d at 1186-87 (domestic abuse). Maintaining the privacy of a student's gender identity has a reasonable relationship with those interests – especially given that the AR 5145.3 Transgender Provision contains exceptions to the confidentiality requirement, such as for the child's health or safety.

Accordingly, for all of these reasons, Count Three fails to state facts raising a legally-cognizable Section 1983 claim.

**IV. The SAC Fails to Plead Factual Allegations Establishing that the Manner in which the District Applied the AR 5145.3 Transgender Provision to Regino "Shocks the Conscience" (Count Four)**

**A. Regino's "As-Applied" Challenge Concerns an Executive Act**

Count Four raises a Section 1983 claim alleging that the specific, "as-applied" manner District personnel followed the AR 5145.3 Transgender Provision

53

in connection with Regino and her daughter violated the aforementioned, newly-proposed, "notice" and "consent" parental right. ER 137-138 (SAC, ¶¶ 128-134). To that end, with regard to the legislative/executive act dichotomy previously noted, "[e]xecutive acts characteristically apply to a limited number of persons (and often to only one person); executive acts typically arise from the ministerial or administrative activities of members of the executive branch." *McKinney*, 20 F.3d at 1557 n.9. Here, Regino's "as-applied" challenge concerns the specific manner in which the AR 5145.3 Transgender Provision was applied to her. Accordingly, Count Four concerns an executive act.

## B. The SAC Fails to Plead Factual Allegations Which "Shock the Conscience"

As discussed above, the Supreme Court has found that "for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Lewis*, 523 U.S. at 846. To satisfy this "shocks the conscience" standard, the plaintiff must establish that the defendant either (1) acted with "deliberate indifference" or (2) with a "purpose to harm" for reasons unrelated to a legitimate governmental objective. *Porter,* 546 F.3d at 1137. In other words, "only the most egregious official conduct" meets the standard. *Lewis*, 523 U.S. at 846.

Notably, the "shocks the conscious" query comes *before* any determination as to whether the purported right in question is actually fundamental. "[I]n a due

54

process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience. … Only if the necessary condition of egregious behavior were satisfied would there be a possibility of recognizing a substantive due process right to be free of such executive action, and only then might there be a debate about the sufficiency of historical examples of enforcement of the right claimed, or its recognition in other ways." *Lewis*, 523 U.S. at 847 n.8. Here, Regino cannot meet that precedential inquiry. As recounted above, the District adopted AR 5145.3 after the CDE instructed all school districts that they must confidentially accept transgender names and pronouns in order to remain compliant with both federal and state gender rights and privacy laws. SER 319-346 (District RJN). Moreover, nothing in the legislative history of AR 5145.3 evidences an intentional purpose to harm parents, as opposed to protect the privacy rights of transgender students, and to protect that population from unwarranted harassment. SER 319-346 (District RJN).

Indeed, the United States Court of Appeals for the Eleventh Circuit ("Eleventh Circuit") recently found that a similar school regulation did not "shock the conscience." In *Littlejohn*, 132 F.4th at 1235-37, the school board of Leon County, Florida ("Leon County") maintained a support guide directing its employees to use a student's requested name and gender pronouns without notifying parents absent student consent. The parents of a Leon County student

55

raised an as-applied challenge, alleging that various Leon County employees infringed upon their parental rights and familial privacy by employing the guide's directions with their respective children. *Id.* at 1237-38. However, the Eleventh Circuit affirmed dismissal of the action on account that the policy did not "shock the conscience." "[W]e cannot conclude that Defendants' actions with respect to the Littlejohns' child 'shocked the conscience.' The child was not physically harmed, much less permanently so. Defendants did not remove the Littlejohns' child from their custody. And Defendants did not force the child to attend a Student Support Plan meeting, to not invite the Littlejohns to that meeting, or to socially transition at school. In fact, Defendants did not force the Littlejohns' child to do anything at all. And perhaps most importantly, Defendants did not act with intent to injure. To the contrary, they sought to help the child. Under these circumstances, even if the Littlejohns felt that Defendants' efforts to help their child were misguided or wrong, the mere fact that the school officials acted contrary to the Littlejohns' wishes does not mean that their conduct 'shocks the conscience' in a constitutional sense." *Id.* at 1245 (citations omitted).

Likewise, here, the District did not force Regino's daughter to do anything; nor, did it force the daughter to keep her transgender status a secret from her parents. Accordingly, whereas the SAC fails to raise factual allegations evidencing "the most egregious official conduct" imaginable, the District Court correctly dismissed Count Four too.

**V. Regino Is Not Entitled to Any Individual, Procedural Due Process in Connection with the District's Legislative Act of Adopting the AR 5145.3 Transgender Provision (Counts Five and Six)**

Finally, Counts Five and Six raised procedural due process claims under Section 1983. ER 138-139 (SAC, ¶¶ 135-145). However, these claims fail for two reasons. As a preliminary matter, "[t]he first inquiry in every [procedural] due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Sullivan*, 526 U.S. at 59. "Only after finding the deprivation of a protected interest do we look to see if the State's procedures comport with due process." *Id.* To that end, as discussed above, the SAC fails to raise factual allegations establishing the deprivation of any protected interest.

Second, the Supreme Court has long held that when a public entity deprives a person of a liberty interest through legislative action, that person is not entitled to any procedural due process beyond the standard, regulation-making process. *Bi-Metallic Inv. Co.*, 239 U.S. at 445-46. This Court has repeatedly followed that determination. See e.g., *Nev. Rest. Servs. v. Clark Cnty.*, 638 Fed.Appx. 590, 592 (9th Cir. 2016). "[G]overnmental decisions which affect large areas and are not directed at one or a few individuals do not give rise to the constitutional procedural due process requirements of individual notice and hearing; general notice as provided by law is sufficient." *Halverson v. Skagit Cnty.*, 42 F.3d 1257, 1261 (9th Cir. 1994). Here, the SAC lacks any allegation that the District adopted the AR 5145.3 Transgender Provision in an improper manner. ER 111-141 (SAC).

57

Accordingly, on this additional ground, the pleading fails to allege sufficient facts to raise a valid procedural due process claim.

For both of these reasons, the District Court also correctly dismissed Counts Five and Six.

## CONCLUSION

For the reasons set forth above, this Court should affirm the District Court order dismissing each count raised in the SAC.


DATED:  April 6, 2026                    /s/ Jimmie E. Johnson
                                         BRIAN A. DUUS
                                         JIMMIE E. JOHNSON
                                         *Attorneys for Defendant-Appellee*
                                         GREG BLAKE

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** | 26-475

The undersigned attorney or self-represented party states the following:

⊙ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

○ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/ Jimmie Johnson    **Date** | Apr 6, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-475

I am the attorney or self-represented party.

**This brief contains** 13,999 **words,** including [ ] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [ ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Jimmie Johnson **Date** 4/6/2026
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*

**ADDENDUM**

**TABLE OF CONTENTS**

<u>**Page(s)**</u>

Chico Unified School District Administrative Regulation 5145.3 ......      A1



| | | |
|---|---|---|
| **Chico Unified School District**<br>*1163 East Seventh Street, Chico, CA  95928-5999*<br>*(530) 891-3000* | **Administrative Regulation:** | **#5145.3** |
| | **Section: 5000** | **Students** |
| | | **Page 1 of 7** |

_____

**Nondiscrimination/Harassment**

The district designates the individual(s) identified below as the employee(s) responsible for coordinating the district's efforts to comply with applicable state and federal civil rights laws, and to answer inquiries regarding the district's nondiscrimination policies. The individual(s) shall also serve as the compliance officer(s) specified in AR 1312.3 - Uniform Complaint Procedures as the responsible employee to handle complaints alleging unlawful discrimination targeting a student, including discriminatory harassment, intimidation, or bullying, based on the student's actual or perceived race, color, ancestry, nationality, national origin, immigration status, ethnic group identification, ethnicity, age, religion, marital status, pregnancy, parental status, physical or mental disability, medical condition, sex, sexual orientation, gender, gender identity, gender expression, genetic information, or any other legally protected status or association with a person or group with one or more of these actual or perceived characteristics.. The coordinator/compliance officer(s) may be contacted at: (Education Code 234.1; 5 CCR 4621)

Kristine Keene
Director of State and Federal Programs
1163 East Seventh St.
Chico, CA 95928
(530) 891-3000

*(cf. 1312.1 - Complaints Concerning District Employees)*
*(cf. 1312.3 - Uniform Complaint Procedures)*
*(cf. 5145.7 - Sexual Harassment)*
*(cf. 5145.71 - Title IX Sexual Harassment Complaint Procedures)*

**Measures to Prevent Discrimination**

To prevent unlawful discrimination, including discriminatory harassment, intimidation, retaliation, and bullying, of students at district schools or in school activities and to ensure equal access of all students to the educational program, the Superintendent or designee shall implement the following measures:

1.    Publicize the district's nondiscrimination policy and related complaint procedures, including the coordinator/compliance officer's contact information, to students, parents/guardians, employees, volunteers, and the general public by posting them in prominent locations and providing easy access to them through district-supported communications.

2.    Post the district's policies and procedures prohibiting discrimination, harassment, student sexual harassment, intimidation, bullying, and cyberbullying, including a section on social media bullying that includes all of the references described in Education Code 234.6 as possible forums for social media, in a prominent location on the district's web site in a manner that is easily accessible to parents/guardians and students  (Education Code 234.6)

*(cf. 0410 - Nondiscrimination in District Programs and Activities)*
*(cf. 1113 - District and School Web Sites)*
*(cf. 1114 - District-Sponsored Social Media)*
*(cf. 5131.2 - Bullying)*
*(cf. 5145.9 - Hate-Motivated Behavior)*

3.    Post the definition of sex discrimination and harassment as described in Education Code 230, including the rights set forth in Education Code 221.8, in a prominent location on the district's web site in a manner that is easily accessible to parents/guardians and students  (Education Code 234.6)

Regulation Approved: 06/15; 09/30/15; 01/17/17; 02/12/18; 02/25/19; 11/18/19; 03/01/21



| | | |
|---|---|---|
| **Chico Unified School District** | Administrative | #5145.3 |
| *1163 East Seventh Street, Chico, CA  95928-5999* | Regulation: | |
| *(530) 891-3000* | | |
| | **Section: 5000** | **Students** |
| | | **Page 2 of 7** |

_____

Post in a prominent location on the district web site in a manner that is easily accessible to parents/guardians and students information regarding Title IX prohibitions against discrimination based on a student's sex, gender, gender identity, pregnancy, and parental status, including the following: (Education Code 221.6, 221.61, 234.6)

    a.    The name and contact information of the district's Title IX coordinator, including the phone number and email address

    b.    The rights of students and the public and the responsibilities of the district under Title IX, including a list of rights as specified in Education Code 221.8 and web links to information about those rights and responsibilities located on the web sites of the Office for Equal Opportunity and the U.S. Department of Education's Office for Civil Rights (OCR)

    c.    A description of how to file a complaint of noncompliance with Title IX, which shall include:

        (1)  An explanation of the statute of limitations within which a complaint must be filed after an alleged incident of discrimination has occurred and how a complaint may be filed beyond thestatute of limitations

        (2)  An explanation of how the complaint will be investigated and how the complainant may further pursue the complaint, including web links to this information on the OCR's web site

        (3)  A web link to the OCR complaints form and the contact information for the office, including the phone number and email address for the office

5.    Post a link to statewide CDE-compiled resources, including community-based organizations, that provide support to youth who have been subjected to school-based discrimination, harassment, intimidation, or bullying and to their families. Such resources shall be posted in a prominent location on the district's web site in a manner that is easily accessible to parents/guardians and students.  (Education Code 234.5, 234.6)

6.    Provide to students a handbook that contains age-appropriate information that clearly describes the district's nondiscrimination policy, procedures for filing a complaint, and resources available to students who feel that they have been the victim of any such behavior.

7.    Annually notify all students and parents/guardians of the district's nondiscrimination policy, including its responsibility to provide a safe, nondiscriminatory school environment for all students, including transgender and gender-nonconforming students. The notice shall inform students and parents/guardians that they may request to meet with the compliance officer to determine how best to accommodate or resolve concerns that may arise from the district's implementation of its nondiscrimination policies. The notice shall also inform all students and parents/guardians that, to the extent possible, the district will address any individual student's interests and concerns in private.

*(cf. 5145.6 - Parental Notifications)*

8.    Ensure that students and parents/guardians, including those with limited English proficiency, are notified of how to access the relevant information provided in the district's nondiscrimination policy and related complaint procedures, notices, and forms in a language they can understand.

Regulation Approved: 06/15; 09/30/15; 01/17/17; 02/12/18; 02/25/19; 11/18/19; 03/01/21



| **Chico Unified School District**<br>*1163 East Seventh Street, Chico, CA 95928-5999*<br>*(530) 891-3000* | Administrative<br>Regulation: | #5145.3 |
|---|---|---|
| | Section: 5000 | Students |
| | | Page 3 of 7 |

---

If 15 percent or more of students enrolled in a particular district school speak a single primary language other than English, the district's policy, regulation, forms, and notices concerning nondiscrimination shall be translated into that language in accordance with Education Code 234.1 and 48985. In all other instances, the district shall ensure meaningful access to all relevant information for parents/guardians with limited English proficiency.

9. Provide to students, employees, volunteers, and parents/guardians age appropriate training and/or information regarding the district's nondiscrimination policy; what constitutes prohibited discrimination, including discriminatory harassment, intimidation, retaliation, or bullying; how and to whom a report of an incident should be made; and how to guard against segregating or stereotyping students when providing instruction, guidance, supervision, or other services to them. Such training and information shall include details of guidelines the district may use to provide a discrimination-free environment for all district students, including transgender and gender-nonconforming students.

*(cf. 1240 – Volunteer Assistance)*
*(cf. 4131 - Staff Development)*
*(cf. 4231 - Staff Development)*
*(cf. 4331 - Staff Development)*

10. At the beginning of each school year, inform school employees that any employee who witnesses any act of unlawful discrimination, including discriminatory harassment, intimidation, or bullying against a student is required to intervene if it is safe to do so. (Education Code 234.1)

*(cf. 4112.9/4212.9/4312.9 - Employee Notifications)*

11. At the beginning of each school year, inform each principal or designee of the district's responsibility to provide appropriate assistance or resources to protect students from threatened or potentially discriminatory behavior and ensure their privacy rights.

**Enforcement of District Policy**
The Superintendent or designee shall take appropriate actions to reinforce BP 5145.3 – Nondiscrimination/Harassment.  As needed, these actions may include any of the following:

1. Removing vulgar or offending graffiti

*(cf. 5131.5 - Vandalism and Graffiti)*

2. Providing training to students, staff, and parents/guardians about how to recognize unlawful discrimination, and how to report it or file a complaint, and how to respond

3. Disseminating and/or summarizing the district's policy and regulation regarding unlawful discrimination

4. Consistent with the laws regarding the confidentiality of student and personnel records, communicating to students, parents/guardians, and the community the school's response plan to unlawful discrimination or harassment

*(cf. 4112.6/4212.6/4312.6 - Personnel Files)*
*(cf. 4119.23/4219.23/4319.23 - Unauthorized Release of Confidential/Privileged Information)*
*(cf. 5125 - Student Records)*

5. Taking appropriate disciplinary action against students, employees, and anyone determined to have

Regulation Approved: 06/15; 09/30/15; 01/17/17; 02/12/18; 02/25/19; 11/18/19; 03/01/21



| **Chico Unified School District** | Administrative Regulation: | #5145.3 |
|---|---|---|
| 1163 East Seventh Street, Chico, CA  95928-5999 (530) 891-3000 | | |
| | Section: 5000 | Students |
| | | Page 4 of 7 |

_____

engaged in wrongdoing in violation of district policy, including any student who is found to have filed a complaint of discrimination that the student knew was not true

*(cf. 4118 – Dismissal/Suspension/Disciplinary Action)*
*(cf. 4218 - Dismissal/Suspension/Disciplinary Action)*
*(cf. 5144 - Discipline)*
*(cf. 5144.1 - Suspension and Expulsion/Due Process)*
*(cf. 5144.2 - Suspension and Expulsion/Due Process (Students with Disabilities))*
*(cf. 6159.4 - Behavioral Interventions for Special Education Students)*

**Process for Initiating and Responding to Complaints**
Students who feel that they have been subjected to unlawful discrimination described above or in district policy is strongly encouraged to immediately contact the Compliance Officer, principal, or any other staff member. In addition, students who observes any such incident are strongly encouraged to report the incident to the Compliance Officer or principal, whether or not the alleged victim files a complaint.

Any school employee who observes an incident of unlawful discrimination, including discriminatory harassment, intimidation, retaliation, or bullying, or to whom such an incident is reported shall report the incident to the Compliance Officer or principal within a school day, whether or not the alleged victim files a complaint.

Any school employee who witnesses an incident of unlawful discrimination, including discriminatory harassment, intimidation, retaliation, or bullying, shall immediately intervene to stop the incident when it is safe to do so. (Education Code 234.1)

When a report of unlawful discrimination, including discriminatory harassment, intimidation, retaliation, or bullying, is made to or received by the principal or compliance officer, the principal or compliance officer shall notify the student or parent/guardian of the right to file a formal complaint in accordance with AR 1312.3 - Uniform Complaint Procedures or, for complaints of sexual harassment that meet the federal Title IX definition, AR 5145.71 - Title IX Sexual Harassment Complaint Procedures. Once notified verbally or in writing, the compliance officer shall begin the investigation and shall implement immediate measures necessary to stop the discrimination and ensure that all students have access to the educational program and a safe school environment. Any interim measures adopted to address unlawful discrimination shall, to the extent possible, not disadvantage the complainant or a student who is the victim of the alleged unlawful discrimination.

Any report or complaint alleging unlawful discrimination by the principal, compliance officer, or any other person to whom a report would ordinarily be made or complaint filed shall instead be made to or filed with the Superintendent or designee who shall determine how the complaint will be investigated.

*(cf. 5141.4 - Child Abuse Prevention and Reporting)*

**Transgender and Gender-Nonconforming Students**
Gender identity of a student means the student's gender-related identity, appearance, or behavior, as determined from the student's internal sense, whether or not that gender-related identity, appearance, or behavior is different from that traditionally associated with the student's physiology or assigned sex at birth.

Gender expression means a student's gender-related appearance and behavior, whether stereotypically associated with the student's assigned sex at birth. (Education Code 210.7)

Gender transition refers to the process in which a student changes from living and identifying as the sex assigned to the student at birth to living and identifying as the sex that corresponds to the student's gender identity.

Regulation Approved: 06/15; 09/30/15; 01/17/17; 02/12/18; 02/25/19; 11/18/19; 03/01/21

Case 2:23-cv-00032-DJC-DMC    Document 88-3    Filed 06/27/25    Page 26 of 28



**Chico Unified School District**
*1163 East Seventh Street, Chico, CA  95928-5999*
*(530) 891-3000*

Administrative
Regulation:

Section: 5000

#5145.3

Students

Page 5 of 7

_____

Gender-nonconforming student means a student whose gender expression differs from stereotypical expectations.

Transgender student means a student whose gender identity is different from the gender assigned at birth.

The district prohibits acts of verbal, nonverbal, or physical aggression, intimidation, or hostility that are based on sex, gender identity, or gender expression, or that have the purpose or effect of producing a negative impact on the student's academic performance or of creating an intimidating, hostile, or offensive educational environment, regardless of whether the acts are sexual in nature. Examples of the types of conduct which are prohibited in the district and which may constitute gender-based harassment include, but are not limited to:

1.      Refusing to address a student by a name and the pronouns consistent with the student's gender identity

2.      Disciplining or disparaging a student or excluding the student from participating in activities, for behavior or appearance that is consistent with his/her gender identity or that does not conform to stereotypical  notions of masculinity or femininity, as applicable

3.      Blocking a student's entry to the restroom that corresponds to the student's gender identity

4.      Taunting a student because the student participates in an athletic activity more typically favored by a student of the other sex

5.      Revealing a student's transgender status to individuals who do not have a legitimate need for the information, without the student's consent

6.      Use of gender-specific slurs

7.      Physical assault of a student motivated by hostility toward the student because of the student's gender, gender identity, or gender expression

The district's uniform complaint procedures (AR 1312.3) or Title IX sexual harassment procedures (AR 5145.71), as applicable, shall be used to report and resolve complaints alleging discrimination against transgender and gender-nonconforming students.

Examples of bases for complaints include, but are not limited to, the above list, as well as improper rejection by the district of a student's asserted gender identity, denial of access to facilities that correspond with a student's gender identity, improper disclosure of a student's transgender status, discriminatory enforcement of a dress code, and other instances of gender-based harassment.

To ensure that transgender and gender-nonconforming students are afforded the same rights, benefits, and protections provided to all students by law and Board policy, the district shall address each situation on a case-by- case basis, in accordance with the following guidelines:

1.      Right to privacy: A student's transgender or gender-nonconforming status is the student's private information and the district shall only disclose the information to others with the student's prior written consent, except when the disclosure is otherwise required by law or when the district has compelling evidence that disclosure is necessary to preserve the student's physical or mental well-being. In any case, the district shall only allow disclosure of a student's personally identifiable information to employees with a legitimate educational interest as determined by the district pursuant to 34 CFR

Regulation Approved: 06/15; 09/30/15; 01/17/17; 02/12/18; 02/25/19; 11/18/19; 03/01/21



| | | |
|---|---|---|
| **Chico Unified School District**<br>*1163 East Seventh Street, Chico, CA 95928-5999*<br>*(530) 891-3000* | **Administrative Regulation:** | **#5145.3** |
| | **Section: 5000** | **Students** |
| | | **Page 6 of 7** |

99.31. Any district employee to whom a student's transgender or gender-nonconforming status is disclosed shall keep the student's information confidential. When disclosure of a student's gender identity is made to a district employee by a student, the employee shall seek the student's permission to notify the compliance officer. If the student refuses to give permission, the employee shall keep the student's information confidential, unless the employee is required to disclose or report the student's information pursuant to this administrative regulation, and shall inform the student that honoring the student's request may limit the district's ability to meet the student's needs related to the student's status as a transgender or gender-nonconforming student. If the student permits the employee to notify the compliance officer, the employee shall do so within three school days.

As appropriate given the student's need for support, the compliance officer may discuss with the student any need to disclose the student's transgender or gender-nonconformity status or gender identity or gender expression to the student's parents/guardians and/or others, including other students, teacher(s), or other adults on campus. The district shall offer support services, such as counseling, to students who wish to inform their parents/guardians of their status and desire assistance in doing so.

*(cf. 1340 - Access to District Records)*
*(cf. 3580 - District Records)*

2.     Determining a Student's Gender Identity: The Compliance Officer shall accept the student's assertion of his/her gender identity and begin to treat the student consistent with that gender identity unless district personnel present a credible and supportable basis for believing that the student's assertion is for an improper purpose.

3.     Addressing a Student's Transition Needs: The Compliance Officer shall arrange a meeting with the student and, if appropriate, the student's parents/guardians to identify and develop strategies for ensuring that the student's access to educational programs and activities is maintained. The meeting shall discuss the transgender or gender-nonconforming student's rights and how those rights may affect and be affected by the rights of other students and shall address specific subjects related to the student's access to facilities and to academic or educational support programs, services, or activities, including, but not limited to, sports and other competitive endeavors. In addition, the Compliance Officer shall identify specific school site employee(s) to whom the student may report any problem related to the student's status as a transgender or gender-nonconforming individual, so that prompt action could be taken to address it. Alternatively, if appropriate and desired by the student, the school may form a support team for the student that will meet periodically to assess whether the arrangements for the student are meeting the student's educational needs and providing equal access to programs and activities, educate appropriate staff about the student's transition, and serve as a resource to the student to better protect the student from gender-based discrimination.

4.     Accessibility to Sex-Segregated Facilities, Programs, and Activities: When the district maintains sex-segregated facilities, such as restrooms and locker rooms, or offers sex-segregated programs and activities, such as physical education classes, intermural sports, and interscholastic athletic programs, students shall be permitted to access facilities and participate in programs and activities consistent with their gender identity. To address any student's privacy concerns in using sex-segregated facilities, the district shall offer available options such as a gender-neutral or single-use restroom or changing area, a bathroom stall with a door, an area in the locker room separated by a curtain or screen, access to a staff member's office, or use of the locker room before or after the other students. However, the district shall not require a student to utilize these options because the student is transgender or gender-nonconforming. In addition, a student shall be permitted to participate in accordance with the student's

Regulation Approved: 06/15; 09/30/15; 01/17/17; 02/12/18; 02/25/19; 11/18/19; 03/01/21



**Chico Unified School District**
*1163 East Seventh Street, Chico, CA  95928-5999*
*(530) 891-3000*

| | |
|---|---|
| **Administrative Regulation:** | **#5145.3** |
| **Section: 5000** | **Students** |
| | **Page 7 of 7** |

_____

gender identity in other circumstances where students are separated by gender, such as for class discussions, yearbook  pictures, and field trips. A student's right to participate in a sex-segregated activity in accordance with the student's gender identity shall not render invalid or inapplicable any other eligibility rule established for participation in the activity.

*(cf. 6145 - Extracurricular and Cocurricular Activities)*
*(cf. 6145.2 - Athletic Competition)*
*(cf. 6153 - School-Sponsored Trips)*
*(cf. 7110 - Facilities Master Plan)*

5.      Student Records: A student's legal name or gender as entered on the mandatory student record required pursuant to 5 CCR 432 shall only be changed with proper documentation. When a student presents government-issued documentation of a name and/or gender change or submits a request for a name and/or gender change through the process specified in Education Code 49070, the district shall update the student's records.  (Education Code 49062.5, 49070)

*(cf. 5125 - Student Records)*
*(cf. 5125.1 - Release of Directory Information)*
*(cf. 5125.3 - Challenging Student Records)*

6.      Names and Pronouns: If a student so chooses, district personnel shall be required to address the student by a name and the pronoun(s) consistent with the student's gender identity, without the necessity of a court order or a change to the student's official district record. However, inadvertent slips or honest mistakes by district personnel in the use of the student's name and/or consistent pronouns will, in general, not constitute a violation of this administrative regulation or the accompanying district policy.

7.      Uniforms/Dress Code: A student has the right to dress in a manner consistent with the student's gender identity, subject to any dress code adopted on a school site.

*(cf. 5132 - Dress Code)*

Regulation Approved: 06/15; 09/30/15; 01/17/17; 02/12/18; 02/25/19; 11/18/19; 03/01/21